**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **BRENDON TAYLOR,** *et al.*, | : | **CASE NO. 1:24-cv-0204** |
| | : | |
| **Plaintiff,** | : | **HON. SUSAN J. DLOTT** |
| | : | |
| **v.** | : | |
| | : | |
| **JESSE LEE HOOVEN,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## DECLARATION OF JUSTIN M. WHITTAKER

**COMES NOW**, the Declarant, Justin M. Whittaker, Esq., pursuant to 28 U.S.C. §1747, and declares under penalty of perjury as follows:

1.      That I am over the age of 18.

2.      That I am counsel of record for the Plaintiffs in this case, Brendon Taylor and Holly Hooven.

3.      That I offer this Declaration in support of Plaintiff Holly Hooven's Motion for Temporary Restraining Order.

4.      That attached to my Declaration is a true, accurate, complete, and authentic copy of the Judge's Decision entered on October 29, 2025, by Hon. Betsy Sundermann in Case No. DR1801899 ("State Court Order") pending in the Hamilton County Court of Common Pleas, Domestic Relations Division ("the DR Action").  [**Doc.108-1**].

5.      That because the Motion for TRO turns almost entirely on questions of law, the facts stated in the Motion for TRO material to the same, are based on my personal review and knowledge of the record in this civil action, my review and personal knowledge of the various Declarations I submitted in the summer of 2024 associated with my

personal attempts to serve Officer Hooven in this case, my review and limited knowledge of the pleadings in the DR Case, my personal knowledge of my own actions, and my personal knowledge of the facts I testified to in the DR Case.  And I certify that the same are true and accurate to the best of my personal knowledge.

6.      I also certify that I served the persons listed in the Certificates of Service to the TRO Motion at the email address I have on file for them, most of whom I have communicated with by email at one time or another, and/or with whom I've been copied on emails.

7.      I certify that I have made reasonable efforts to serve the adverse parties or their counsel, if known, via email on December 1, 2025, upon filing the Motion for TRO, and that to the best of my knowledge, service via email was successful.  I certify that if I learn that service was not successful, I will inform the Court and make additional efforts to achieve the same.

8.      I certify that I will contact Chambers and obtain a date and time for the informal conference specified in Local Rule 65.1, and shall immediately notify counsel for the adverse parties, and/or their counsel if known.

**I declare under penalty that the foregoing is true and accurate to the best of my knowledge.**

**EXECUTED ON: December 1, 2025.**

_____
**Justin M. Whittaker (0093212)**

2





**COURT OF COMMON PLEAS**
**DIVISION OF DOMESTIC RELATIONS**
**HAMILTON COUNTY, OHIO**

**Holly Pratt Hooven**

        Plaintiff

      - vs -

**Jesse Lee Anthony Hooven**

      Defendant

ENTERED
OCT 29 2025

Case No: DR1801899 POST
File No : Z182429
CSEA : 7118423743

**JUDGE'S DECISION**
Judge Sundermann

Plaintiff, Holly Hooven ("Mother"), was present with her attorney, Edward Collins and K. Joshua Waters. Defendant, Jesse Hooven ("Father") was present with his attorney, Barry Spaeth. Elizabeth Murray was present in her capacity as GAL for the children. This matter came before the Court for trial on the following motions:

- Father's *Motion for Contempt and Attorney Fees* (filed 5/3/2024)
- Father's *Motion for Contempt and Attorney Fees* (filed 5/29/2024)
- Mother's *Motion for Contempt and Attorney Fees* (filed 6/7/2024)
- Father's *Motion to Terminate Shared Parenting* (filed 6/12/2024)
- Father's *Motion for Contempt and Attorney Fees* (filed 6/28/2024)
- Father's *Motion for Contempt of Agreed Order* (filed 7/17/2024)
- Father's *Motion for Contempt* (filed 7/19/2024)
- Father's *Fifth Motion for Contempt* (filed 11/4/2024)

Based on the evidence adduced at trial, the Court finds the following:

## FINDINGS OF FACTS

(1) Mother and Father entered into a Decree of Shared Parenting on 1/3/19. They have two children: WH (dob 8/22/16) and AH (dob 9/4/18). Since the shared parenting plan began, Mother and Father have participated in nonstop litigation regarding the children and other issues.

(2)     The children attend school at Indian Hill Public Schools, Father's district, and are thriving academically and socially. Mother wants the children to attend school in her district, Ross Public Schools.

(3)     Over the years, Father has coached the children's school sports teams multiple times. He would not be able to do so if the children transfer to schools in Ross Public Schools, Mother's home district. AH currently enjoys plays football for Indian Hill. Ross does not have a football team.

(4)     Indian Hill Schools offer many extracurriculars including sports and non-sports. (Exh. OOO and PPPP) Ross Schools only have one extracurricular option, student government. (Exh. TTTT)

(5)     Mother moved to the Ross School District after telling Father she was moving to the Lakota School District. Father moved to the Indian Hill School District based on Mother's statement that she would move to Lakota. Now that Mother is living in Ross, she lives about 45 minutes from Father which is inconvenient for everyone, most importantly the children. When asked why she told Father she was moving to one school district when she was moving to another, Mother testified that Father shouldn't depend on what she tells him. Mother testified that she moved to the Ross area because they have excellent school and the area is closer to her fiancee's place of employment.

(6)     Both Indian Hill and Ross have academically excellent public schools. (Exh. HHHH, IIII, LLLL, AAAA, UUUU)

(7)     WH struggles with Adjustment Disorder with Anxiety and is in individual therapy to address her needs. (Exh. BBBBB, CCCCC, DDDDD, EEEEE, FFFFF) AH is in speech therapy to address his Mixed Receptive-Expressive Language Disorder. (Exh. ZZZZ, ZZZZZ) Mother and Father agree that AH need an Individualized Education Plan for school so he can get extra

2

help with schoolwork. (Exh. 25)

(8) Father wants the children to stay in the Indian Hill Schools. They have been attending school there for a while and have developed school friendships with many of the children in Father's neighborhood. Both children participate in multiple extracurricular activities through school. AH loves playing on the school football team.

(9) Mother has a master's in social work and is employed at Cincinnati Children's Hospital. Father is employed as a police officer for the Cincinnati Police Department.

(10) Mother notes that it has been difficult for her to work due to: (1) having to work around Father's police schedule and (2) having to drive 45 minutes to drop the children off and pick them up at school, and (3) only having a small window of time to work between dropping off the children at school and picking them up.

(11) Mother has a master's in social work and is employed by Cincinnati Children's Hospital. Her supervisor schedules her shifts around Father's work schedule. On days Mother does not have the children, she can work longer shifts. Mother is also able to work from home one day per week. She claims she cannot work a full work week because of the limitations.

(12) Mother used to have a fully remote job that gave her great flexibility with her work schedule. She was able to work a full work week while getting the children to and from school. When asked why she changed job to one where she makes much less money due to alleged obstacles, Mother said she did not like the previous job.

(13) When asked why she chose not to sign the children up for the before and after school programs at school so she could work longer hours, Mother said she did not want to pay for those programs, even though Father could pay half of the fees and she would be able to make much more money.

(14) When discussing the long drive Mother and the children must make to school, Mother

3

was focused mostly on how it inconvenienced her, not on how it inconvenienced the children. She stressed that she herself would be driving much less if the children attended school in her district. If the children attended school in her district, they would still have to travel 45 minutes each time they go to and from Father's home.

(15) Mother requested a typical 2-2-3 or 2-2-5 schedule so she can have a more regular work week. When asked how much the children would be able to see their father with either of those schedules, she said she did not know. It was not a priority to her.

(16) Father recently married his new wife, Emma Strahm. Mother is now living with her fiance, Brenden Taylor. Mr. Taylor and Father do not get along. They have both instigated fights with the other. After Mr. Taylor send Father a long, cruel message, Father responded by saying he was sorry to have put Mr. Taylor in the middle of any arguments between Mother and he. Mr. Taylor replied that he would like to shake Father's hand the next time they see each other.

(17) During trial, Mr. Taylor testified that he put the dispute between Father and he behind him. Mr. Taylor presented an email he allegedly sent to Father in which he apologized for his own behavior and said he hoped to put the argument aside for the sake of the children. (Exh. 65) This Court does not find Mr. Taylor's testimony to be credible. The exhibit he produced does not support that claim. Father never received the email. Also, the screenshot clearly shows that the message remained in draft form at the time it was captured. The predictive text bar is visible, the "To:" line with the recipient's address is still highlighted, the subject of the message contains a visible cursor, and there is no notation or timestamp indicating that the email was sent. These features are consistent with a composition screen rather than a sent message. Accordingly, the Court finds that the email was never transmitted and that the witness's testimony to the contrary lacks credibility.

(18) After Mr. Taylor testified at trial, he mocked Father in a Facebook meme post that said:

4

"When the judge reads the text messages to your baby daddy out loud. Me yesterday saying it with my chest in Court reading my texts out loud making fun of her ex to his face." (Exh. FFFF)

(19)	Elizabeth Murray was appointed guardian ad litem for the children on 8/9/24. In her GAL report filed 12/10/24, she recommended Mother and Father should continue exercising Shared Parenting. After hearing the testimony at trial, Ms. Murray testified that it was clear the parents could no longer work together to make decisions, so one parent would need to be granted custody. Ms. Murray recommended this Court grant sole custody to Mother.

(20)	Ms. Murray shared the parents' concern with the children having to travel 45 minutes to and from school from Mother's home to their current school in Indian Hill. Ms. Murray recommends the children attend Ross Public Schools. However, if the parents stay in their current homes, the children will have similar travel time whether they attend school in Mother's school district or Father's school district. The only solution to the long commute would be for one parent to move closer to the other.

(21)	Ms. Murray believes Mother should have sole custody for a number of reasons. First, she stated Father has unnecessarily involved Mother in extensive litigation. Second, Ms. Murray is concerned that Father's wife (fiance at the time of the GAL's testimony) might not be around long term to support Father and the children. Third, Father has a predictable, yet unconventional, work schedule that does not synchronize well with the children's school schedule.

(22)	Ms. Murray recommends Father have the children every Monday and Tuesday, Mother have the children every Wednesday and Thursday, and the parents rotate weekends, prioritizing Father getting weekends when he is not working. This schedule would result in Father spending significantly less time with the children than he does now.

(23)	An Agreed Entry filed by Mother and Father on 3/7/24 states: "Communications: The parents shall continue communicating exclusively through Our Family Wizard, except in the

5

case of emergency." (Exh. 5, p. 6)

(24) The Agreed Entry from 3/7/24 also states: "Telephone Contact: The children shall have telephone contact with the parent not exercising parenting time as follows: The parent exercising parenting time shall initiate the phone calls with the children present. The call shall be initiated between 7:45pm and 8:15pm. Once the other parent answers the phone, the calling parent shall provide the children with reasonable privacy while talking to the other parent." (Exh. 5, p. 5-6)

(25) Mother called or texted Father regarding non-emergency matters on 3/22/24 (Exh. A and B), 4/14/24 (Exh. C), 4/15/24 (Exh. D), 5/10/24 (Exh. Z), 7/1/24 (Exh. PPPPP), 8/18/24 (Exh. XX, YY), 9/17/24 (Exh. ZZ), and 11/1/24 (Exh. BBB) instead of using OFW, as court ordered.

(26) Mother failed to have the children call Father on 3/20/24 (Exh. HH), 5/3/24 (Exh. EE, FF, GG) 7/7/24 (Exh. 24, 47, RR, QQ), 7/17/24 (Exh. QQ), and 8/1/24 (Exh. TT), pursuant to the Agreed Entry from 3/7/24. Mother was twenty minutes late with her phone call from the children to Father on 6/19/24 (Exh. PP). Mother did not provide the children with reasonable privacy for their phone call with Father on 4/25/24 (Exh. GG, LLL, XXX) She said she would make sure future calls were more private.

(27) An Agreed Entry filed by Mother and Father on 3/7/24 states: "Neither parent shall speak disparagingly about or directly to the other parent, the other parent's family, and/or the other parent's significant other in front of the children . . . Both parents shall not permit any family, friends, or significant others to speak disparagingly about the other parent, his/her family, or his/her significant other in front of the children or directly to the other parent." (Exh. 5, p. 6)

(28) At Aiden's preschool graduation on 5/16/24, Mother and her sister confronted Father and his wife (fiance at the time) in front of the children and many others. Mother loudly told Father's now wife that Father was a cheater and that he cheated on her (the fiance). Mother then allowed her sister to join in, yelling to Father in front of the children that he was a "child." At no time did

6

Mother attempt to stop her sister speaking in that way to Father in front of the children. (Exh. CC, DD) Mother believed she and her sister's actions were justified.

(29)    Mother sent a message to Father through OFW stating her opinion that he "use[s] and abuse[s] people to get ahead in life and leaves others in [his] destruction." (Exh. EE)

(30)    The Agreed Entry from 3/7/24 also states: "Travel: When a parent travels overnight with the children, regardless of whether he or she is exercising regular, holiday, or extended parenting time, the traveling parent shall provide the other parent with the address of each location where the children are spending the night." (Exh. 5, p.6)

(31)    Mother told Father she would take the children on vacation to Gatlinburg from 3/29/24-4/1/24 (Exh. 10 and G), but did not provide Father with the address where the children would be staying, pursuant to the Agreed Entry from 3/7/24. Mother took the children to Louisville on 4/27/24, but did not provide Father with the address where the children would be staying. (Exh. 15 and EE) Mother told Father she was taking the children to St. Louis from 6/20/24-6/24/24, but took them somewhere else without notifying Father or giving him the address where the children would be staying. (Exh. 74 and WWWWWW)

(32)    On 5/18/24, Mother sent her sister to a child exchange instead of transporting the children herself. (Exh. JJ)

(33)    Mother cancelled AH's speech therapy on 3/25/24 without consulting Father. Mother had a meeting at work that conflicted with the scheduled therapy time. Also, it turned out the therapy building was under construction, so the appointment would have been cancelled by the provider that day anyway. (Exh. H)

(34)    Mother and Father were previously in constant disagreement about whether AH should attend St. Therese School or not.

(35)    Father claims Mother filled out a form giving her fiance authorization to make medical

7

decisions for the children. Father did not present a completed medical authorization form or evidence of the fiance making an actual medical decision.

(36)     Mother failed to take the children to karate on 4/27/24 (Exh. P, Q). She failed to take WH to softball practice on 5/14/24, but explained that WH did not want to attend that specific practice because it was moved into the gym where WH had been injured in two previous practices. (Exh. 16 and V) Mother did not take AH to his flag football game on 5/18/24 (Exh. W, X). Mother failed to take AH to school on 4/1/24 (Exh. R), 5/20/24 (Exh. S), and 5/22/24 (Exh. S). Mother did not take AH to his flag football game on 10/20/24 because she chose to take him to a family baptism at the same time, against Father's wishes. (Exh. 26 and YYYY

(37)   Mother told Father multiple times throughout 2024 that she was about to move to the Lakota School District. At least two notifications were in writing. (Exh. EEE, LLL) When Father signed the Agreed Entry on 3/7/24, he was under this false understanding. Mother filed a Notice of Intent to Relocate on 7/11/24, noting she would be moving to the Ross School District on 7/29/24. (Exh. 49) Mother eventually bought a house and closed on or about 8/13/24, more than thirty days after she filed the Notice of Intent to Relocate. (Exh. 64) Father moved to Indian Hill without filing a Notice of Intent to Relocate. However, he did notify Mother in writing that he was planning to move there.

(38)     The Agreed Entry from 3/7/24 also states: "Safety Provisions: Both parents shall follow all child car safety recommendations, including using appropriate car seats and restraints for the children." (Exh. 5, p.6) Father was concerned that Mother was allowing WH to ride in the front seat or that the children are not always in appropriate car seats. (Exh. JJJJJJ, KKKKKK) Mother testified she provides adequate car seats for the children.

(39)     An Agreed Order was filed by the parties on 7/8/2024, stating: "[P]etitioner Holly Hooven shall not disclose, or cause others to disclose, any present or future residential address of petitioner Jesse Hooven to any third party in any communication whatsoever, including but not

8

limited to oral communications, social media postings, email, and other correspondence." (Exh. OO) Father testified he wanted his address hidden from public view because he is a police officer and the disclosure of his address could be dangerous for the children and himself.

(40) Mother and her attorney on her federal case, Justin Whittaker, testified that Father's home address was disclosed in a document her attorney filed in federal court on 7/15/24. Mother said she did not give Father's address to her federal case attorney. Mr. Whittaker testified that he did not receive Father' address from Mother, but that he retrieved it from the Hamilton County Auditor's site. (Exh. MM, NN, and 41)

(41) Father has Mother' wedding dress. He paid $250-$300 to have it cleaned and boxed. Mother has requested the dress be returned to her multiple times, but Father told her he will not give it to her until she reimburses him for the cleaning/boxing costs. (Exh. 13, L, M, N)

(42) Father requested his and her wedding band be returned to him. Mother told Father she will not give him her wedding band and no longer has his wedding band because she sold it three years ago. (Exh. L)

(43) Mother messaged Father on 1/4/24 to "keep an eye out for Fox News." (Exh. O) Soon thereafter, an allegation about Father appeared on Fox News.

(44) In April of 2023, Mother's current husband, Brendon Taylor, made a formal complaint to The Cincinnati Police Department alleging that Father and his paramour conspired to access confidential JFS records about Mother's husband, among other claims. He accused Father of unethical conduct and improper use of a law enforcement database. After an internal investigation, the Cincinnati Police Department "exonerated" Father of improper use of a law enforcement database and determined the unethical conduct allegation was "not sustained." (Exh. GGG and 27

(45) Next, Mr. Taylor made a formal complaint about Father to the Citizens Complaint Authority ("CCA"), an independent agency comprised of civilian citizens that investigates

9

allegations of police misconduct within the Cincinnati Police Department. (Exh. GGG and 27) His allegations were the same as in his complaint to the Cincinnati Police Department. The CCA did not find that Father solicited the information from his paramour, a JFS employee. However, the CCA did "Sustain" an allegation of misconduct on the part of Father for sharing information with Mother that was improperly accessed by the JFS employee

(46)     Next, in April of 2024, Mother and her current husband, Brendon Taylor, jointly filed a federal lawsuit against Father and others. (Exh. GGG and 27) The lawsuit alleges the same facts as in the complaints previously made to the Cincinnati Police Department and Citizen's Complaint Authority. The federal lawsuit is still pending. Mother testified that she and her husband have spent thousands of dollars on the federal lawsuit so far

(47)     On 1/25/24, with Mother's knowledge, Mother's stepmother called the Cincinnati Police Department to let them know that Father was at his child's basketball game in Kentucky when she believed he still should have be on duty. Father's supervisor told the stepmother that he allowed Father to leave work early to attend the game. Next, also with Mother's knowledge, Mother's stepmother contacted the local police in Kentucky, stating she was scared because there was a man with a gun at a children's basketball game. When the police quickly responded, they found the man was actually Father dressed in his Cincinnati Police uniform. (Exh. OOO) No charges or reports were filed. Mother did not see any problem that day with her stepmother contacting either Father's employer or the local police.

(48)     Mother is frustrated that Father has not reimbursed her for the children's medical bills in a timely manner. To obtain reimbursement, Mother is required to give him a copy of a child's medical bill within 30 days of receiving it. Instead of providing bills, she sent Father screenshots of just the amounts due from the MyChart app. (Exh. 61 and QQQ) When Father told her he needed to see the actual bills (Exh. KK, GGGGG), Mother told him she has not been able to get copies of the

10

bills. She said the billing information "disappears" from MyChart after she pays a bill. Mother said she also contacted Cincinnati Children's Hospital to get copies of the bills and was unable to get them. This Court does not find her testimony to be credible. It does not make sense that she cannot access her own children's medical bills, especially considering she is an employee of Cincinnati Children's hospital, the custodian of the records.

(49)	When the children's pediatrician retired, Mother claims that Father selected a new pediatrician without her consultation or consent. Father's response was that he switched to another pediatrician in the same practice as the retired doctor. Father said, "[I]t makes no sense to move the kids to a new practice when we are both moving." (Exh. LL)

## CONCLUSIONS OF LAW

## TERMINATION OF SHARED PARENTING

R.C. Section 3109.04(E)(2) provides:

*(c) The court may terminate a prior final shared parenting decree that includes a shared parenting plan approved under division (D)(1)(a)(i) of this section upon the request of one or both of the parents or whenever it determines that shared parenting is not in the best interest of the children. The court may terminate a prior final shared parenting decree that includes a shared parenting plan approved under division (D)(1)(a)(ii) or (iii) of this section if it determines, upon its own motion or upon the request of one or both parents, that shared parenting is not in the best interest of the children. \* \* \* \**

*(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:*

    *(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;*

    The parents' relationship has deteriorated, so they can no longer make joint decisions about the children.

11

*(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;*

The parents' relationship is too contentious right now. They both need to work on speaking positively to the children about the other parent. Father does not speak negatively of Mother in front of the children. Mother, her sister, and her stepmother openly speak poorly of Father in front of the children.

*(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;*

*There are no concerns.*

*(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;*

Mother and Father live 45 minutes apart. It is highly inconvenient for both parents and the children.

*(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.*

Beth Murray, the GAL for the children, originally recommended the parents continue their shared parenting plan. After hearing the testimony at trial, the GAL is confident the parents cannot work together to make decisions for the children. The GAL recommends that Mother be granted sole custody.

*(d) Upon the termination of a prior final shared parenting decree under division (E)(2)(c) of this section, the court shall proceed and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable under division (A),(B), and (C) of this section as if no decree for shared parenting had been granted and as if no request for shared parenting ever had been made.*

## BEST INTEREST FACTORS FOR ALLOCATION OF CUSTODY

12

E-FILED 11/26/2025 12:11 PM / CONFIRMATION 1731122 / C 2500659 / COURT OF APPEALS / NOP

*(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:*

*(a) The wishes of the child's parents regarding the child's care;*

Father wants sole custody of the children. Mother's stance changed throughout the trial. At first, she requested shared parenting, then changed her position to requesting sole custody.

*(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;*

The Court did not interview the children.

*(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;*

The children have positive relationship with both Mother and Father and enjoy spending time with each of them and their extended families. The children also seem to enjoy spending time with Father's wife and Mother's fiance. The children do not have contact with Mother's fiancee's other children.

*(d) The child's adjustment to the child's home, school, and community;*

The children are well adjusted in Indian Hill Schools. Many of their school friends are also their neighbors at Father's home. The children enjoy spending time in both Mother and Father's homes.

*(e) The mental and physical health of all persons involved in the situation;*

WH struggles with Adjustment Disorder with Anxiety and is in individual therapy. AH is in speech therapy to address his Mixed Receptive-Expressive Language Disorder. AH need an Individualized Education Plan for school so he can get extra help with schoolwork.

13

*(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;*

Father is more likely to follow court orders. Mother often disregards court orders, then accuses Father of not being more flexible. While their relationship remains high conflict, flexibility in court orders is difficult.

*(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;*

Not an issue in this case.

*(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;*

Not an issue in this case.

*(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;*

As stated above, Mother often disregards court orders, then accused Father of not being more flexible.

14

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

Not an issue in this case.

## CONTEMPT

A person who disobeys or resists a "lawful writ, process, order, rule, judgment or command of a court or officer" may be punished for contempt. R.C. 2705.02. The party alleging contempt of a court order must prove by clear and convincing evidence that the other party is in contempt of a lawful court order. Pugh v. Pugh, 15 Ohio St.3d 136, 139, 472 N.E.2d 1085 (1984). In the context of civil contempt, "proof of purposeful, willing or intentional violation of a court order is not a prerequisite to a finding of contempt." Id.

R.C. 2705.05 provides:

"(A) *In all contempt proceedings, the court shall conduct a hearing. At the hearing, the court shall investigate the charge and hear any answer or testimony that the accused makes or offers and shall determine whether the accused is guilty of the contempt charge. If the accused is found guilty, the court may impose any of the following penalties:*

*(1) For a first offense, a fine of not more than two hundred fifty dollars, a definite term of imprisonment of not more than thirty days in jail, or both;*

*(2) For a second offense, a fine of not more than five hundred dollars, a definite term of imprisonment of not more than sixty days in jail, or both;*

*(3) For a third or subsequent offense, a fine of not more than one thousand dollars, a definite term of imprisonment of not more than ninety days in jail, or both.*"

## AGENCY

The legal basis for attributing a lawyer's actions to their client rests upon the well-established common law principle of agency, wherein a lawyer acts as the legal agent of their client in the conduct of litigation. In Ohio, a client is bound by the actions and omissions of their counsel when those actions are taken in the course of their representation. An attorney's duty is

15

to represent the client zealously within the bounds of the law, and acts performed in that capacity are legally deemed the acts of the client.

Mother's argument that she is not liable for the disclosure of Father's address is not compelling. This Court's order prohibited Mother from disclosing the address to "anyone." When her attorney disclosed that address in a filing in a federal lawsuit, her attorney was performing a necessary act of litigation on behalf of the wife, thereby acting as her agent. Consequently, the disclosure by her attorney is legally attributable to Mother. Whether her attorney obtained Father's address from Mother or from a public online source is irrelevant. Mother is ultimately accountable for violating this Court's order via her representative.

16

## DECISION

**Father's *Motion for Contempt and Attorney Fees* (filed 5/3/2024)**

1. Mother called Father on 3/22/24 and 4/14/24 and texted him on 4/15/24 for non-emergency matters when all communication was to be by OFW per the 3/7/24 Agreed Entry. **Mother in contempt and fined $250.**

2. Mother failed to have the children call Father on 3/20/24 and 4/3/24 per the 3/7/24 Agreed Entry. She missed minimal calls, so she is not held in contempt.

3. Mother didn't tell Father where she was taking the children out of town from 3/29/24-4/1/24, pursuant to the 3/7/24 Agreed Entry. **Mother is in contempt and fined $250.**

4. Mother canceled Aiden's speech therapy session w/o consultation with Dad on 3/25/2024. She had a work conflict that preventing her from taking the child to therapy. Also, the building when the child attends therapy ended up being under construction, so the session would have been can celled by the provider. Mother is not in contempt.

5. Mother did not overstep by asking Father multiple times if it was best for AH to attend a certain school. She was also within her rights to ask for her wedding dress to be returned. While it is not helpful to her relationship with Father or the children, Mother had the legal right to contact FOX News about Father and file a federal lawsuit against him. Mother is not in contempt.

6. No evidence was presented that Mother authorized her fiancé to make medical decisions for the children at Cincinnati Children's Hospital or that he actually made any medical decisions for them. Mother is not in contempt.

**Father's *Motion for Contempt and Attorney Fees* (filed 5/29/2024)**

17

1. Moher not take the children to karate on 4/27/24. Mother is not in contempt.

2. Mother did not take AF to school on 4/1/24, 5/20/24, and 5/22/24. **Mother is in contempt and fined $250.**

3. Mother did not take WF to softball practice on 5/14/24 because the child was worried to practice in the gym because she had recently been injured practicing there. Mother is not in contempt.

4. Mother did not take AF to a flag football game on 5/18/24. **Mother is in contempt and fined $250.**

5. Mother called Father on 5/10/24 about non-emergency matters instead of using OFW. **Mother is in contempt and fined $250.**

6. Mother violated the 3/7/24 Agreed Entry by speaking disparagingly about Father at AH's preschool graduation by telling Father's fiancée in front of the children that Father was cheating on her. Further, Mother allowed her sister to loudly call Father a "child" at Aiden's preschool graduation in front of the children and others. **Mother is in contempt. She is fined $250 for her own behavior and another $250 for allowing her sister's behavior.**

7. Mother told Father through OFW that he was unstable, mentally unwell, and that he "use[s] and abuse[s] people to get ahead in life and leaves others lying in your destruction." The children were not aware of that message. Mother is not in contempt.

8. Mother did not facilitate a phone call between the children and Father on 5/3/24. She apologized to Father. Mother is not in contempt.

9. Mother did not provide the children with reasonable privacy during their phone call with Father on 4/25/24. She told Father she'll do better in the future. Mother is not in contempt.

10. Mother did not provide Father with the address where the children would be staying when she took them to Louisville on 4/27/24. **Mother is in contempt and fined $250.**

18

11. On 5/18/24, Mother sent her sister in her place to pick up the children. Mother is not in contempt.

**Father's *Motion for Contempt and Attorney Fees* (filed 6/28/2024) and Father's *Motion for Contempt of Agreed Order* (filed 7/17/2024)**

1. Mother did not violate the 3/7/24 Agreed Entry by filing a federal lawsuit, but it is clear that she was not acting in good faith when signing the Agreed Entry. Mother is not in contempt.

2. This Court's order prohibited Mother from disclosing Father's address to "anyone." When her federal lawsuit attorney disclosed the address in a filing in the federal lawsuit, her attorney was performing a necessary act of litigation on behalf of the wife, thereby acting as her agent. Consequently, the disclosure by her attorney is legally attributable to Mother. Mother is ultimately accountable for violating this Court's order via her representative. **Mother is held in contempt and fined $250. Mother must request that Father's address be redacted from the federal court filings. Her request must be made of the federal court within 30 days of this decision. If she does not, this Court will most likely find her in contempt for each separate occurrence of Father's address in the federal case.**

**Father's *Motion for Contempt* (filed 7/19/2024)**

1. Mother did not violate the 3/7/24 Agreed Entry by falsely leading Father to believe she was moving to the Lakota School District, but it is clear that she did not act in good faith when signing the Agreed Entry. Mother is not in contempt.

2. Mother failed to file a Notice of Intent to Relocate at least 30 days prior to her anticipated move which disadvantaged Father. Since the closing was later than the date she had stated in her Notice, she most likely did file the notice 30 days before moving. Mother is not in contempt.

19

**Father's *Fifth Motion for Contempt* (filed 11/4/2024)**

1. Mother was twenty minutes late to have the children call Father on 6/19/24. Mother is not in contempt.

2. On 7/7/24, 7/17/24, and 8/1/24, Mother failed to have the children call Father in violation of the 3/7/24 Agreed Entry. **Mother is held in contempt and fined $250.**

3. From 6/20/24-6/24/24. Mother told Father she was taking the children to St. Louis, but took them to another location without telling Father or giving him their address. **Mother is held in contempt and fined $250.**

4. There was no evidence that Mother told Father she was taking the children to a lake from 6/29/24-6/30/24, but took them to another location without notifying Father. Mother is not in contempt.

5. Mother called Father instead of using OFW on 7/1/24, 8/18/24, 9/17/24, and 11/1/24. **Mother is held in contempt and fined $250 for the violations on 7/1/24 and 8/18/24 and fined another $250 for the violations on 9/17/24 and 11/1/24.**

6. There was not sufficient evidence that Mother does not follow car seat safety standards with the children. Mother is not in contempt.

7. Mother failed to take AH to flag football on 10/20/24 because she took him to a family baptism instead. Mother is not in contempt.


**Mother's *Motion for Contempt and Attorney Fees* (filed 6/7/2024)**

1. There was not sufficient evidence that Father spoke to Mother in loud voice at AH's preschool graduation. In fact, there was evidence presented to the contrary, that Mother spoke inappropriately to Father in front of the children. Father is not in contempt.

20

2. Father did not pay many medical and therapeutic expenses requested by Mother because she did not provide him with bills within 30 days. Father is not in contempt.

3. Father sought to get a new physician for the children without consulting Mother when their pediatrician retired. He merely moved them to another pediatrician within the same practice until the parents knew where the children would attend school long term. Father is not in contempt.

4. Father relocated his residence without filing a notice of intent to relocate. He did file a motion requesting that he not be required to file the Notice due to wanting his home address protected. Father is not in contempt.

**Mother owes a total of $3,250 in contempt fines, all to be paid to Father by 12/31/25.**

**Father's _Motion to Terminate Shared Parenting_ (filed 6/12/2024) is GRANTED.**

1. **Custody**: Father, Jesse Hooven, is designated the residential parent and legal custodian of the parties' two minor children, WH (dob 8/22/16) and AH (dob 9/4/18).

2. **School District**: The minor children shall attend school in Father's school district, Indian Hill. as long as their school is within twenty-five (25) miles of the Father's current residence. There is no restriction on how far Mother may live from Father's current residence. If Father chooses to relocate to another school district, the children will attend school in Father's school district unless the children's new school is farther away from Mother's home (at the time) than their current school is from her current home. If Father moves to a new school district and the children's school is farther from Mother's home, the children will attend school in Mother's school district. Mother and Father will equally split all school fees.

21

3. **Child Support**: The child support order, cash medical order, and private insurance order shall be the same as in the Agreed Entry from 3/7/24.

4. **Extracurricular activities**: The parties shall consult and mutually agree on all extracurricular activities for the minor children. Neither party shall unreasonably withhold their agreement. The parties shall continue to equally share the cost of such agreed-upon activities. If the parties cannot agree, then Father has the authority to select two sports or other activities each school year for each child without Mother's consent, and the costs/fees for those activities will be split evenly between the parents. Mother is required to transport the children to those activities when they fall on her parenting time. If Father signs the children up for additional activities, Mother is not required to accommodate the activities during her parenting time. Each parent will be responsible for transportation to and from the children's activities that fall on their parenting time. Either parent has the authority to coach/lead school sports or other activities participated in by one or both of the children.

5. **Medical Care**: Father will consult with Mother on major medical decisions, but will ultimately have final decision-making authority. All medical appointments will be shared in OFW as soon as they are scheduled. Both parents may attend medical appointments and access all medical records.

Father shall continue to provide and maintain health insurance coverage for the children. The parents shall divide the child's unreimbursed medical expenses equally. The parties shall reconcile unreimbursed medical expenses each month. If either party incurs an expense, they must submit proof of payment to the other party within thirty (30) days of incurring the expense. The other party must then reimburse the party who incurred the expense within thirty (30) days

22

of receipt. Each parent shall send the other proof of payment in the form of a cancelled check, credit card statement, or receipt as part of said reconciliation. Father has authority to select the children's physician and dentist.

In the event of a medical or non-medical emergency requiring an immediate response, before consultation with the other parent is possible, the parent who has the minor children shall notify the other parent of the emergency, children's status, locale, and any other pertinent information as soon as reasonably practical. The parents shall consult each other with regard to the emotional and physical health, discipline, and well-being of their children.

6. **Holiday Schedule**: The holiday schedule set forth in the Agreed Entry from 3/7/24 shall remain in effect.

7. **Right of First Refusal**: There is not a Right of First Refusal provision.

8. **Telephone Contact:** The children shall have telephone contact with the parent not exercising parenting time as follows: The parent exercising parenting time shall initiate the phone call with the children present. The call shall be initiated between 7:45pm and 8:15pm. Once the other parent answers the phone, the calling parent shall provide the children with reasonable privacy while talking to the other parent. Phone calls shall occur on the second day of a party's parenting time. If either party will have the children for more than five (5) consecutive days, another phone call shall occur on the 6th and 10th days of consecutive parenting time. The parties shall cooperate to initiate additional phone calls as requested by the children.

9. **Regular Parenting Time Schedule**: The parenting time schedule set forth in the Agreed

23

Entry dated 3/7/24 shall remain in effect.

10. **Travel:** When a parent travels overnight with the children, regardless of whether he or she is exercising regular, holiday, or extended parenting time, the traveling parent shall provide the other parent with the address of each location where the children are spending the night.

11. **Safety Provisions**: Both parents shall follow all child car safety recommendations, including using appropriate car seats and restraints for the children.

12. **Communications:** The parents shall continue communicating exclusively through Our Family Wizard, except in the case of an emergency. Neither parent shall speak disparagingly about or directly to the other parent, the other parent's family, and/or the other parent's significant other in front of the children, or to third parties associated with the children's schooling, extracurricular activities or healthcare. Neither parent shall speak disparagingly directly to the other parent. Both parents shall not permit any family, friends, or significant others to speak disparagingly about the other parent, his/her family, or his/her significant other in front of the children or directly to the other parent.

13. **Significant Others:** In the event a parent's current relationship comes to an end, neither parent shall introduce any future romantic partners to the children until after the parent has known the romantic partner for at least six months.

14. **Miscellaneous**: Father shall return Mother's wedding dress to her within 7 days of this decision, still clean and boxed. She will not reimburse him for cleaning/boxing fees or any other

24

dress related expenses. Mother shall keep her own engagement ring and wedding band, if she

still has them. She shall pay Father $350 for his wedding band that she sold.

**The motions for attorney fees will be address in a separate entry.**

_____
Judge Sundermann

Copies sent by Clerk of Courts to:
Edward Collins & K. Joshua Waters, attorneys for Mother (email)
Barry Spaeth, attorney for Father (email)
Elizabeth Murray, GAL for the children (EMAIL)

25