UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
- - -

BRENDON TAYLOR, et al., :
: CASE NO. 1:24-cv-0204
Plaintiffs, :
vs. : **DISCOVERY CONFERENCE**
:
JESSE LEE ANTHONY HOOVEN, et al., : 5th of May, 2026
: 9:37 a.m.
Defendants. :

- - -

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE**

- - -

APPEARANCES:

For Plaintiffs:
Justin Whittaker, Esq.
Whittaker Law, LLC
2055 Reading Road, Suite 260
Cincinnati, Ohio 45202

For Defendant, City of Cincinnati:
Shuva J. Paul, Esq.
Katherine Clarke Baron, Esq.
City of Cincinnati, Law Division
801 Plum Street, Room 214
Cincinnati, Ohio 45202

For Defendants: Hamilton County Board of County Commissioners, Hamilton County Department of Jobs and Family Services:
Eric Adam Munas, Esq.
Dmitriy Bikmayev, Esq.
Hamilton County Prosecutor's Office
230 East 9th Street, Suite 4000
Cincinnati, Ohio 45202

For Defendant, Madison M. Paul:
Stephen E. Imm, Esq.
Finney Law Firm
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, Ohio 45245

For Defendant, Jesse Lee Anthony Hooven:
Zachary Gottesman, Esq.
Gottesman & Gottesman, LLC
9200 Montgomery Road
Building E, Suite 18B
Cincinnati, Ohio 45242
And
Robb S. Stokar, Esq.
Stokar Law, LLC
9200 Montgomery Road
Building E, Suite 18B
Cincinnati, Ohio 45242

Also present: Julie Niesen

Law Clerk: Margaret Fechtel, Esq.

Courtroom Deputy: William Miller

Court Reporter: Lisa Conley Yungblut, RDR, RMR, CRR, CRC
United States District Court
100 East Fifth Street
Cincinnati, Ohio 45202

**PROCEEDINGS**

(Proceedings held in the ADR Suite at 9:37 a.m.)

THE COURT: Good morning, everyone. Well, you all know my law clerk, Peggy Fechtel, and my court reporter, Lisa Conley Yungblut. Let's see, we've got Mr. Whittaker.

MR. WHITTAKER: Yes, Judge.

THE COURT: And, Ms. Niesen, I understand you're about to graduate?

MS. NIESEN: I am, yes.

THE COURT: Congratulations.

MS. NIESEN: Thank you very much.

THE COURT: Mr. Gottesman --

MR. GOTTESMAN: Good morning, Your Honor.

THE COURT: -- Mr. Stokar, you're both here for --

MR. GOTTESMAN: Officer Hooven.

THE COURT: -- Officer Hooven.

Shuva Paul and Katie Baron, good morning.

MR. PAUL: Good morning, Your Honor.

THE COURT: For Cincinnati.

Mr. Imm, can I get your autograph afterwards? For Ms. Paul.

And, Mr. Munas and Mr. -- you're going to have to pronounce your last name for me.

MR. BIKMAYEV: Bikmayev.

THE COURT: Thank you, thank you. From the County.

Okay. We're going to get things worked out today. This case is -- I looked at the docket sheet, it was filed April 15th of 2024, so it's just about one of the oldest cases on my docket already. I don't have any cases before '24, and I want to get this one moving.

I appreciate what you all have filed. I started with actually Mr. Gottesman's because it was easier to understand, frankly, than Mr. Whittaker's objections, so we'll start with that. We're two years into this case. Tell me at least, how many depositions have you done already?

MR. GOTTESMAN: One.

THE COURT: Just one?

MR. GOTTESMAN: We took the deposition of Holly Hooven.

THE COURT: Okay. And the one that was aborted, was that --

MR. GOTTESMAN: The other plaintiff, Brendan Taylor.

THE COURT: And, Mr. Whittaker, there was some talk about the cost of that?

MR. WHITTAKER: Yes, Your Honor. It turned out I was -- I had wrote down the wrong time, the wrong start time, 11 a.m. It was supposed to be 10 a.m. As soon as I realized the error, I --

THE COURT: I don't need your explanation for it. I just want to know that you're going to pay for it.

MR. WHITTAKER: I'm paying the court reporter, yes.

THE COURT: And you also made representations you were going to pay the attorneys for their time.

MR. WHITTAKER: Yeah. That was later revoked once I sort of learned that it was not -- I was not as late as I seemed to be and they made no effort to try to contact me before they went off -- went on the record and then went off the record.

THE COURT: Was there a Notice for the deposition or was it just agreed upon?

MR. GOTTESMAN: It was originally noticed by Mr. Imm's office, and then there was subject -- a modification of that time on that Notice. We met on the 6th, all counsel were around the table, and we all agreed that we would appear on the 8th at 10 a.m.

THE COURT: Mr. Whittaker, there's no excuse for that.

MR. WHITTAKER: There's no excuse for being late, Your Honor. It was a 14-minute delay.

THE COURT: You need to pay the attorneys for their time.

MR. WHITTAKER: Okay.

THE COURT: That is just unconscionable.

MR. WHITTAKER: For 14 minutes of time, Your Honor, or 16 minutes of time?

THE COURT: For an hour.

MR. WHITTAKER: An hour.

THE COURT: Okay.

MR. GOTTESMAN: And one other thing on that, Your Honor.

THE COURT: Go ahead, Mr. Gottesman.

MR. GOTTESMAN: It's my relationship with the court reporter. I've already received the bill.

THE COURT: You attached it, I saw it.

MR. GOTTESMAN: Right. So Mr. Whittaker has contacted them. They didn't want to get dragged into this.

THE COURT: I don't blame them.

MR. GOTTESMAN: So they would prefer that he pay me for the -- or reimburse me for their services.

MR. WHITTAKER: The court reporter told me that Mr. Gottesman told her that --

THE COURT: I don't want to hear it.

MR. WHITTAKER: If she wants me to pay --

THE COURT: Just make the check to Mr. Gottesman for her, end of story, and I want it done within 30 days.

MR. WHITTAKER: Okay.

THE COURT: Okay. Let's get to Mr. Gottesman's agenda. Okay. That's what we start out with. I'm on Mr.

Gottesman's letter dated April 29th, 2026 to me. Do you all have copies of that? Okay. All right.

We've talked about the deposition of Brendan Taylor. Has that been rescheduled?

MR. GOTTESMAN: It has not, Your Honor.

THE COURT: Let's get that -- I assume that that's necessary.

MR. WHITTAKER: It is.

THE COURT: What other depos -- why don't we talk about scheduling depos, first, okay?

MR. PAUL: The other one would be Madison Paul where it looked like everyone had almost come to a confirmation on June 12, but we just fell short of that. That's the other one that I think is close, yeah.

THE COURT: Okay. Let me back up for one minute. Do you all have all of the documents you need to do depos?

MR. WHITTAKER: I believe so.

MR. GOTTESMAN: Speaking for the defense, no, Your Honor.

THE COURT: Okay. All right. It seems to me, then, before you proceed with the depos, we need to talk about documents.

MR. GOTTESMAN: We do, Your Honor.

THE COURT: All right. What documents do you need?

MR. GOTTESMAN: We have requested and have yet to

receive a complete list of healthcare providers from whom Mr. Taylor sought treatment. Also, Mr. Imm's office sent a release for the Kettering Medical Center and the Kettering Health Network, and I believe we don't have -- what was returned by plaintiff's counsel was not -- it had been narrowed in scope.

I don't know if, Steve, you're ready to address that or you want me to.

THE COURT: Go back. Healthcare providers for who?

MR. GOTTESMAN: Brendon Taylor.

THE COURT: Okay, Brendon Taylor. Okay. And then Kettering, what's Kettering got to do with this?

MR. GOTTESMAN: Kettering Medical Center, we understand that Mr. Taylor has some health history and mental health history for treatment from Kettering Medical Center or one of its satellite facilities.

THE COURT: Why would Mr. Imm have that?

MR. GOTTESMAN: Mr. Imm represents Madison Paul, and his office sent the release for that information.

THE COURT: For Mr. Taylor's health records?

MR. GOTTESMAN: Correct. So Mr. Taylor is alleging mental distress, psychotic injury, as a result of the facts in the Complaint.

THE COURT: Wait a minute. He's your client, right?

MS. FECHTEL: No.

MR. WHITTAKER: My client, Your Honor.

MS. FECHTEL: The names are hard in this one. Ms. Paul is also one of the defendants and cross-plaintiffs wanting to say that Mr. Taylor --

THE COURT: Taylor and Paul are defendants?

MR. GOTTESMAN: No, Your Honor.

MS. FECHTEL: They're the plaintiffs.

THE COURT: Wait a minute. Officer Hooven and --

MS. FECHTEL: Ms. Paul are the defendants.

THE COURT: -- and Ms. Paul are the defendants.

MR. GOTTESMAN: It's confusing, Your Honor.

THE COURT: Okay. I know.

MR. PAUL: No relation, by the way. This case doesn't need any more --

THE COURT: Thank you for that representation, Mr. Paul.

MS. FECHTEL: Ms. Hooven and Mr. Taylor are the plaintiffs. So Ms. Paul wants Mr. Taylor's medical records so presumably she can argue that whatever mental distress he is having was caused by some previous event, not by this incident.

THE COURT: Okay. And so Mr. Imm, representing Ms. Paul, wants Mr. Taylor's health records. And, Mr. Imm, did you get those?

MR. IMM: No, Your Honor. We actually requested authorizations to allow us to get those.

THE COURT: Sure.

MR. IMM: And those have not been executed.

THE COURT: Okay. What about that, Mr. Whittaker?

MR. WHITTAKER: They have been executed, it was just a different form that the County asked me to have them authorize and for their records, and those are going to be sent out. They're going to be the same records from Kettering. I don't think they would be different. They're going to be the same records from Kettering that have already been requested.

THE COURT: Did you request them?

MR. WHITTAKER: Yes. The County sent me forms asking me to get authorizations for Brendon Taylor and Holly Hooven. So there's three providers each, if I recall correctly, and those have been sent out.

THE COURT: Sent out to who?

MR. WHITTAKER: The providers.

THE COURT: How long ago?

MR. WHITTAKER: Last week, I believe.

THE COURT: Oh, all right. You won't get them probably for several -- how long, guys?

MR. STOKAR: Usually 30 days out and back.

THE COURT: We just settled a real big lawsuit for

Kettering, maybe we can lean on them.

MR. GOTTESMAN: Your Honor, the reason I raised the issue, he did provide the releases supplied by the County. Plaintiff's counsel did get those signed and returned. Our issue is there was a Kettering Health Network release, their own release.

THE COURT: Right.

MR. GOTTESMAN: We wanted a signature on their release because they tend to react better to their own releases.

THE COURT: I know, they're worse than ever.

MR. GOTTESMAN: We would like it en blanc, not restricted as to which providers in their network have to respond.

MR. WHITTAKER: We'll send it to Kettering Health Network or whatever it's called.

THE COURT: Have you got the form to fill out?

MR. WHITTAKER: The Kettering form, I don't know. If I do, I'll fill that out.

THE COURT: Did you send it?

MR. GOTTESMAN: Mr. Imm's office sent it.

THE COURT: Did you send it, Mr. Imm?

MR. IMM: Yes.

THE COURT: You've got it.

MR. WHITTAKER: If that needs to be done by

Kettering, sure, we'll use that form.

THE COURT: You'll do that this week?

MR. WHITTAKER: Yes.

MR. GOTTESMAN: We're asking for that form to be signed and sent back to all defense counsel.

MR. WHITTAKER: That was a different instruction than I got from the County.

THE COURT: All right. I think that that makes the most sense.

MR. WHITTAKER: I think it does too.

THE COURT: Get that filled out and send it to all counsel.

MR. WHITTAKER: All right.

THE COURT: This week.

MR. WHITTAKER: Um-hmm.

THE COURT: Okay. What else do you need to do depos?

MR. GOTTESMAN: I'm surprised it's an issue, but we're waiting on verifications of Mr. Taylor's and Ms. Hooven's answers to interrogatories.

THE COURT: Oh, yeah, I saw that.

MR. GOTTESMAN: We don't have that and that's necessary before we begin the depositions.

MR. WHITTAKER: If there's any missing, I'll get their verifications this week as well.

THE COURT: Well, you've known about that for a while.

MR. WHITTAKER: I thought that I sent them, but if I did not, I will get them.

THE COURT: Verifications for plaintiff's depos -- interrogatories.

MR. WHITTAKER: Answers to interrogatories.

THE COURT: Yeah. Verifications for plaintiff's interrogatories. What else?

MR. GOTTESMAN: Your Honor, going off the list in my letter, if we have the verifications for all discovery responses provided by Mr. Taylor, that solves a lot of what's at issue in my letter.

THE COURT: Okay, great. You write long letters.

MR. GOTTESMAN: The rest were prospective only, Judge. Item 7, I sent discovery to Mr. Whittaker asking if Mr. Taylor -- asking if plaintiff had ever been committed voluntarily or involuntarily on a psychiatric hold. And that discovery by the rules is not due yet, but based on the history of objections and non-answers to interrogatories, I wanted to get the Court's assistance in whether or not that was a fair interrogatory and whether he would be required to respond in full.

THE COURT: I think it's a fair interrogatory. What's the answer, Mr. Whittaker?

MR. WHITTAKER: If he's been voluntarily committed?

THE COURT: Yeah.

MR. GOTTESMAN: Or involuntarily committed.

MR. WHITTAKER: I don't know the answer to that question right now as I sit here.

THE COURT: Okay.

MR. WHITTAKER: But the response is due shortly.

THE COURT: When is it due?

MR. WHITTAKER: Thirty days from April 22nd.

THE COURT: That's still a few weeks away.

MR. GOTTESMAN: It is.

THE COURT: All right. But you're going to get it done by then?

MR. WHITTAKER: Yeah.

MS. FECHTEL: There won't be an objection?

MR. WHITTAKER: I don't know if there will -- there will be objections reserved, I'm sure, but if it's a relevant request, as Your Honor has said it is, I'll get the answer.

THE COURT: All right.

MR. GOTTESMAN: The only issue that I've raised in my letter, Your Honor, is -- and we're today to resolve it. I don't know that I need to give it much treatment. That is, we've had just a lot of difficulty in scheduling. We're going to deal with the depositions today, now.

THE COURT: Good.

MR. GOTTESMAN: And so I'll leave it at that, and I can reserve comments later, if necessary.

THE COURT: Okay. Yeah. I was looking at the last scheduling order was January 21st of this year, and you had reserved the dates of February 18th, 19th, April 6th, 7th, 8th, and 9th. And I take it -- you have done one depo?

MR. GOTTESMAN: We did one on April 6th.

THE COURT: Ms. Hooven, okay. So her depo was April the 6th. All right.

MR. GOTTESMAN: That goes back to an issue, Judge. Again, give me unlimited time, I'll fill it. There was a question I asked during --

THE COURT: I see a bunch of excited faces around the table here.

MR. GOTTESMAN: During the deposition of Holly Hooven, I asked a question -- I've attached the transcript. I said -- I asked her how it is that she came to hire Mr. Whittaker as her counsel, and he objected and instructed her not to answer.

THE COURT: What was the basis of the objection?

MR. WHITTAKER: I don't see how it's relevant, for one thing.

THE COURT: Well, it may or may not be. I mean, I don't see that it's prejudicial to her to answer that.

MR. WHITTAKER: Okay.

THE COURT: What's the answer?

MR. WHITTAKER: How she came -- she contacted me after going through, I guess, the CCA process.

THE COURT: Okay.

MR. GOTTESMAN: Well, there's follow-up on that, Judge, and that is that --

MR. WHITTAKER: It was either the CCA process or after the IIS investigation or, perhaps, it was after both.

THE COURT: I don't understand your initials.

MR. WHITTAKER: Oh, I'm sorry.

MS. FECHTEL: The internal investigation.

MR. WHITTAKER: The internal investigation for the police, and there was a Cincinnati Citizens Complaint Authority.

THE COURT: Oh, I created that.

MR. WHITTAKER: I know.

MR. GOTTESMAN: That touches on the precise issue, and that is the CCA made an adverse finding. They found that Officer Hooven violated the code of conduct or an ethical rule applicable to police officers.

The CCA, as you created it, is supposed to be mutual and unbiased. And we believe -- and we're investigating this -- that the CCA after making adverse findings is then directing parties to Mr. Whittaker as counsel, which puts

them in an adversarial posture.

THE COURT: That's a little weird --

MR. GOTTESMAN: It is.

THE COURT: -- if that's the case.

MR. GOTTESMAN: And we believe that's the case. It's been openly discussed. But I wanted to hear that from Ms. Hooven. What I would ask the Court to consider is, when we reconvene for Brendon Taylor's deposition, I be permitted to reopen hers on that issue.

MR. WHITTAKER: Object to that, Your Honor. I don't know what the CCA has to do -- if the CCA is directing clients to me, that would be news to me, and I don't know if there's a beef with the CCA, that's not -- has nothing to do with Holly Hooven or me.

THE COURT: Mr. Paul or Ms. Baron, do you know anything about that?

MS. BARON: We did look into that, Your Honor, and we spoke with the attorney that staffs the Citizens Complaint Authority. He indicated to us that he doesn't believe that they're giving work to Mr. Whittaker or Ms. Niesen, but they are frequently present at the meetings.

THE COURT: Oh, they're open meetings?

MS. BARON: They are.

MR. PAUL: There's a public comment portion of the CCA process at which point really anyone can be there,

right, but as you -- you know, it's not an outpouring of Cincinnati residents at these meetings. It's a few people who want to come to those meetings.

THE COURT: Gee, I'm hurt. I won't take it personally.

I think that that sounds like that may be your answer, if they've made inquiry. Who's running it now?

MR. PAUL: CCA, John Kennedy.

THE COURT: It probably wasn't him when this hearing was held, though.

MS. BARON: It wasn't. I think he just started within the past few months.

THE COURT: Does that answer your question?

MR. GOTTESMAN: I'd like to ask -- you know, obviously, Brendan Taylor's deposition is yet to occur. I'm going to ask him the same questions. I think it's an improper objection, and relevancy has never been a threshold determination on whether a question is proper at a depo.

THE COURT: Well, I think he can ask it. I don't see that it's prejudicial.

MR. GOTTESMAN: Thank you, Your Honor.

THE COURT: Okay. What else?

MR. GOTTESMAN: That's it. That covers my letter, I believe.

MS. FECHTEL: I want to go back, there's still

Mr. Taylor's deposition to happen, and so you're saying Mr. Gottesman can ask the CCA question to Mr. Taylor. Ms. Hooven's deposition is already closed. Are you saying that they can reopen that deposition, Judge?

MR. GOTTESMAN: I would like to. If she's present at Mr. Taylor's deposition, I would like to be able to reopen her deposition to ask the questions that he instructed her improperly, I believe, not to answer.

MR. WHITTAKER: I don't understand what any of this has to do with any claim or defense or counter or cross-claim alleged in this case, Your Honor.

MR. GOTTESMAN: The CCA adverse finding is part of their pleading. He actually attached it to the Complaint. So the bias motivation of the CCA in making an adverse finding is directly relevant.

MR. WHITTAKER: But the CCA is not a party to this case.

THE COURT: No, I understand that.

MR. WHITTAKER: They're a third party.

THE COURT: No, they're not. The City is a part of the case. I don't see any prejudice in being able to ask the question.

MR. WHITTAKER: We're going to reopen Holly Hooven's deposition, Your Honor?

THE COURT: Yeah, yes. I assume she'll be present

anyway.

MR. WHITTAKER: Are you ordering her to be present during the --

THE COURT: I don't see how she can answer the question, unless you're going to do it telephonically or something. If you want to do a depo that way, I guess, if it's one question, you could do that. I mean, I think it would be easier since you're going to convene everybody to do a depo just to have her there for the purpose of that.

MR. WHITTAKER: Okay.

THE COURT: I think it would be more efficient.

MR. GOTTESMAN: That's everything in my letter, Your Honor.

THE COURT: Okay.

MR. WHITTAKER: Just to be clear, Your Honor, so I can explain to Holly she's being ordered to reappear to answer this question?

THE COURT: Yes, that's correct.

All right. Mr. Whittaker, what is it that you don't have that you need?

MR. WHITTAKER: Essentially, Officer Hooven's answers to interrogatories and requests for admission and request for production of documents.

THE COURT: You've gotten some things, right?

MR. WHITTAKER: Gotten some things.

THE COURT: What haven't you gotten?

MR. WHITTAKER: Essentially, admissions that documents say what they say, are what they are, and --

THE COURT: Is that necessary?

MR. WHITTAKER: Well, I think the Rule 36 says that that's pretty much the prime reason for --

THE COURT: What kind of documents are you talking about?

MR. WHITTAKER: Text messages exchanged between him and Holly Hooven.

THE COURT: Oh, okay.

MR. WHITTAKER: I need -- there's testimony that he gave before the IIS about --

THE COURT: What's the IIS?

MR. WHITTAKER: I'm sorry. The Internal Investigation Service of Cincinnati police.

THE COURT: Oh, okay.

MS. FECHTEL: Internal affairs.

MR. WHITTAKER: About documents that -- or text messages that he deleted when it was discovered that he and Madison Paul were exchanging information. I want to know what those text messages were, at least the substance of them.

THE COURT: Okay, that's legitimate. No?

MR. GOTTESMAN: No, it's totally legitimate, Judge.

In fact, this is performative. He has them in full, completely. Madison Paul produced them in discovery. The complete script of everything Officer Hooven and Madison Paul ever texted to each other is in his possession.

MR. WHITTAKER: I've got what Madison Paul has in her possession. I don't have what Officer Hooven --

MR. GOTTESMAN: Officer -- I don't mean to interrupt, sorry.

MR. WHITTAKER: Officer Hooven might -- obviously, doesn't have them in his possession anymore because he spoiliated them, but if there's more information, I want to know from him, not Madison Paul.

THE COURT: Go ahead.

MR. GOTTESMAN: I said that he doesn't have them in his possession or control. He deleted them in 2023, basically within weeks after the text message with his ex-wife.

THE COURT: Did somebody recover them or they just don't exist?

MR. GOTTESMAN: That effort has not been made, but at this point, they just don't exist.

MR. WHITTAKER: I would like an answer as to what the substance of those communications were.

THE COURT: Well, you can ask him that, I guess, at his deposition.

MR. WHITTAKER: Okay.

MR. PAUL: Which hasn't been scheduled yet.

THE COURT: We're getting to that, Mr. Paul. We're getting to that.

MR. PAUL: I'm sorry. I'll try to keep my mouth shut.

THE COURT: I remember settling the case of the menorah on the Square with Charlie Luken and --

MR. PAUL: That was Rick's case.

THE COURT: I think it was, and the rabbi. And I remember I looked at Charlie sitting here and the rabbi was here, I said, Charlie, come on, and he said, all right. So then the rabbi says, oy, a 17-foot menorah, and Charlie turns green, and I said, Rabbi, a little smaller. We had some great times with the City and Mr. Ganulin.

MR. PAUL: He's not with the City. He's doing education law still. We're in touch.

THE COURT: He was a piece of work.

MR. PAUL: Well, yeah, yeah. He's colorful.

MS. FECHTEL: I'm sorry, I missed the beginning. Were these text messages between Officer Hooven and Ms. Paul or between Officer --

MR. GOTTESMAN: Correct, Officer Hooven and Madison Paul had a text exchange.

MR. WHITTAKER: I don't know that those are the

only messages that were deleted, is what I'm also getting at.

MS. FECHTEL: So Ms. Paul has produced whatever copies of the messages she had.

THE COURT: He's representing that Officer Hooven erased them. You can ask him at his depo, but according to Mr. Gottesman, they're gone.

MR. WHITTAKER: But I don't know that Madison Paul was the only person that he deleted texts.

THE COURT: You can ask him when you take his depo, if you ever get around to his depo.

MR. WHITTAKER: I think they were proper questions for interrogatories and requests as well, but, if not, then, I'll ask him in his deposition.

THE COURT: You can ask him in his depo.

MR. WHITTAKER: I asked him about information that he supplied to internal affairs, and, you know, to expand on that, to admit the substance of what the findings were and, you know, that he told the truth and things like that. He did not -- he said that he didn't have to answer those, those questions like that in interrogatories. It's a host of objections, boilerplate objections, repeated over and over.

THE COURT: A lot of boilerplate objections.

MR. WHITTAKER: A lot of boilerplate.

THE COURT: You both have a tremendous amount. I've never seen -- Peggy and I did a $14 million case on a jet for the government, and I never saw interrogatories and stuff like this in that case. I mean, you guys have blown this thing up.

MR. WHITTAKER: The difference is, I answered the questions, Your Honor.

THE COURT: Well, I wouldn't agree with that at all, Mr. Whittaker.

MR. WHITTAKER: Okay. But there's dozens of interrogatories that were not answered and objected to.

MS. FECHTEL: Why were they not answered?

THE COURT: What do you need to do their depos? What documents do you -- are critical to be able to do their depos? You can ask questions at the depos.

MR. WHITTAKER: I want to make sure that we have all of the text message communications.

THE COURT: We've talked about that.

MR. WHITTAKER: I understand that. And that there are no other ones.

THE COURT: We've talked about that. Mr. Whittaker, get off of it already.

MR. WHITTAKER: Okay. But I don't have any text messages other than the ones that I've been given. All I want to know is are there any other communications, are

there any other communications with other people that I don't know about and don't have.

THE COURT: What's the answer to that?

MR. GOTTESMAN: There are none.

THE COURT: Okay, you got your answer.

MR. WHITTAKER: Okay. Then, if there are no documents that are going to be -- no other communications that are going to be exchanged, and I ask him about them at his deposition and that's when I learn about them or learn that they don't exist, then, that's the bulk of my questions. I want to know about documents and communications.

THE COURT: Okay. All right. So anybody missing any documents that they need to go forward with depositions?

MR. MUNAS: For the County, we're waiting on verifications from Ms. Paul's interrogatory answers for the County. We think that those are important for her deposition.

MR. PAUL: We're not waiting for anything specifically, but we've been monitoring the exchanges, so if we had something to add, we would. So yeah, we're waiting for those completions, yeah.

THE COURT: Okay. Where are the verifications?

MR. WHITTAKER: You've told me to produce them for Mr. Gottesman. Oh, do I owe you some, Steve?

THE COURT: Yeah.

MR. IMM: Ms. Paul is in my office today to sign them. You'll have them by the end of the day.

MR. WHITTAKER: That was the County, I think, asking Ms. Paul instead of me this time. If I owe anybody else verifications, I will send them to you.

THE COURT: Mr. Imm, you're going to take care of that verification today?

MR. IMM: Yes.

THE COURT: Is that all you're missing?

MR. MUNAS: It is, Your Honor.

THE COURT: Anybody else missing anything else?

MR. WHITTAKER: There's an issue of a subpoena I want to send out to Barry Spaeth, who was disclosed as somebody who has knowledge that what I would consider to be defense to the 1983 claims.

THE COURT: Who is Barry?

MR. WHITTAKER: Mr. Spaeth is Officer Hooven's attorney in the domestic relations matter, and he was disclosed by Officer Hooven as a person who's going to testify at trial that -- from what I understand, the information will be that he's going to testify that the dispute between the parties is based in the domestic relations dispute. I assume that means this case is born from that. I don't know what that means exactly.

But he was disclosed as a person with information who's going to testify, and I want to send a subpoena to Mr. Spaeth for that information, and it's been objected to. I don't think -- you know, beyond privilege, I don't think there's a standing to object, other than by Mr. Spaeth.

THE COURT: What do you want to ask him?

MR. WHITTAKER: I want to know the information that it's been disclosed that he has.

THE COURT: Disclosed to him from his client?

MR. WHITTAKER: I don't know where he got that information. If it's information he just -- if it's just facts, then, I want to know --

THE COURT: About this case, though?

MR. WHITTAKER: I don't know, Your Honor. It was disclosed in --

MS. FECHTEL: Officer Hooven said that his attorney, Barry Spaeth, had facts relevant to this?

MR. WHITTAKER: Yes, and that he was going to testify about them. So I would like to get those documents, if there are any, and the information he has, if there is any; if there's not, then, he can say that.

THE COURT: What's the status of the dom rel case; is it still going on?

MR. GOTTESMAN: It's over. There's more to come, but there were --

THE COURT: That's why I quit dom rel.

MR. GOTTESMAN: There was a decision issued in October finding Holly Hooven, Plaintiff, in contempt on 13 different counts and no contempt findings against Officer Hooven. That decision has been incorporated in these proceedings through more than one filing.

And to address this subpoena issue, it's important that I can go back in time a little.

THE COURT: Okay.

MR. GOTTESMAN: In the original Complaint filed in this matter, it was plaintiff's allegation that Officer Hooven was -- committed the tort of abuse of process, that he had used the domestic relations case improperly to abuse or harass or oppress Holly Hooven by seeking custody orders, which he was ultimately awarded full custody of his children, and filing contempt proceedings against the wife, 13 of which were successful. It was plaintiff's allegation in the Complaint that that was all for an improper purpose, just to injure his wife, and they were trying to make a federal case out of it, to use the term. You dismissed that claim.

The dismissal of that claim came -- there were multiple dismissal orders. There was an original ruling on a motion to dismiss. Mr. Whittaker filed a motion for reconsideration. You granted that reconsideration in very

narrow part. But in the decision in which you did that, there was a mistake in the final paragraphs.

THE COURT: Right.

MS. FECHTEL: Which we amended. Sorry.

MR. GOTTESMAN: And we clarified that. That decision finally disposing of pleading-based dismissal was issued on the 29th of March, I believe. It was the 28th when -- or the 27th when initial disclosures were due. I included Attorney Spaeth as a potential witness because of this argument that the dom rel matter was an abuse of process. His testimony at that point would have been everything done in this domestic relations case was done with proper basis and for proper purpose.

So after the Court disposed of that, another domestic relations issue presented itself. By way of history, Mr. Whittaker's client, Holly Hooven, appealed the adverse decision against her in the -- from October of '24 to the First District, where appeals go from DR court. She then decided it was not worth the fight. She paid the contempt sanctions. She paid the attorneys' fees sanctions. She withdrew her appeal of the domestic relations decision against her.

Mr. Whittaker then sought a TRO and preliminary injunction in this case --

THE COURT: Yeah.

MR. GOTTESMAN: -- which you all, thankfully, dismissed within 12 hours of its filing. He has now appealed that to the Sixth Circuit, and that appeal remains pending.

THE COURT: Oh, my God. Are you kidding?

MR. GOTTESMAN: And so suddenly he's trying to get an injunction against enforceability of a domestic relations court order in the Sixth Circuit.

THE COURT: This is why when I was in private practice, I turned all of my dom rel cases over to my partner, Mike Barrett.

MR. GOTTESMAN: Well, so, Judge, they --

MS. FECHTEL: Where is that appeal?

MR. GOTTESMAN: We just filed our appellee's brief. Last night or yesterday, Mr. Whittaker filed a reply to a motion to dismiss based on mootness because everything had been satisfied. And it all comes down to whether or not -- well, I'm not going to -- it won't serve all counsel to go into this. However, to issue a subpoena to my client's domestic relations attorney for his file materials on itself is unspeakable. I mean, that's just beyond the pale.

MR. WHITTAKER: Unspeakable? He waived it and disclosed the information --

THE COURT: Wait, Mr. Whittaker, let him finish.

MR. WHITTAKER: Okay.

MR. GOTTESMAN: What's more, Your Honor, is -- I'm looking for a copy of the subpoena. What it says --

MS. FECHTEL: Usually the subpoena is objected to by the recipient. He said he won't ask for privileged stuff. So I'm just wondering -- I'm taking apart whether, you know, the Court -- how the Court would rule on the Spaeth motion. I'm just wondering what your standing is.

MR. GOTTESMAN: So I believe my client has some ability to object, but also Barry Spaeth certainly has his own ability to object to the subpoena. I think it's improper. To the extent Jesse Hooven has the attorney-client privilege, he's objecting on that ground. It's also his attorney who could end up charging him for the time spent in responding to this. Hooven doesn't want to incur that expense. I don't know if Barry Spaeth plans to charge him for that, but I think -- I, frankly, don't think he should, but there's a lot of reasons that Jesse Hooven doesn't want his attorney subpoenaed.

Now, there's one other aspect --

THE COURT: Did you list him as a witness, though?

MR. GOTTESMAN: When the abuse of process claim was still a part of the case.

MS. FECHTEL: Before the claim was dismissed. So you would have not listed him as a witness if the claim hadn't been dismissed?

MR. GOTTESMAN: Yes.

MR. WHITTAKER: The process claim had been dismissed for months, for months.

THE COURT: What are we fighting about here?

MR. WHITTAKER: I want to know the information that was disclosed by Officer Hooven in his initial disclosures by Mr. Gottesman of what the information Barry Spaeth has that speaks to a defense to Officer Hooven's claims in this case.

THE COURT: That's not attorney-client privileged.

MR. WHITTAKER: It would be waived as to that topic because it was voluntarily disclosed. I told Mr. Gottesman that if we need to work out parameters -- this is the stuff that's been left out, is the negotiation back and forth in all of these discussions. I told Mr. Gottesman, if I can narrowly tailor the request to avoid stepping on legitimately privileged issues, I will do that.

THE COURT: There's a lot of legitimately privileged issues.

MR. WHITTAKER: But not the ones that were disclosed, not the ones that were voluntarily disclosed. He's going to testify at trial about X topic.

THE COURT: Is he going to testify at trial?

MR. GOTTESMAN: No.

THE COURT: He's not going to testify.

MR. GOTTESMAN: Your Honor --

MR. WHITTAKER: That's like saying, oh, we don't want to give you this information that this witness has, so we're not going to call him. It could be adverse. It could be -- I mean, I wasn't the one who identified Barry Spaeth as a witness with particular information that he's going to testify about at trial. It speaks to a defense. My clients are entitled to get that information.

If Mr. Spaeth tells me what that information is or that he doesn't have anything or that he doesn't have any particular documents, he can object. Officer Hooven can object based on privilege. The privilege is waived as to that particular topic, but if Mr. Spaeth --

THE COURT: I don't think it is.

MR. WHITTAKER: By voluntarily disclosing that he's going to testify about X topic.

MS. FECHTEL: What was the topic he said he was going to testify to?

MR. WHITTAKER: That the dispute between the parties is all domestic relations related, that would speak to state action, that would speak to the primary elements of the 1983 claim and defenses to that.

MR. GOTTESMAN: There's another issue that goes even further beyond this, which is -- for the record, I would like to show you, Judge, the description of materials

he's asking. For the record, I'll represent to you this is the subpoena that Mr. Whittaker sent over stating he wanted to serve this on counsel. And if I can direct your attention, that's the description of the materials he's asking for. (Indicating.)

THE COURT: Can you see, Peggy?

MR. GOTTESMAN: So if I could read that into the record.

THE COURT: Yeah.

MR. GOTTESMAN: He's commanding the witness to produce the following material: Documents, communications, papers, ESI, and things related to or suggesting that the allegations of Holly Hooven and Brendan Taylor in the above-referenced civil action are related to or motivated by a current or former dispute between Holly Hooven and Jesse Hooven in the Hamilton County domestic relations case.

I'm just going to tell you, I don't know what that means, and it would require Attorney Spaeth to do a mental analysis of their allegations in this case to determine what possibly could be responsive to this. That is an unworkable subpoena, not withstanding the fact that it's being served on my client's attorney, and I think that the Court should not permit it. I think it's improper on every possible basis.

THE COURT: Did you list him as a witness?

MR. GOTTESMAN: I did initially in my initial disclosures include his name, but it was related to the fact that they were bringing an abuse of process claim related to the domestic relations case.

THE COURT: Okay.

MR. WHITTAKER: This was disclosed months after the abuse of process claim was dismissed, Your Honor.

MS. FECHTEL: Could you explain why you think this is relevant to the nonabuse of process claims?

MR. WHITTAKER: If the allegation is the underlying motivation is domestic relations related rather than speaking to 1983 allegations.

MS. FECHTEL: These are your allegations, I mean, you're the ones making the allegations.

MR. WHITTAKER: Yes. And that sounds like a defense, that sounds like a defense to stay an action to me.

MS. FECHTEL: You're saying he's going to say that everything he did was -- I'm not sure, was or was not related to domestic relations, therefore, it was or was not --

MR. WHITTAKER: If the motivations of the parties and the actions of the parties were just related to the domestic relations and not to state action, that's a defense that's in 1983 claims.

THE COURT: I don't know.

MR. WHITTAKER: That's what he disclosed as the information he had. It's not related to abuse of process. Abuse of process counterclaim was dismissed months before initial disclosures were made. The corrected order, it had nothing to do with abuse of process. The corrected order had to do with how --

THE COURT: What's the difference what the motivation was? If, in fact, they did it, who cares what the motivation is?

MR. WHITTAKER: I think it's a defense, Your Honor, to the mandatory element of my 1983 claims. If it wasn't state action, if it was purely a private endeavor or a private beef that was being -- that's what he's been -- that's the disclosure, and that's a defense, and it's -- I don't know if it's a valid defense, but it sounds like one to me, that if the parties -- if this was a purely private dispute and had nothing to do with state action or nothing to do with color of state law, that's a defense.

THE COURT: But isn't what you're asking for attorney-client privileged, what conversations that he had with his clients about the motivations for their case?

MR. WHITTAKER: If that's part of the -- if that is what's being disclosed, which it would fall under what initial disclosures said Mr. Spaeth was going to testify about.

THE COURT: Yes, Mr. Paul.

MR. PAUL: This discussion reminds us of the very first conference we had with you, Your Honor, where you asked us to address *Linkey*, under color of law, right. So the question is: Was there actual authority to act under it pursuant to the allegations in the case? So I don't think that -- to me or to us, that's the ultimate thing that we're trying to get to, and this seems to be a distraction from that.

THE COURT: I think so too.

MS. FECHTEL: I mean, it seems if he is going to make -- if there's any risk of that Officer Hooven is going to on some grounds defend it on that way, then, perhaps, if he said something different to his attorney, that might be relevant, but I still wonder if we're in a world where we need to make -- the attorney to make that.

THE COURT: But isn't it privileged?

MR. WHITTAKER: Not if it's facts.

MR. GOTTESMAN: I disagree.

MR. WHITTAKER: The facts are not privileged.

THE COURT: I think any discussion that he had with his attorney is privileged.

MR. WHITTAKER: If there's facts that predated the dispute.

THE COURT: I don't see how you --

MR. WHITTAKER: Facts are not privileged. Communications might be.

MS. FECHTEL: But Spaeth would only know it if it was communicated to him.

MR. WHITTAKER: That's possible, but he was disclosed as having the information and as a witness with information.

THE COURT: But he's no longer going to be a witness.

MR. GOTTESMAN: He's no longer going to be a witness.

MR. WHITTAKER: If that's the case, Mr. Gottesman told me that that topic is relevant. I take it that that is a judicial admission or it is a waiver of the argument.

MS. FECHTEL: A waiver of the defense of this only.

MR. WHITTAKER: Maybe not the whole defense, but that part of the defense is.

MS. FECHTEL: I guess that's the question. Is Officer Hooven still going to argue that -- is Officer Hooven going to argue somehow that this wasn't state action because it was personally motivated?

MR. GOTTESMAN: So Officer Hooven definitely doesn't -- is going to argue this is not state action. He came into information related to the health, safety, and welfare of his children, and to share that with his wife

about the care and custody of his children was not state action, so -- but that doesn't drag Barry Spaeth into this.

MR. WHITTAKER: You dragged Barry Spaeth into this by disclosing him.

THE COURT: I just think that the Barry Spaeth thing is a rabbit hole that doesn't need to be gone into. It's the dom rel matter. You know, I think if Officer Hooven said anything to his lawyer that isn't privileged, he will have to divulge it to you in his depo, but you don't need Barry Spaeth.

MR. WHITTAKER: Barry Spaeth is the person who has the information. I don't know how Barry -- I don't know if Barry Spaeth came into information from Officer Hooven or someone else or independent to that.

THE COURT: Wouldn't that be work product in his dom rel case?

MR. WHITTAKER: It might be. He might have standing to object on that.

THE COURT: I just think that that's just a rabbit hole. I'm going to preclude his depo.

MR. WHITTAKER: But I would just say that, if that line of inquiry is irrelevant and it's not going to be raised at trial, then --

THE COURT: Which Mr. Gottesman has represented it's not, correct?

MR. GOTTESMAN: I don't plan to call Barry Spaeth.

MR. WHITTAKER: I'm not just talking about Barry Spaeth. I'm talking about the subject matter of Barry Spaeth's testimony. If that is irrelevant, which Mr. Gottesman told me it's irrelevant, and, therefore, it's not going to come up, if it's not relevant, then, that topic is a waiver of that defense, to that portion of that defense. If it is relevant, then, I should be able to --

MS. FECHTEL: Seems to me there's two different -- there's whether it was related to some sort of domestic relations fight only or whether it was related to some desire to help his -- do what's best for his children, which is a little different than an abuse of process claim. It seems to me he could --

MR. WHITTAKER: Abuse of process is not on the table.

MS. FECHTEL: Yes. So him saying I wanted this information because I think it is relevant to whether the best care, custody of my children, which of course he will then use in a domestic relations case, I don't see how -- where Spaeth could contradict or have anything relevant to say on that part of it.

MR. WHITTAKER: Spaeth would have presumably the --

MS. FECHTEL: Something that isn't privileged.

MR. WHITTAKER: Whatever information that he's been

disclosed as having within that universe, I want to know about. If it's not a defense -- if it's irrelevant and not a defense, then, that can be carved out, but the subject matter of that information can be carved out from the defense.

MR. PAUL: I'm sorry, just for clarification, is that to get at the remaining federal claim against Officer Hooven as to whether he was acting under color of law in this proceeding?

MR. WHITTAKER: Yeah, that's what the 1983 claims against Officer Hooven are.

MR. PAUL: Goes back to our *Linkey*.

MS. FECHTEL: I don't remember. It's complicated.

MR. PAUL: You have to show that the officer had actual authority to do what he's accused of doing under color of law, not what someone might have thought or might have read into it. There was a Tenth Circuit case, *Martinez*, that just came out a few days ago that talked about an officer in that setting.

MR. WHITTAKER: I don't see what that has to do with Spaeth.

THE COURT: Let him finish. Don't interrupt him.

MR. PAUL: So that for us, if you go back to the motion for reconsideration that the Court granted in part and denied in part in September, there was -- you know, you

dismissed the City. And you looked at some of the allegations around Jesse Hooven with respect to the neighbors and teachers. You say, you know what, that doesn't meet *Trombley*, so I'll dismiss that aspect of the federal claim, if you recall.

But you said what needed a little bit more discovery -- because of the allegation in the Amended Complaint talked about the MOU between City and County, so you said, well, you know what, with respect to what happened between Madison Paul and Officer Hooven, you know, maybe a little discovery that needs to be happening in order -- before I can dismiss that federal claim against Officer Hooven. It was a footnote, set out the blueprint.

Okay, great, so we understand. We didn't agree because is it plausible to think that the MOU would somehow permit officers, you know, to go and get information that would leverage their child custody cases? You would have to -- it would be a real creative, disgusting, scandalous conspiracy.

All right. But, okay, a little modicum of discovery will get us to that duty to defend hearing. That should be the focus of discovery I think at this point, at least with respect to the City and with respect to Officer Hooven's federal claim. The federal claim is about did he actually have authority to do what he was doing under color of law. I think it's very clear he didn't.

Just last night at 11:55, Mr. Whittaker filed something where he says, you know, the facts are -- basically to us, just basically said this is really a personal dispute between these two exspouses. I don't want to pivot too hard, but there is something that -- because of the late filing last night, I would love to get some clarification.

THE COURT: I'm not aware of it. Why don't you tell us.

MR. WHITTAKER: Sixth Circuit --

MR. PAUL: Just for the record, I would love to get some clarification as to how this relates to --

THE COURT: That's what we're here for.

MR. PAUL: Case No. 26-3005, Document 28, filed May 4th, 2026, so last night. 26-3005.

MS. FECHTEL: Three, two zeros, five?

MR. GOTTESMAN: It's a Sixth Circuit.

MR. WHITTAKER: It's the appeal of the TRO, Your Honor, denial.

MR. GOTTESMAN: If you give me a page, I can pull it up.

MR. PAUL: So after the denial of the TRO preliminary injunction, Mr. Whittaker timely appealed from that denial. However, in the civil appeal statement and then in the initial briefing, Mr. Whittaker took on all of the Judges' or the Courts' orders preceding that, all of the

interlocutory orders, including the dismissal of the Monell claim against the City, which took us by surprise. I mean, okay, do we really need to brief this? Well, we did because it was -- it showed up in the initial brief.

A major section of his brief was, yes, you can go back and revisit the denial of the dismissal of the City, the municipal liability claim based on the denial of the TRO, which was because the -- argument Mr. Whittaker made was that it's a final order, nothing left to be resolved in the case, which -- I mean, how is that possible to argue that? I mean, we're here, right? I mean, there's --

MR. WHITTAKER: That's not --

THE COURT: Wait.

MR. PAUL: However -- so all right. So we briefed it, we, all of us, briefed it. I believe you denied it on abstention grounds. And after that happened, Mr. Whittaker or Holly Hooven withdrew her appeal. So we did a Rooker-Feldman argument and said, look, you don't get to go to district court just because you didn't want to follow the state process. But the City argued about why that it seems that the denial of the TRO was not a final order. I mean, we're looking to do some discovery so we can get rid of the federal claim, it's obvious. Well, last night Mr. Whittaker in response to Officer Hooven's motion to dismiss for lack of jurisdiction --

THE COURT: This is all in the Sixth Circuit case?

MR. PAUL: All in the Sixth Circuit. Last night, Mr. Whittaker said, well, it shouldn't have to be said that Holly doesn't allege that the Panel should review all other interlocutory orders, other than the preliminary injunction ruling. So which is it?

MR. WHITTAKER: That's a response to an allegation quoting the motion to dismiss.

MR. PAUL: But we have --

MR. WHITTAKER: The claims in federal court and the appeal are not that every single interlocutory order is reviewable because the case is over. The interlocutory order became a final unappealable order because abstention orders are final and appealable. Because of that, there's arguments and there's cases that say, once you have a final order, interlocutory orders that preceded it are merged. If the final order resolves -- effectively puts the party out of court. On the TRO issue, that effectively put Holly out of court because there was no other remedy other than the Court of Appeals. We included in that an argument that other interlocutory orders preceding that get caught up.

The arguments against or for Rooker-Feldman and Younger are based on law that is no longer good. Rooker-Feldman doesn't apply and Younger doesn't apply for the reasons that have been argued in the appeal. That's an appeal issue that

has nothing to do with whether or not Mr. Spaeth has relevant information about claims and defenses in this case. So I don't know why the appeal is being brought up, other than -- I don't know why it's being brought up.

THE COURT: I don't know why there's an appeal to start with.

MR. PAUL: That's kind of -- Katie and I, Ms. Baron and I, wrestled with whether both of us need to come here today because you're looking at two-thirds of the litigation section. Normally, we're two out of five. We're two out of three because we have two people out on leave for the next several weeks.

THE COURT: You guys can just send one of you.

MR. PAUL: No, it's true. The reason we did it is because honestly to see you. We don't see you in person very often. Remember the very first oral argument and you didn't recognize me; how is that? I have a half a dozen cases in front you, but most have been referred. So, you know, yeah, so we will tag team after this, and we will --

THE COURT: And the County, too, you don't have to send two attorneys.

MR. PAUL: We came to the initial one because of the importance of it, and also we brought other work from other cases. We're going to tag team and share that. The reason we brought it up is because it is such a distraction

from the discovery that needs to be done so we can get to the resolution of the federal claim, which I think is still live. If it's still pending, how could you argue that the TRO was a final order and nothing else to be done?

MR. WHITTAKER: What issue?

MR. PAUL: There's no federal claim left against Officer Hooven.

MR. WHITTAKER: Yes, there is. The TRO doesn't involve the claims of -- against Officer Hooven. The TRO involves a prior restraint entered against Holly Hooven by the state court that the Court dismissed based on Younger abstention.

THE COURT: Why would we, the federal court, want to get involved in this dom rel matter? We don't want anything to do with that.

MR. WHITTAKER: No one is asking the Court to get involved with the state court action. The state court action interfered with this action, Your Honor.

THE COURT: You did.

MR. GOTTESMAN: You're seeking an injunction against the domestic relations court judge.

MR. WHITTAKER: For interfering in this action.

THE COURT: It's ridiculous.

MR. PAUL: Because he's not served directly anymore, all service is through Mr. Gottesman. I don't

understand how that has any bearing on this case, and it's tying up everyone's time.

MR. GOTTESMAN: Hundreds of hours.

THE COURT: Mr. Whittaker, is it really necessary?

MR. WHITTAKER: Yes, Your Honor. Yes, Your Honor.

MR. PAUL: I wouldn't say anything if we could at least schedule the depositions. But on April 8th, when this deposition didn't go forward, we tried to block out time as fast as we could, and we're still here not able to reschedule it because -- you know, Mr. Whittaker has been very cordial with us, not unprofessional with us, but I think just to put it jaggedly, you're stretched so thin that -- if you were to schedule the depositions and then do all of the other stuff, we would probably be less, you know, bothered by it.

THE COURT: We're going to get the depositions scheduled today, and people are going to appear, and if they don't, there's going to be big sanctions.

MR. WHITTAKER: You're saying that the appeal is interfering with your ability to schedule depositions?

MR. PAUL: No, your ability to schedule depositions.

MR. WHITTAKER: It's not, though. I don't understand.

THE COURT: All right, enough.

MR. WHITTAKER: Dates have been exchanged.

THE COURT: Enough. I'm going to leave it with the Circuit's headache, thank God, not mine.

MR. GOTTESMAN: Judge, we took a detour after the Spaeth subpoena. I'm asking the Court to preclude that.

THE COURT: Quash it, yeah. Unless you can come up with something -- he's no longer a witness. He was the dom rel attorney. All of the communications I assume he had or discovery he did during that is either work product or attorney-client privileged. I don't see how you get to his dom rel attorney.

MR. WHITTAKER: I think a voluntary waiver and disclosure of that information as a witness, a person who's going to be a witness.

MS. FECHTEL: Can I just --

MR. WHITTAKER: And in the initial disclosures.

MS. FECHTEL: Is it possible, just to try to move on from this now, that if you're inclined to deny this deposition of Mr. Spaeth right now --

THE COURT: Yeah.

MS. FECHTEL: -- in the next few months, by the end of the year, we're going to get motions for summary judgment, presumably, from all of the defense side. If there is a particular argument in that, in the motions to dismiss, that Mr. Whittaker feels like and has real specific

grounds to believe that Mr. Spaeth would have some information on, I think you would have the right under 56 to say, you know, I need further discovery on this particular topic, can we get that deposition, and then three weeks to file a response.

THE COURT: Yeah.

MS. FECHTEL: Could we possibly do that, so if it does become relevant, but right now we're just dealing in abstraction that sounds like it's most likely covered by attorney-client?

THE COURT: Work product.

MS. FECHTEL: That at least allows us to move forward, but you can make the argument at the relevant time, if there's something in the argument that you think --

MR. WHITTAKER: If it comes up on summary judgment, I can file a Rule 56(d) motion.

MS. FECHTEL: If there's a specific argument that -- you know, not just a general he's saying it's not state action, but something specific that you have reasonable grounds to believe.

MR. WHITTAKER: I think an argument that this is a domestic relations dispute and that's the foundation.

MS. FECHTEL: There's a difference between this is a domestic relations court case and this is an I care about the welfare of my children.

MR. WHITTAKER: Right.

MS. FECHTEL: I wonder --

MR. WHITTAKER: I would say those are two things. If it's welfare of the children, I don't know if that's a defense, but it's a separate question from this whole thing was motivated by a domestic relations dispute.

MS. FECHTEL: Which is a claim that's gone anyways. As a separate claim, it's gone anyways.

MR. WHITTAKER: Yes, that part of the 1983 claim was carved out, but I still think it's a defense to say this is all motivated by domestic relations.

THE COURT: Let's get the depositions scheduled on the principal.

MS. FECHTEL: If it turns out --

THE COURT: Let's not go down any more rabbit holes. We're going to get the depositions scheduled. Okay. Okay. Whose depositions need to be taken?

MR. GOTTESMAN: Brendan Taylor, Officer Hooven, Madison Paul, those are the three primary. Anybody else can chime in.

THE COURT: Anybody got any more that they want to take?

MR. WHITTAKER: I've got some people from the County I would like to take.

THE COURT: Who?

MR. WHITTAKER: Madison Paul's -- three of Madison Paul's supervisors, but two of them no longer work for the County.

MR. MUNAS: I thought two you requested. One works for the County and one had left employment with the County.

MR. WHITTAKER: So there's one who is still employed?

MR. MUNAS: Yes.

MR. WHITTAKER: I forget his name.

MR. BIKMAYEV: There's one supervisor and one section chief.

MR. MUNAS: Yeah, there's layers. They're in the supervisory chain of command, so I'm not going to beat you up about the terminology at this point. But Tara Resediz-Terejo.

THE COURT: How do you spell that?

MR. MUNAS: T-A-R-A, R-E-S-E-D-I-Z hyphen T-E-R-E-J-O, and that's a guess.

MR. WHITTAKER: I will defer to his spelling.

THE COURT: Okay. That's one.

MR. MUNAS: Still employed with the County. We have availability generally Mondays and Fridays. So presumably, if counsel can agree on days for that, we could get the witness available on a Monday or a Friday.

THE COURT: Do you have another witness, too, or

just the one?

MR. MUNAS: The other witness that I think Mr. Whittaker asked about was Supervisor Dylan Martini, who is no longer employed by the County.

MR. WHITTAKER: I thought it was the other way around.

MR. MUNAS: I'm pretty sure I got it right. We have been attempting to reach Mr. Martini with this is a case you're going to be a witness in, and we haven't gotten responses. We did send -- we've tried e-mail, electronic communications, without a response. We sent a letter, I think at the end of last week is when we may have sent it.

MR. BIKMAYEV: I believe so, yeah.

MR. MUNAS: We're hopeful that we'll get a response from a more formal communication like that, but it's unclear. So obviously, I think there's other avenues that we could get a witness to testify in the case, but --

THE COURT: Another witness?

MR. MUNAS: No, that witness who is a former employee.

THE COURT: Mr. Martinez?

MR. MUNAS: Martini, like the beverage.

THE COURT: Okay.

MR. MUNAS: Although, today, Cinco De Mayo, not the right beverage of choice. Then, there was a 30(b)(6)

request, but we still haven't articulated the subject matter or topics, so I haven't been able to confer with the Department of Child and Family Services to determine who might be the right 30(b)(6), if we need more than one. So that's --

THE COURT: I can't believe you'll need more than one. I mean, I can, but --

MR. MUNAS: It's been suggested, you know, that there are some, you know, general policy-type testimony that is needed and an interpretation of policy, but then separately -- and maybe it's related, but I think there's been a request generally about 30(b)(6) witness for the Department of Job and Family Services in their duty to defend decision-making, which I'm raising an eyebrow at because that feels like it may be privileged depending on how that question is approached. I don't know if there's a Department of Job and Family Services witness that could speak to that. So again, we're waiting on topics to be identified.

THE COURT: You think it might be -- it would be their counsel. You would have the duty to defend.

MR. MUNAS: Well, you know, there were different assistant prosecutors involved in this case at the outset and they were involved in that process. They're no longer assistant prosecutors with the County. You know, I have a

feeling we would probably object to testimony on that front, but, again, we haven't seen, you know, a written-down articulation of topics for a 30(b)(6).

THE COURT: You're talking about possibly two depos of the County?

MR. MUNAS: That's requested.

THE COURT: Two plus the 30(b)(6)?

MR. MUNAS: Three total, that's what's been requested up to this time.

THE COURT: All right. So we've got Brendan Taylor, Officer Hooven, Madison Paul, County employees, possibly three depos. What about the City?

MR. GOTTESMAN: So, Your Honor, the way -- Officer Hooven has a cross-claim against the City for their duty to defend and indemnify. I'm satisfied with Officer Hooven's testimony. There's two other witnesses that I'm going to talk to. At this point, I don't anticipate that I'll be taking their depositions.

THE COURT: Okay. Are they City?

MR. GOTTESMAN: City, yes.

THE COURT: Okay. So no depos for the City?

MR. PAUL: As far as taking them, we're content with the list that's been presented.

MS. BARON: I think Mr. Whittaker had requested a 30(b)(6) representative from the City, but we, like the

County, haven't received any topic list.

MR. PAUL: To shed light on that, you know, with regard to the MOU, our understanding, Mr. Whittaker asked us to authenticate the version that was in place then at the time of this, and we were having trouble locating that version. And then we realized it's really the County that puts out this MOU with dozens of jurisdictions, and the City is one of the partners to that MOU. It's not like a specific agreement just between City and County. So I think if it's the MOU-related 30(b)(6), then, I don't know that the City would be able to shed light on that. But we're still waiting.

MS. BARON: I do think that he did include like the defense and indemnity piece, which I'm not sure that --

MR. WHITTAKER: I don't think I'm asking about indemnity.

MR. PAUL: We're all ears.

MR. WHITTAKER: I'm not asking about indemnity. I don't have an indemnity claim. If you're referring to Mr. Gottesman's topics --

MR. PAUL: Let us know. We're waiting.

MR. WHITTAKER: I'll circulate topics. We haven't scheduled the depositions.

MS. BARON: We can't schedule without the topics.

MR. WHITTAKER: Right. I'll circulate topics,

then.

THE COURT: When?

MR. WHITTAKER: By the end of next week.

MS. FECHTEL: For both the City and the County?

MR. WHITTAKER: Yes.

MS. FECHTEL: This would be the Rule 30(b)(6) deposition topics for the County and the City by next week.

MR. WHITTAKER: Yes. Oh, at the end of next week, the 15th.

THE COURT: So that would be plaintiff to circulate topics for 30(b)(6) depos for City and County by May 15th. Okay.

MR. WHITTAKER: And plaintiffs may want to depose Former Chief Theetge as the person who signed off on the exoneration of Officer Hooven.

THE COURT: My guess, Mr. Imm, is that she's going to say she doesn't recall, but correct me if I'm wrong.

MR. IMM: I'm sure you're right, Judge. I haven't spoken to her about it, but I'm sure that's correct.

THE COURT: I mean, is that really necessary?

MR. WHITTAKER: She's a witness. She's the person who supervised, she was the supervisor.

THE COURT: I understand the hierarchy.

MR. WHITTAKER: The claim goes -- you know, if the person with signing authority is the person involved, that's

an important element.

THE COURT: If Mr. Imm can represent to you that her response would be she doesn't recall, is it really necessary to do that?

MR. WHITTAKER: I think there's going to be more than just a question about do you remember signing on this. I'm going to -- I want to ask her about her authority. I want to ask her about --

THE COURT: What do you mean, her authority? She was the police chief.

MR. WHITTAKER: She's the highest authority in the police department that can sign off.

THE COURT: That's a given.

MR. WHITTAKER: That's material to 1983 claims. If the authority is made -- or if the decision is made at the highest level, that --

THE COURT: If she has no personal recollection, you've got her signature on it, it was made at the highest level, she has no recollection, what are you going to get out of a deposition of her?

MR. WHITTAKER: The custom and practice of what she -- of whether she answers or whether she investigates or participates in these investigations regularly, what the procedure is for that, how the decision is made to sign off on things like this. She signed the ultimate document

exonerating him. So she is, is a person with knowledge, not only with this case, but of the custom and practice.

She can say she doesn't remember. If she testifies to that, then, that's her answer, but I can probe a little bit deeper than that I think if I can get information that she does know. I think her term as chief was several years. I think she has knowledge of custom and practice; if she doesn't, that's an interesting defense.

THE COURT: Anything you want to say?

MR. PAUL: If the IIS report itself had something that went to actual authority to do what he's accused of doing, I suppose there could be something there, but that's not what the report says, so, you know, that doesn't make any sense.

MR. WHITTAKER: I don't know why we're hung up on actual authority when actual authority can be abused. Abuse of actual authority is state action. And if there's a custom and practice involved within the police department, the former chief would certainly know about it. She would certainly be the highest authority to implement and regulate that custom and practice. If she says she doesn't know, then, I can either accept that answer or go deeper, and if she says she doesn't know, doesn't know, doesn't know, then, I have to accept her answer. But she was the chief, she was the decision-maker, and I think she knows something. I

think she knows about what happened in her office, what the procedure was going for doing these types of investigations and what motivated her to sign off on it.

MR. GOTTESMAN: Judge, if I may chime in.

THE COURT: Yeah, please.

MR. GOTTESMAN: Under the current formulation of the rules, the proportionality, the importance of the matter being discovered compared to the issues in the case and the overall proportionality of it needs to be taken into account. This case is very simple, and it's being unnecessarily expanded with appeals and endless letters and multiple versions of discovery responses that are nonsensical with all of this boilerplate. To the extent I participated in that, forgive me.

However, this needs to be constrained, not expanded, and unnecessary depositions -- we all know how Internal works. They investigate hundreds of complaints against officers, reports make it to her desk, she signs off. To suggest that she has some personal knowledge about the dispute between Taylor and -- Mrs. Hooven and Officer Hooven is really completely -- it's ludicrous.

MR. WHITTAKER: That's not the suggestion. The suggestion is she knows about the investigation that went into the allegations.

THE COURT: Let Mr. Gottesman finish, please.

MR. WHITTAKER: Sure.

MR. GOTTESMAN: My point is I think that Shuva when he was speaking about the appeal and the time and the way this case is going, the trajectory, the time strain this case has become is because we're not observant of the principle of proportionality. And I would like to ask the Court to inject that into the way that we approach this, and I think defense counsel would agree with that.

MR. WHITTAKER: Proportionality is one thing.

THE COURT: Ms. Baron, do you want to say something? Go ahead, talk.

MS. BARON: Yes, yes. I think that I agree that this is a -- there are vast resources that are being expounded on this case.

MR. PAUL: Bifurcation at least.

THE COURT: I'm not going to allow her deposition at this point. I just don't think it's necessary.

Okay. So we've got depos for Brendan Taylor, Officer Hooven, Madison Paul. The County employees, there may be three, including the 30(b)(6). And the City may have a 30(b)(6). Plaintiff is going to circulate topics for the 30(b)(6) depos for the City and the County by May 15th, 2026.

Okay. Let's pick out some dates for depos. Get your calendars out. Depo dates.

MR. GOTTESMAN: Your Honor, I had suggested on a couple of occasions that the parties use the days of June 8th -- the week of June 8th and the week of June 15th. I got responses from most counsel that there was availability those weeks. I know Mr. Taylor has a conflict on one or two days. So I would kick that out. I think that that gives us time to get his medical records, and if we could block off time those two weeks, that was our proposal.

THE COURT: How's that work for everybody else?

MR. PAUL: We've been holding June 9, 10, 13.

THE COURT: Not the 8th?

MS. BARON: I'm free the 8th.

MR. PAUL: We could do it. We based it on what everyone seemed to be saying on the thread, but --

THE COURT: Mr. Stokar, do you need to be there or --

MR. STOKAR: I'm just a sideshow.

MR. WHITTAKER: The 9th, 10th, and 12th are held.

THE COURT: How about the 8th?

MR. WHITTAKER: It wasn't.

THE COURT: Is it going to be the 8th, 9th, and 10th?

MR. PAUL: I was asking the County if June 8th was on your availability. I think I based it on your availability. By the time we climbed in on that, we had

started with many more dates and then various counsel said they weren't available.

THE COURT: Just what works for you, do the 8th, 9th, and 10th, and 12th work for you?

MR. MUNAS: We said that the 9th worked for Madison.

THE COURT: You're saying the 12th doesn't work?

MR. MUNAS: The 12th does.

THE COURT: What doesn't?

MR. MUNAS: The rest of the week. I think there were other dates in the week that were possibly in consideration, but other counsel had excluded them from the list by the time it got to us.

THE COURT: Let's just start again. Okay. June 8, 9, 10, and 12, who doesn't that work for and what days don't work, 8, 9, 10, and 12?

MS. BARON: The City is available all three days.

THE COURT: I've got four.

MS. BARON: Yes, the City is available all four.

THE COURT: Mr. Gottesman?

MR. GOTTESMAN: I'm available all of those dates.

THE COURT: Got the City. What about the County?

MR. MUNAS: We can make it work.

THE COURT: Mr. Whittaker?

MR. WHITTAKER: Same, I can do all of those.

THE COURT: What time are you starting?

MR. MUNAS: Early.

MR. GOTTESMAN: We chose 10:00, Your Honor. We've been doing it at the Finney firm.

Steve, are you able to tell us whether your conference room is available on those days? We've been using your offices because they're the nicest.

MR. IMM: We'll make it available.

THE COURT: The Finney firm.

MR. WHITTAKER: Is there no availability in May?

MR. GOTTESMAN: I'm not.

MS. BARON: We're tight in May, but if you have specific dates you want us to look at, we can.

THE COURT: I think that by the time that you exchange documents and stuff, I think it's safer to start with June to make sure that you've got everything by then.

MR. WHITTAKER: I would say certainly for 30(b)(6) for sure, but if there's no availability for individuals in May, like Taylor or Officer Hooven or Madison Paul, then, we're putting all of the depositions in the last month of discovery.

THE COURT: Well, we're going to have to kick out the schedule, as much as I hate to do that. It's going to get kicked out anyway, so I think you're probably better off to do the individual depos and then the 30(b)(6)s.

MR. WHITTAKER: Agreed.
MR. PAUL: Is there any inclination on the Court's part to bifurcate all 30(b)(6); is that a good practice here?
MR. WHITTAKER: I don't think there's anything wrong with that.
THE COURT: I think it's a good idea.
MS. BARON: Also, can we pick which individuals we do?
THE COURT: The more specific, the better. Go ahead.
MR. PAUL: I'm told Brendan Taylor was doing some kind of training until the 13th.
MR. WHITTAKER: He is back the 13th.
MS. BARON: So how are we going to do his deposition that date?
MR. WHITTAKER: I told everybody that he's not available that week.
MS. FECHTEL: Let's stick with the 8, 9, 10, 12, which --
MR. PAUL: Madison on the 12th, does that work?
MR. MUNAS: That's what we had penciled in.
MR. WHITTAKER: Yes.
MR. IMM: That's fine.
MR. WHITTAKER: I've gotten that date cleared.

MR. PAUL: Okay. Start at 10.

MR. WHITTAKER: At 10 a.m. with Madison Paul on the 12th.

THE COURT: At the Finney firm. All right. Who else?

MR. GOTTESMAN: Hooven is not available until after the 9th, so --

MS. FECHTEL: So Hooven could be the 10th?

MR. GOTTESMAN: Hooven would be fine on the 10th.

MR. STOKAR: That's Officer Hooven, just to be clear.

MR. GOTTESMAN: Officer Hooven.

MR. WHITTAKER: But is the County available on the 10th?

MR. MUNAS: We can make it work.

THE COURT: They said they're available all these dates. You've got Officer Hooven and Madison Paul. You still need Taylor.

MS. FECHTEL: If we can't do him -- you know, you said you might do them before you do the 30(b)(6)s, but we can line up those two County employees, right, because we still have two dates that are open. We've got the 9th.

THE COURT: The 8th and 9th are still open.

MR. WHITTAKER: I was hoping to not have to drag County employees multiple times to multiple depositions and

hopefully just doing them --

MS. FECHTEL: You say you need to finish the big three before we do the County ones?

MR. WHITTAKER: I'm just saying I wasn't trying to drag the County's employees to more than one deposition. I was going to suggest doing those individuals at the same time as the 30(b)(6)s, like before or after that. But if we need to do multiple days, that's okay too.

MR. MUNAS: I'm not sure I understand.

MR. WHITTAKER: I didn't think we needed to schedule multiple days, one for the individuals and one for a 30(b)(6).

MR. MUNAS: Different people.

MR. WHITTAKER: Okay. I didn't mean to drag everybody to two different depositions.

MR. MUNAS: You're going to get each witness that you want. You're going to get them for a day.

MR. WHITTAKER: I don't think I'm going to need them for --

MR. MUNAS: Part of a day. And their schedules are not -- you know, the one former employee, we can't even speak to their availability currently.

MR. WHITTAKER: Right. We're talking about one or two.

THE COURT: The only one that you can commit to

right now is Tara Resediz-Terejo.

MR. MUNAS: She said Mondays and Fridays are available.

THE COURT: Isn't Monday the 8th?

MR. MUNAS: Pencil her in for that.

MS. FECHTEL: County employee on the 8th.

MR. MUNAS: Tara Resediz-Terejo.

MS. BARON: Just put "County employee."

MR. PAUL: All right, says the guy with the funny first name. Was that 10:00 as well?

MR. WHITTAKER: On the 8th.

MR. MUNAS: She said she was generally available Mondays and Fridays. We'll confirm, but we believe we can make 10 a.m. on the 8th work for her.

THE COURT: Okay. You don't know about the -- you haven't found the other guy yet, Mr. Martini. You're going to wait on the 30(b)(6). If you find Mr. Martini, perhaps, he can be done on the same day, if possible.

MR. MUNAS: Potentially.

THE COURT: We've got nobody for the 9th.

MS. BARON: There was a Notice that was actually filed for Brendan Taylor's deposition on the 9th.

THE COURT: But that's not going to work.

MS. FECHTEL: We need a date for Mr. Taylor.

THE COURT: When can we do Mr. Taylor?

MR. WHITTAKER: We can do Taylor the week of June 22nd.

THE COURT: Not until June 22nd?

MR. WHITTAKER: Well, we could do it in May as well, but I understand that those days aren't good for anybody else, but if we're going back to May or this month, then, we can certainly look at more days.

THE COURT: When can he do it in May?

MR. WHITTAKER: He can do it before the 28th. He goes on -- he has a training with the National Guard beginning the 28th through the 13th of June. We can do it the week of the 18th.

MR. GOTTESMAN: We don't have the discovery materials, Judge, so it's got to be in June.

THE COURT: You're going to have to go when he's back then. When is he available, after --

MR. WHITTAKER: He's available after the 13th. I have a trial the week of the 15th.

MR. GOTTESMAN: Is he available on the 22nd, then?

MR. WHITTAKER: Should be.

MR. GOTTESMAN: Counsel, anybody?

MS. BARON: The City is free.

THE COURT: June 22nd.

MR. MUNAS: County is free.

MR. IMM: I'm sorry?

MS. BARON: June 22nd.

MR. IMM: Yeah, that's fine.

MR. PAUL: We're awaiting confirmation from the client.

MR. WHITTAKER: I just said that he's available. I'm going to triple check with him to make sure that he's going to be there or he's available, but he's told me he's available.

MR. GOTTESMAN: He usually shows up.

MR. WHITTAKER: Yeah.

MR. PAUL: Possible to confirm that with a break, Your Honor, before we --

THE COURT: Do you want to call him right now?

MR. WHITTAKER: I'll get him right now. I don't have to call, I can text him.

THE COURT: I'm old-fashioned. So then we just have the 30(b)(6)s after that.

(Pause.)

MR. WHITTAKER: He will promptly respond.

MR. GOTTESMAN: Could I suggest that in the abundance of caution we look at the other days that week to hold them aside. For instance, the 24th, 25th, and 26th, are counsel available on those days?

MR. STOKAR: Of June.

MS. BARON: I can't do the 23rd. I can be free the

24th. I can't do the 26th.

THE COURT: But Mr. Paul can?

MS. BARON: The 26th, I'm in New York.

MR. WHITTAKER: I cannot do the 25th. I can do the 26th, but not the 25th.

THE COURT: So you're available the 24th and the 26th?

MR. WHITTAKER: Yes.

MS. FECHTEL: This would be for the 30(b)(6) people?

MR. PAUL: Besides the 26th, what's the other date?

MR. WHITTAKER: The 22nd, Mr. Taylor is confirmed at 10:00.

THE COURT: They're all 10 so far, so there's no misunderstanding. And then the 24th and the 26th, you're going to reserve for any 30(b)(6)s.

I hate to ask this, but where are we on expert deadlines? Are there going to be experts?

MR. GOTTESMAN: There are deadlines.

THE COURT: I know there are deadlines. We're going to be way past those. So the question is now: Do I need to set expert deadlines?

MR. GOTTESMAN: That's really a question to you, I think, Justin.

MR. WHITTAKER: I don't think -- well, I have not

done any -- taken any depos yet. I would like to at least get into a little bit of that. I mean, I don't -- we have an expert disclosure deadline.

MR. GOTTESMAN: The current deadline for expert reports is May 29th with rebuttals on June 30th.

MR. WHITTAKER: By the 29th -- we will have a report or not by May 29th.

THE COURT: That's what I'm asking. Do I need to extend the expert deadlines?

MR. GOTTESMAN: No expert has been identified in discovery.

THE COURT: Okay.

MR. WHITTAKER: That's because the expert deadline is the 29th. I would think so, Your Honor, I would think they would need to be extended until after Taylor's deposition.

THE COURT: Which is not going to be until June 27th.

MR. WHITTAKER: 22nd.

MR. GOTTESMAN: What kind of expert?

MR. WHITTAKER: I don't know.

MR. GOTTESMAN: You don't know?

MR. WHITTAKER: I need to get into discovery in depositions. If there's no expert, there's no expert.

THE COURT: We'll just pick a date in July, then.

Peggy, give me a date for expert deadline.

MS. FECHTEL: Let me go back and see. July 17th, Friday, July 17th.

MR. WHITTAKER: That's fine, um-hmm, yes.

THE COURT: Okay.

MR. PAUL: July 17th?

THE COURT: Uh-huh. And then rebuttal expert, if there are any, a month later.

MR. GOTTESMAN: Friday is the 14th.

THE COURT: 14th of July?

MR. GOTTESMAN: August. If you go a month out, it would be August 14th.

THE COURT: Okay. Hang on here. August 14th for rebuttal expert.

MR. GOTTESMAN: And that is, Judge, our current disclosure -- or discovery end date, that's the discovery cut-off.

THE COURT: Okay. Yeah, that should work still, doesn't it? So the discovery cut-off is also August 14th.

MR. GOTTESMAN: And that's on your ECF 118.

MS. FECHTEL: Judge, do you want the parties to submit an agreed order with all of this information?

THE COURT: That would be great.

MR. GOTTESMAN: Looking at me?

THE COURT: Yeah, yeah.

MS. FECHTEL: We like agreed orders.
THE COURT: You're so organized, Mr. Gottesman. That's what you get for being organized.
Okay. Let me see if there's anything else we need. Okay. And then Bill will -- then, we've got -- because of the stuff with the City and the County, we've got weird dispositive motion deadlines.
MS. FECHTEL: Why don't we get their order.
THE COURT: We'll worry about that then.
MR. GOTTESMAN: We have one more looming issue that hasn't come up yet.
THE COURT: Okay.
MR. GOTTESMAN: I don't want to trample on Justin's letter. We were going through his discovery agenda, and I don't know, we haven't covered the SACWIS subpoena.
MR. WHITTAKER: Right. Has that been issued?
THE COURT: What is SACWIS?
MR. GOTTESMAN: SACWIS is the state database that is at issue that was accessed in this particular case. It's an acronym, S-A-C-W-I-S, State Agency -- something.
MS. FECHTEL: That's the one who Ms. Paul was the only one who had the authority to access.
MR. GOTTESMAN: This has been an issue -- I think the County raised this as an issue. It's an issue from all of our perspectives, and there's some differences on

opinions about what's going on here. So there was discovery sent to the County asking for what information in the SACWIS database is there related to Mr. Taylor.

MS. FECHTEL: Who asked for that?

MR. GOTTESMAN: Multiple people, multiple people asked for it. The way it comes down is, the County responded this isn't our database, we don't have it, it's not in our possession and control, and we can't answer that. Is that fair, Eric?

MR. MUNAS: Fair.

MR. GOTTESMAN: Fair response, no one is quibbling with that. From there, we have talked about -- it's been a moving target. So I sent a subpoena to ODJFS in Columbus, and I requested any SACWIS data related to Plaintiff Brendan Taylor. I issued a subpoena for that, and I filed notice of issuance of subpoena on the Pacer website, on your docket. Mr. Whittaker contends I've done something improper in doing that.

Before I yield the floor on this issue, I was contacted by an attorney for ODJFS, an assistant attorney general, her name was Nicole Moss, and Nicole informed me that it was news to me and news to the County that they no longer manage this database. It's no longer in their possession and control, and there's a new Ohio administrative agency called the Ohio Department of Children and Youth that has

responsibility to control and manage that database. O-D-C-Y, ODCY is the acronym.

I was contacted by an attorney from the Ohio Department of Children and Youth because the subpoena I had served on ODJFS had been relayed to her for handling. She told me, she says, we're not going to respond to this subpoena, and I said I think that that's fine because it's not directed to you. And then Mr. Whittaker accused me of again doing something improper and retaliating against his client. And so before doing anything else to subpoena that information, it's in his letter, and I don't think I've done anything wrong, but the accusations have been made.

MR. WHITTAKER: The issue was that the subpoena was issued before it was circulated to counsel to object to, to offer objections. Rule 55(a)(4) says before you issue a subpoena, it's got to be tendered on counsel, give them time to object; that wasn't done.

THE COURT: What's your objection?

MR. WHITTAKER: Well, the scope of the request goes to every possible -- all possible information about Brendan Taylor and SACWIS. I wanted to preserve objections based on privilege, confidentiality, that the state itself says this material is to be treated especially confidentially and especially carefully.

THE COURT: Well, before you get into that, I mean,

they may have relevant knowledge.

MR. WHITTAKER: They might.

THE COURT: So what's wrong with issuing the subpoena?

MR. WHITTAKER: There's nothing wrong per se with issuing the subpoena. It was the process by which the subpoena was issued.

THE COURT: Let's get over the process. Has the -- you're waiting to issue the subpoena?

MR. GOTTESMAN: I have not reissued it to the new agency, Judge, because --

THE COURT: Is there any problem with reissuing the subpoena to the new agency?

MR. WHITTAKER: If that's the proper target of the subpoena, then, probably not, but I still -- I wanted to have objections in the record about the scope.

THE COURT: Well, you haven't gotten to the scope yet. He's just noticing the depo.

MR. WHITTAKER: It's a records subpoena.

THE COURT: I'm sorry, it's a records request.

MR. GOTTESMAN: That's not super clear, but that's the subpoena that I sent, Judge, and it says --

THE COURT: Have you seen a copy of the subpoena?

MR. GOTTESMAN: These are all documents and records in ESI that relate or pertain to Brendan Taylor with his

date of birth and Social specifically including, but not limited to, SACWIS database information.

MR. WHITTAKER: That was the one filed and I believe rejected. I have not seen the one that was reissued.

THE COURT: He hasn't reissued it. He's waiting because you had an objection.

MR. WHITTAKER: The only objection was that it needs to be circulated so that we can object. I don't know if it's been issued or not.

THE COURT: Well, are you going to object? He's got it ready.

MR. WHITTAKER: I haven't seen the subpoena, Your Honor.

THE COURT: He's got the language right here.

MR. WHITTAKER: That's the one that was issued before.

THE COURT: But it's just to another entity, it's the same subpoena.

MR. WHITTAKER: I need to see it.

THE COURT: You can look at it.

MR. WHITTAKER: Is that the same subpoena that's going to be issued?

MR. GOTTESMAN: It is.

MR. WHITTAKER: That's what I was asking. I still

object.

THE COURT: Your objection was overruled.

MR. WHITTAKER: I was just wanting the opportunity to object, like the rule says I'm entitled to, and it's been overruled.

THE COURT: You've objected and it's overruled. You may issue the subpoena.

MR. WHITTAKER: The only other issue that I had was that the subpoena was filed with the Court putting my client's name as being implicated in an investigation with SACWIS in the record.

THE COURT: He had to name the person. How are they supposed to know who he wants records for?

MR. WHITTAKER: You don't file the subpoena, though. You don't file the subpoena until it's relevant and it comes back or if it comes up in a discovery dispute. The subpoena was filed before it was issued.

THE COURT: Pardon me, but I think it's a bullshit objection.

MR. WHITTAKER: That's what the rule says and I just wanted to preserve the objection.

MR. GOTTESMAN: He's gone on at some length, Judge, accusing me because these records are -- he said this is another offense, just like Jesse Hooven, by putting it in the record.

THE COURT: Well, I think that that's inappropriate.

MR. GOTTESMAN: Thank you.

MR. WHITTAKER: I think putting it in the record --

THE COURT: Enough, Mr. Whittaker, it's resolved.

MR. WHITTAKER: Okay, Your Honor. Okay.

THE COURT: Anything else?

MR. GOTTESMAN: I think that's it, Judge.

THE COURT: Anything else for the good of the order, anybody?

MR. WHITTAKER: Nothing, Your Honor.

THE COURT: Thank you all for being so cooperative, I appreciate it. I think we've got a schedule we can live with. I'm going to hold you to it.

MS. FECHTEL: Mr. Gottesman is going to --

THE COURT: Prepare an order.

MR. GOTTESMAN: Prepare an order.

MS. FECHTEL: An agreed order.

MR. GOTTESMAN: I might be contacting you, Lisa.

MS. FECHTEL: Counsel can sign off on it.

THE COURT: Thank you, everybody.

(Proceedings concluded at 11:20 a.m.)

**C E R T I F I C A T E**

In accordance with 28 U.S.C. Section 753, I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter prepared from my stenotype notes and that the transcript page format is in accordance with the regulations of the Judicial Conference of the United States.

*/s/* Lisa Conley Yungblut *May 18, 2026*

LISA CONLEY YUNGBLUT, RDR, RMR, CRR, CRC DATE