UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

CASE NUMBER: 1:24-CV-00204-SJD

BRENDON TAYLOR, et al., PLAINTIFFS,

vs.

JESSE HOOVEN, et al., DEFENDANTS.

* * * * * * * *

DEPONENT: SHERYL MARIE LONG

DATE: September 21, 2026

* * * * * * * *

LEE ANN GOFF

COURT REPORTER

B a r l o w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

The deposition of SHERYL MARIE LONG, taken for the purpose of discovery and/or use as evidence in the within action, pursuant to notice, heretofore taken at Cincinnati City Hall, 801 Plum Street, Room 214, Cincinnati, Ohio 45202 on September 21, 2026, at 11:06 a.m., upon oral examination, and to be used in accordance with the Federal Rules of Civil Procedure.

* * * * * * * *

APPEARANCES

REPRESENTING THE PLAINTIFFS:

Justin Whittaker, Esq.
Whittaker Law, LLC
2055 Reading Road
Suite 260
Cincinnati, Ohio 45202

REPRESENTING THE DEFENDANT JESSE HOOVEN:

Zachary Gottesman, Esq.
Gottesman & Associates
9200 Montgomery Road
Building E, Suite 18B
Montgomery, Ohio 45242

REPRESENTING THE DEFENDANT CITY OF CINCINNATI:

Shuva J. Paul, Esq.
Katherine Clarke Baron, Esq.
City of Cincinnati
801 Plum Street
Suite 214
Cincinnati, Ohio 45202

REPRESENTING THE DEFENDANTS HAMILTON COUNTY BOARD OF COUNTY COMMISSIONERS AND DEPARTMENT OF JOB AND FAMILY SERVICES:

Dmitriy Bikmayev, Esq.
Hamilton County Prosecutor's Office
2300 East Ninth Street
Suite 4000
Cincinnati Ohio 45202

REPRESENTING THE DEFENDANT PAUL:

Mickey S. McClanahan, Esq.
Finney Law Firm
635 Main Street
Cincinnati, Ohio 45202

ALSO PRESENT: Brendon Taylor

* * * * * * * *

# I N D E X


| Examination of SHERYL MARIE LONG | Page |
| --- | --- |
| BY MR. GOTTESMAN: | 5 |
| BY MR WHITTAKER: | 40 |
| BY MS. GOTTESMAN: | 74 |
| BY MR. PAUL: | 76 |


# E X H I B I T S


| Exhibit | Page |
| --- | --- |
| Long Exhibit Number 1 | 8 |
| Long Exhibit Number 2 | 8 |
| Long Exhibit Number 3 | 14 |
| Long Exhibit Number 4 | 20 |
| Long Exhibit Number 5 | 27 |
| Long Exhibit Number 6 | 36 |

SHERYL MARIE LONG

called on behalf of the Defendants, after having been first duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. GOTTESMAN:

Q. Good morning.

A. Good morning.

Q. I'm Zach Gottesman. I represent Cincinnati Police Officer Jesse Hooven in a lawsuit pending in federal court. We're here this morning for your deposition. As I said, because you're the city manager, I appreciate you taking time out of your schedule to sit for this. We'll try to keep this as brief an interruption of your day as possible; okay?

A. Okay.

Q. I'm going to ask you a series of questions. If at any point I am unclear, you're not certain that you understand what I'm asking, please ask me to clarify or rephrase. And when you answer questions, please do so using words rather than sounds or gestures. Uh-huh and huh-uh look remarkably similar on paper, even though I would understand what you meant while

we're sitting here; okay?
A. Okay.
Q. Have you been deposed before?
A. Yes.
Q. Okay. Multiple times?
A. Yes.
Q. I figured. The case we're here to discuss is Taylor, et al., versus Hooven, et al. Are you familiar with that litigation?
A. I am now, yes.
Q. Okay. What is your understanding of that litigation?
MR. PAUL: Objection. You can go ahead and answer if you can.
A. Yes. My legal team just brought it to my attention, that it is essentially a case where -- regarding the officer who did something on -- an officer who did something regarding looking at -- giving information to -- looking at information or working with somebody in the county to get some information about an ex or -- it's a very domestic issue, it sounds like.
Q. Okay. I don't want to invade your conversations with your attorneys.
A. Yes.

Q. It's none of my business; okay?
A. Yes.
Q. Okay. So do not, in response to my question, divulge any attorney-client communications.
A. Okay.
Q. That said, was that conversation you just referenced with your counsel the first -- your first notice of this case?
A. For me it was, yes.
Q. Okay. And how long ago was that conversation?
A. Just last week.
Q. Okay. Before last week, did you have any notice at all that this case was pending?
A. Other than a calendar invite regarding the deposition, no.
Q. Okay. Did you see any of the news reporting regarding this case?
A. No.
Q. Okay. Did you know that I had filed, on behalf of Officer Hooven, a third-party complaint against you?
A. No.
Q. Okay. Let me show you -- I'm going to

hand you what I've marked for identification --
A. Okay.
Q. -- as Long Exhibit 1, the First Amended Complaint and Jury Demand that's the operative complaint document in this case. Have you ever seen that before?
(Long Exhibit Number 1 was marked for identification.)
A. I have not.
Q. Okay. I brought copies just for counsel and me on this. And then I'm going to hand you what I've marked for identification as Long Exhibit 2.
(Long Exhibit Number 2 was marked for identification.)
A. Okay.
Q. And ask you, have you -- that is the Answer, Cross-Claim, and -- I should have an extra copy of that -- and Third-Party Complaint that I filed. Have you ever seen that before?
A. I have not.
Q. Okay. As city manager, are you the chief executive officer of the City of Cincinnati?
MR. PAUL: Objection. You can answer.

A. Yes.
Q. And when it comes to decisions about -- for instance, in this case, whether or not the city will defend Officer Hooven, do you understand that that's something that's subject to your authority and you can make the decision on that?
A. I understand that I have a city solicitor who would made a recommendation one way or another whether we would move forward on it and I would take their recommendation.
Q. Okay. Do you -- you told me at the beginning of this deposition that your first notice of this was just last week.
A. Yes.
Q. Had you received a recommendation one way or another from the solicitor before that?
A. I can't recall at this time.
Q. Okay. How long have you been the city manager?
A. Four years.
Q. When were you invested or whatever the ceremony is called for a city manager?
A. September 2022.
Q. Of what year, '24?

A. 2022. September 1st, 2022.
Q. Oh, forgive me.
A. Um-hmm.
Q. And before that, what did you do?
A. Assistant city manager.
Q. And how long were you an ACM?
A. Three years.
Q. And what did you do before you were the assistant city manager?
A. I was the city manager of the City of North College Hill.
Q. Okay. As the city manager, is one of your responsibilities to review decisions made by the Citizen Complaint Authority?
A. When it goes through the board. Once it passes the board, I would then get the CCA decisions on my desk, yes, to look at.
Q. And when they arrive at your desk, what is your understanding of what it is your position requires you to do with those decisions?
A. Look at the recommendations that the board may have or may not have recommended or -- the CCA director made and then whatever the board has recommended and then look at those complaints.

Q. Do you complete paperwork in that process?
A. Sometimes.
Q. Okay.
A. My schedule is -- paperwork, sometimes it's hit or miss. So some of them I may sign off on, some of them I may not, depending on what my schedule looks like.
Q. So is it possible that the CCA board makes its -- or investigator makes a recommendation, the board approves it, it ends up on your desk, and you do nothing with it?
A. Sometimes. Correct. Oh, I do nothing with it?
Q. Yeah.
A. I don't do -- it is a recommendation, so CCA is not legally binding. So they have -- they cannot tell the police department nor can they tell the city. It's just a recommendation. So at any time, whatever the CCA recommendation is, I don't have to do -- it's just a recommendation. It's just something for me to look at.
Q. Sure. So when you do create paperwork as part of your review process, what does that look like?

A. I will look at the recommendations. I will look at the case. Sometimes I'll look at the video if that's needed. And then from there I'll -- sometimes maybe will communicate to the chief and/or sometimes I'll just communicate to the CCA that I don't agree. But it's hit or miss, depending on what my schedule is. I may not get to all of those CCA recommendations.

Q. And is your understanding of this CCA process, the CCA, does it exist as an organization created by the City of Cincinnati's charter? It evaluates complaints regarding police officers; right?

A. Correct.

Q. Do you understand that the CCA is empowered to review conduct of police officers that is completely unrelated to their employment?

MR. PAUL: Objection. You can answer if you are able.

A. Can you restate that again, please?

Q. So do you understand that the CCA is empowered to evaluate officers' conduct that is completely unrelated to their employment?

A. I do think the CCA does look at things and may bring up things that may or may not be

related to their employment, yes.

Q. Okay.

A. But that does not necessarily mean that that is a -- something that has to be followed through by the police department or looked at by the police department and/or recommendation made to me to address.

Q. So to be clear -- I'm not sure I got an answer directly to my question.

Do you understand that the CCA is authorized to investigate officer conduct that's completely unrelated to their employment?

MR. PAUL: Objection. Asked and answered. You can answer.

A. Yes. What I believe is they are authorized to look at conduct. I do sometimes think that they may go outside of their lines and look at things that are unrelated to an officer's job duties. And at that time, that's when I utilize the chief and/or internal, those processes, to determine whether that's something that they should be giving an opinion on, whether they broke a rule or did not break a rule.

Q. So is --

A. It's a board, so sometimes boards go

outside their lines.
Q. Okay. So as you understand it, the CCA occasionally goes outside their boundaries of what they're allowed to evaluate?
A. Correct.
Q. And have you reviewed Mr. Taylor's complaint filed with the CCA in this case?
A. I can't recall.
Q. Okay.
A. Is there a signature? If there's a signature, then I would have.
Q. When you say a signature, do you mean your signature?
A. Yes. Correct.
Q. Okay. So I'm going to put in front of you what I've marked for identification as Long Exhibit 3.
(Long Exhibit Number 3 was marked for identification.)
A. Okay.
Q. And because this is a single page document, I brought one for everyone.
MS. MCCLANAHAN: Thanks, Zach.
Q. And City Manager Long, I'm going to ask you: Have you seen that before?

A. I can't recall, no.
Q. In reviewing Long Exhibit 3, do you see there's a box for off-duty officer?
A. Yes.
Q. And that's not checked; correct?
A. Correct.
Q. And also there's a box for off-duty detail officer. Do you see that?
A. Yes.
Q. And that is not checked as well; right?
A. Yes.
Q. The complaint, as it's presented here, the narrative describes Mr. Brendon Taylor alleged that Officer Jesse Hooven obtained Mr. Taylor's personal records from Hamilton County Job and Family Services through illicit means for Officer Hooven's personal gain. Mr. Taylor is dating Officer Hooven's ex-wife and alleged that Officer Hooven abused his authority by obtaining Mr. Taylor's personal JFS children's services records.
Do you see that?
A. Yes.
Q. When it says abused his authority, do you know what authority that complaint is

referring to?

A. I'm assuming his authority as an officer.

Q. I think that's a fair reading of it. And as you sit here now, do you understand that CCA did, in fact, undertake an investigation of this complaint?

A. Yes.

Q. Do you think this is within the purview of CCA's mandate as far as something it should investigate?

A. I think that -- can you restate that again?

Q. Do you think it was proper for the Citizen Complaint Authority to investigate this complaint?

A. I think that -- yes. Yes, I do.

Q. Okay. And is your reasoning for thinking it's appropriate because it involves an allegation of abuse of authority by a police officer abusing his police authority conferred upon him by the City of Cincinnati?

A. My understanding of why CCA should investigate this complaint, because a resident and/or a person felt that they needed to -- they

utilized the proper chain of utilizing CCA. So they should investigate all complaints that come in from those channels.

Q. Even if it's completely unrelated to employment and just a personal matter?

A. Regardless, I think the CCA is supposed to -- as a customer service, if somebody was to raise a complaint about an officer, they should definitely go through the process of their investigation.

Q. So specifically my question is -- you just said CCA should investigate any complaint brought to them by a customer? Is that what you called them?

A. Yeah. Consumer, resident.

Q. Consumer?

A. Yes.

Q. Resident? Whoever?

A. Yes. Absolutely.

Q. So using that language, if CCA should investigate any complaint brought to them by a customer --

MR. PAUL: Objection. Asked and answered. And, Zach, it sounds like you're trying to get a different answer to the question.

MR. GOTTESMAN: Not at all. I'm clarifying.

MR. PAUL: So if you don't want to withdraw it, would you want to rephrase the question perhaps, because that question has been asked and answered.

MR. GOTTESMAN: You actually didn't let me finish. Let me finish, please. Thank you.

BY MR. GOTTESMAN:

Q. If CCA should investigate any complaint brought to it by a customer, then --

A. Yes.

Q. -- there's no limits on what CCA can investigate; is that fair?

A. There are many things that are brought into CCA that CCA will potentially look at. But that does not necessarily mean that the board should have looked into those areas. So, yes, they will look at it, but it is a board. That is recommendations of the public. So when they're looking at something, it is not -- they don't -- sometimes they don't know whether it's within their threshold, whether they should be paying attention to it within their policy. So, yes, CCA will look and go pretty broad. And sometimes

it takes the director in addition to the police chief and/or whomever I designate to bring them back within their bounds. Long way of saying that.

Q. I understood. My understanding of the process is a complaint comes in?

A. Yes.

Q. And then there's the director, an investigator, and the board of the CCA; correct?

A. Yes.

Q. And the director makes the decision to assign a complaint to an investigator. Then the complaint -- investigator does the investigation; is that right?

A. Correct.

Q. And then after the investigator completes the investigation, they generate a report, they sign -- the investigator signs off on it, the director signs off on it?

A. Yes.

Q. And then the board has the ability to approve it or reject it?

A. Yes.

Q. Okay. And then if it's approved, it ends up on your desk?

A. Regard -- yes. Yes.
Q. Okay. In a situation where the complaint involves nothing to do with police authority, police work, police duties, nothing to do at all with an officer's job, it's totally personal between the complainant and the officer, is it -- would CCA investigate that complaint?
MR. PAUL: Objection. Asked and answered. You can answer.
A. Yes. CCA investigates a complaint that is made by residents.
Q. Okay.
A. And they will go through all of those complaints. Or those actions that are...
Q. Thank you. Let me show you -- here is what I've marked for identification as Long Exhibit 4.
(Long Exhibit Number 4 was marked for identification.)
Q. And I'll ask you, City Manager Long, have you seen this before?
A. I don't see my signature on it, so I would say I don't recall.
Q. Okay. There is -- the date on this is September 21 of 2023. Do you see that?

A. Yes.
Q. Okay.
MR. WHITTAKER: Zach, are there Bates numbers?
MR. GOTTESMAN: These are City 01 through 04.
MR. WHITTAKER: Thank you.
MR. GOTTESMAN: It's just --
MR. WHITTAKER: Gotcha.
MR. GOTTESMAN: Sorry.
MR. WHITTAKER: Sure.
BY MR. GOTTESMAN:
Q. This, I believe, was approved by the board in late '23 or very early in '24. I'll let you read it.
A. Yes. Thank you.
Q. Tell me when you're ready.
A. You can proceed.
Q. Thank you. It was approved by the board in either late '23 or very early in 2024. So if -- if matters took their normal course, this would have ended up on your desk in January of 2024; okay?
A. Yes.
Q. If there's been no action taken on it --

further action, as far as I understand it, because I've asked if you've signed off on it or approved it or done anything with it and the city has said we don't have anything.
A. Yes.
Q. So is it something you're still considering or is this one of those reports that's not going to get any further attention from the city manager?
A. Yes. This is -- at this moment, this would not get any attention from me.
Q. Okay. And if you look on page 3, there's a sustained finding of misconduct against Officer Hooven.
Do you see that?
A. Yes.
Q. Okay. Now, the CCA -- I've attended some meetings. I've represented some of your officers there.
By the way, do you know Officer Hooven?
A. I do not.
Q. Okay. If he was in --
A. We have a lot of officers.
Q. Yes. If he was in the room, you couldn't pick him out?

A. I would not have any clue.
Q. All right.
A. No. No.
Q. Do you have any idea about his prior history at all?
A. No. No.
Q. Any -- nothing at all?
A. No.
Q. Blank slate then?
A. Yeah. I have no clue who he is.
Q. All right. At the CCA, do you know what, if any, role Iris Roley plays with the CCA?
MR. PAUL: Objection. You can answer.
A. I believe she attends meetings.
Q. Okay. Any role beyond that?
A. No.
Q. All right. What is your -- do you have a personal relationship with Iris Roley?
MR. PAUL: Objection. You can answer.
A. She is my consultant and she will call to talk about work matters, but other than that, then no.
Q. Before you were an assistant city manager here, did you know Ms. Roley?
A. I knew of her. I had no relationship

with Iris at all.
Q. So was your first contact with her as assistant city manager?
A. Yes.
Q. Okay. And how often do the two of you communicate? Is it regularly? Weekly? Monthly?
A. I would say it's regularly. There's a lot going on in the city CPD-related, so I would say regularly. She speaks to my ACMs. Probably she speaks to my -- the chief. She speaks to everyone in the city.
Q. How many ACMs are there?
A. I have one, two, three -- I have three other ACMs.
Q. Who are they?
A. John Brazina. He deals with public safety. Cathy Bailey, she deals with public services. And Billy Weber.
Q. Okay.
A. I also have a floating one right now, Bill Vedra, because Cathy will be retiring soon.
Q. Okay.
A. But I've had also a lot of turnover in that area as well.
Q. All right. So there's a fourth one, but

he's not --
A. No. No. No. No. There's still three.
Q. Three.
A. And then you include me.
Q. Okay.
A. Yeah.
Q. And when you say Iris Roley is a consultant for you, it's my understanding she has a contract with the city to serve as a consultant?
A. Correct.
Q. What is the -- what is the scope of what she consults on?
A. It's mostly Collaborative Agreement. It's -- she also has community care initiative, which is the civilian --
Q. I'm sorry. I didn't understand that word?
A. It's community care initiative --
Q. Okay.
A. -- which it's kind of a separate contract, but it -- but she helps out with just being in that civilian role to help and support police officers. But anything regarding the Collaborative Agreement, she -- if she feels that

there is any people violating or -- or has opinions on that, she may sometimes share it.

Q. Okay. Did you say has opinions on that?

A. Yes.

Q. Okay. I'm sorry. I was unsure what you said.

A. Yeah.

Q. So the Collaborative is a document that was signed off on by the city as a result of a federal court case; correct?

A. Yes. Yes.

Q. And that -- she is, in her role as consultant, empowered to see to it that the city abides its obligations under the Collaborative; right?

A. Yes. Yes.

(Mr. Bikmayev entered the deposition.)

Q. And the Collaborative Agreement was the source for the CCA; correct?

A. Yes.

Q. So if she is in charge of or consults on enforcement of the Collaborative Agreement, that would include operations of the CCA; correct?

A. Yes.

Q. Okay. There's been testimony in this

case that Iris Roley referred Mr. Taylor and Ms. Hooven -- that's the plaintiff, by the way. I don't know if you --

A. Oh, okay. I did not. I didn't know.

Q. That's unfair. I shouldn't have dropped that on you.

But there's been testimony that Iris Roley is the person that recommended Mr. Taylor and Ms. Hooven hire counsel to pursue these claims. Would that surprise you?

A. Yes. I am not aware of any of that.

Q. Okay. And not only did she recommend that they hire counsel and pursue these claims, but specifically that they engage Mr. Whittaker?

MR. WHITTAKER: Objection.

A. I am not aware of that.

MR. WHITTAKER: Objection.

Q. As you sit here now, do you understand what claims Officer Hooven is making against the city and you?

A. No.

Q. Okay. I'm handing you what's been marked as Long Exhibit 5.

(Long Exhibit Number 5 was marked for identification.)

Q. Have you seen this document before?
A. I have not.
Q. This, I will represent to you, is the internal investigation report in case number 2023-102. It was signed off on by Police Chief Theetge on June 25th, 2023.
Do you see that?
A. Yes.
Q. Okay.
A. Sorry, I'm just familiarizing myself with the document. Okay.
Q. The allegations against Officer Hooven are set forth on page 2 at the top. Are you -- I can't see what you're looking at.
A. Page 2 at the top?
Q. That's -- it's this page.
A. Okay.
Q. Second page.
A. Oh, okay. I was looking at the page numbers. I'm sorry.
Q. Second page of the exhibit.
A. Okay. I understand.
Q. It is that paragraph where the internal reviews -- just go ahead and read the introduction section there.

MR. PAUL: I'm sorry. What page, Zach?
MR. GOTTESMAN: It's the second page of Exhibit 5. I'll give you one.
MR. PAUL: I had one.
MR. GOTTESMAN: Excuse me. I'm sorry. I brought you a copy.
MR. PAUL: Thank you.
THE WITNESS: Okay. I read the top.
BY MR. GOTTESMAN:
Q. Okay. So one of the allegations Mr. Taylor was advancing was that Officer Hooven illegally queried Mr. Taylor using a law enforcement database.
Do you see that?
A. Yes.
Q. Would you agree with me that that has a direct connection to Mr. -- Officer Hooven's employment as a Cincinnati police officer?
MR. WHITTAKER: Objection. You can answer the question.
A. It says it's a law enforcement database, so I would assume that he has the -- yes, I guess, the law enforcement database.
Q. Yeah. I mean, it says what it says.
A. Right.

Q. Would you agree with me that that's a direct --

A. That's something police officers can, I guess -- well, people in law enforcement can access, yes.

Q. And Officer Hooven, being a law enforcement officer --

A. Yes.

Q. -- that would be a direct connection to his employment; correct?

A. He has access because he is a -- he is in law enforcement, so...

Q. Okay. And do you recognize that as a Cincinnati police officer, Officer Hooven works with multiple other law enforcement agencies?

A. Yes.

Q. Okay. For instance, he could work with a federal law enforcement agency?

A. Yes.

Q. Sometimes the Cincinnati police coordinate with ATF, Alcohol, Tobacco and Firearms; right?

A. Yes.

Q. They coordinate with the FBI?

A. Yes.

Q. They coordinate with the Secret Service?
A. Yes.
Q. They can coordinate with the IRS and the treasury department?
A. Yes.
Q. And they also coordinate with other local law enforcement agencies, like the Hamilton County Sheriff; right?
A. Yes.
Q. And the Ohio Department of Job and Family Services, Child Welfare Division; right?
A. Yes.
Q. And those interactions by Officer Hooven, if he were to have those, that would be a direct connection to his employment; correct?
A. Yes.
Q. Okay. Are you aware of a database maintained by the Ohio Department of Children and Youth that's confidential and deals with allegations of abuse, neglect, dependency?
A. I'm not aware of that specific database, but I would imagine it is stored somewhere.
Q. Okay.
A. Yes.
Q. And do you know whether or not the

Cincinnati police have access to it?
A. I don't know --
Q. Okay.
A. -- that information.
Q. In your role as the city manager, do you have final executive authority over discipline for Cincinnati police officers?
A. Yes. I feel like it's a little complicated question. I don't get all of the -- to sign off on situations. It usually lies at the police chief. I can't recall their disciplines coming to my desk all the time. Actually, I can't recall the last time I signed off on a police matter at this moment.
Q. If -- let me ask it this way: If a police officer had engaged in misconduct and you thought it was appropriate to terminate that officer because of that misconduct, but instead the officer was just -- was given a lesser discipline, would you be able to contact the chief and say, I want that officer fired?
A. If it was brought to my attention, their -- I'm sorry. I may sound -- but there's some times when I can intervene or will have an idea of something that meets that threshold, but

it's not all times. So I'm just -- so I could, in some situation where it hits the threshold, say I don't agree with it. But I don't get that -- it mostly lies with the chief.

Q. It would be a pretty rare occurrence?

A. Correct. Yes. Yes.

Q. An extreme situation?

A. Yes. It happens.

Q. I'm not suggesting this is that situation.

A. Yes.

Q. But when it comes down to it, I mean, as the city manager, you're the top of the pyramid. You are the person with the top executive authority --

A. Correct.

Q. -- in this city?

A. Yes.

Q. And that would include personnel matters, including termination for discipline if appropriate?

A. Yes. It's a group project and I have directors who -- but ultimately it will be me --

Q. Okay.

A. -- that you'll see on the paper.

Q. That's what I was getting at.
A. Yes.
Q. Okay. So are you familiar with the term ESL insofar as it deals with police personnel?
A. I am not.
Q. Okay. If you look at the top sheet of Exhibit 5. That's it, you have it in your hand.
A. I've got it.
Q. Go to the front page.
A. Okay.
Q. Have you come to recognize Chief Theetge's initials or writing?
A. Yes.
Q. Do you see in the upper right-hand corner there's some handwriting?
A. Yes, I see.
Q. Do you recognize that as Chief Theetge's handwriting?
A. I -- well, I see her initials underneath this so I'm assuming it is, but I don't recognize the handwriting.
Q. So in this case it's not been disputed that Chief Theetge had put that handwriting on there. And if -- can you read it or would you like me to read it to you?

A. I think I can.
Q. Okay. Tell me if you have any problems reading what's there; okay?
A. Yes. Documented in ESL, yes.
Q. Okay. Do you see how she used the term ESL there?
A. Yes.
Q. Do you know what that refers to?
A. I don't.
Q. Have you ever heard the term employment supplemental log?
A. I have not, but you're educating me on something. What is an employment supplemental log?
Q. Well, my understanding is that -- and I'm not sure you should take it from me, I think there's other people you might want to ask.
A. Okay.
Q. But the employment supplemental log is a notation in an employee's personnel file, for lack of a better term --
A. Okay.
Q. -- that reflects training or incidents or counseling that may have occurred.
A. Okay.

Q. Okay. I think that's a fair definition.
A. Okay.
Q. In furtherance of that definition, I'm going to hand you what I've marked as Long Exhibit 6.
(Long Exhibit Number 6 was marked for identification.)
Q. Tell me when you've had a chance to review that.
A. I have read it.
Q. Have you seen that before?
A. I have not.
Q. All right. Well, I'll represent to you that this was the ESL meeting written instructions by Captain Amanda Caton and Lieutenant Robert Wilson as directed by Chief Theetge in that handwritten note we just saw on Long Exhibit 5.
A. Okay.
Q. Okay?
A. Yes.
Q. If you read the activity summary, it says: On July 7th, 2023, Officer Hooven met with Captain Caton and Lieutenant Wilson at the Chief's request to discuss some of his recent

decisions. Officer Hooven was open to suggestions made to him during the discussion and was reassured that the department wants him to succeed in his role. Actions taken: Instructed.

Do you see that?

A. Yes.

Q. Okay. Now, when you're -- do you agree with me that being a Cincinnati police officer is a position of trust?

A. Yes.

Q. Okay. And the city gives its police officers authority to act on behalf of the city in enforcement of the law?

A. Yes.

Q. Okay. And because of that, those officers are held to a higher standard of conduct than some other city employees?

MR. PAUL: Objection. You can answer.

A. For me, I would say that I hold all employees to a higher level of conduct.

Q. Okay.

A. So I wouldn't say it's just police officers.

Q. So you hold all city employees --

A. Yes.

Q. -- to the same level?
A. It's pretty high. I think they --
Q. Okay.
A. -- are annoyed with me. It's pretty high. And it's not just the police department, but...
Q. Fair enough. Then let me ask you this: If the -- if an officer engages in conduct that's completely personal, has nothing to do -- not a violation of the law, not the subject of a complaint, just something he's doing in his personal time, a hobby, for instance, that is disfavored by the city, is that appropriate for the city to document with an ESL?
A. If it's a hobby?
Q. Yes.
MR. PAUL: Objection. You can answer.
A. I don't know what CPD personally has done in the past, but if it's a hobby, I don't -- I don't see why it would be documented in an ESL, no.
Q. Okay. So then you'd agree with me there are some limitations on what are appropriate for the ESLs?
A. Yes. I mean, if you are, yeah, golfing

and hit somebody -- I mean, not hit, but like I -- yeah, when I think about hobby...

Q. Sure.

A. So yeah. Yes.

Q. In other words, for an ESL to be appropriate, it has to have some connection to employment?

A. Yes. Yes.

Q. Okay. Do you know how much discipline goes across the chief's desk in a given month?

A. It's a lot.

Q. It's a lot, isn't it?

A. Yes.

Q. And you don't review all that, do you?

A. I -- no. No.

Q. Do you trust the chief to make those decisions on behalf of the police department?

A. Yes.

Q. And that's -- same for Chief Hennie -- Interim Chief Hennie as it was for Chief Theetge; correct?

A. Yes. Yes.

Q. When it comes down to the actual nuts and bolts of the allegations brought by Mr. Taylor and Ms. Hooven against Officer Hooven and

the city, do you know what those allegations are?
A. I do know it's a lot. It's a very complicated and interesting matter. So I, I -- it is not something that's retained to memory.
MR. GOTTESMAN: All right. City manager Long, I appreciate you taking the time to answer my questions. And I am going to tender the witness.
Do you want to switch chairs.
MR. WHITTAKER: It's up to you. It looks like you're camped out, settled there.
MR. GOTTESMAN: I'm mobile.
THE WITNESS: Thank you. Nice officially meeting you.
MR. GOTTESMAN: Nice to meet you.
CROSS-EXAMINATION
BY MR WHITTAKER:
Q. Good morning, ma'am.
A. Good morning.
Q. My name is Justin Whittaker. I am the attorney for Brendon Taylor in this case. And I'm going to follow up on a few --
MR. PAUL: The plaintiff.
A. Okay. Got it.
Q. Yes. Sorry.

A. Thank you.

Q. I'm going to follow up on a couple of things Mr. Gottesman asked about. There's been allegations in this case, and I think mostly by me, that Former Chief Theetge had the ultimate say on the outcome of any police -- internal disciplinary matter within the police department affecting a police officer. Am I wrong about that, that the city manager's office has the ultimate authority over disciplining police officers?

A. I think, as I mentioned, there is -- while I'm -- my name would be the one that gets, you know, kind of in that blank, there is not everything that comes to my level.

Q. Okay.

A. There are certain incidents that may come to my level that I may be asked to chime in. But what that HR procedure is, the majority of them go at the chief's level.

Q. Okay. So is it your position or your understanding of your disciplinary authority that it's an HR matter?

A. Correct.

Q. Is it your -- I think I understand your

testimony to be that there are certain situations in which you may have the final decision, but those are rare?

A. Correct.

Q. What would make that, in your -- in your mind and your position, what would make a situation that you have the final decision-making authority? What -- what would qualify for that versus just a regular HR matter as you put it before?

A. I would want to make sure I verify with HR, but there is -- I believe in some situations, if it's an assistant chief maybe, that will come to me to be able to have some say so, depending on what that level of issue is.

Q. So a disciplinary action involving an assistant chief?

A. Yeah.

Q. Okay.

A. Things -- people that ultimately I have the final say in hiring.

Q. I see.

A. That would be -- that would come to me.

Q. Okay.

A. Or we have to -- you know, that I have

some input on.
Q. Okay.
A. But I would verify with our HR on what that looks like.
Q. So there are certain city employees, for example, assistant chief --
A. Yeah.
Q. -- who you have direct hiring and firing authority over?
A. Correct. Correct.
Q. At what level below assistant chief does your hiring and firing authority end?
A. It -- well, the only ones I really have -- captain and below -- I mean, assistant chief. Captain and below, the chief pretty much --
Q. Okay.
A. -- they appoint themselves through processes. But, again, I want to verify with HR, because I'm tagged in accordingly.
Q. Sure.
A. So but, yeah, I have -- in the police department I have assistant chiefs and chief --
Q. Okay.
A. -- and executive assistant chief.

Q. Okay. The chief -- does Former Chief Theetge, currently Interim Chief Hennie --
A. Yes.
Q. -- interim chief, they have the authority in the room to appoint and assign their own subordinates?
A. Correct.
Q. Do you have oversight over that?
A. I do not.
Q. Okay. But you have hiring and firing authority?
A. Over those, there probably is a way for me to have that. But they do not -- I'm not -- I'm not consulted --
Q. Okay.
A. -- on any of those picks, to be quite honest. I'm given an FYI, these people will be the next captain, at times.
Q. Gotcha.
A. But I am not consulted in that process.
Q. Do you ever -- who do you get the FYI from?
A. Usually the chief will give me the heads-up because captains and -- they're all moving from different districts.

Q. Right.

A. So if there is a lot of moving around or if somebody is going to be the captain of this, he will give me a heads-up of what is going on there.

Q. And do you review those?

A. I don't review, but I just -- I'll get the FYI. I trust that they have the knowledge to know who needs to be where. And I'll just say okay, I support it.

Q. As city manager, you have the authority to hire Mr. Kennedy?

A. Yes.

Q. Okay. And I think, as you discussed with Mr. Gottesman, Brendon Taylor's complaint to CCA went through the investigation process and there was a sustained finding against the officer's conduct alleged in that complaint; right?

A. Yes.

Q. And that finding came to you after the CCA made it and sustained it; correct?

A. It was on my desk.

Q. It was on your desk. And I don't remember -- would that have been January of '24?

A. That's what the document said, yes.
Q. Okay. You don't have any independent recollection of whether that was January '24 or February?
A. I do not.
Q. Okay.
A. I do not.
Q. And you've never seen the CCA's recommendation?
A. I can't recall, no.
Q. Okay.
A. I -- there's a lot that has hit my desk that I may or may not have gotten the opportunity to --
Q. Sure.
A. -- see.
Q. Sure. Do you have any reason to dispute the CCA's finding?
A. I would have to look further into it to actually evaluate it and see it for myself, so...
Q. But as you sit here today, you don't -- you're not familiar enough to say one way or another?
A. Correct.
Q. Is there any information that you would

need to have to satisfy yourself that you had enough information to say one way or another?

A. The process would be probably for me to look at the internal thoroughly, look at CCA thoroughly, the interview thoroughly, and then go from there and make a decision one way or another.

Q. And what is your decision-making authority over a sustained complaint?

A. I -- only thing I can -- because the CCA does not have any legal binding, that was something established in the Collaborative Agreement. What I could do is I could go, if there was a sustained finding and I saw something that I supported or not, then I would usually send communication to the chief.

Q. Okay.

A. And say, okay, I recommend that we look at this or we need to do additional training. That has happened recently, recently.

Q. It has happened?

A. Recently, yes.

Q. Could you, without breaking any confidentials or privileges, could you tell us about the recent --

A. Yes. For instance, Chief Hennie handles CCA investigations a lot differently than previous, so if it would come through me, then I would send a memo that would just say -- say, for instance it's discourtesy or needs new training. I'll say, I recommend -- I support CCA and that they have more customer service training or deescalation. And then he would -- he would -- he, in some cases, will give me a heads-up and say, yes, I will move forward with that.

Q. So is the difference because it's Chief Hennie who is the one making the recommendation?

A. I think it's -- well, the difference is we also have a different director now, John Kennedy.

Q. Right.

A. I think this was a different -- so they have a great relationship together with the CCA.

Q. Right.

A. So I think it's just a better funnel of information coming through now --

Q. Okay.

A. -- with the new director, the chief, like everybody working together.

Q. So --

A. And they're now caught up, so I'm not getting 50 billion cases at once, too.

Q. Right.

A. So it helps a little bit.

Q. And at the time of January '24, that was not the case?

A. Correct.

Q. The relationship between CCA and then Chief Hennie was, what, not as amicable?

A. Well, it would have been Chief Theetge at that time.

Q. Theetge. I'm sorry.

A. Yes, and it wasn't -- they didn't have a great working relationship.

Q. Okay. Have there been instances -- you said that you could review a file and the interviews and the investigation and video, if there is any, to decide for yourself whether or not a sustained -- a sustained finding should be approved or not approved. Is that the right terminology?

A. Yes.

Q. You approved --

A. I have seen that in the past where -- I wouldn't -- I wouldn't -- I think it's -- we've

had three CCA directors.
Q. Since you've -- during your tenure?
A. Yes.
Q. Okay. That's four years; right?
A. Four years, yes. And there have been some CCA directors where it's -- when you're reading it you're like, what are we doing?
Q. Okay.
A. I mean, like what are we doing here? So sometimes you would communicate, like --
Q. Okay.
A. -- this is, probably, ridiculous. What are we doing?
Q. This wasn't one of them though?
A. No. No.
Q. I guess my question is: If it comes to your desk, and assuming that you are familiar with the case, you're satisfied that you were familiar with the situation and you wanted to take further action, what would your next step be?
A. My next step would be to probably either tag in law.
Q. Does that mean alert?
A. Yes. Solicitors, yeah.

Q. I've gotcha.
A. So I would create a memo.
Q. Okay.
A. That maybe even would tag in law.
Q. Okay.
A. Would tag in the chief, and I would give direction on what I want to happen moving forward.
Q. Have you done that before?
A. I have done that before.
Q. About how many times in four years?
A. It's just been recent. I would --
Q. Just recently --
A. Just recently.
Q. -- because of Kennedy-Hennie?
A. Yes. Yes.
Q. Okay. Same thing about if there was an exonerated finding that came from CCA and you thought differently, would you engage the same process of bringing in the law department, the chief, to say --
A. Yes.
Q. -- I want to take a different look at this?
A. Yes.

Q. Has that happened before?
A. The exonerated cases? Usually we're pretty much on the same page with exonerated.
Q. Okay.
A. I don't recall seeing an exonerated.
Q. Okay. So an exonerated case doesn't come to your desk at all?
A. It does.
Q. Okay.
A. But I don't recall. Maybe there was -- I'm trying to think. Yeah, I don't recall on exonerated. I'm usually going through and seeing where we are -- like to look at sustained. The unfounded and exonerated --
Q. Yeah.
A. -- I'll bleep over it, but I pay more attention when it's sustained.
Q. Do you meet with Mr. Kennedy regularly?
A. No. He goes through my assistant city manager.
Q. Who is that?
A. John Brazina.
Q. Spell Brazina?
A. B-R-A-Z-I-N-A.
Q. And does Brazina report back to you on a

regular basis about his meetings with Mr. Kennedy and anybody else from CCA?

A. Only on things that he wants to make sure he keeps me updated with, but not necessarily -- if there's board issues or if there's, I don't know, conflicts that are arising between CPD and the director, he'll give me heads-up on those.

Q. And he'll keep you apprised of things that he thinks you need to know?

A. Yes.

Q. And you felt -- fair enough that you've let him know that if these kind of things come up, please let me know?

A. Correct.

Q. And then has he come to you with situations that you didn't know about that he thought you needed to know about?

A. Recently?

Q. Yeah.

A. Regarding CCA?

Q. Yes.

A. Yes. I think the only -- yes, there's been some updates that he's provided me.

Q. And you want to be kept apprised of

presumably what he updates you on and what you have asked him to update you on?
A. Yes.
Q. What action do you take if Brazina comes to you and says, maybe you should look at this exoneration or sustained finding of the CCA?
A. That has not happened.
Q. Okay.
A. And I can't even recall that -- now, he does go to the board meetings, but that has not happened.
Q. He goes to every board meeting?
A. Yes. As of recently, since he's become assistant city manager, he has.
Q. Okay. And he goes to every board meeting?
A. I mean, since he has reported to -- CCA has reported to him, he has.
Q. Okay. When did that happen?
A. Just recently. I think John Brazina has been ACM over CCA over a year.
Q. Okay. What was the -- what was the arrangement before that? Was there a different assistant or was it --
A. Cathy Bailey --

Q. Okay.
A. -- was the -- for a blip. Not long. I told you we have a -- I have a lot of moving around.
Q. Yes.
A. She -- I think she attended the meetings. And then prior to that --
Q. Weber?
A. No. He never -- he doesn't deal with public safety at all. So prior -- we started having, because there was a lot of conflict going -- when it -- I mentioned taking things to the board. So we wanted to try to help and support the CCA directors --
Q. Okay.
A. -- and CPD with the board.
Q. Gotcha.
A. So I started making my ACMs go to the meetings.
Q. I see. About a year ago?
A. Yes.
Q. Or a little more than a year ago?
A. Yes.
Q. You yourself don't go?
A. I've only went to two. I can't do it.

Q. Are they monthly?
A. Yes.
Q. When someone from your office goes to the board meetings, they are there as your representative; right?
A. Yes.
Q. As the -- or, more fairly, a representative of the office?
A. Yes.
Q. At your behest and direction?
A. Yes.
Q. Okay. Mr. Gottesman was asking about whether or not -- let me scratch that.
You were the person who authorized the hiring of Mr. Kennedy; right?
A. Yes.
Q. Does he serve at the pleasure of the city manager's office?
A. He does.
Q. There's no term or anything like that?
A. No.
Q. Is there a contract?
A. No.
Q. Okay. Would you agree with me that when the CCA makes a finding, whether exonerated or

unsustained or -- exonerated or sustained, that that is an official formal act of the city?

A. I think that's a little bit of a stretch, because the CCA doesn't have any legal like oversight, like legal requirement for the city. So it's -- no, I think it's not until it comes to my desk and I officially sign off and/or give a recommendation that it's official.

Q. Okay.

A. CCA is a board.

Q. Right.

A. And the director gives recommendations.

Q. Sure.

A. So until that whole process goes through and then I then follow through and say I agree one way or give direction, that is when it becomes official. But until then, no.

Q. CCA has subpoena authority, doesn't it?

A. They tried. That would have to be something -- I know in the past they've tried to use the subpoena, but I don't know if we've ever been able to get that resolved as far as legally whether somebody has to or not. I know they can investigate, like the police departments have to talk to them in a way.

Q. So they do have authority?
A. But they have authority in the investigation, yeah.
Q. And they have authority to compel police officers to come --
A. Yes.
Q. -- and make statements?
A. Yes.
Q. They have authority to compel the leadership to attend meetings?
A. That's -- well, they -- they can request. But just an example is, recently the police officers -- for instance, they wanted the police officers to go to the meetings in person. We had police officers on Zoom.
Q. Okay.
A. The chief basically said --
Q. Which chief?
A. Chief Hennie.
Q. Okay.
A. Said that if your CCA board members come to the meetings in person, all of them, then I'll have my officers go to them in person; right?
Q. Okay.
A. So he's still -- so even though that

request was made, you know, they said I'm not -- the chief said, I'm not doing this until this happens.

Q. Okay.

A. And then that started happening. So it's -- it's -- that goes to the relationship; right?

Q. Yeah.

A. Just the -- so they don't really -- they have authority in a sense, but they can't force the chief to do...

I just broke a nail.

Q. Oh, no. Do you need to take a break?

A. No.

Q. I don't want you focused on --

A. I am so sorry. All right. Go ahead.

Q. But you would agree with me that the CCA is a creature of the city charter; right?

A. It is a creature of the Collaborative Agreement. Is it in the charter?

MR. PAUL: Only answer if you know.

A. I feel like this is a -- I can't recall if it's in the charter. I do know it's in the Collaborative Agreement.

Q. And --

A. I mean, yeah, in the Collaborative Agreement.
Q. And Mr. Kennedy is a city employee?
A. Correct.
Q. He reports not directly to you but to your office?
A. Yes.
Q. You hire and fire and he serves at your pleasure?
A. Yes.
Q. The board as well; correct?
A. The mayor appoints.
Q. The mayor appoints. Okay. And Mr. Kennedy has a staff?
A. He does.
Q. And they are also city employees?
A. Yes.
Q. So my question is not whether the city -- or, I'm sorry, CCA has the authority to act on its on recommendation or act on its own investigative authority to take action against a police officer or to say that X result must happen with a police officer, but it is still an official finding of the City of Cincinnati; right?

MR. PAUL: Objection.
Q. By virtue of it coming from an agency. CCA is a city agency; right?
MR. PAUL: Objection. You can answer if you're able to understand the question.
A. I -- yeah, I understand. I just -- it is a -- CCA is an agency on behalf -- an agency that is by way of the Collaborative. Sorry, I'm mathematically...
Q. Do what you've got to do.
A. Doing the process.
Q. Do it however you want.
A. That makes recommendations --
Q. Yeah.
A. -- on behalf of the city --
Q. Yes.
A. -- regarding officer conduct.
Q. I think we agree that CCA has the authority and the ability to make a recommendation to you?
A. Yes.
Q. And that only you have the authority to approve or disapprove of that recommendation?
A. Correct. Yes.
Q. That said, it is still a recommendation

of a city agency to your office?
A. Yes.
Q. Okay. But your office is not a blank -- you don't just rubber stamp what the CCA findings are?
A. Correct.
Q. Understanding that you have a high volume of information from them that you have to sift through and you might not read all of the recommendations -- is that a fair characterization? You just don't get to them all?
A. Correct.
Q. What is the status of a recommendation that has neither been approved or disapproved by you?
A. By me?
Q. Or your office or whomever -- whatever the procedure is?
A. I can't answer that right now, but I will tell you, like I have -- there are stacks from previous city managers that I inherited. I think -- I don't know what their number is right now as far as what I have not signed off on recently.

Q. I think I asked my question poorly.
If the status -- if you have not approved it or disapproved it, any complaint, what status does that recommendation from CCA have?
MR. PAUL: Objection. You can answer if you can.
A. Yeah. I think it's just a recommendation.
Q. Okay.
A. It is just -- it's sitting there as a recommendation from CCA.
Q. Then what impact does your approval or disapproval have over this recommendation, one way or the other?
A. Yeah. When I then move forward and I say, okay, I support what the CCA has done and give that to the chief, the chief will then do -- make his officers do further actions; right?
Q. Okay.
A. So that takes it fully across the finish line. So it's just a state of limbo then until I say, yeah, okay. And then there's a recommendation tied to it. Now, sometimes CCA, they may do a sustained or not and they won't put

a recommendation.
Q. Okay.
A. If there is a recommendation tied to it, which I've seen more recently, then I can -- it gives me a specific recommendation which I then take from a -- somebody, the director, who -- and/or investigator who has a subject matter expert. And then I can move forward and say I support that.
Q. Okay.
A. So if this sustained is just sustained, I'm not going to assume that this is what I think that -- without any recommendation, I'm not going to just prescribe something.
Q. I see.
A. I would not.
Q. Without a recommendation, you don't perceive a signal for you to take any further action?
A. Correct. Yes.
Q. Because if you're not getting a recommendation about what to do, what are you supposed to do?
A. What am I supposed to do, correct.
Q. But when you do get a recommendation and

say you do follow up with the chief, your word is final?
A. Yes.
Q. Either way?
A. Yes.
Q. It's not optional for the chief?
A. Yes.
Q. You're agreeing with me that it's not optional for the chief?
A. When I give a recommendation to the chief, he's then --
Q. Or instructions or whatever?
A. Or instructions, they should be moving forward with direction.
Q. And can you recall instances in which that's happened?
A. Recently, yes.
Q. Okay. Could you describe the situation?
A. Yeah.
Q. What type of case?
A. Yeah. Yeah. It was an issue where officers went to a park. And it was two of them, I believe. And there was a lot going on. And the officers, in my -- the CCA said that there was -- brought up some taunting and verbal

stunning, but not really verbal stunning, kind of --

Q. Who was doing the taunting?

A. The officers were -- they were getting annoyed, you could tell the level of annoyance from the people in the park.

Q. Okay.

A. They weren't necessarily following their orders. And I felt that the officers -- the CCA recommended that there should be some customer service deescalation, because they were doing a little bit more verbal back and forth than what they should have been.

And my opinion was I supported that because I was concerned about officer safety, because it was clear that there was more residents than there was the officers. And I'm like, we should just -- we need to give them further deescalation and customer service training.

Q. Okay.

A. So that was the recommendation that came from CCA, that they should have deescalated and that they weren't being customer service or whatever -- discourtesy. And then they gave the

recommendation of further training. And I went to the chief and I said, yes, please try to give -- I think this is appropriate. We need to do further training. And then the chief said that there's already training coming up, I'll make sure that I assign them to that training.

Q. Okay. And you mentioned the phrase customer service. I'm just wondering where that phrase -- is that your phrase?

A. That's my phrase.

Q. Okay.

A. That's my phrase. It's discourteous and I can't think -- discourtesy and I can't think of what the other finding was.

Q. Are you aware of a memorandum of understanding between the CPD and Hamilton County Prosecutor's Office regarding the sharing of confidential information involving child welfare abuse and neglect cases?

A. I am not, no.

Q. Are you aware of any other memoranda of understanding between the City of Cincinnati and any other agency?

A. I've never seen them, but I would imagine that we would have, you know, some type

of MOU to say how we are to work with each other.
Q. But you've never seen them in particular?
A. No.
Q. Okay.
A. The only one I've seen, I take that back, was when we were working with the troopers in the state. The state came in to get the MOU.
Q. Recently?
A. Yeah, probably last summer. That's the only MOU that I've ever been intimately involved in.
Q. Was that because it was prepared then -- prepared at that time under your tenure or --
A. Yes. Yes. Well, no. It's only because it was a -- it was a different circumstance.
Q. Right.
A. And we just wanted to -- it was an added layer of due diligence.
Q. And that's the only one you're aware of?
A. Yes.
Q. As far as you understand it, is it appropriate for police officers -- police officers to accompany or meet caseworkers from Hamilton County Department of Job and Family

Services, if called upon, to help with whatever service the county needs them to do?

A. If that is in their MOU the way it happens, then, yes, I would assume that that would be appropriate. And I hesitate because I know my assistant city managers, for instance, may be meeting at that level, so it would be higher level. So I don't know how that organization will work.

Q. Let me give you a better example. In this case there's been testimony that a Job and Family Services worker needed to go -- was looking for some children who were evidently reportedly at a hotel over on Central Avenue.

A. Okay.

Q. And she didn't know the circumstances of what was going on there, so she called the police and Officer Hooven met her there.

A. Okay.

Q. I believe Officer Hooven and a couple of other officers. It's my understanding that they were there essentially for safety and to accompany the Job and Family Services worker.

A. I understand.

Q. Do you understand that kind of thing to

be appropriate?
A. Yes. Yes.
Q. And within the -- within the duties of police officers?
A. Yes.
Q. Are you aware of that happening in other circumstances?
A. No.
Q. Okay.
A. But I would imagine that that makes sense.
Q. Okay. And at the time this was an ongoing case in which the Job and Family Services worker and Hooven kept in contact about the case. And they exchanged their personal cell phone information and they kept in communication about the case. Is that appropriate --
MR. PAUL: Objection.
Q. -- as far as you understand between a police officer and Department of Job and Family Services worker?
MR. PAUL: Objection. You can answer.
A. I, I don't -- I don't know what -- I don't know what is -- is their policy on being -- on what that is, so I can't speak to somebody's

policy.
Q. What is the city's policy?
A. But if it's written in the policy and they're following through on policy, then I would say it would be appropriate.
Q. Okay. I understand that you can't speak to county policies, but is there a city -- particular city policy?
A. I don't know. That would lie with the chief on whatever that policy -- and I don't know at this level.
Q. Okay. As far as the decision of whether or not to assign a defense to Officer Hooven in this case, that decision is yours to make?
A. It would be the --
MR. PAUL: Could you repeat the question? I couldn't -- I'm sorry.
Q. As far as the decision of whether or not to supply a defense to Officer Hooven in this case from the city, that decision is yours?
A. I would follow whatever recommendation my solicitor provides to me on that.
Q. Okay. But that -- the buck stops with you on that?
A. Yes.

Q. Okay. It doesn't go through an assistant?
A. No.
Q. You personally -- you alone can make that decision?
A. I can make that decision with the recommendation of my solicitor.
Q. With the recommendation. Is there a situation in which you would not follow the recommendation of the solicitor's office?
A. I am not a lawyer so, no, there is not.
Q. You rely on the solicitor's office?
A. I rely on the solicitor's office, yes.
Q. So is the recommendation or the findings of CCA with respect to Brendon Taylor's complaint, is that still an open case?
MR. PAUL: Objection.
Q. Or an open -- yeah, an open case?
MR. PAUL: Objection. You can answer if you know.
A. I think, because it went to the board, it's done with CCA.
Q. Right.
A. They've done their job.
Q. Right.

A. But as far as me, again, I have other city manager stuff that I refuse to sign off on, so it's in this state of purgatory going on right now that we really don't have a definition to.
Q. Okay. So it --
A. It's a sustained finding.
Q. It's a sustained finding of the CCA --
A. Yes.
Q. -- without a resolution from your office?
A. Correct.
Q. And you've described that as a state of limbo?
A. Yeah.
Q. And maybe that -- you know, maybe state of limbo isn't the legal terminology, but as far as its current status, it is unresolved by your office?
A. Yes. It is -- it is -- all of those cases, if they don't have my signing, they are sitting -- they are unresolved by the city manager.
Q. Okay.
A. Yes. Yes.
Q. And is there a time line in which -- do

you understand if there is a time line for you to make a decision yea or nay about a finding of the CCA?

A. I don't think so. Or at least because there's so many that's out there from previous city managers. If that was the case, then we would never make that deadline.

Q. Okay.

A. I think I'm the first city manager that has even addressed any of these reports, so, no.

Q. Your office is in this building?

A. Yes.

Q. Mr. Kennedy's office is not in this building though?

A. Correct.

MR. WHITTAKER: And that's all I have. Anyone else?

MR. GOTTESMAN: I have two questions.

MR. PAUL: Do you want to go on break?

MR. WHITTAKER: I'm sorry. We can take a break.

THE WITNESS: No, I'm just trying to go through.

RECROSS-EXAMINATION

BY MS. GOTTESMAN:

Q. City Manager Long, I'm going to stay down here.
Mr. Whittaker just asked you, is it -- is it final? Is there a time line? You said it's in limbo. Should anyone expect any further action on the Taylor CCA complaint against Officer Hooven?
A. From my office?
Q. Yes.
A. I would probably consult with legal at this moment on what they would want me to do with this, considering there's the potential active litigation going on.
Q. As you sit here now, do you have any intention on signing off on it?
A. I do not. I'm moving forward with the future.
Q. Then Mr. Whittaker asked you another question about the determination of whether or not to provide a defense to Officer Hooven. And you said you'd rely on your solicitor for that analysis; correct?
A. Yes.
Q. As you sit here, do you know what criteria would be evaluated in making that

determination?

MR. PAUL: Objection. You can answer.

A. What I would say is I do not know what my solicitors are using. They would just come up with a recommendation.

MR. GOTTESMAN: Okay. That's it. Do you have questions?

MS. MCCLANAHAN: I have nothing.

MR. BIKMAYEV: I have nothing.

MR. PAUL: Let's take a break.

(Brief recess.)

DIRECT EXAMINATION

BY MR. PAUL:

Q. So City Manager Long, I just -- I want to take you back to something Mr. Gottesman asked you about in his examination. He said for an ESL to be appropriate, it has to have some connection to employment, to which you said or responded yes. And I would ask you if you could elaborate.

A. Yes.

MR. GOTTESMAN: Objection.

MR. WHITTAKER: Same objection.

MR. GOTTESMAN: Go ahead. I didn't mean to interrupt you.

A. Okay. No problem. Yeah, as a city

employee, I know that my people have access to a lot of information. And it's important that they utilize that information responsibly, so there is what you're doing as business and what you're doing as personal. So you just have to be able to understand those differences and utilize them appropriately. So in those cases, in my mind, with the ESL, if something is used inappropriately, you should be understanding that -- you should understand when to -- when to switch off your business hat and when to put on the personal hat.

MR. PAUL: No further questions.

MR. GOTTESMAN: Does your client need you to explain signature to her? I am ordering this and not on a rush basis. I have no further questions.

MR. PAUL: We will review and sign.

(Witness excused.)

(Deposition concluded at 12:37 p.m.)

_______________________________ ________

SHERYL MARIE LONG DATE

State of Ohio )
)
)

I, Lee Ann Goff, Notary Public in and for the State of Ohio, do hereby certify:

That the witness named in the deposition, prior to being examined, was by me duly sworn;

That said deposition was taken before me at the time and place therein set forth and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF I have subscribed my name and affixed my seal this 5th day of October, 2026.

______________________________

Lee Ann Goff, Notary Public

Commission Number: 2019-RE-791489

My Commission Expires: 8/26/29