IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BRENDON TAYLOR, et al., | : | |
| Plaintiffs, | : | Case No.: |
| vs. | : | 1:24-CV-00203-SJD |
| JESSE HOOVEN, et al., | : | Judge Dlott |
| Defendants. | : | |

* * * * * * * * *

DEPONENT: Amanda Caton

DATE: October 1, 2026

* * * * * * * * *

Kristina L. Laker

Court Reporter

BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

The deposition of AMANDA CATON taken for the purpose of discovery and/or use as evidence in the within action, pursuant to notice, heretofore taken at City Hall, 801 Plum Street, Room 338, Cincinnati, Ohio, on October 1, 2026, at 10:00 a.m., upon oral examination, and to be used in accordance with the Federal Rules of Civil Procedure.

* * * * * * * *

APPEARANCES

REPRESENTING THE PLAINTIFFS:

Justin M. Whittaker, Esq.
WHITTAKER LAW, LLC
2055 Reading Road, Suite 260
Cincinnati, OH 45202
justin@whittakerlawfirm.com

REPRESENTING THE DEFENDANTS:

Zachary Gottesman, Esq.
GOTTESMAN & ASSOCIATES, LLC
9200 Montgomery Road, Building E, #18B
Cincinnati, OH 45202
zg@zgottesmanlaw.com

Robb S. Stokar, Esq.
STOKAR LAW, LLC
9200 Montgomery Road, Building E, #18B
Cincinnati, OH 45242
rss@stokarlaw.com

Katherine Clarke Baron, Esq.
Shuva J. Paul, Esq.
THE CITY OF CINCINNATI
OFFICE OF THE CITY SOLICITOR
801 Plum Street, Suite 214
Cincinnati, OH 45202
katherine.baron@cincinnati-oh.gov
shuva.paul@cincinnati-oh.gov

Mickey S. McClanahan, Esq.
FINNEY LAW FIRM
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, OH 45245
mickey@finneylawfirm.com

Eric Adam Munas, Esq.
HAMILTON COUNTY PROSECUTOR'S OFFICE
230 East Ninth Street, Suite 4000
Cincinnati, OH 45202
eric.munas@hcpros.org

* * * * * * * *

# I N D E X


| | Page |
|---|---|
| Cross-Examination by Mr. Gottesman: | 5 |
| Cross-Examination by Mr. Whittaker: | 26 |
| Cross-Examination by Ms. Baron: | 38 |


# E X H I B I T S


| | |
|---|---|
| Defendants' Deposition Exhibit No. 2 | 10 |
| Defendants' Deposition Exhibit No. 3 | 11 |
| Defendants' Deposition Exhibit No. 4 | 14 |
| Defendants' Deposition Exhibit No. 1 | 17 |
| Defendants' Deposition Exhibit No. 5 | 23 |

AMANDA CATON,

of lawful age, as having been duly sworn, as hereinafter certified, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. GOTTESMAN:

Q. Good morning, Amanda. We're here this morning for your deposition pursuant to notice I issued and pursuant to subpoena that I had sent in to the City. Have you had your deposition taken before?
A. Yes, I have.
Q. Okay. If you would, please state your full name for the record.
A. Amanda Caton.
Q. And how are you currently employed?
A. With the City of Cincinnati Police Department.
Q. What do you do?
A. I am the captain of our special investigations section.
Q. Okay. I'm going to review the instructions for depositions even though I know you already know them.
A. Okay.

Q. Kristina, who is seated to your left, is the court reporter. She's taking down everything that we say. At the end of this process she's going to render a transcript. And to make sure that transcript is fair to all parties involved and a usable transcript, we have to avoid speaking over each other and we have to use words to communicate as opposed to sounds or gestures, because while uh-huh and uh-uh are -- we understand clearly what we mean when we use those, it looks remarkably similar on paper and it's hard to interpret. So yeses, noes, no shaking of the head, and so on and so forth, okay?
A. Okay.
Q. Did you do anything to prepare for this deposition?
A. No. I -- just doing some thinking. I know I was asked during the prep a couple of things. So I was just thinking on those questions and that's about it.
Q. So did you have a prep session with the city solicitors in this case?
A. Yeah.
Q. What was discussed during that prep session?

MS. BARON: Objection.

MR. GOTTESMAN: What's the basis?

MS. BARON: Privileged information.

MR. GOTTESMAN: Are you asserting that she's within the city's command circle?

MS. BARON: We are.

MR. GOTTESMAN: Okay. Very good.

Q. I won't at any point ask you to divulge attorney-client communications you had with city personnel, okay?

A. Okay.

Q. So if I ask a question that seems to you that asked for that information, then I need you to stop and not provide that information, okay?

A. Okay.

Q. Before you became the captain in charge of criminal investigations section -- or special investigations section --

A. Yes.

Q. -- what other roles as the captain did you hold in the Cincinnati Police Department?

A. I have been the Captain of District 5, Captain of District 4, Captain of Inspections, Captain of Planning, Captain of our Community

Services Relations -- it might have had a different name, I can't remember -- Captain of Internal Investigations, Captain of Records.

Q. How long have you been a captain?

A. I think it's been since 2018. It could have been '18 or '19. I'd have to go back and look at my work history.

Q. Okay. What time period were you the captain in charge of the Internal Investigations Section, if you can place that?

A. I believe it was '21 -- 2021 to beginning of 2023.

Q. And when you left that position, is that when you transferred to District 5?

A. Yes.

Q. Okay. So do you know when you started as the commander of District 5?

A. I believe it was January '23, but -- it's a rough -- rough estimate.

Q. Rough estimate. Okay. When you were the captain in charge of Internal, what did that entail?

A. I was overseeing all the investigations we have, serious complaints on police officers.

Q. Okay. Were you in charge of assigning personnel to investigate various complaints against

the officers that work for the Cincinnati Police Department?

A. Yes.

Q. Okay. And after they completed investigations, did you review their investigations?

A. Yes, I did.

MR. GOTTESMAN: Kristina, would you note Mr. Stokar's appearance.

THE COURT REPORTER: Sure.

(Mr. Stokar entered the room.)

Q. As the captain in charge of Internal, did you have input into recommended sanctions if an officer had been engaged in misconduct?

A. Well, yes. But we go by the matrix.

Q. Okay. Can you explain what that means?

A. The disciplinary matrix, it's -- this is part of it, this Exhibit 2. It's got a whole -- different sections and different violations. And then there's a matrix at the end of it that has the discipline recommended for each violation and progression of the violations.

Q. All right. So from my experience I understand the Cincinnati Police Department has adopted a matrix so the discipline for certain offenses is uniform -- uniformly applied to officers

who engage in the same or similar conduct?
A. Correct.
Q. Okay. And so when you were in Internal, you would then review and evaluate how discipline as provided in the matrix was applied to an officer for any allegation of misconduct?
A. Yes.
(Defendants' Deposition Exhibit No. 2 was marked for identification.)
Q. Okay. I think it's Exhibit 2 you were just referencing. Do you recognize that as Section 9 taken from the manual of the Cincinnati Police Manual of Rules and Regulations for discipline?
A. Yes.
Q. If I could direct your attention to Section 9.26. That section reads, If the hearing officer sustains the charge, he will recommend either corrective measures or disciplinary action to the police chief. Recommendations may include, A, corrective measures and it lists off four options and then, B, disciplinary actions and, again, it lists off in that instance five options; do you see that?
A. Yes.
Q. A-2 is an oral reprimand documented via

ESL. Do you know what ESL stands for?
A. Employee supplementary log.
(Defendants' Deposition Exhibit No. 3 was marked for identification.)
Q. Okay. If you would, look at Exhibit 3 that I put before you.
A. Look at what?
Q. You should have Exhibit 3. It's that thick packet.
A. Yes.
MR. GOTTESMAN: This is a document produced by the City and it bears City Bates number 00037 through 00063.
Q. Captain Caton, across the top of this Exhibit 3 it says Evaluation Supplement Log; do you see that?
A. Evaluation Supplement Log. Okay.
Q. Does that refresh your memory --
A. Yes.
Q. -- as to what ESL stands for?
A. Yes.
Q. What does it stand for?
A. Evaluation Supplement Log.
Q. And how are those used in the Cincinnati Police Department?

A. It is our kind of first line of discipline in the progressive discipline process.
Q. Okay. And when are ESLs used?
A. Really whenever an employee has either violated a procedure or rule and regulation that rises to the level of that, or it could be if there's something of concern that they needed talking to or it doesn't -- they didn't necessarily have to cite a rule. But just any time a supervisor talks to an employee about something, then they would document it.
Q. And is it used for work-related matters?
MS. BARON: Objection.
You can answer.
Q. Work-related conduct?
MS. BARON: Objection.
You can answer if you know.
THE WITNESS: Should I answer?
MS. BARON: Yes.
A. I've seen it used for both, because we take complaints and look into work-related and off-duty conduct.
Q. Okay. And with regard to the ESLs here, these are all of the ESLs that were produced by the City in response to a discovery request that

pertained to Officer Hooven. Do you know -- from looking through all of these, do you see any ESLs here that are not related to his employment?

MS. BARON: Objection.

You can answer if you know.

A. I'd have to look through the report. It looks like they were work-related.

Q. Okay. When you were in Internal, would you routinely attend the CCA meetings?

A. Yes, I did.

Q. Okay. And what was your role when -- in attending those CCA meetings?

A. I was there to monitor and just answer any questions that might come up.

Q. Okay. Were you ever -- would Internal regularly investigate complaints received by CCA?

MS. BARON: Objection. Zach, I'm just going to object to this line of questioning. I don't believe that Captain Caton was over IIS during this period of time that we're discussing.

Q. So limited to your time when you were in Internal --

A. Yes.

Q. -- if a complaint -- is that --

MS. BARON: I'm still going to object on relevance. I'm not sure how her time in Internal Inspections [sic] is relevant to this case since she wasn't over Internal Investigations when this came in.

MR. GOTTESMAN: In other words, I don't believe Ms. Baron is instructing you not to answer.

THE WITNESS: Okay.

Q. So would Internal -- IIS investigate complaints regarding officers received by the CCA when you were the captain in charge of Internal?

A. Yes and no. It depended what the complaint was. If it was something that didn't rise to the level of Internal Investigation, we'd pass it on to the districts or if we looked into it and we didn't think it was a complaint, we would not investigate it.

MR. GOTTESMAN: I put in front of you what's been marked for identification as Exhibit 4.

(Defendants' Deposition Exhibit No. 4 was marked for identification.)

Q. And all counsel should have that. That is the CCA complaint sheet.

A. Yes.
Q. This was a complaint filed by Brendon Taylor against Officer Jesse Hooven in April of 2023. And the complaint was set forth in the narrative section. You can read that to yourself.
A. Yes.
Q. In your experience as the captain in charge of Internal, are those complaints that Internal would have investigated?
MS. BARON: Objection.
You can answer if you have an opinion.
A. Yes.
Q. Okay. If a citizen complained that an officer was misusing a law enforcement database, would Internal investigate misuse of a law enforcement database?
MS. BARON: Objection.
You can answer if you have an opinion.
A. Yes.
Q. With regard to -- after you moved to District 5, did you become aware of complaints regarding Officer Hooven being made by his ex-wife and Brendon Taylor?

A. Yes.

Q. Okay. What was your first awareness of Brendon Taylor's complaints regarding Officer Hooven?

A. My memory is kind of murky, but to the best of my memory I believe -- and I never had contact with Mr. Taylor or the ex-wife -- but they came to District 5 to the front desk and tried to make a complaint. I don't remember if it was him and her or just him, but -- and then I was made aware of one -- I think it was one of my sergeants came to me and said this guy walked in and is trying to complain on Jesse, I looked into it, I talked to him, and there's nothing -- nothing there. So I said okay.

Q. Okay.

A. Yeah.

Q. So was the complaint received or taken in like an intake of a complaint against Officer Hooven at that time?

A. No. Because the way our process works, if a supervisor receives a complaint, they have to do a preliminary investigation. And if it's not a complaint, we don't take it.

Q. Okay. Do you recall who that officer was?

A. I think -- and I can't be sure, but I think it was -- the one who he talked to?
Q. Yes.
A. I think it was Sergeant Brad White.
Q. Brad White.
A. But I could be wrong.
(Defendants' Deposition Exhibit No. 1 was marked for identification.)
Q. At some point did you receive the Internal Investigations report as approved by Chief Theetge marked for identification in front of you as Exhibit 1?
A. Yes.
Q. Okay. And when you were the captain in Internal, you had seen countless of those that you had approved and sent up the chain to the chief for approval, right?
A. Correct.
Q. Okay. The general way this works, to my understanding, the procedure of the Cincinnati Police is that once Internal completes the investigation, it's submitted to the lieutenant for approval?
A. Yes.
Q. And then it's submitted to you as the

captain in charge of Internal --
A. Correct.
Q. -- for approval?
A. Yes.
Q. And then from you it's submitted to the chief for review and approval?
A. The chief or whoever is in charge of Internal at the time.
Q. Okay.
A. Yeah.
Q. Well, my question is, does every report you -- that the captain and then Internal signs off on go to the chief for review?
A. Yes.
Q. Okay.
A. Our assistant chief.
Q. All right. So when this report came out of Internal, you were not the captain in charge of Internal --
A. No.
Q. -- correct?
A. I was at District 5.
Q. All right. Who was the captain who signed off on it?
A. Jay Johnstone.

Q. Okay. And then do you recognize the handwriting in the upper right-hand corner in blue?

A. Yes.

Q. Whose handwriting is that?

A. Theetge. Teresa Theetge.

Q. Okay. And what were her comments?

A. D5 commander and Officer Hooven relief commander to meet with Officer Hooven regarding this investigation. Meeting to be documented with an ESL.

Q. Okay. Now, when it says D5 commander, that's a reference to you --

A. Yes.

Q. -- right? And Officer Hooven's relief commander, was that Lieutenant Rob Wilson at the time?

A. Yes, it was.

Q. Okay. Did you take this as an order from Chief Theetge --

A. Yes.

Q. -- that you and Lieutenant Wilson were to meet with Officer Hooven and discuss what was in this Internal report?

A. Yes.

Q. Did you review this Internal report?

A. Yes.
Q. Okay. Look at the second page of Exhibit 1. It's got a -- just inside the cover sheet. It's City 00019. It indicates that Internal completed an investigation into a complaint of law violation and unethical conduct filed on April 12 by Brendon Taylor with the CCA, right?
A. Yes.
Q. So this was not a complaint received at the district or directly to the police officer in Internal, this was received by CCA?
A. Yes.
Q. Okay. And that is the complaint sheet we've already looked at, Exhibit 4?
A. Yes.
Q. Okay. Read the last sentence of the introduction section.
A. Mr. Taylor also -- Mr. Taylor also alleged Officer Hooven illegally queried Mr. Taylor using a law enforcement database.
Q. Okay. Law enforcement officers, police officers in Cincinnati have access to LEADS?
A. Yes.
Q. Okay. Is there another law enforcement database of which you're aware available to law

enforcement officers at the Cincinnati Police Department?

A. LEADS. RCIC. There's -- there's a couple of others I can't remember. Just -- I can't remember them.

Q. All right. And then there's an allegation that he obtained records from Hamilton County Jobs and Family Services through illicit means; do you see that?

A. Yes.

Q. The reference to Hamilton County Jobs and Family Services -- are you familiar with Hamilton County Jobs and Family Services?

A. Yes.

Q. Is that what you would call a partner agency?

A. Yes.

Q. Okay. In the regular course of conduct for Cincinnati Police Officers, is it common for them to interact with partner agencies?

A. Yes.

Q. Do partner agencies include other law enforcement agencies like the Hamilton County Sheriff?

A. Yes.

Q. Blue Ash Police Department?
A. Yes.
Q. Norwood Police Department?
A. Yes.
Q. Does it also include the FBI?
A. Yes.
Q. ATF?
A. Yes.
Q. Secret Service?
A. Yes.
Q. And the Department of Treasury?
A. Yes.
Q. Are those interactions with those partner agencies part of a law enforcement officer's duties?
A. Yes.
Q. Before you met with Officer Hooven as directed -- as ordered by Chief Theetge, did you review the entirety of this report?
A. Yes. I read through this report, yes.
Q. Okay. And when you met with Officer Hooven, did you discuss all of the allegations and the conclusions that were arrived at in this report?
A. No. Because it had already been investigated. We just talked about just his conduct and how it's affecting his work.

Q. And then when you say his conduct, are you talking about his interactions with the Hamilton County Jobs and Family Services personnel?

A. Yes.

Q. Okay. Did you document your meeting with Officer Hooven as ordered by Chief Theetge in an ESL?

A. Well, Rob Wilson did.

Q. Okay.

A. Yes.

Q. But did you sign off on that documentation?

A. Yes, I -- yeah.

(Defendants' Deposition Exhibit No. 5 was marked for identification.)

Q. And is that the exhibit before you marked for identification as Exhibit 5?

A. Yes.

Q. From your perspective as the District 5 commander tasked with this meeting by Chief Theetge, was there any reason to believe that Officer Hooven was acting in bad faith?

MS. BARON: Objection.

You can answer if you know.

THE WITNESS: What?

MS. BARON: If you need clarification, you can ask him to clarify the question.

THE WITNESS: Yeah.

Q. With regard to the conduct outlined in that Internal Investigation report --

A. Yes.

Q. -- from your perspective as the District 5 commander, was there any reason to believe that Officer Hooven was acting in bad faith?

MS. BARON: Objection.

You can answer if you have an opinion.

A. I don't -- I mean, acting in bad faith as far as the whole investigation or --

Q. No. His conduct. Was his conduct from your perspective in bad faith?

MS. BARON: I'll object.

But you can answer.

A. I don't really think I can answer that. I mean, he -- he was exonerated and not sustained. So I think he was -- you know, we believed he was doing what he was supposed to do and we were just cautioning him that his -- you know, his conduct is getting -- is affecting his work.

Q. Okay. And was there any reason to believe Officer Hooven had engaged in criminal behavior?
MS. BARON: Objection.
You can answer if you know.
A. No.
Q. Okay. From your perspective was the conduct investigated by Internal regarding Brendon Taylor's complaints regarding Officer Hooven -- was that conduct that was investigated from your perspective as the District 5 commander manifestly outside the scope of Officer Hooven's employment?
MS. BARON: Objection.
You can answer if you have an opinion.
A. No. Because we were investigating it.
Q. Okay. Was Officer Hooven receptive to the counseling that you gave in that instructional ESL?
A. Yes.
Q. Was he otherwise a valued member of the Cincinnati Police Department?
A. Yes.
Q. Did he serve in District 5 with the level of professionalism required of Cincinnati Police Officers?
A. Yes.

Q. From your perspective as the District 5 commander did Jesse Hooven violate any Cincinnati Police Department rule or regulation?
A. No.
MS. BARON: Objection to form.
MR. GOTTESMAN: She already answered. So give her a chance, if you would, to let her insert her objections as necessary.
THE WITNESS: Okay.
Q. From your perspective as the District 5 commander tasked with counseling Officer Hooven by Chief Theetge, did Officer Hooven violate any aspect of his training as a police officer?
MS. BARON: Objection.
You can answer.
A. No.
MR. GOTTESMAN: Thank you, Captain Caton. I don't have anything else.
Mr. Whittaker might.
THE WITNESS: Okay.

CROSS-EXAMINATION

BY MR. WHITTAKER:
Q. Good morning, Captain. My name is Justin Whittaker. I am the attorney for Brendon Taylor and Holly Hooven in this case.

A. Okay.
Q. Thank you for your time this morning. I'll try to make this quick. To clarify, you were not assigned to IIS at the time of the investigation of Taylor's complaint into Officer Hooven; is that right?
A. Correct.
Q. You were the D5 commander?
A. Yes.
Q. So is it fair to say when we're looking at Exhibit 1, the Internal Investigations Section, you didn't even contribute to the preparation of this report; is that right?
A. Right. I didn't contribute.
Q. Okay. And you didn't participate in the investigation that IIS did?
A. No.
Q. Did IIS ask you for information during the investigation of Officer Hooven?
A. No.
Q. Okay. When did you learn about the investigation?
A. I think it was when I -- when this came across my desk.
Q. Okay.

A. Yes.
Q. This is the first time you knew about the investigation --
A. Yes.
Q. -- at all?
A. Yeah. I thought it was done when he came to District 5.
MR. GOTTESMAN: And for the record, when you say this came across my desk, are you referring to Exhibit 1?
MR. WHITTAKER: Exhibit 1.
THE WITNESS: Yes.
MR. WHITTAKER: I'm sorry.
THE WITNESS: Yes.
Q. I think I heard you mention in your earlier testimony to Mr. Gottesman that when you were in IIS, a part of your -- your duties were to investigate serious complaints against police officers?
A. Correct.
Q. Would the investigation into Exhibit -- or, I'm sorry, Officer Hooven exemplified in Exhibit 1, would that constitute a serious complaint against the police officer, that investigation?
MS. BARON: Objection.

You can answer if you have an answer.

A. Yes. It's a law violation.

Q. I'm sorry. Did you say a law violation?

A. Yes.

Q. And a law violation is a serious complaint, right?

A. Pardon?

Q. A law violation is a serious complaint?

MS. BARON: Objection.

A. Yes.

Q. Okay. I'm sorry if you can't hear me. I don't have a booming voice that Zach does. So just tell me if you don't hear me, and I'll try to speak up. Okay. Very good.

I thought I heard you testify to Mr. Gottesman that as far as you're concerned Officer Hooven didn't violate any rule or regulation of the City of Cincinnati or the police department as part of this investigation; is that fair?

A. Yes.

Q. As far as you understand it, did Officer Hooven act as the regulation -- rules and regulations that the City of Cincinnati and the police department require?

A. Yes.

Q. Okay. Would it be your perspective that he acted consistently with rules and regulations of the city and the police department?

MS. BARON: Objection.

You can answer if you have an opinion.

A. Do you mean his whole career or. . .

Q. No, no. Just with this investigation -- just related to the facts involved in this investigation.

A. Just reading these facts, then yes.

Q. Okay. And it's your understanding that he acted in all ways that he was trained as a police officer by the City of Cincinnati in connection with this investigation and the facts investigated?

A. Yeah. Because I wasn't involved in the investigation. So all I have to go on is this.

Q. All you have to go on is this?

A. Yes.

Q. And based on your reading of it he -- at all times in this -- and the facts involved in the investigation, he complied with how he had been trained by the City?

MS. BARON: Objection.

You can answer.

A. Yes.
Q. And by the police department?
MS. BARON: Objection.
You can answer.
A. Yes.
Q. The same with rules and regulations, he acted in compliance with all rules and regulations of the City of Cincinnati Police Department in connection with the facts involved in this investigation?
MS. BARON: Objection.
You can answer.
A. Well, yes. Because he was not sustained and exonerated.
Q. And I think you testified that you -- that Officer Hooven -- when you spoke with him in connection with the ESL, he told you that he was doing what -- he thought he was doing what he was supposed to do, or that you determined that he was doing what he was supposed to do?
MS. BARON: Objection.
You can answer.
A. I don't think I said that. I think we just told him that what he was doing -- just to caution him on what he was doing because it could

affect his job.

Q. In what way would it affect his job?

A. Well, Mr. Taylor -- and I don't know if Ms. Hooven came with him -- came to District 5 initially to make a complaint. And then they went to the CCA to complain on him. It was investigated by Internal. And now we were sitting down with him, so. . .

Q. Okay.

A. It affected his job.

Q. So by virtue of it happening at all it affected his job?

A. Yes.

Q. Okay. Fair enough. And if it didn't affect his job, IIS wouldn't be investigating, would they?

MS. BARON: Objection.

A. Correct.

Q. Okay. And it wouldn't have come across your desk if it hadn't been affecting his job?

MS. BARON: Objection.

You can answer.

A. Correct.

MR. WHITTAKER: Can I give you a sustained [sic] objection on everything

or --

MS. BARON: That's totally fine.

MR. WHITTAKER: Okay. Thanks. Unless you want to tell her not to testify for privilege --

MS. BARON: Then I'll jump in.

MR. WHITTAKER: -- I would consider it all sustained -- or all whatever. Okay. Fair enough.

MR. GOTTESMAN: Justin, did you mean sustained or standing?

MR. WHITTAKER: Standing. Sorry.

MR. GOTTESMAN: Because sustained would be a problem.

MR. WHITTAKER: I'm not arguing for the sustainment of all of the objections. Standing.

BY MR. WHITTAKER:

Q. And is it your testimony that by -- first of all, do you have any reason to doubt the facts as they are set forth in Exhibit 1?

MS. BARON: I have a standing objection.

THE WITNESS: Oh, okay.

A. No. I take it for what it is in the

investigation, yes.

Q. Okay. Is it your testimony that by accessing a database that includes child welfare information Officer Hooven acted consistently with the rules and regulations and policies of the police department and the city?

A. I don't think he did access it. That was determined in the investigation. Like I said, I didn't investigate it, so I can just go off of what this is.

Q. Sure.

A. Yeah.

Q. Is it your testimony and understanding that if he had someone else access child welfare records on his behalf, that that would be consistent with the rules and regulations and policies of the City of Cincinnati and the police department?

A. Well, he wasn't found to do that.

Q. Right. If he had, would that be consistent with the rules and regulations and the policies and procedures of the police department?

A. If he had what?

Q. Accessed a child welfare database.

A. Well, it just depends on the circumstances.

Q. Okay.
A. Yeah.
Q. Could you explain what circumstances in which that would be acceptable or would be within the policies and procedures of this police department?
A. I couldn't think -- I mean, I can't answer that, because all I can -- like I said, all I can go on is what's in this report pertaining to this investigation.
Q. Maybe it's easier this way. Is it your testimony that all of the conduct attributed to Officer Hooven in this investigation, all of it, complied with the rules and regulations and policies and procedures of the city and the police department?
A. Based on the report, yes.
Q. Okay.
A. Yes.
Q. You're not aware of any other facts that are not in this report?
A. No.
Q. Is it your understanding that Officer Hooven was off duty when the facts underlying this report occurred?

A. Was he off duty?
Q. Yes.
A. My only involvement was being the District 5 commander. I knew that they had come to the district. I thought that was the end of it. The next thing I know this Internal report is coming and I had to counsel him.
Q. Okay.
A. So. . .
Q. Do you have any understanding of whether the conduct alleged occurred while Officer Hooven was on duty?
A. I don't know.
Q. Okay. There's been some testimony that there are varieties of ESLs. There's been testimony that there are neutral ESLs, positive ESLs, and something other than neutral or positive, something in the direction of negative.
Is that your understanding, that there are varieties of ESLs, or is there just one ESL?
A. Yes. We have various categories.
Q. Okay. What are the categories?
A. Instructed. We have a counseling, a positive. There may be a couple of different ones. It's been a while since I had to write one.

Q. Okay.
A. So those are the ones that I can remember.
Q. And was Exhibit 1 an example of a positive ESL -- or resulting from a positive ESL as from the investigation?
A. The one that Theetge ordered us to do?
Q. Yes.
A. No. She just wanted it documented.
Q. Okay.
A. So that was why Rob did it as instructed.
Q. Okay. So not positive, not -- would counseling fall under the umbrella of instructed, or is that distinct from instructed?
A. It's different.
MR. WHITTAKER: Okay. That's all I have. Thank you.
THE WITNESS: Okay.
MR. MUNAS: No questions from the County.
MS. McCLANAHAN: No questions.
MR. GOTTESMAN: One last item from me. Previously Ms. Baron instructed the witness not to answer. And I'd like to certify that question to the Court.
THE COURT REPORTER: Okay.

MR. GOTTESMAN: The instruction was not to answer what was discussed in the prep session based on attorney-client privilege. So I certify that question.

MS. BARON: And I do have some questions.

CROSS-EXAMINATION

BY MS. BARON:

Q. So you testified in one of the attorney's questioning that IIS only investigates work-related conduct; is that your understanding?

A. No. I don't think I testified -- we do on duty and off duty.

Q. Okay.

A. Yeah.

Q. So how do you decide what off-duty conduct to investigate?

A. It is just if we think it rises to the level of violating our policies and procedures.

Q. Okay. All right. Have you had your conduct looked at by IIS before?

A. Have I had my personal conduct?

Q. Yes.

A. Yes.

Q. Okay. And what was that for?

A. I got arrested for OVI.
Q. Okay. And when you were arrested for the OVI, IIS investigated that?
A. Well, I shouldn't -- they didn't -- we don't investigate criminal conduct, meaning the Internal. We monitor it until the criminal case is over. And then Internal will investigate it and issue discipline depending on the outcome.
Q. Okay. So they do investigate it, but it's at the back end?
A. Correct.
Q. Okay.
A. Not till the criminal case is over.
Q. And when you were arrested for OVI, was that while you were on duty?
A. No.
Q. And who represented you on your OVI?
A. Zach Gottesman.
Q. And has Zach Gottesman represented you on other matters?
A. No, not before that. I mean, before that or. . .
Q. After, since that.
A. Yeah. He was -- he represented me in the civil case we had against the City of Loveland. And

then he's represented -- well, not represented --

MR. GOTTESMAN: Excuse me. I'm going to instruct you -- to the extent I've provided services, I think the nature and extent of that consultation is privileged.

It's your privilege to assert or to -- you are entitled to withhold that information. It's your privilege to assert. It's not up to me whether you assert attorney-client privilege. It's up to you.

THE WITNESS: Okay.

MR. GOTTESMAN: So how far you go in answering those questions is your choice.

THE WITNESS: Okay.

MR. GOTTESMAN: If you want to tell her all the things I've done and what you've consulted with me on, you can, but you're also entitled to keep it confidential.

THE WITNESS: Okay.

Q. So you were describing -- and I don't know if you were going to describe further, but -- other representation that Mr. Gottesman has had for you.

A. Represented on family matters.

Q. Does he currently represent you?
A. No.
Q. And when did your representation end?
A. Back when the civil service -- not civil service, the civil case was settled.
Q. Do you know approximately when that was?
A. I think -- I think it was beginning of this year maybe.
Q. Okay. Beginning of --
A. But I could be wrong about that. Yeah.
Q. Beginning of 2026?
A. Yes, I think.
Q. Okay. And is it fair to say that was while this case was pending, the Hooven case?
A. I don't know. Because I don't know anything about this except this was my involvement as far as the ESL.
Q. Okay.
A. I don't know at what point -- I don't know anything about this case.
Q. At any point in time did you talk to Mr. Gottesman about this case outside the presence of city attorneys?
A. No.
MS. BARON: All right. I don't think

I have any other questions.

THE WITNESS: Okay.

(Witness excused.)

(Deposition concluded at 10:50 a.m.)

REPORTER'S CERTIFICATE

I, Kristina L. Laker, Court Reporter and Notary Public, do hereby certify:

That the witness named in the deposition, prior to being examined, was duly sworn;

That said deposition was taken before me at the time and place therein set forth and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF I have subscribed my name and affixed my seal this 15th day of October, 2026.

/s/ Kristina L. Laker
______________________________
Kristina L. Laker
Notary ID KYNP38960
My Commission expires: 12/21/29