UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

\- - -

| | | |
|---|---|---|
| BRENDON TAYLOR, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| -vs- | : | CASE NO. 1:24-CV-00204-SJD |
| | : | |
| JESSE LEE ANTHONY | : | |
| HOOVEN, et al., | : | |
| | : | |
| Defendants. | : | |

\- - -

Deposition of MADISON MARIE PAUL, a defendant herein, taken by the Plaintiffs as upon Cross-Examination and pursuant to the Federal Rules of Civil Procedure and Notice at the offices of Finney Law Firm, 635 Main Street, Cincinnati, Ohio, on June 12, 2026 at 10:00 a.m., before Jennifer K. Starner, RPR, a Notary Public within and for the State of Ohio.

\- - -

APPEARANCES:

On behalf of the Plaintiff:

Justin Whittaker, Esquire
Whittaker Law, LLC
2055 Reading Road
Suite 45202
Cincinnati, Ohio 45202
513/475.5545
justin@whittakerlawfirm.com

On behalf of the Defendant,
Jesse Lee Anthony Hooven:

Zachary Gottesman, Esquire
Gottesman & Associates, LLC
404 East 12th Street
First Floor
Cincinnati, Ohio 45202
zg@zgottesmanlaw.com
513.651.2121

On behalf of the Defendant, Madison Paul:

Mickey S. McClanahan, Esquire
Finny Law Firm
4270 Ivy Pointe Boulevard
Suite 225
Cincinnati, Ohio 45245
513.797.2850
mickey@finneylawfirm.com

On behalf of the Defendant, City of Cincinnati:

Katherine Baron, Esquire
Assistant City Solicitor
801 Plum Street
Suite 214
Cincinnati, Ohio 45202

On behalf of the Defendant,
Hamilton County Commissioners:

Eric Munas, Esquire
Dmitriy Bikmayev, Esquire
Amanda R. Bent, Esquire
Assistant Prosecuting Attorneys
230 East Ninth Street
Suite 4000
Cincinnati, Ohio 45202
513.946.3229
eric.munas@hcpros.org

Also present:

Claire Roncallo
Emma Schaffer
Payton Ulrich

\- - -

S T I P U L A T I O N S

It is stipulated by and among counsel for the respective parties that the deposition of MADISON MARIE PAUL, a defendant herein, called as upon Cross-Examination by the Plaintiffs may be taken at this time and place pursuant to the Federal Rules of Civil procedure and Notice as to the time and place of taking said deposition; that the deposition was recorded in stenotypy by the court reporter, Jennifer K. Starner, RPR, and transcribed out of the presence of the witness; and that said deposition is to be submitted to the witness for her examination and signature, and that signature may be affixed out of the presence of the Notary Public.

- - -

# I N D E X

WITNESS:

MADISON MARIE PAUL


| | Page |
|---|---|
| Examination By Mr. Whittaker | 6 |
| Examination By Mr. Munas | 172 |
| Examination By Mr. Gottesman | 216 |
| Examination By Ms. Baron | 231 |
| Examination By Ms. Mcclanahan | 234 |
| Further Examination By Mr. Whittaker | 236 |


# E X H I B I T S


| | Page |
|---|---|
| Deposition Exhibit A | 137 |
| Deposition Exhibit B | 158 |
| Deposition Exhibit C | 159 |
| Deposition Exhibit D | 160 |
| Deposition Exhibit Q | 163 |
| Deposition Exhibit HC1 | 172 |
| Deposition Exhibit HC2 | 177 |
| Deposition Exhibit J | 189 |
| Deposition Exhibit 10 | 195 |
| Deposition Exhibit HC3 | 203 |
| Deposition Exhibit HC4 | 206 |

MADISON MARIE PAUL

of lawful age, as having been duly sworn, as hereinafter certified, was examined and testified as follows:

MR. WHITTAKER: Good morning. We're on the record again in the matter of Taylor and others versus Hooven and others.

EXAMINATION

BY MR. WHITTAKER

Q. Would you please state your name, please.
A. Madison Paul.
Q. That's your full name?
A. Yes. Madison Marie Paul.
Q. I'm sorry. What was the --
A. Madison Marie.
Q. Marie. And have you ever had your deposition taken before?
A. I have.
Q. Okay. What was -- what were the circumstances of that?
A. I was deposed officially for a car accident I was in.
Q. Okay. When was that? Ballpark.
A. When was that? I believe in 2023.
Q. Okay. And you were the plaintiff in

that case?

A. Yes.

Q. And what was the outcome?

A. I ended up winning. We settled. We settled.

Q. Was that case in Hamilton County?

A. Yes.

Q. Is that the only time you've been deposed?

A. I don't know that I've been officially deposed for the county. I don't know what it was called. Like, I don't know if it was mediation or if I was being deposed.

Q. Okay. Were you under oath?

A. Yes.

Q. Okay. Well, this is going to be a lot like that except for maybe some more people. But you were here the other day on the 10th when Officer Hooven's deposition took place?

A. Yes.

Q. So you have some familiarity with how the procedure goes and all that?

A. Yes.

Q. I'll just say the same things. If I mumble, as sometimes my voice doesn't carry -- got the air

conditioning on again today. You might not hear a question I ask or a question I might ask may not make sense to you. Please ask me to clarify if you don't understand. Okay?

A. Will do.

Q. I will do my best -- it's my job to ask a good question. I'll do my best to clarify my question if you don't understand it. Otherwise, if you answer, I'm going to assume that you understood it; is that fair?

A. That is fair.

Q. Are you on any medications today that would prevent you from answering questions truthfully?

A. No.

Q. How about any health conditions that would prevent you from answering questions truthfully?

A. No.

Q. Excuse me. We have to answer orally, out loud without uh-huhs or huh-uhs or shaking your head or nodding your head so that Madam Court Reporter can take down what we're saying cleanly. There might be an instance in which one of us asks you to speak up or to answer audibly. That's not being rude. It's just making sure that we have a clean record. Does that make sense?

A. It does.

Q. If you will do me the courtesy of letting me finish my question before you start your answer,

I'll do my best to do the same for you. Is that fair?
A. That's fair.
Q. Okay. Are you currently employed?
A. I am.
Q. Where do you work now?
A. University of Cincinnati Hospital.
Q. What do you there do there?
A. I am a limited permit holder respiratory therapist.
Q. Limited permit holder, what does that mean?
A. So that means that I am in school to become a licensed registered respiratory therapist. But after a year in school your school can sign off and say you're competent and you can become working as a student.
Q. Okay. And what's the title of your current role?
A. It's called a limited permit holder respiratory therapist. Sorry. It's kind of long.
Q. That's okay. And do you -- what do you do in that capacity?
A. Right now I work on the floors, which basically means patients that have been admitted to the hospital and are in need of, like, a respiratory therapist. So, like, I administer nebulizer medications, things like

that.

Q. Okay. Is that more in a technician type role; is that fair to say?

A. No. Because I was a technician. I actually just kind of got promoted.

Q. Okay. Well, congratulations.

A. Thank you.

Q. How long have you worked at UC in this capacity?

A. So I've been a technician for a little over a year and then I just became a limited permit holder respiratory therapist within the past couple of weeks.

Q. So did you start -- when did you start working at UC?

A. April 2025.

Q. Okay. All right. And where did you work before UC?

A. I was a Door Dash driver for a little bit.

Q. Okay.

A. And a babysitter. And then before that I was at ProKids.

Q. How long -- did you do the Door Dashing and babysitting around the same time?

A. Yeah. It was about -- so I left ProKids

in April of '24 and I Door Dashed, babysat and collected unemployment for the next about 12 months.

Q. Okay. And you were with ProKids from October of '23 to April of '24?

A. I think I was officially hired in November of '23.

Q. Gotcha. And before ProKids you were with the Department of Job and Family Services?

A. That is correct.

Q. Okay. When -- when did you work there? What years -- year to year?

A. I started JFS in October of 2019 and left in October of 2023.

Q. And you voluntarily left your employment with the county in October of 2023, right?

A. That is correct.

Q. Was that to take the job at ProKids?

A. I had not yet had the job at ProKids.

Q. Okay. Was there an offer?

A. No. I had not even applied to ProKids at that time.

Q. Okay. What made you decide to leave the Department of Job and Family Services in October of '23?

A. There was a collection of issues going on, but my final straw was I was asked to lie on the stand,

so I decided to leave.

Q. Goodness. Well, I'm going to have to ask you about that. What -- what were the -- what were the circumstances of you being asked to lie on the stand in October of 2023?

A. I believed the child was not in danger. They told -- my supervisors told me that they believed the child was in danger and that I needed to say that this child was. And I refused.

Q. You believed the child was not in danger?

A. Correct.

Q. And your supervisors instructed you to testify in a proceeding that the child was in danger?

A. That is correct.

Q. What was -- what was the nature of this proceeding?

A. It would have been a dependency case in juvenile court.

Q. Over on 800 Broadway?

A. That is correct. Sixth floor.

Q. Sixth floor. What -- had you testified in dependency matters before that one?

A. Several times.

Q. Several times. Any other matters that

you've testified in in your -- first of all, what was the -- what was your role of -- with the county?

A. I was an assessments working.

Q. Say again.

A. An assessments worker.

Q. What was the general job description and duties of an assessments worker?

A. We received reports of child abuse, neglect, dependency. And I believe the other one was, like, FINs, which meant family in need of services. I would receive those cases and then be sent out to meet with those families.

Q. And in some of those instances you were called on to testify in juvenile court?

A. That is correct.

Q. And you mentioned that you did that several times. Could you ballpark that in your -- what is it? About four years of working in that capacity, about how often -- how many times did you testify?

A. I truly do not have a number. I worked hundreds of cases while I was there. And some of them went to court, some of them didn't.

Q. Would you say that you testified a hundreds times?

A. Maybe.

Q. Okay. Could have been?
A. Could have been.
Q. More than 50?
A. I'd say.
Q. Between 50 and a hundred?
A. Yeah.
Q. How about 75 and a hundred?
A. Now you're too specific. I'm not sure.
Q. Okay. And was your role with the county the entire four-ish years that of an assessments worker?
A. That is correct.
Q. Okay. And could you tell us what your duties were as an assessments worker? I'm going to ask you to not spare any detail. If it comes to you, go ahead and tell us. We're not -- we're not -- I'm not asking you to abbreviate your duties. I'm not asking you to expand any further than you need to, but what were your duties?
A. Overall, my duty was to assess and -- I would just say assess child safety.
Q. Okay.
A. And that was through reports or whatever have you. And then we would have to identify if there was impending or present danger. And that kind of determined what we did with the family. Then I would work their case, whether -- if they went to court or -- I would -- I would --

like, then I would transfer it on to a different unit within children services. And then sometimes I close their cases if they didn't need my help at all. Sometimes I'd put in referrals to, you know, let's say, a mental health service, things like that. So a wide variety of things.

Q. Generally having to do with the health and safety and welfare of children?

A. That is correct.

Q. Children being your primary concern? Primary focus?

A. Yes.

Q. What about older adults or anything like that?

A. No. Children -- Job and Family Services has an adult protective services agency. So they handle all that.

Q. So no -- no adult services from your role?

A. No, unless if they had special needs.

Q. Gotcha.

A. Then I think we serve them up to 21 maybe. But that was the only time you would see that is if their mental capacity was of -- younger.

Q. Okay. And that would be if they -- that was a capacity issue, if the child was diminished capacity.

But only up to until the person was age 21?

A. I can't speak on the exact -- I think -- I believe -- I believe it was 21.

Q. Okay.

A. But I think that there may have been some outstanding, you know, circumstances. I'm not fully aware of all of those.

Q. Gotcha. And was your office at the time on over on Central Parkway?

A. It was.

Q. It's my understanding that's no longer there. Is that -- is that your understanding?

A. I have no clue.

Q. Okay. And where did you work before 2019? Before you started work at the Department of Job and Family Services?

A. Longhorn's Steakhouse.

Q. Okay. What did you do there?

A. Little bit of everything. I was server, bartender, host, assistant manager.

Q. Which location?

A. The one on Harrison Avenue.

Q. Okay. Are you from the west side?

A. I am.

Q. Okay. You currently live on the west

side of Cincinnati?
A. I do.
Q. Okay. Do you have kids?
A. Yes.
Q. Married?
A. No.
Q. Okay. Have you been married?
A. No.
Q. Okay. How many kids?
A. Just one.
Q. Okay. Do you own your home? Apartment?
A. I do.
Q. Okay. How long did you work at Longhorn?
A. My goodness, I started there in 2012 and then I left when I started JFS. So about seven years, a little over seven years.
Q. Okay. And did you go to high school?
A. I did.
Q. Where did you go to high school?
A. Taylor High School.
Q. Taylor High School. Where's Taylor?
A. Well, it's knocked down now.
Q. Oh, I'm sorry.
A. So -- but it's now Three Rivers -- it's

like one big campus, but it's in Cleves, Ohio.
Q. Cleves?
A. Uh-huh.
Q. Did you graduate?
A. I did.
Q. When did you graduate?
A. May -- or I'm sorry. June of 2012.
Q. Okay. Did you go to -- did you do any schooling after that?
A. I did.
Q. Where did you go?
A. I went to Cincinnati State for a little bit, completed an associate's there and then I went to UC.
Q. What -- associate's being a two-year program?
A. That is correct.
Q. What was the program?
A. Just associate's of arts. It was a general degree.
Q. Okay. And then did you start that upon graduation?
A. Yes. And then -- well, I continued to work at Longhorn and then I transferred to University of Cincinnati.
Q. Oh, I see.

A. Yeah. And completed a bachelor's.
Q. Bachelor's. Bachelor's in what?
A. Psychology and minoring in criminal justice.
Q. Would that have been a --
A. BA.
Q. -- BA?
A. Yeah.
Q. When did you -- when did you transfer to UC?
A. I believe it was fall of 2015.
Q. Okay. When did you graduate from UC?
A. May of 2019.
Q. Okay. So that entire time from 2012 to 2019 you were working at Longhorn while going to school?
A. That is correct.
Q. Right. And then I assume the county would have been your first job out of college? Out of school?
A. That is correct.
Q. Must have been exciting for -- exciting to get your first job?
A. Yes, it was.
Q. Was that something that you had -- that kind of role, was that something that you wanted to do for a

long time, work with children protective services and the like?

A. Yes. I love working with women and children specifically. I really enjoy advocating for them and helping them and just, like, creating a community with them. So I knew that I wanted to do something and then I just kind of jumped on Indeed or whatever it was at the time and found the county.

Q. So you found the job by looking on Indeed?

A. Something like that, like, online.

Q. Sure. So you had not been looking at the county while you were in school or anything like that? Was there any -- I mean, I know UC has a co-op program. Did you participate in anything like that?

A. No, I did not. I actually found out I was pregnant right after I transferred to UC. So I had to take it pretty slow because I was raising a newborn, going to school and working. So I just took it really slow and one thing at a time. So I didn't start looking for jobs until actually after the summer I graduated because I wanted to spend time with my son that summer.

Q. When was your son born?

A. May of 2016.

Q. Okay. That makes him ten-ish?

A. Yes.
Q. Just turned ten?
A. Yes. Fresh ten.
Q. Well, ten years of keeping another human alive is an accomplishment.
A. Yes. And also a reward.
Q. Oh, good. So I'd like to go back to your -- your mentioning of the case in which you were asked to -- you said lie, right?
A. Yes.
Q. Lie on the stand. Could you tell me -- that was October of '23, right?
A. Yes.
Q. Okay. Who asked you to lie on the stand?
MR. MUNAS: Objection.
A. My -- so I was on the phone with my supervisor, Dillon Martini, and my section chief, Tara -- I can never say her last name right. Tara Resendiz-Trejo.
Q. Dillon Martini?
A. Yes.
Q. And Theresa --
A. No. Sorry. Tara.
Q. Tara.
A. I had a section chief named Theresa at

one point. So sorry about that.

Q. What was Dillon Martini's title?

A. Children's services manager.

Q. Tara's title?

A. Section chief.

Q. Was one of those people your direct supervisor?

A. Yes. Dillon was.

Q. Okay. And so you reported to Dillon?

A. That is correct.

Q. And then is it your understanding that Dillon reported to Tara?

A. That is correct.

Q. Okay. And Dillon's title was children's services manager?

A. That is correct.

Q. Were there other -- anybody else who you reported to when you worked at the Department of Job and Family Services?

A. No. It was just kind of just a line. I reported to Dillon. Dillon reported to Tara and Tara reported to Alex and Alex reported to Margie and so on and so forth.

Q. Could you estimate for us about how many employees with a similar role to assessment worker were at

that sort of level that you were -- you were at?
A. I'm not sure.
Q. Okay.
A. We had a lot of turnover. A lot of people did not stay. So I really have no clue at any point in time how many people we had.
Q. Several? I mean, was -- you weren't the only one?
A. I was not the only one.
Q. So there were -- is ten a fair number?
A. I would say more than that. So I believe that, like, a fully staffed section would be, like, five -- five managers and then, like, five workers a piece, but we were never fully staffed.
Q. So you worked under Dillon Martini?
A. That is correct.
Q. And he was the children's services manager?
A. That is correct.
Q. And I think I understood your testimony to be that there were five folks like you who reported to Dillon?
A. Yes. I don't think he ever had five.
Q. Up to five?
A. Yeah. It was just, like, me and one

other person. Sometimes it was, like, four people, but, like I said, constant moving.

Q. And were there other children services managers or was children services managers or was Dillon the only one?

A. No. There were multiple.

Q. Okay. How many of those were there?

A. I'm not sure.

Q. But each one of them, as far as you understand it, had up to five persons reporting to them?

A. That is correct.

Q. And Martini reported to Theresa?

A. Tara.

Q. Tara?

A. Tara.

Q. Section chief.

A. Yes.

Q. And what does section chief mean? What is the section that she was the chief of or was the chief of?

A. So there are -- there's multiple departments in children's services and then every department has section chiefs.

Q. Okay.

A. So section chiefs then have managers.

So they'll have, like, a team of -- like, I think a section chief -- a full team is, like, five managers. So she would delegate their work.

Q. And were all -- were all the managers children's services managers?

A. That is correct.

Q. So all those -- that collection of people who were -- had a similar managerial role as Dillon Martini reported to Tara?

A. Yes. Like, the only people that would have reported to Tara are assessment workers and managers.

Q. Gotcha. And what was the section called?

A. Just a section. It was just assessments -- a section within assessments.

Q. Okay. And then any idea how many section chiefs there are?

A. I believe -- let's see, I don't recall because I know there was, like, a lot of people quitting and things. So I -- when I left I'm not sure how many section chiefs there were.

Q. Again, there were several?

A. Yes. There was never just one.

Q. And section chiefs had other managers working under them?

A. That is correct.
Q. Would they be different than children services managers?
A. No.
Q. All children services manager?
A. All of us, if we were in a section, we were in the same section. She would never oversee multiple different departments. It was just assessment.
Q. Gotcha. So the assessments section chief?
A. Yes.
Q. And there were other section chiefs for different departments?
A. Yes.
Q. What were the names of those departments?
A. There was, like, an ongoing section.
Q. What would -- what would -- how would a case land in the ongoing section?
A. They would get it from assessments. If we determined that the case needed to remain open whether they're court involved or they just are a family that needs ongoing services. Because assessments is really supposed to be more of an investigation role.
Q. Okay.

A. Not an ongoing service provider, we would then transfer the case to ongoing.
Q. At what point would a case be determined to be ongoing?
A. If it was court involved.
Q. Court involved?
A. Yep. It went to ongoing. Or we had things called safety plans, which is a step below custody. Those would also go to ongoing.
Q. Okay. So is it conceivable that a child could be in -- a child could be receiving services under the ongoing -- the ongoing section for years?
A. That is correct. Because then after ongoing, once a child is determined to be committed to the State of Ohio, then they go to the adoptions unit.
Q. Okay.
A. So essentially a child could be within the streamline of the department for years.
Q. What other sections?
A. There was one called kinship.
Q. Kinship?
A. Yes. Kinship was a unit that, like, looked into the family members. And then they also had, like, a runoff section called 30 Days to Family. They worked with kinship to find family.

Q. Uh-huh. To find family, like, missing?
A. No. Like -- so let's say a child comes into the state's custody and we only have a foster home. We can't find family. This unit will actually reach out to people that these people didn't even know they were family because they had a strong belief that children should stay with family. So they tried every -- you know, every avenue they could.
Q. So family that these kids didn't even know they had --
A. Yes.
Q. -- were suddenly family for them --
A. Yes.
Q. -- according to the county?
A. Yes. And, I mean, it wouldn't be just, like, hey, here's your long lost cousin. It was like, hey, we have some family. Like, do you want to start, you know, going to -- like, would you be interested in meeting them, especially with, like, with older kids.
Q. So there would be need to be a mutual interest?
A. Yes.
Q. It wouldn't be just here's your family now?
A. Yes. Correct.

Q. Okay. Any other sections?
A. There were a few. Like, there was one called KISR, which stood for Kids In School Rule.
Q. Kids In School Rule?
A. Yes. And they just managed children -- because once a child enters into the system, you know, their education kind of takes a back burner.
Q. Sure.
A. So this department makes sure that they are -- you know, they look at report cards and, you know, just making sure that they're enrolled in school and all of those good things.
Q. And was each section organized similarly as the assessment section in that there would be a chief?
A. Yes.
Q. And then several managers under the chief?
A. Yes.
Q. And then several -- your counterpart of assessment worker under each of those?
A. Yes. We were called case workers.
Q. Case workers?
A. Yes.
Q. What were -- okay. What other sections?
MR. MUNAS: Objection.

A. So KISR.
Q. Hold on one second. We've got ongoing, kinship, KISR?
A. Adoptions.
Q. Adoptions. Okay.
A. And it's been a few years since I've worked there so I may be missing some, but that's all I remember.
Q. Okay. Did you work -- did you work with members of these -- of other sections on a particular case or were you strictly limited to the purview of assessments?
A. So when you are the assigned case worker, you have responsibility of that case.
Q. Okay.
A. So if you believe that you need to consult with, let's say, kinship or you're, like, hey, KISR, I have this kid that I just got custody of and he needs to get to school. So it really is case-by-case basis on who you're consulting with. Because sometimes we place a child with their grandparent and the grandparent has got everything figured out and they don't really need any outside sources.
Q. So as an assessment worker/case worker?
A. Yes.
Q. Would you be the first sort of line of

department -- the first person -- the first contact a child would have with the department would be a case worker?

A. Sometimes. I forgot we do also have an after hours unit.

Q. Okay.

A. That is kind of what people would refer to as 241-KIDS.

Q. Yes.

A. They answer the phones. Then they also respond to cases after hours. So after 4:45 and on the weekends.

Q. So 241-KIDS is a number that someone would call if they believed a child was being abused?

A. Neglected, dependent. If they're in need of services, other counties will call us and ask us for help within our own county, things like that.

Q. Okay.

A. They're just the screeners of the calls.

Q. Gotcha. So they don't have -- 241-KIDS doesn't have any responsibility -- I don't want to put it that way. But they -- they -- they don't -- do they have discretion about where a call or a child or a case gets placed or is it just, like you said, they screen the calls?

A. So 241-KIDS has multiple different responsibilities. They have one, which is taking the

report. They take the report, they send it to their manager, the manager speaks with the section chief. They decide what are we going to do with this? Are we going to screen it out, which means it didn't reach the threshold.

Q. When you screen something out, is there an investigation to get that or is it we don't even do an investigation because it doesn't even meet the baseline of what will qualify?

A. Exactly. There's no threshold, the report is taken and it's basically closed and moved on.

Q. Closed before there's an investigation?

A. Yes.

Q. Sorry. Continue.

A. That's okay. And then, like I said, during after hours and the weekends, they would respond since the assessment workers are off work.

Q. And would 241-KIDS -- was that a line that people could call 24 hours a day?

A. Yes.

Q. Okay. And were there assessment workers or intake workers or case workers available 24 hours a day?

A. Yes. So that's whose answering the phone.

Q. Oh, I see.

A. The case worker's answering the phone

and sometimes they would have to report to the same -- I'm sorry -- respond to the same report they took --

Q. Gotcha.

A. -- if we were not there. If assessments was in the building Monday through Friday, we would respond.

Q. Gotcha. Were you ever charged with working intake with 241-KIDS? Was there a shift that had to work evenings or weekends or overnight or anything like that?

A. No. They are actually their own unit. Sometimes they would reach out to us, like, hey, we have some overtime, do you want it, but I never did work that.

Q. Would it be possible for you to get a call that there was a child in need of services after hours or on the weekend or anything like that?

A. Not that I would respond to, but if I had a case assigned to me and let's say another call came in about that said case, sometimes they would call me.

Q. Okay. And would that be unusual or was that something that you could -- that happens somewhat regularly? However, you define regular, is it something that happened regularly?

A. They were told not to call us. If we were off work, we were off work. They continued to call us. It was a huge ongoing issue. I always answered even if it

was 3:00 in the morning because I truly cared about all of the children in my caseload. So I would answer, but they were not supposed to call us.

Q. And was it 241-KIDS who were doing the calling?

A. That is correct.

Q. Okay. Did you have -- during your tenure, did you have any managers other than Dillon Martini? By managers, I mean how you define Dillon's role. Did you have any other managers besides him?

A. Yes.

Q. What were their names?

A. The first one I had was Jennifer Buyers.

Q. Okay.

A. Then I had Carrie Cwynar.

Q. How do you spell Carrie's last name?

A. I believe it's C-W-Y-N-A-R.

Q. Pronounced Cwynar?

A. Cwynar.

Q. And those were your supervisors for Dillon?

A. Yes. But then, like, Carrie would go on maternity leave, so I would be under -- I would be under other managers for the day. I always had to have a manager covering me.

Q. Gotcha. And as far as your work space, did you have an office?

A. Yes. I had a cubical.

Q. Okay. What -- what floor of the building?

A. I don't remember.

Q. The building being on?

A. I don't remember.

MR. MUNAS: I'll object to the question. It's a secure office for the record.

MR. WHITTAKER: Fair enough. Fair enough.

Q. And were there others in your general area in your -- others in cubicles in your area?

A. Yes.

Q. Were they assessment workers like you?

A. Yes.

Q. And at your -- did you have a desk?

A. I did.

Q. And do you have a separate phone line at your desk?

A. Yes, I did.

Q. Were you issued a mobile phone by the county?

A. No.

Q. Okay. So you didn't have a separate phone if you were -- there were circumstances when you had to go out in the field, right?

A. Yes.

Q. When you went in the field, they needed to be able to get in touch with you?

A. Yes.

Q. You needed to be able to get in touch with them?

A. Yes.

Q. You used your own phone for that?

A. I was given a stipend of $30 a month. I could either use my own personal phone. I could do whatever I want with it. I believe I had, like, a burner type phone for a little bit, but I didn't use that often. I mainly used Google text because having two phones was just overwhelming.

Q. So you had two phones at one point or had the option of having two phones?

A. That is correct.

Q. You elected to have one?

A. Yes.

Q. Keep one. Because carrying around two phones is a pain?

A. Yes.

Q. And you used Google chat to communicate on your personal phone about work matters with whomever in your office?

A. Yes. It was, like, called Google Voice or something.

Q. Oh, yeah, yeah, yeah. But that Google Voice service, was that a county service or was that something you signed up for?

A. No. That was my own personal service that I have to sign up for and then I could use the stipend to pay part of my phone service.

Q. Okay. Were there others who used Google Voice for that same purpose?

A. I'm not sure.

Q. Your Google Voice number was different than your personal mobile number, though, right?

A. Yes.

Q. Any idea -- could you tell us what the Google Voice number was?

A. I'm not sure. And I also had to change it multiple times because, as you can imagine, people didn't love me after I removed their children. So I would often have to block them because they would make personal threats to me and my child, so I changed it a lot.

Q. Oh, I'm sorry to hear that. But it

was -- it was just a Google Voice number that you changed or did you change physical phones and all that as well?

A. I mean, I upgrade whenever I can.

Q. Gotcha. Okay. IPhone?

A. Yes.

Q. About how long did you have a Google Voice line?

A. It would have been the entire time that I was at JFS.

Q. Okay. And did you use -- did you use that number exclusively for -- if it was a mobile call related to your employment?

A. I would use that to contact my clients.

Q. Gotcha. So that was for clients only?

A. Yes.

Q. Gotcha. Did the department approve the use of a Google Voice line?

A. Yes.

Q. Okay. Is that something that you had to ask if you could do or did they say could you do that if you want to and you just --

A. So the first day of training they basically said, hey, you can do whatever you want. You can use your own personal number, you can use Google, you can buy a new phone. You can just contact them through your

work -- you know, your, like, work phone that's stationed at your desk or through email. We don't care. Whatever you do, you don't have to tell us.

Q. Were you -- did you have access to any confidential information on your mobile phone?

A. Well, nothing stored on my phone, but SACWIS is just a website.

Q. Okay.

A. So you can access SACWIS. And I also use my phone to contact attorneys and things like that. So I would say yeah, probably.

Q. Okay. And when you contacted attorneys, would you use that Google Voice line or would you use more -- would it be more often your phone at your desk?

A. I guess it really just depends on where I was.

Q. Okay.

A. Sometimes I'd accidently use my own personal number just being in -- you know, the case itself gets a little overwhelming. I'd jump on and be, like, oh my gosh, I just accidentally called from my personal number. So it really just depends.

Q. Okay. Forgive me if I already asked this, but were there other assessment workers who also used Google Voice lines or some sort of secondary line to

communicate with families or whomever they had to communicate with outside of the office?

A. I have to assume some of them used it, but I'm not for sure for sure. I never talked to anybody about that.

Q. And you mentioned SACWIS. Could you tell us what SACWIS stands for?

A. I believe it stands for Statewide Access to Child Welfare Information System or something.

Q. If I -- Statewide Automated Child Welfare Information System, does that sound about right?

A. What is it again?

Q. Statewide Automated Child Welfare Information System. Does that sound right?

A. That sounds right.

Q. Okay. And you could access it on your phone?

A. Yes. Because we were field workers, we truly had to be able to access that wherever we could.

Q. Sure. Is it just a website or is there an app?

A. I believe there was just a website.

Q. And you could log into the website from anywhere?

A. Yes. With your log-in and password, of

course.

Q. Sure. Sure. But you weren't required -- there wasn't any limitation on the device you could use to log into SACWIS?

A. Not that I'm aware of.

Q. So in addition to your mobile phone, would you log into SACWIS or access SACWIS from your desk?

A. Yes. We had a -- what is it called? A Surface Pro. It's like a tablet with a thing.

Q. Uh-huh.

A. That's what we carried.

Q. Oh, I see. Okay.

A. So I guess you could have a number on that too if you wanted.

Q. So Surface Pro, is that issued to you from the county?

A. Yes.

Q. Okay. And -- and you would carry that Surface Pro with you everywhere; fair to say?

A. I tried.

Q. Yeah.

A. Sometimes it's not always feasible to take anything with you. So you take your mobile phone and your keys and that's all you have.

Q. Why would there be circumstances in

which you couldn't take the Surface Pro?

A. It depends. Sometimes I'd go see clients in jail.

Q. Okay.

A. I wasn't allowed to have it in there.

Q. Okay.

A. Or just because I didn't want to take it into a family's home, you know, whether it was cluttered and I didn't have anywhere to put it.

Q. Uh-huh.

A. Or, you know, if I had to sit down and, like, it was kind of more dirtier home with bed begs and stuff, I wouldn't want to carry that in with me.

Q. Gotcha. Did you use the Surface Pro while at the office?

A. Yes.

Q. Was that your -- the device you used at the office or did you have a desktop or laptop as well?

A. No. You just plug it in.

Q. Just the Surface Pro?

A. Yep.

Q. So did -- did you have the same Surface Pro the entire time you worked there or did they upgrade or swap them out at any point?

A. At one point I had to switch it out

because I broke it.

Q. Okay.

A. But I can't remember.

Q. So had you not broken it, would you have kept the same one?

A. I'm not sure. I think that they switch devices sometimes. I'm not really sure.

Q. But as far as you recall for you, you had two devices: One issued to you that you broke and the other one was the replacement for that?

A. Yes.

Q. And you use your mobile phone. Did you have the same phone the whole time? You mentioned that you upgraded phones. Did you have the same phone or did you upgrade phones during that period of time?

A. I have no clue. I just upgrade my phone when I can.

Q. Okay. So other than the Surface Pro and your personal phone, any other devices that you used in the furtherance of your duties while you worked at JFS?

A. Not that I can think of.

Q. Okay. And the Surface Pro you could also access SACWIS from?

A. Yes.

Q. I want to go back to the case that you

were asked to lie on the stand about. You mentioned that that is Dillon Martini who you asked you to do that?

A. I was on the phone with Dillon and I believe it was Dillon and Tara. Oh, my gosh. I'm sorry. Wrong name. In Tara's office.

Q. Dillon was in Tara's office.

A. Yes. Like, the communication was coming from both of them.

Q. I see. At the same time or separately?

A. I don't recall.

Q. Okay. Any other circumstances in which your supervisors asked you to not tell the truth in a -- in a court proceeding?

MR. MUNAS: Objection.

Q. You can answer.

A. That is the only time that I currently remember of being told outright to just not tell the truth.

Q. Have you had heard of that being asked of others?

MR. MUNAS: Objection. Relevance.

A. I can't say. I have never really talked to anybody about that.

Q. Okay. Was that the only other -- the only instance in which you were asked to lie?

MR. MUNAS: Objection.

A. Yes.
MR. MUNAS: Relevance.
MS. MCCLANAHAN: I'm going to object as well.
A. Yes.
Q. Okay. And that I think you described that as the final straw.
A. Yes.
Q. Were there other straws that came before that that made that the final one?
A. There were a lot.
Q. Uh-huh?
A. I was overworked, underpaid.
Q. Uh-huh.
A. The -- just the way that the county was ran, it was just very overwhelming.
Q. Uh-huh.
A. I didn't have any support.
Q. Okay.
A. I had a panic attack while I was driving and I actually passed out.
Q. Goodness.
A. I called my section chief and she said, okay, do you think you can make it back to work tomorrow?
Q. Uh-huh.

A. Between all of that, I was kind of at my wits end.

Q. Was that something that was compounding over a period of time or did it start at some point in particular?

A. I always had my griefs.

Q. Sure.

A. But it got really bad towards the end.

Q. Could you give us a time frame of how you define that period towards the end? When did towards the end start?

A. So I left in October of 2023. I would say, like, starting that summer --

Q. Okay.

A. -- I started really not -- really kind of not being able to do it anymore. My body was starting to break down.

Q. Okay. And do you know why you were asked to not tell the truth by Dillon Martini and Tara?

MR. MUNAS: Objection.

MS. MCCLANAHAN: Objection.

A. It was a disagreement and a safety decision.

Q. It was a disagreement about a safety decision?

A. Yes.
Q. Okay. What was the safety decision?
A. They wanted the child removed.
Q. Oh. Any idea -- any idea why that was so important to them?
MR. MUNAS: Objection. Relevance.
A. I'm not sure. I can't speak for them. I tried to tell them. I tried to even offer, hey, if you guys want to come testify --
Q. Sure.
A. -- I will step to the side. You can take this case away from me. I don't have to stay on this case.
Q. So it wasn't expressed to you why you needed to do that other than they believed that it was -- other than they believed it was the case that the child needed to be removed?
MR. MUNAS: Objection.
A. That is correct.
Q. And what was the response when you said you would step aside if they wanted to come and reassign the case or handle the case themselves or testify themselves? What was the response to that?
MR. MUNAS: Objection.
MS. MCCLANAHAN: Objection.

A. I was basically told no, they weren't coming.

Q. Okay. Was that -- how long was that process of -- I assume that you knew you were going to be testifying in this case before you were there to testify? Or am I assuming incorrectly?

A. No. That's correct.

MR. MUNAS: Objection.

Q. About how much time did you have before that and the time in which you were called on to testify?

A. It was an incident that happened over the weekend. So I clocked in at Monday at, like, 8:00 and I get a phone call at 8:30 when case assignments start coming out. And they say, hey, you have to be at court at whatever time it was. I think Day 1 usually started at 10 or 11. So it was, like, a couple of hours.

Q. Oh, I see.

A. Yeah.

Q. And that was a new case?

A. It was actually an existing case that I already I had. I had met the family. Already had made the safety decision. Another incident had happened over the weekend, after hours responded. So then I'm brought back into the loop on Monday.

Q. And were you -- are you the person who's

informed of the incident over the weekend? Are you the first person who's informed or does somebody else -- does that information go to somebody before it reaches you?

MR. MUNAS: Objection.

MS. MCCLANAHAN: Objection to relevance.

MR. MUNAS: Justin, for the record, if we get too specific about this case, you know, children's services and juvenile court cases, dependency cases are confidential.

MR. WHITTAKER: I'm not going to ask any details about any specific case.

MR. MUNAS: I understand that. You seem to be stuck on this at the moment and it is irrelevant.

MR. WHITTAKER: She testified that she was asked to lie. I'm going to go into it.

MR. MUNAS: I understand why you're interested in it. I just don't understand why it has anything to do with this case at all.

MR. WHITTAKER: She testified that she was asked to lie by her boss, Dillon Martini and Tara, unprompted. And I'm going to ask questions about it.

MR. MUNAS: And unrelated to this case.

MR. WHITTAKER: I'm going to ask

questions about it unless you're telling her not to answer.

MR. MUNAS: I'm going to keep objecting.

MR. WHITTAKER: Okay. I understand your objection. I'm not going to ask details about any of these cases. I think it's more than valid and more than proper to go into a witness testifying that she was asked by a public official to lie.

MR. MUNAS: And that's not what your lawsuit is about. That's not what any of the claims in this case are about. We have a limited amount of time with the witness today.

MR. WHITTAKER: Okay.

MS. MCCLANAHAN: Justin --

MR. WHITTAKER: I understand your objection.

MS. MCCLANAHAN: Madison, if you are -- if at any point you feel like you do have to disclose any information based on his questions, have anything to do with who was involved, what happened, do not go into any facts.

THE WITNESS: Absolutely.

MR. WHITTAKER: And I'll reiterate that. I don't want to know any specific details. I don't want to know the names of children involved,

families involved. Anything.

MS. MCCLANAHAN: And if you could refrain from -- like, don't give anything that could specify exactly what happened.

THE WITNESS: Okay.

MS. MCCLANAHAN: If you could avoid that.

THE WITNESS: Okay.

Q. So when you would get a call, would it be unusual for you to have to go to court with a couple hour's notice on a Monday?

A. No. That was pretty normal. We would sometimes remove kids and go to the court the same day. It's a very time sensitive matter.

Q. Okay. Okay. Not unusual?

A. Not unusual.

Q. Would you ever have to go to court on that sort of limited time frame for a case that you didn't have any familiarity with?

A. Yes.

Q. And I'm going to hand you what I believe is already an exhibit in the record. I'm going to hand you this pile of exhibits from the other day.

A. Okay.

Q. If we could just keep those safe.

A. Okay.
Q. I believe Exhibit 1 is already -- if you wouldn't mind looking for that file. It should already be there. I think I introduced this in Officer Hooven's deposition. It's the First Amended Complaint in this case. It might be easier to look at the exhibit numbers.
A. Got it.
Q. Okay. I've handed you what's already been marked as Exhibit 1. It is I'm going to represent to you the First Amended Complaint and Jury Demand filed in this case. Have you seen this before?
A. I have.
Q. Okay. Did you review any documents before your -- in preparation for your deposition today?
A. With my attorney.
Q. Okay. What did you review document wise?
A. Am I allowed to say what I did with my attorney?
Q. I'm going to say yes, but your attorney might say no.
A. Okay.
MS. MCCLANAHAN: Objection to that.
MR. WHITTAKER: Are you instructing her not to answer?

MS. MCCLANAHAN: Yeah. Don't answer that.

Q. Did you look at any documents independent of meeting with your attorney?

MS. MCCLANAHAN: You can answer that.

A. Yes.

Q. What did you look at?

A. I reviewed the text messages between me and the defendant.

Q. Text messages between you and Officer Hooven?

A. That is correct.

Q. Would that be -- would that be that document that is 200 and something -- 200 and something pages?

A. Yes.

Q. Okay. I believe that it was introduced at Officer Hooven's deposition. I don't know if it's in that stack, but it's printed --

A. It is.

Q. Oh, it's that one right there.

MR. MUNAS: It's Exhibit 22.

Q. Exhibit 22. I don't know if it was introduced that way, but that's how I marked it. As far as -- have you look at that exhibit, Exhibit 22? Should be

in the pile there.
A. Of the text messages?
Q. Yeah.
A. Yes.
Q. Have you -- are those -- those are text messages that you produced, right?
A. Yes.
Q. In discovery. And as far as you know, is that a complete -- complete -- complete accounting of text messages between you and Officer Hooven?
A. I believe so.
Q. Did you delete any text messages exchanged between you and Officer Hooven?
A. I did not.
Q. Okay. Did you communicate with him by email?
A. No.
Q. How about on any other apps? Any other messaging apps?
A. Nope.
Q. Did you use the Google Voice number or did you use your personal number?
A. Personal number only.
Q. Did you use the Google Voice number to communicate by text with anybody?

A. Other than clients, no.
Q. So you did communicate with clients via text?
A. Yes.
Q. And from the Google Voice number?
A. That is correct.
Q. But you didn't communicate with anybody else via text through the Google Voice numbers?
A. Correct. My Google Voice was for clients only.
Q. Gotcha. And did you -- did you inquire about whether or not it was appropriate to have a Google Voice number or did someone just mention it to you and say that is okay?
MS. MCCLANAHAN: Objection. Already asked and answered.
MR. MUNAS: I also object for the same reason.
A. Yes. They told us we could use whatever we needed.
Q. Is that in response to a question you had or was that just generally spoken --
A. It was general training.
MS. MCCLANAHAN: Objection. Asked and answered.

(Off-the-record discussion.)

Q. And that was part of your training?

A. Yes.

Q. You said it was part of your general training. There was no specific -- was there any specific training on the handling of confidential information?

A. I don't recall.

Q. I'm going to clarify that I'm asking about the entire time you worked at Department of Job and Fam9ly Services, not specifically with respect to the Google Voice number. But did you have training at all about the handling of confidential information?

A. I'm not sure. I went through training probably six years ago, so I don't recall what it was all about.

Q. Okay. Do you recall any of your training? And, again, not a memory contest. If you can't remember something specific -- if I have a document that I could show you, I will try to do that. But if you can't remember something you can't remember. So I don't want you to speculate about what you might have done or what you think you would have done, but do you remember any of the topics that you had training about?

A. I do. I remember -- I don't remember, like, my in-house training that much, but we had to go to

statewide training called Core. And I remember --

Q. What was it called?

A. Core, C-O-R-E.

Q. Gotcha.

A. I remember some subjects. We talked about, like, response times.

Q. In-house?

A. That was both in-house and state.

Q. Okay. So response times?

A. Yes.

Q. In what context?

A. Just, like, when a case would be called in, it would be -- you know, whether it's a one-hour response -- I think it was in 24, 48 -- whatever it was. So we, like, just, you know, like, the basics of how, like, a case is sent through the system.

Q. Oh, I see.

A. Things like that.

Q. Any other training that you recall either in house or Core?

A. I don't recall any specifics.

Q. You had to have Core training on various topics every year? Or was there a calendar that you needed to accumulate a certain number of credits?

A. Yes, there was a calendar. I'm not sure

what, like, the details were. I do recall being in one Core training and the Core, like, instructor was a Lake County Job and Family Services director. And he was, like, oh, you're in Core and you already have how many cases. And I was, like, I have 60 something cases. And he said you should have completed Core before you were here. So it was very much -- it was very clear to me that we were not doing what we were supposed to be doing.

Q. Okay. So was the Core training not something that happened every year? Was that a -- something that people new to role, new to the job needed to do when they started --

A. Yes.

Q. -- and then -- okay.

A. Yes. We had someone that maintained our training. So we would just go when we were told.

Q. Gotcha. I guess my question is whether or not you had to go to training sessions every year? Annually or --

A. I'm not sure.

Q. Okay.

A. I'm not sure if we had, like, continuing education or anything. I don't recall.

Q. The core training was supposed to be, as far as you understand, something that happened upon being

hired?

A. Yes. I was under the understanding that after that conversation that I was supposed to complete all statewide and in-house training before receiving cases.

Q. Okay. What was the source of that information to you?

MS. MCCLANAHAN: Asked and answered. Go ahead.

A. I'm not sure I understand the question.

Q. Who is it who informed you that you were supposed to have the Core training before you even had a case?

A. It was someone -- oh, that was the Lake County Job and Family Services, like, director. I don't recall his name.

Q. So this is at a session? At a Core training session?

A. Yeah, at a statewide session.

Q. Statewide session?

A. Yeah.

Q. Where was that located? Where was that session?

A. It was at a training facility called Sourcey.

Q. Where's that?

A. It's off of Wards Corner in, like -- I think that's Clermont County.

Q. Okay. And a person who worked at the -- as the director of the Lake County office informed you that you should have had Core training before you had cases?

A. Yes.

MS. MCCLANAHAN: Objection. Mischaracterization of your testimony, but go ahead. You can answer.

Q. Okay. Did I mischaracterize your testimony?

A. Can we back up?

Q. Sure.

A. I'm kind of confused. I'm sorry.

Q. Sure. Yeah. My question was whether or not the person you discussed this with at the training facility, the Lake County director, if that person told you that you were supposed to have your Core training completed before you had cases?

A. Yes.

Q. Okay. And did you also -- did you also come to learn that you were supposed to have your in-house training completed before having cases?

A. Yes.

Q. And was that -- did the same person

inform you of both Core and in-house training needed to be completed before you had cases?

A. Yes.

Q. Okay. Why? Why was the importance of that training -- what was the importance of that training to be done before you had any cases?

A. He was under the belief that it was irresponsible to send case workers that did not have their full training modules completed.

Q. When were you informed of this?

A. I don't recall when I had that training.

Q. Did you raise that training issue with any of your supervisors?

A. Yes.

Q. Who?

A. At the time I was under Carrie Cwynar.

Q. Okay.

A. So I told her.

Q. And she was your manager at the time?

A. Yes.

Q. And you don't -- you don't recall when that was?

A. It would have been before covid.

Q. Oh, 2019 then?

A. Because it was in person. So I think it

was actually at the very beginning of, like, 2020.
Q. Okay. It could have been January or February of 2020?
A. Yes. Sometime in that range.
Q. And so you went to Carrie and said -- and asked her -- well, you tell me. What did you -- what was the conversation with Carrie Cwynar about?
A. We had a pretty detailed conversation because I learned a lot in this training.
Q. Okay.
A. And I came out with a lot of concerns.
Q. Okay. What information did you learn in the training that you came out of it with a lot of concerns?
A. One, that this director of Job and Family Services from another county is telling me that, you know, that's not standard practice. You shouldn't be out here taking cases without these training modules. And I also -- he also told me -- well, not just me directly, but the class that part of our -- so we have -- when we get a closer case, we can do what's called unable to locate.
Q. Uh-huh.
A. And that's, like, if we're unable to find a family. We go through, like, a checklist. One of those checklists -- one of those items on that checklist is conferring with your local county's Medicaid and SNAP

services. You ask them, do you have any addresses on file. He said that's actually illegal and we should not be doing that. However, everything we do -- like, protecting children trumps everything. And so I kind of went back to the office, like, wow, that was --

Q. Illuminating?

A. Yeah, illuminating.

Q. As a general matter, would you agree that the protection of children is the most important part of your job?

A. Yes.

Q. So how long before you -- after you learned that information do you go to Carrie with it and raise -- raise the issue?

A. Pretty shortly after. I'm not sure the exact timeline.

Q. Would it have been as soon as you got back from the training?

A. Yes. Like, the next day or if I had, like, Core training that second day, whatever next day I saw her at work.

Q. Was it a priority for you to get in contact with Carrie to discuss the issue?

A. Yes.

Q. Did you discuss it with Carrie in -- did

she have an office? A separate office?
A. Just an open cubicle like me.
Q. She had a cubicle like you. Did you discuss this with her openly in a cubicle or were there meeting rooms that you stepped aside into?
A. No. We just talked openly in the cubicle.
Q. Tell me what the conversation was. How did it go?
A. I just basically said, like, I kind of feel lost a little bit. You know, I have this huge caseload and now I'm -- like, I'm not even fully trained. I have all these concerns. I'm working by myself with no support. I mean, I feel like I'm being thrown to the wolves. And that was pretty much it.
Q. And did you feel that way before the training session?
A. A little bit. A little bit. When my case -- my caseload rose so quickly.
Q. Uh-huh. And did you -- was it the training session that elevated your concern?
A. Yes.
Q. What did Carrie say in response to your concerns about a lack of training?
A. I don't recall exact words, but it was

essentially like, yep, that's what we do here in Hamilton County.

Q. Did Carrie offer any suggestions or solutions to how you expressed your feeling about the lack of training?

A. No. I had told her to. I said every time I go to Core everybody laughs at Hamilton County. They say we do things so wrong and backwards. So I was feeling really overwhelmed and kind of rethinking everything. You know, am I diving into the wrong career. You know, am I -- with an agency that I don't morally align with. So I really started to question things. And I kind of talked to her about that. And she basically said, like, you are not alone in how you feel.

Q. So --

MS. MCCLANAHAN: Justin, you're not, but when we're at -- it's a good break time, could we just take a break?

MR. WHITTAKER: That's fine. Now's a good time.

MS. MCCLANAHAN: Is now a good time?

MR. WHITTAKER: Yes.

(Whereupon, a brief recess was taken.)

MR. WHITTAKER: Okay. We're back on the record after a quick break.

Q. Miss Paul, you realize you're still under oath?

A. Yes.

Q. Okay. And I neglected to mention any time you need a break, go ahead and ask for one and that happened.

So is it fair to say you know the defendant in this case? You've met the defendant in this case, Jesse Hooven?

A. That is correct.

Q. And you met him in March of '23?

A. Yes.

Q. And you met Officer Hooven during a call for services to -- scratch that.

How did you meet Officer Hooven?

A. I was in need of police officer services in District 5, I believe it was, so I called District 5 for help.

Q. Okay. Was that unusual?

A. No.

Q. And so you called District 5. And when you called District 5, did you get Officer Hooven or did you get somebody else?

A. No. I believe it was, like, a supervisor or something that I spoke to, like, a

communications supervisor or something. Told him what was going on and then he dispatched officers.

Q. Okay. And I think you testified that that was to the Quality Inn down on -- is it Eighth Street or Gess Street?

A. No. It's on Central Parkway. I believe it's called the Budget Inn.

Q. Budget Inn. How silly of me. Budget Inn on Central Parkway?

A. Yes.

Q. Okay. And that's where he testified he was asked to report to. Is that your recollection?

A. Yes.

Q. Without getting into too much details, what was the nature of the call that you -- that you needed or asked for a police officer to meet you there?

A. Earlier that day the state had received custody. I was given a court order saying that with police assistance I needed to go try to find them.

Q. Okay.

A. So that's what I was doing.

Q. And what led you to believe you needed to go to the Budget Inn?

A. We received a report that the children were being basically hidden by dad.

Q. Oh, I see. Okay.
MS. MCCLANAHAN: Same thing. Don't mention -- divulge too much information.
THE WITNESS: Absolutely.
Q. And when you arrived at the Budget Inn on Central Parkway, was Officer Hooven waiting for you or how did that go?
A. Yes. I actually was at my office and received a phone call from him.
Q. I see. And what -- what did he tell you?
A. Basically, like, I'm at the Budget Inn, are you going to be here soon? We've been waiting for you.
Q. Oh, okay. And then did you -- is that when you went to the Budget Inn?
A. Yes. I had paperwork to do.
Q. Okay. And you met him there at the Budget Inn?
A. Yes.
Q. Were there any other officers with him or was it just him?
A. There were others.
Q. Any idea what their names are?
A. I have no clue.
Q. How many officers were with him?

A. I'm not sure.
Q. Were there multiple police vehicles?
A. I know there were multiple vehicles. Not sure how many.
Q. Okay. And I take it that you needed -- you needed police because this could be -- did you anticipate that this could be a dangerous situation?
A. Yes. Without indulging too much information, we believed it was dangerous.
Q. Okay. Is that unusual?
A. No.
Q. Okay. Other -- there were other instances in which you called to ask for police to meet you at a scene?
A. Yes.
Q. Would that include people's homes?
A. Yes.
Q. And what is the role, as you understand it, of police officers in these situations? Do they have an active role as far as you understand it or -- or describe that?
A. I can't speak on what police officers are told per their agency. My understanding was that we were a partnering agency.
Q. Uh-huh.

A. If I called them, they were to come and just basically assist in whatever I needed assistance with.
Q. I see. So your understanding of that situation is that the police operates in an assistive capacity according to what you -- what you need them to do?
A. Yes.
Q. And when you arrived at that scene, are you the person with authority to make decisions about what happens at the scene?
A. Yes, but no.
Q. Okay. Explain that.
A. I can only do so much without a court order.
Q. Sure.
A. I can do what a court order says --
Q. Uh-huh.
A. -- as far as, you know, making decisions about the children, that's coming from JFS. That's not coming from the police.
Q. Okay. And are you the -- are you the public face of JFS when those decisions are made in that situation?
A. That is correct. So the state will have custody, but I'm the case worker representing the state.
Q. Gotcha. And you described the

Cincinnati Police as a partnering agency?
A. Yes.
Q. Are there any other partnering agencies that you recall?
A. Lots.
Q. Okay. Other police departments or just the Cincinnati Police?
A. It was the expectation that where you were working you were able to rely on whatever jurisdiction you were in.
Q. I see. So if it was Norwood, you could call the Norwood Police?
A. Correct.
Q. Okay. And did -- was there some sort of training on how to coordinate with the partnering agencies like Cincinnati Police?
A. Can you reask the question?
Q. Yeah. Did you have any training sessions or did you get any instruction from any of your supervisors about how to coordinate with partnering agencies about whatever you needed to partner and coordinate with? About?
A. The only thing that I can recall is that when you're working with these -- with these partnering agencies, whoever it may be, whether it's a hospital or

police, just standard, that whatever you tell them is confidential, that they are working within your confidential, you know, whatever -- however you want to word that.

Q. Okay. So the training you received was that whenever you were working with a partnering agency that a level of confidentiality that you had to follow, they also had to follow? Was that the nature of the training?

A. That is correct.

Q. Okay. And as far as confidential information goes, what sort of training did you receive about the handling of confidential information? And to clarify, your handling of confidential information.

A. I don't recall specifics.

Q. Specifics aside, do you remember having training on the topic of confidentiality?

A. I don't recall, like, specific agendas --

Q. Okay.

A. -- if you will.

Q. Okay. And by agenda, do you mean, like, sessions to have for -- sessions in which the topic was confidentiality or confidentiality was discussed?

A. Yes. Like, I would go to training and I wasn't sure what the agenda was.

Q. Gotcha. Are there any agendas and agenda items that you do remember from any of your training?
A. I recall the mandator reporter training.
Q. Uh-huh.
A. And that's pretty much it. That was seven -- you know, going on seven years now.
Q. Okay. And you are a mandatory reporter, right? Or you were?
A. I still am.
Q. Still are. And you were at the time?
A. I was.
Q. Who did you receive instruction from about how to coordinate with partnering agencies while you worked at JFS?
A. It was kind of just figured out as you go.
Q. Okay.
A. Everybody worked with every agency differently.
Q. I see. Did you understand that you had some confidentiality obligations?
A. Yes.
Q. What was -- what's your understanding of what those obligations were?
A. Reporter name is always confidential no

matter what. Even if you're asked on the stand you cannot disclose that information.

Q. Is that meaning the name of a person who, say, called in a situation?

A. Yes.

Q. Okay.

A. That is always to remain anonymous.

Q. Okay.

A. In fact, the specific details that we couldn't hand paperwork to clients. Like, I couldn't say, hey, here's the report that was written about you.

Q. Okay.

A. I also couldn't, like, say word for word. It was real heavy ensuring that we didn't disclose reporter information.

Q. Okay. Was there any emphasis on the confidentiality of information about children?

A. Yes, a general understanding I would say.

Q. Okay. Can you explain what you mean by a general understanding as opposed to specific training?

A. When gathering information about -- like, they call collateral information. It's a one-way street. Let's say I was to call a child's teacher. They can't say, oh, well, what's on the report? You can only

give me information. I can't give you information.

Q. I see. Is there -- and, again, is that something you had training on or did you have some sort of instruction from somebody about that in particular?

A. Yes. It was verbal through another case worker that was training me.

Q. Oh, okay. So another case worker at or around your -- your level?

A. Yes.

Q. Was training you, I assume, when you started? Around the same time that you started?

A. Yes.

Q. What was that person's name?

A. I had a few.

Q. Okay. Were they all case workers? Other case workers?

A. Yes.

Q. Did you have -- did you receive any training from someone at the manager level ever?

A. Like, as far as, like, on, like --

Q. Let's say confidentiality.

A. I don't recall.

Q. Did you receive any training from anyone at section chief level on confidentiality?

A. I don't recall. I don't recall at all.

Q. Okay. Does it mean it didn't happen, you just don't recall that if it did or not?
A. Correct.
Q. Okay. But as far as -- as far as you remember and as you sit here, you remember receiving training from fellow assessment workers?
A. Yes.
Q. Any other topics that you received training from other assessment workers about in addition to confidentiality?
MS. MCCLANAHAN: Objection. Relevance.
Go ahead.
A. It was a lot. I mean, just how to work a case.
Q. Okay. Did you -- did you receive any written materials, training material about any topic at any time during your employment with JFS?
A. I don't recall receiving any physical documents.
Q. Okay.
A. Other than, like, what I was -- got in the hiring process.
Q. Okay. Was there a library of material you could consult online or anything like that about training? Any -- any issues of training?

A. I was told that our policy book was on the JFS website.
Q. Okay.
A. Not their website, but, like, the internal website.
Q. Gotcha. Who told you that?
A. I'm not sure.
Q. Okay. Any other materials beside the policy book that was available on the internal JFS website?
A. I don't recall what was all on that website.
Q. Did you ever consult that website?
A. I think I did once and I couldn't find what I needed.
Q. Okay. What were you looking for in that instance?
A. It was a specific policy for agreements that we had with Kentucky.
Q. Oh, I see. Would that be agreements you had with partnering agencies in Kentucky or --
A. It was about the legality of how we placed children in Kentucky.
Q. I see. And any other instances in which you consulted that resource?
A. Not that I recall.

Q. Did you ever have any questions yourself about confidentiality -- confidentiality requirements, specifically your requirements?

A. I can't speak on what I -- you know, I worked there for four years. I can't speak on if I have that thought at all.

Q. Okay. Okay. Did anyone ever approach you with information about whether or not you were handling a particular piece of information correctly in terms of how it was in terms of confidentiality? Did anyone ever tell you that you were not doing something properly within the bounds of confidentiality with any information?

A. Not that I recall.

Q. Did anyone ever come to you and say, hey, here's how we like to handle this particular kind of information confidentially?

A. Just when speaking with the prosecutor's office.

Q. Okay. The prosecutor's office would let you know that they -- how they treated information confidentially? Or what do you mean by that?

A. A case-on-case basis in speaking with them since they were my legal counsel.

Q. Okay. The prosecutor's office -- not in connection with this case?

A. Correct.
Q. Okay. In connection with other cases?
A. Yes. So the prosecutor's office represented JFS.
Q. Right. Okay. And there were instances in which you had to speak with someone at the prosecutor's office?
A. Yes. If we filed anything in court, we had to talk to prosecutors.
Q. I see. And you had discussions with them about confidentiality?
A. On a case-to-case basis, you know, this is this case, hey, we're not sharing this information or whatever. I mean, I always feel like that falls under --
MR. MUNAS: I'm going to just put an objection here. You're approaching what may be considered attorney-client privilege.
MR. WHITTAKER: Okay. I understand. I thought I might be, so I'm going to not go any closer.
MR. MUNAS: Okay. But I'm just --
MR. WHITTAKER: I don't want to go any closer to it.
MR. MUNAS: Okay.
Q. Did you have any training on accessing

the SACWIS database?
A. Yes, there was.
Q. Okay. Do you remember when that was?
A. I do not.
Q. Would that have been something you had upon being hired or --
A. It would have been a part of a curriculum, whether it was state or county.
Q. I see. So it could have been part of the Core training?
A. It could have.
Q. And it could have been part of your in-house training?
A. Yeah, it could have.
Q. Probably -- probably close in time to when you were hired?
A. I would say.
Q. Okay. Do you remember the details of any of your training on how to access SACWIS -- the SACWIS database?
A. I do not.
Q. Did you have any training specifically about just how to use the SACWIS database generally?
A. Yes.
Q. Okay. That was part of your Core

training or in-house training?
A. I can't say.
Q. Would that have been training that you think you would have received close in time to when you were hired?
A. Yes.
Q. Okay. Was there any ongoing training about SACWIS?
A. Not that I recall.
Q. I've never seen the SACWIS database and I doubt I ever will. From your perspective as a worker, was it easy to navigate? Was it --
A. No. It was incredibly difficult.
Q. Difficult. Okay. And did you ever have questions about how to navigate it?
A. Yes.
Q. Who would you ask if you had questions about that?
A. Another case worker.
Q. Okay. Did you ever ask any of your supervisors about an issue you had or ran into with the SACWIS database?
A. I'm not -- I don't recall. I'm not sure.
Q. Do you recall any of your instructors

ever giving you -- offering you information -- your supervisors ever offering you information about anything related to the SACWIS database, how to use it, how to access it, anything?

A. Yes, but I'm not sure of what context.

Q. Okay. And to clarify, that would have been from Dillon?

A. Or Carrie or any of them.

Q. Or Carrie. Okay.

A. They would have their SACWIS profile and I would have mine. So I would ask them questions about how to send them certain things.

Q. Okay. And did you get responses?

A. Typically, yes.

Q. Okay. Do you feel like you had a good handle on how to use the SACWIS database while you were working for JFS?

A. Eventually, yes.

Q. Eventually. How long did it take for you to get the feeling that you had that thing under control and you knew how to operate and navigate that database?

A. Probably a couple of months.

Q. Okay. Did it ever change, like, the formatting or the layout of the -- of the database?

A. I don't recall.

Q. Okay. So you meet Officer Hooven at the Budget Inn at Central Parkway?
A. Yes. Yes.
Q. And some other officers whose names you don't remember. Did you have any conversations with Officer Hooven?
A. Yes. But it was case related.
Q. Case related. About the case you were -- that you were both there to work on?
A. Yes.
Q. How long you were at that location?
A. I'm not sure.
Q. Did -- were the kids found at that located?
A. No. And we actually went to two locations.
Q. Same day?
A. Yes, same day.
Q. What was the second location?
A. Stanley Row.
Q. Say that again.
A. Stanley Row.
Q. What's that?
A. Apartment complex.
Q. Okay. Where?

A. Down here in Cincinnati. Downtown.
Q. Okay. And Officer Hooven, did he meet you at that location or did he accompany you to that location as well?
A. Yes.
Q. And why did you -- why did you travel to a second location?
A. Just trying to find the kids. We were going off of what we were told.
Q. And were the children located at that second location?
A. No.
Q. Okay. About how much time from you arriving at the Budget Inn to the time you depart the Stanley Row Apartments did that process take?
A. I'm not sure.
Q. Was it half a day?
A. I would say, yeah.
Q. Did you go back to work after that?
A. I did because the children were at my office.
Q. Oh. The children you were looking for were at your office?
A. Yes. They appeared.
Q. Did they appear on their own? Did

someone bring them there?

A. I don't want to go into too many details.

Q. Fair enough.

So you learned -- so you go back to your office after that interaction. And did you have conversations with Officer Hooven related to the case throughout your interaction with him that day?

A. Yes.

Q. And I don't want to get into the details of the case, but did you have any other conversations about any other topics with Officer Hooven that day?

A. In person?

Q. Yeah.

A. No.

Q. Okay. Did you have conversations -- communications with him that day not in person?

MS. MCCLANAHAN: Can you reframe that question? Do you understand what he's asking?

THE WITNESS: Kind of. Not really.

A. If you don't mind.

Q. Okay. So on the day that you met Officer Hooven to meet you at the call at the Budget Inn on Central Parkway, you had conversations with him in person about work stuff, the topic that you were there about?

A. Yes.

Q. The kids and the case. And I understood that you had more conversations with him after that the same day but not in person. Is my understanding wrong?

A. Correct. I did -- we did speak later that evening.

Q. Gotcha. And was that over the phone?

A. Yes. I called him to tell him the kids were there, stop looking for them.

Q. Okay. So in order to do that, you had to exchange numbers, right?

A. Yes.

Q. Okay. And you gave him your personal mobile number?

A. Yes.

Q. Not the Google Voice number?

A. Correct.

Q. Okay. And he gave you his mobile number?

A. Correct.

Q. And was the purpose of that to keep -- to keep each other updated on the case?

A. Yes. I essentially told him, hey, do you -- are you going to keep looking for them tonight? And he was, like, yeah, probably. Okay. Do you want to

exchange -- I don't know who discussed that, but we basically were, like, we'll be in contact if we find them and vice versa. Or if he found the kids he would call me.

Q. And it was understood -- well, did you understand that to be you could be in contact about that case outside of regular business hours?

A. I was still clocked in.

Q. Gotcha. So you could have discussed it later that day with him while you're still clocked in?

A. Yes. I was clocked in pretty late that night.

Q. Okay. How late were you clocked in that night.

A. I'm not sure because I have to take the kids and go place them. I have to find a home for them first, sit with them while we find them a home and place them in that home.

Q. So the kids that you were looking for that day who ended up at your office --

A. Yes.

Q. -- you -- once they were at your office, you had to find a place for them to --

A. Yes.

Q. Was that -- was that understood to be, like, a temporary placement or was it meant to --

MR. MUNAS: Objection.

MS. MCCLANAHAN: This is confidential information, not related to her job.

MR. WHITTAKER: Okay. Okay. Okay.

Q. But it took you into the evening that night?

A. Correct.

Q. And did you have -- did you communicate with Officer Hooven that evening while you were at your office?

A. I believe so.

Q. About the -- about the same case? Or scrap that.

You were at your office because of the same case you were working on with Officer Hooven?

A. Yes.

Q. And you called him to let him know you found the kids?

A. Yes.

Q. Called him or texted him?

A. I don't recall.

Q. Okay. And what was his response?

A. He was happy.

Q. Okay. Had he -- do you -- had he been looking for the kids that day? I think you mentioned -- you

asked him if he was going to keep looking for them and he said yes. Did you discuss that?

A. No.

Q. Okay. But it's your understanding from previous communications with him that he was going to continue looking?

A. Yes. He said their unit was going to keep a lookout for them.

Q. Okay. And was that the first time you spoke to him on the phone other than I'll meet you at the Budget Inn?

A. Correct.

Q. Okay. And how long did that conversation last?

A. I have no idea.

Q. An hour?

A. The conversation when I told him the kids were found?

Q. Yeah.

A. I can't imagine I was on the phone for an hour with kids in my office.

Q. Oh, yeah. Okay. So was the purpose of the call just, hey, found the kids, you don't have to look for them anymore?

A. Yes.

Q. And he was pleased about that?
A. Yes.
Q. It was after hours, after regular business hours?
A. For me, yes.
Q. For you. What is your regular -- what is your regular schedule or was your regular schedule?
A. I worked Monday through Friday 8:00 a.m. to 4:45.
Q. Okay. And you don't remember what time that was? It was after 4:45?
A. It would have been.
Q. Is that all you spoke about with Officer Hooven that first call to inform him that the kids had been found?
A. I don't recall what all we talked about.
Q. Okay. Did you talk about any topics that were -- did you talk about personal matters or was it all work related?
A. The same day that I found the kids?
Q. That phone call. Yeah, same day.
A. Again, I can't imagine I would have been on the phone yucking it up with somebody while the kids were in my office.
Q. So you don't necessarily recall the

subject matter as you sit here, but you suppose it would have been a short phone call, and if you had spoken about anything, it would have been work related?

A. Correct.

Q. You wouldn't have spoken about something other than --

A. Correct.

Q. Because you were still working?

A. Yeah. And we had not talked about anything other than the kids up to that point.

Q. Okay. Was there -- okay. That was the first phone call. Did you speak with Officer Hooven about this case -- not this lawsuit, but the case that you worked with him on at any time after that first day?

A. Yes.

Q. Phone calls?

A. I don't recall.

Q. Okay. If not phone calls, then would it have been text messages?

A. Yes.

Q. Did you speak in person ever about the same case?

A. We spoke in person, but I'm not sure if we talked about it or not.

Q. Okay. And Officer Hooven testified

yesterday that the time frame in which he knew you and your spending time together was about two weeks. Does that sound right to you?

A. I think it was more like a month.

Q. A month. Okay. Seems to me it was from early March -- or I'm -- maybe mid March to mid April. Does that sound about right?

A. Sounds about right.

Q. Did you ever have additional calls for services at any other location or any other case involving Officer Hooven?

A. Not with Officer Hooven.

Q. Did you ever -- did you have any work related engagements with Officer Hooven besides that first one on the -- at the Budget Inn in that case?

A. Can you ask -- reask the question?

Q. Did you have -- ever have any occasion to -- for your -- in connection with your employment to work with Officer Hooven again?

A. He asked me for help and advice.

Q. Okay. Help and advice about what?

A. Some runs he had with, like, custody disputes.

Q. Uh-huh.

A. I think at one time he said -- he asked

me if caller information was confidential. Yes.

Q. Caller information being the person who reports --

A. To 241-KIDS.

Q. Okay.

A. Yes.

Q. And is that in keeping with your testimony before that caller information is always kept confidential?

A. Always kept confidential.

Q. And that -- and callers refers to people who call 241-KIDS?

A. Yes, with the concerns. Yes.

Q. Is that the only situation in which a caller is treated with -- their information is treated confidentiality or is it any time someone brings a matter to you, that person's information is confidential?

A. Only when they are the caller.

Q. Only when they are the caller. And Hooven was asking you whether or not the information about -- well, you tell me. What was he asking you about caller information being confidential?

A. I just remember him saying, is caller information confidential. And I said yes, always.

Q. And you understood that to be the same

topic we're talking, someone who would call with information?

A. Correct.

Q. Did -- did he -- did he tell you why he was asking you about that?

A. He did not.

Q. Did you ask him why he was asking you about that?

A. No, I did not.

Q. Okay. So he asked you for advice during this monthlong time frame about how to handle cases he was working on?

A. Yes. Something like that.

Q. Okay. All of these cases, as far as you understood it, involving children?

A. Yes.

Q. Okay. And so did he consult you as sort of resources because of your position?

A. Yes.

Q. So to be clear, he was asking -- he asked you throughout this monthlong period issue in his capacity as a police officer for information from in your capacity as a case worker at DJFS?

A. Correct.

Q. While you were on the clock, right, or

while you were at work?

A. I'm not sure. Just in conversation. I'm not sure if I was at work or not.

Q. Okay. Were some of those conversations at work? While you were at work?

A. I believe so.

Q. Some not?

A. Possibly.

Q. Possibly. And was Officer Hooven also on duty when he was asking you for advice about whatever case he was working on?

A. I assume.

Q. Did you discuss with him that he could contact you for information as a resource about a question he might have that would be within your -- within your wheelhouse?

A. Yeah. Sure.

Q. Okay. And was that something that was unique to him as a police officer or could other police officers who you're working with on other cases also call you?

A. I have a lot of friends that are, you know, different careers.

Q. Sure.

A. And so, yeah. I mean, it wasn't unheard

of to kind of, like, use each other's community relationships.

Q. Okay. And in your view, as far as you understood it, there was nothing unusual about you communicating with a police officer while you were both on duty working in your capacity as, in your case for DJFS, in his case as a police officer, to help each other out, to exchange information as partners partnering agencies about whatever case you were working on?

A. It was very common.

Q. And was that something that your supervisors instructed you that you should be doing with -- with partnering agencies?

MS. MCCLANAHAN: Objection. Asked and answered. Go ahead.

A. I would say yes, for sure.

Q. Okay. And did your supervisors instruct you to specifically that you were to treat police officers as partners?

A. Yes.

Q. And it was your understanding that that was a two-way street, that they were to treat you similarly as a partner?

A. Yes.

Q. Did that -- did that mean that if a

police officer asked you for something that you were to assist the police officer with whatever they were asking for if you could?

MS. MCCLANAHAN: Objection.

A. It depends on what they were asking.

Q. If it was something that you could assist them with, would you if you were asked?

A. Yeah.

MR. WHITTAKER: Objection.

Q. Okay. And that wasn't unusual?

MR. WHITTAKER: Objection.

A. Not unusual.

Q. It was typical?

A. Typical.

Q. You were instructed that that's something you should be doing?

MR. WHITTAKER: Objection.

A. Yes. Maintain strong relationships with community partners.

Q. And that's how it was put to you?

A. Yes.

Q. Strong relationships with community partners?

A. Yes.

Q. Would the -- would the Cincinnati Police

Department be the largest of the partnering agencies you had?

A. That's hard to say.

Q. Okay. Was there a particular emphasis put on the relationship with the Cincinnati Police Department and DJFS?

A. Yes. Because Cincinnati Police Department has a unit that we work with called personal crimes.

Q. And were you -- did you receive any instruction or training about how to engage with the personal crimes unit, say, differently than other community partners?

A. Only to get the referral to them. We had a specific process on how to submit the referral.

Q. Okay. What was unique about that process?

A. It was a fax. No other police department accepted faxes, so...

Q. So in order to communicate a referral to the -- is it personal victims unit?

A. Personal crimes unit.

Q. Personal crimes unit. You had to send them a fax referral?

A. Yes.

Q. Okay. Was that the only thing that was a little bit different about that community partner?

A. That's all I can think of.

Q. Were they considered -- was that unit considered to be distinct -- a distinct partner from others within the police department or was the police department the partner?

A. The police department is the partner, but because a lot of Hamilton County is the City of Cincinnati, we worked a lot with personal crimes, a bulk of our work was with personal crimes.

Q. Gotcha. The bulk of your work overall or the bulk of your work involving the City of Cincinnati?

A. I'm sorry. The bulk of our work that involves criminal cases. If we were to -- if there was a prosecution on one of our cases, that's really it for that.

Q. Okay. And could you estimate what percentage of your cases turned out to be criminal investigations or have a criminal component?

MS. MCCLANAHAN: Objection. Relevance.

A. I have no clue.

Q. Could you estimate how often you spoke with Cincinnati police officers about a particular case?

A. It depend on the case.

Q. Not unusual, though?

A. Not unusual.

Q. And, again, something that your supervisors told you -- were you instructed that you should accommodate police officers when they ask you for information?

A. Yes.

Q. Because -- because of maintaining the community partnership relationship?

A. Yes.

Q. Was it emphasized that -- that -- that was reciprocal, that you could ask police officers for help and information?

A. Yes.

Q. Okay.

MS. MCCLANAHAN: I felt like we've done the same thing three or four times.

MR. WHITTAKER: Really?

MS. MCCLANAHAN: Yes. I don't know if anyone -- I don't know if you feel the same way, but I feel like we've gone over --

MR. MUNAS: Repetitive, it's a little, yeah.

MR. WHITTAKER: Okay.

MR. MUNAS: You're coming at it from different angles, but it's kind of the same

question.

MR. WHITTAKER: Yeah. Yeah.

Q. But at some point the relationship with Officer Hooven became more than just a professional relationship; fair to say?

A. Fair to say.

Q. How would you characterize it?

A. A romantic friendship.

Q. Okay. He disagreed that it was romantic; you would describe it as romantic?

A. Yes.

Q. Okay. A Romantic friendship?

A. Yes. We never dated.

Q. Didn't date.

A. Officially. I'm a millennial girl. I'm sorry.

Q. You didn't put it on Facebook or anything like that?

A. No, it wasn't on Facebook.

Q. You didn't date in the macro sense, but did you go out on dates?

A. A lot.

Q. A lot of dates. I'm sorry. With Officer Hooven?

A. Yes.

Q. Okay. And did you talk about work stuff while on dates?
A. Yeah.
Q. Like, you would discuss issues you were having at work and he would discuss issues that he was having at work?
A. Yes. It wasn't always specifics. Sometimes it was just overall grievances. We kind of got each other's line of work.
Q. Okay. And was it he who initiated the dating -- not the dating, but the going out on dates?
A. I would say it was kind of mutual.
Q. Did he ask you to go out on a date?
A. Yes.
Q. Was he the person to ask first?
A. I'm not sure.
Q. Okay. At some point he began talking to you about his then former spouse Holly Hooven, right?
A. Yes.
Q. How soon into the relationship did Holly come up?
A. Almost immediately.
Q. First day?
A. I'm not sure what day.
Q. Within -- within the first week?

A. Yes.
Q. Holly came up within the first week. And what did he tell you about his relationship with Holly.
A. That it was pretty fractured.
Q. Okay. Did he ask you for any advice or assistance or resources at all in connection with that?
A. A little.
Q. Could you just generally describe what sort of -- what he asked you for?
A. I don't know that he specifically asked me, but we kind of just talked about how to navigate broken coparenting relationships.
Q. Gotcha. And is that something that's within your training and expertise as navigating coparenting relationships?
A. It was more from my personal experience.
Q. Gotcha. Was there any discussion about your experience and background and training and any information you had related to your position at JFS?
A. Yes.
Q. Could you describe that?
A. He had explained to me that he was concerned that Holly dated a lot of men and introduced them to her kids particularly fast.
Q. Okay.

A. I did tell him that's a huge red flag. Nonbiological father figures are the number one perpetrator of abuse towards children. So that was a huge red flag to me.

Q. So did you say nonbiological father figures or --

A. Yes.

Q. Okay. So you mentioned to him that that was a red flag, something that in your background and experience in your training you had observed as being cause for concern?

A. I would say professional and personal.

Q. Professional concern and personal concern. And where did the conversation go from there? Did he ask you -- well, you tell me. Where did the conversation go from there after you expressed that concern?

A. He basically agreed. Like, yeah, that's kind of my point.

Q. Okay. Was that in person or was that over the phone or was that in text?

A. I know we talked about it over text, but we may have talked about it multiple times.

Q. Okay. And you mentioned that probably the conversation started almost immediately within the first week of meeting?

A. Yes.
Q. And had you gone out on dates that first week?
A. I don't think we did the first week.
Q. Okay. And it sounds like to me that you were -- you were conveying information that you had gained and learned and come across professionally --
A. Yes.
Q. -- while working at JFS?
A. Yes.
Q. Information that you would come about in the course of your employment with JFS, right?
A. Yes.
Q. Any way you would have come across this information or training but -- you know, without being a JFS worker, would you have come across this information?
A. I'm not sure.
Q. Okay. So what happened -- what happened next after -- and he agreed that you -- he agreed with you that this was a concern. What -- what steps were taken after that, if anything?
A. I can't speak on his behalf.
Q. Okay.
A. I'm not sure.
Q. Okay. Did you volunteer -- did you

volunteer any services or volunteered to help him with anything that you had access to as a JFS worker?

A. I don't believe that I offered my services explicitly.

Q. Okay. Did he ask?

A. Yes.

Q. Did he ask you to access the SACWIS database?

A. Yes.

Q. He testified that you asked him. Is he wrong about that?

A. That --

Q. I'm sorry. He testified that you offered to look into the SACWIS database for him?

THE COURT: Objection. Misstates testimony.

A. I believed -- I believe so.

Q. Okay. It was the other way around, he asked you?

A. Correct.

Q. About how soon into the relationship did he ask you?

A. I believe it had been a couple of weeks at that point.

Q. Okay. Was that -- that was on a phone

call?

A. Yes.

Q. Was that in April or still March as far as you remember?

A. I'm not sure.

Q. How long did the phone call last?

A. Again, I'm not sure.

Q. So what did he -- what did he -- what did he ask you for? What did he ask you to do?

A. He just kept saying, I have these concerns. I don't know this guy. I can't look him up at the LEADS. It's a felony.

Q. Let's pause there for a second.

A. Okay.

Q. Were there any more discussions about LEADS?

A. No.

Q. But he told you -- did he tell you that he couldn't look him because it's a felony?

A. Correct.

Q. Okay. Where did the conversation go from there?

A. I was like, yeah, I know. And he was, like, however, I don't know if you can look something up.

Q. Okay. Did you have access to any other

databases besides SACWIS?
A. Yes.
Q. Was LEADS one of them?
A. I did not have access to LEADS.
Q. Did you have access to any law enforcement databases?
A. I don't know what's considered law enforcement.
Q. Fair enough. So he suggested to you that maybe you could look something up for him because maybe you have access to that information?
A. Yes.
Q. Access that you only have because you're a Department of Job and Family Services worker, right?
A. Yes.
Q. You would not have -- you would not have access to that information if not for your position working for the county, right?
A. Correct.
Q. Public at large generally does not have access to that information, right?
A. Correct. Unless if that information is somewhere else.
Q. Somewhere else. But if information is found on the SACWIS database, the public doesn't have that

information?

A. Not necessarily. Just because it's confidential through SACWIS doesn't mean it's not confidential somewhere else.

Q. Okay. Fair enough. But the public generally does not have access to SACWIS?

A. No, the public does not have direct access to SACWIS.

Q. Same with the police?

A. Same with the police.

Q. Okay. As far as you understood it, in your relationship with partner -- community partners like the police, was it your understanding that you were to share confidential information with community partners like the police that you got from SACWIS or accessed from SACWIS?

A. Yes. Because they had the expectation to also keep that information confidential.

Q. I see. So to clarify, you were permitted to share information that you -- confidential information with the police or you were instructed that you should share that information with the police?

A. I can't speak for what written protocol is. However, I was told that -- and it is emphasized -- that if a police officer asks you for information help him out.

Q. Gotcha.
A. Or her.
Q. Okay. Upon request?
A. Yes.
Q. Even if this information was confidential?
A. Correct.
Q. It was emphasized even if the information is confidential you should help him out with giving that information?
A. It was you scratch my back, I'll scratch yours.
Q. I see. And that information -- that instruction was given to you from your supervisors?
A. Multiple different people.
Q. Okay. Was -- were your supervisors some of the people who gave you that instruction?
A. Yes.
Q. Okay. So Dillon Martini?
A. I don't know if he explicitly told -- but it was through multiple people. I'm not sure if Dillon Martini was one of them.
Q. Tara?
A. I'm not sure.
Q. Your other coworkers?

A. Yes.
Q. Okay. Was it more from -- was it more passed along from your other coworkers?
A. Yes. But there was also -- going back to the unable to locate kind of thing, we would request police records.
Q. Uh-huh. I see.
A. And we had a specific channel we were supposed to go to. Go through.
Q. What channel?
A. You would -- depends on the department that you're trying to get the records from. You would ask them to send over court records -- public police runs or whatever it was. Whatever -- whatever records you were requesting.
Q. And that would be information that was, as far as you knew, only in the hands of the police?
A. From my understanding.
Q. Okay. So it was a two-way street. There were instances in which you needed to get information from the police to help you out with a case, right?
A. Yes.
Q. And there were instances in which the police needed confidential information from you to help them out with a case, fair?

A. Yes.
Q. And you were trained that when a police officer comes to you and asks you for information about a case and you have that information or you have access to that information that you should give it to them?
A. Just help them out.
Q. And that would be whether or not the case is related to anything you were working on?
A. Yes.
Q. And whether or not -- scratch that.
Would it be understood that they would ask you for SACWIS information or just information and you understood if you could find that in SACWIS?
A. I'm sorry. Can you reask the question?
MS. MCCLANAHAN: I don't understand the question.
Q. Did the police officers call you and ask you for information that was in the SACWIS database or did they ask you for information that you knew to get the information you would consult SACWIS?
A. Little bit of both.
Q. Okay. So sometimes they'd ask you about specifically that information?
A. Yes.
Q. Did Officer Hooven ask you specifically

about that information, meaning SACWIS?
A. Yes.
Q. Okay. What did he ask you?
A. Basically does this guy have any history with you guys?
Q. And that person being Brendon Taylor, the plaintiff in this case?
A. Correct.
Q. And what did you understand having a history to mean?
A. As an alleged perpetrator.
Q. Did he -- did he express that he was asking about information related to whether he was an alleged perpetrator?
A. Yes. Because he knew he had a child or children or whatever.
Q. Okay.
A. So he basically wanted to see if he had ever been accused of anything with his child.
Q. I see. And this was -- this was not -- other than you understood that the request to be a personal request from him or did you understand it to be work related?
A. I understood that it was personal.
Q. Okay. Was it your understanding that if

police officers even asked for information about personal matters you were to cooperate and help them out with that information?

A. I'm really unsure how to answer that.

Q. Okay. Did you not -- is the question unclear?

A. I guess I would say that nobody explicitly said, hey, for personal reasons do this. It was, hey, do whatever you need to do to protect children. Whether they're on your caseload or not, your goal is to protect children.

Q. I see. So you understood your role to be -- even if someone is asking about a case that you have nothing to do with or a case that you understand is personal, if it's a police officer asking you, you help them out with the information so that we can protect kids?

A. Essentially, yes.

Q. And there was no -- excuse me. There was no line drawn by supervisors between professional request and personal request?

A. Correct.

Q. Were you ever told -- excuse me. Were you told there is no line between personal and professional request?

A. I was never told that directly.

Q. Were you ever told that you were to not help a police officer or give a police officer information in response to a personal request?

A. I was never told that.

Q. Did you ask -- did you ask about the boundaries of what the expectations were about information you were expected to share with the police officers?

A. No.

Q. Okay. And so did he ask -- did Officer Hooven ask you to access the SACWIS database?

A. Yes.

Q. And did you?

A. Yes.

Q. And tell me without going into the details what sort of information you enter into SACWIS to find out something about a person, any person?

A. You can type in a lot.

Q. Okay. Are there fields where you fill in things like date of birth?

A. Yes.

Q. Social Security number?

A. Yes.

Q. Age, race?

A. Yes.

Q. Weight?

A. I don't know about that.
Q. What about -- obviously their name?
A. Yes.
Q. Full name helps, right?
A. Yes.
Q. Did he -- did Officer Hooven give you a full name to look up?
A. He gave me Brian D. Taylor. That was it. Or Brendon A. Taylor. I'm sorry.
Q. He gave you the middle initial?
A. Yes, through a screenshot.
Q. Okay. Gave you his approximate age too, didn't he?
A. I believe so.
Q. Any other information about Brendon Taylor that he gave you to -- well, gave you?
A. That he's from Dayton.
Q. Okay. Is that information that's helpful for you to locate a person?
A. Yes.
Q. Any other information that he gave you to help you with your search?
A. Not that I recall.
Q. Were you at work when this -- when you -- scratch that.

So you agreed to look up the information based on -- you agreed to look up Brendon Taylor based on the information given to you by officer Hooven?

A. Correct.

Q. Were you at work at the time?

A. Yes.

Q. And were you using your county issued device?

A. I don't think so.

Q. What device would you have been using?

A. I think I was using my phone.

Q. Okay.

A. Because I was not in office. I was in the field.

Q. Oh, I see. Okay. And you didn't have your -- is it a tablet?

A. Yeah, it's like a tablet. I either didn't have it or it was just, like, not easy to get out while I'm, like, in the car.

Q. Oh, you were in the car.

A. I'm not sure where I was. I know I was in the field and I was on the phone. That's why I wasn't using my Surface Pro.

Q. So you were in the field. And you looked up the information he asked for, right?

A. Yes.

Q. About how long did that process take?

A. A few minutes I would say.

Q. Okay. And was he waiting on the phone while you did this or how did that conversation -- how did the conversation go from, yeah, I'll do it to you getting in touch with him to tell him -- you got in touch with him later, right?

A. This was all on the same phone call.

Q. Same phone call. You look up the information --

A. Yes.

Q. -- and reveal the information to him?

A. I recall there not being much. And I remember saying, hey, there's not much in here.

Q. Okay. But it was within that same phone call?

A. Yes. Anything about Brendon Taylor's SACWIS profile was within that phone call.

Q. The phone -- and, again, you communicated with him about this on your personal phone from your personal number?

A. Correct.

Q. Not the Google Voice number?

A. Correct.

Q. And you were communicating with him, as far as you knew it, from his personal mobile phone?

A. Yes.

Q. You were in the field. Do you know if he was working at the time?

A. No. He was at a physical therapy appointment.

Q. Was that -- I don't want to get into it. Time of day? Any recollection about the time of day?

A. I don't.

Q. Would it have been after work or during normal work hours?

A. It was during normal work hours.

Q. And you work Monday through Friday, right?

A. Correct.

Q. And he knew that, right?

A. Correct.

Q. So he knew that if he called you during -- between the hours of 8:30 and 4:30 or 4:45 that you would be at work?

A. Yes.

Q. And that more than likely doing work related things?

A. Yes.

Q. And so you told him what after you looked up Brendon Taylor in the SACWIS database?
A. I don't recall specifics. I remember saying, just so you know, like, there's a lot of pockets of information. Like, I don't know -- just because what I'm telling you doesn't mean that this is it or, you know --
Q. What do you mean pockets of information?
A. Brendon Taylor could be multiplied times four and I don't know it.
Q. Okay. You didn't know if you were looking up the Brendon Taylor he asked you to?
A. Not necessarily. What I'm saying is that, like, there could be, like, multiple profiles for you and I wouldn't be able to -- I would have to go into each profile, figure out who you were and then merge you together. So I looked at one Brendon Taylor and that was it.
Q. So there could be profiles about the same Brendon Taylor?
A. But with different SACWIS numbers.
Q. Because of different scenarios or because someone didn't know that they already had an existing person?
A. Yes.
Q. Okay.

A. Both.

Q. You could go in and if you just discovered that one profile for Brandon Taylor over here and another other profile for Brendon Taylor over there were the same person, you would merge them?

A. I wouldn't, but I could take all that up and say, hey, manager, will you merge these for me.

Q. Okay. And from that point forward would they be forever merged?

A. Yes. And there would be -- it would be noted that they were merged.

Q. But when you looked up Brendon Taylor, you only -- you only looked up one profile?

A. Correct.

Q. With the understanding that you saw other profiles for Brendon Taylor?

A. I'd have to assume there's probably a lot of people named Brendon Taylor.

Q. Yeah.

A. So that's why approximate age and where he lived helped.

Q. Okay. And you were confident that you found the Brendon Taylor that you were asked to find information about?

A. Yes. It was the same age and he had

history in Montgomery County.

Q. Uh-huh. Now, irrespective of the instruction -- you scratch my back, we'll scratch yours sort of instruction that you received from your supervisors, you understood that that was not something you should be doing, right?

A. I wouldn't say I understood that.

Q. Okay. Did you come to understand that that was maybe not appropriate?

A. Not really, no.

Q. Would you agree with me that if you had disclosed confidential information about somebody that that would have been improper?

MS. MCCLANAHAN: Objection. You can answer if you understand what he's asking.

A. Yeah. Can you reask the question maybe?

Q. Do you understand -- maybe you don't understand. Do you agree with me that if you were to reveal confidential information about somebody, not -- did you understand in this instance -- you understood in this instance that it was a personal endeavor from Hooven?

A. Yes.

Q. But it was also your understanding that that was appropriate because of the partner agency relationship with the police officers?

A. Yes.
Q. Were there other instances in which you gave police officers information that you knew was based on their personal inquiries?
A. Not that I can recall.
Q. Are you aware of any other instances in which any of your coworkers gave police officers information in request to a personal inquiry?
A. Yes.
Q. How many times? How many instances are you aware of?
A. A lot.
Q. A hundred?
A. I wouldn't say that many.
Q. 75?
MR. MUNAS: Objection. Calls for speculation.
MS. MCCLANAHAN: Same objection.
MR. WHITTAKER: I don't know if she's speculating about what she did, but --
A. I'm not sure. I don't know that I could put a number to it.
Q. It was a lot though?
A. It was common.
Q. It was common. And to clarify, it was

common at Department of Job and Family Services -- Hamilton County Department of Job and Family Services where you worked as an assessment worker --

A. Yes.

Q. -- for your fellow assessment workers to supply police officers with confidential SACWIS information when the inquiry was known by the case worker to be for a personal matter?

A. Yes.

Q. So common that you can't even estimate the number of times that you're aware that this happened?

A. Correct.

Q. And, therefore, you understood in your capacity as a -- as an employee of -- for the county and as a DJFS case worker, you understood that giving a police officer confidential information when they asked about it in the context of a private inquiry that that was part of your job description, that was part of your duties?

MS. MCCLANAHAN: Asked and answered.

A. Yes.

Q. And you understood that because all of your coworkers were doing the same thing, right?

MS. MCCLANAHAN: Objection. Asked and answered.

A. Yes.

Q. And no one ever told you that you shouldn't be doing that, right?
MS. MCCLANAHAN: Objection.
A. Correct.
Q. No one ever told you they shouldn't be doing that, right?
MR. MUNAS: Objection.
MS. MCCLANAHAN: Objection.
Q. As far as you observed?
A. Yes.
Q. Did you observe -- from your observations, did you understand that your coworkers -- or your supervisor knew that you and your coworkers were doing that?
A. They were doing it too.
Q. The supervisors were doing it as well?
A. Yes.
Q. The supervisor were looking up confidential information at the request of police officers?
A. Anyone.
Q. From the SACWIS database included?
A. Yes.
Q. And giving them -- sharing confidential information with anyone, not just police officers, that they had access to about personal matters?

A. Yes. And a manager even commented confidential information on a public post at one point.
Q. Who was that?
A. Samantha Fleckenstein.
Q. Was she a supervisor of yours?
A. No. She was an ongoing supervisor.
Q. Let me ask you this: When you do an inquiry on the SACWIS database you have to log in, right?
A. Yes.
Q. Do you know if there's a record kept of the queries you do when you log in?
A. I think so.
Q. You don't know, though?
A. I'm not sure. I'm not for certain.
Q. And your co-workers would do this in the office?
A. I'm not sure what they did.
MS. MCCLANAHAN: Objection. Calls for speculation.
Q. Did you observe your coworkers doing this, giving confidential from SACWIS to police officers knowing it to be a personal inquiry?
A. I did not witness it myself.
Q. Okay. How did you know it was occurring?

A. Everybody talked about it.

Q. Could you -- could you give me an example of a person you spoke to about that?

A. Essentially it was understood that people were going to look up things that they're not supposed to. So if a case was truly, truly confidential, they would just restrict it.

Q. So it was -- who -- could you -- could you tell me the name of the person who told you that or gave you that impression?

A. My boss Carrie Cwynar, we talked about how I had a restricted case once and I said, what does this mean? And she basically says that means somebody in the office is going to be nosey, so we go ahead and we restrict it.

Q. Meaning that -- what is the -- what does the restriction do?

A. You have to be assigned to that case to view it.

Q. Okay. Was that also common? Was that a common occurrence that case information was restricted to only the people working on the case?

A. It was common if it was, like, a news case or it was, like, a family member, something like that.

Q. Okay.

A. But I wouldn't -- I didn't have, like, full caseload of, like, restricted cases. It didn't happen that way.

Q. Okay. But if it was a situation -- it was only those situations that would be restricted if it was something like, for an example, a high profile news case for a family member?

A. I'm not sure how exactly and what exactly they restrict, but that was my understanding.

Q. From your supervisor Carrie?

A. Yes.

Q. And she conveyed to you that it was okay -- it was expected or okay within your duties to share SACWIS data with the police officers even if you knew it was for a personal endeavor?

MS. MCCLANAHAN: Objection. Mischaracterizes testimony.

MR. WHITTAKER: I'm asking.

A. Yes.

Q. Carrie told you that that was okay or that was within your job description?

A. It was common. I can't say that it was okay, but it was common -- it was common practice this is what people did.

MS. MCCLANAHAN: Do you understand what

he asked?

MR. WHITTAKER: Yeah. I want to make sure --

MS. MCCLANAHAN: He asked if Carrie told you that that was the case.

MR. WHITTAKER: Yeah. I want to make sure --

A. Explicitly that that is -- no, she did not tell me that it is explicitly okay in that exact situation. We did not talk about that exact situation.

Q. Okay. Then you -- did she say something to you that led you to believe even if not about that exact situation that that situation was okay for you to share information with a police officer?

MR. MUNAS: Objection.

MS. MCCLANAHAN: Objection.

A. That's the conclusion I came to.

Q. Okay. How did you -- why did you arrive at that conclusion?

MS. MCCLANAHAN: Objection. Asked and answered. She's talked about how she came to this conclusion, but...

A. Yeah. That just other people were doing it. Supervisors were doing it. Directors were doing it. It was just common.

Q. My question is just how you knew they were doing it?

A. Just from working -- just from talking to people.

Q. Okay. Carrie being one of them?

A. Sure.

Q. Anybody else specifically who you spoke to who gave that -- gave you information like that, that it was common?

A. The union.

Q. The union told you that it was common for case workers to share confidential information?

A. When I had met with the union to represent me through my disciplinary action, that was one of the things we talked about.

Q. And who did you speak with, with your union?

MR. WHITTAKER: Is there any attorney-client privilege information there? Was there a lawyer or anything involved with that?

MS. MCCLANAHAN: You can talk about who you talked to at the union.

A. Abrena Rowe.

Q. Say that name again.

A. Abrena Rowe.

Q. How do you spell --
A. It's A-B-R-E-N-A. And then Rowe is R-O-W-E.
Q. And what was Abrena Rowe's role with the union?
A. She was, like, just the union rep.
Q. Okay.
MS. MCCLANAHAN: Justin, I'm assuming your getting into the union stuff might span a long time. I don't know where you're at. I don't know if that's going span a long time with you. I don't know. It is 12:30. I don't know if people want lunch at some point.
MR. WHITTAKER: Totally fine.
MS. MCCLANAHAN: I don't care. We can go later or we can go now, but --
MR. WHITTAKER: This is a good time.
MS. MCCLANAHAN: -- I don't know how much longer -- I wouldn't --
MR. MUNAS: This is a good time.
MS. MCCLANAHAN: I don't care either.
MR. WHITTAKER: We can take a break right now.
(Whereupon, a lunch recess was taken.)
MR. WHITTAKER: We're back on the record

after lunch.

Q. Ma'am, you're still under oath. You understand that?

A. Yes.

MR. WHITTAKER: We're back on the record in Case 124-CV-00204. I circulated electronic copies of exhibits to everyone. Eric has asked that certain exhibits be printed and I think that's completely appropriate.

MR. MUNAS: Didn't know we were going to be getting to them.

MR. WHITTAKER: I apologize.

MR. MUNAS: That's okay.

MR. WHITTAKER: A lot of these, however, we've gone over.

Q. I'm going to ask you to go to what should be in that pile as Exhibit 8.

A. Am I able to clarify some things that we said before lunch?

Q. I mean, look --

A. We kind of left it at a weird spot.

Q. I'm not going to stop you from clarifying. Let's start there.

What do you need to clarify from lunch after you had a chance to speak with your attorney?

A. I think I'd like to clarify that in conversations with JFS this wasn't direct conversations that were happening. I wasn't directly watching anybody do anything. This was, like, office gossip, chatter, things like that, that gave me the belief that this is normal.

And, also, in my conversation with the union, they didn't explicitly say this is okay. What the conversation was is this is what happened, this is what discipline looks like and this is what discipline has looked like for people in the past who have done this. Let's make sure it's fair and just.

Q. Okay. So it was expressed to you by the union that this has come up before?

A. Yes.

Q. And employees at -- the JFS employees were disciplined for it. And they expressed -- the union expressed to you that here's what's alleged -- here's what's happened. Here's how other people were punished in the past. Let's make sure that it's in keeping -- your discipline is in keeping with that?

A. My understanding is that they said this is what we're trying to achieve out of your discipline, this is -- these are cases that were equivalent and this is how we're going to proceed.

Q. And you received eight hours of

discipline, right? Or eight-hour suspension?
A. Yes.
Q. Not -- unpaid, right?
A. It was unpaid.
Q. I think -- I think it's alleged in the complaint that it was eight days. And that was incorrect if it's alleged to be eight days?
A. That is incorrect.
Q. Eight hours is the correct amount?
A. Eight hours of unpaid leave.
Q. Which worked out to be one day, right?
A. Yes. One workday.
Q. And that was on a -- that was the sum total of the discipline you received for the matter we're discussing looking up SACWIS data about Brendon Taylor at Officer Hooven's request, right? You didn't receive any other discipline besides that?
A. No.
Q. Let's go to Exhibit 8, which is the same Exhibit 8 from Officer Hooven's deposition. It is the MOU. Have you seen this exhibit -- this Exhibit before, Exhibit 8, the Child Abuse and Neglect Memorandum of Understanding, Hamilton County, Ohio, dated 6/15/2015.
A. No.
Q. You've never seen -- have you seen a

different version of this document?

A. I've never seen any version of this document.

Q. Had you -- does that include during this litigation or had you come to be aware of it during the litigation?

A. During the litigation.

Q. Okay. Have you examined -- have you reviewed or examined this document since -- in -- you know, since -- in the litigation since receiving it since becoming aware of it?

A. With my attorney.

Q. With your attorney. Okay. Is this -- does this policy -- I'm sorry. This Child Abuse and Neglect Memorandum of Understanding, as far as you understand it, is this the agreement between the city and the county that establishes the partnership between Cincinnati Police and the Department of Job and Family Services?

MS. MCCLANAHAN: Speak to your understanding, not through conversations we have had about the policy.

MR. WHITTAKER: Correct.

A. In my understanding of this document, yes, that was our agreement between us and CPD.

Q. Gotcha.

A. By us and JFS. Sorry.

Q. Now, you testified that you didn't -- you weren't aware of this document before this litigation began. But did you understand there to be some agreement between CPD and the Department of Job and Family Services?

A. Yes.

Q. Okay. Was that agreement written down anywhere as far as you knew at the time?

A. Not that I'm aware of.

Q. Okay. Did you understand the agreement between the police department and JFS to be an unwritten agreement?

A. I'm not sure really what I understood it to be.

Q. Okay. But you didn't -- you never -- you were never handed a policy that said this is the policy?

A. Correct.

Q. You never -- you were never handed a policy while employed at DJFS saying this is the policy -- this is the policy reflecting the partnership with the Cincinnati Police Department?

A. Correct.

Q. Okay. But as you sit here today, you've come to understand Exhibit 8 to be that document or a copy of that agreement?

A. Yes.
Q. Okay.
(Whereupon, Deposition Exhibit A was marked for identification purposes.)
Q. I'm going to hand you what has been labeled as Exhibit A, Exhibit A as produced by the county in discovery.
MR. MUNAS: I don't know what document this is.
MR. WHITTAKER: I'm going to tell you.
MR. MUNAS: Can I get a copy?
MR. WHITTAKER: Yeah. I mean, would you mind.
MS. MCCLANAHAN: Yeah, hold on. It's going to be a moment or two.
MR. MUNAS: I hate to cause delays. I really want to know what the document the witness is looking at.
MR. WHITTAKER: Let's go off the record.
Q. Miss Paul, is it your understanding that only DJFS can only directly access SACWIS?
A. Yes.
Q. Members of public cannot as far as you understand, right?
A. Correct.

Q. And it's also your understanding that though you have a partnership -- or though the county has a partnership agreement with the Cincinnati Police, police officers also cannot access it directly?
MR. MUNAS: Objection.
MR. GOTTESMAN: Objection.
MS. MCCLANAHAN: I will also object.
MR. WHITTAKER: Can I finish the question before you guys object?
MR. MUNAS: I thought you were finished.
Q. Is it your understanding that police officers also do not have access -- direct access to SACWIS?
A. Correct.
Q. You personally could only have access to SACWIS by virtue of being an employee of the Department of Job and Family Services, right?
A. I'm not sure if other agency -- like, if there's any other agencies that exist that can access SACWIS.
Q. Fair. You could only have access to it by virtue of being employed by an agency that makes use of it, a possible agency that makes use of that database?
A. I would say I myself only had access because I was a case workers at Job and Family Services.
Q. Fair enough. Fair enough. And you --

and you understood that information in the SACWIS database to be confidential, right?

A. It didn't necessarily mean that it was confidential information. It could be other places like I said before.

Q. Right. Right. So it's your understanding that just because information is in SACWIS doesn't necessarily mean it's confidential?

A. Correct.

Q. Did you assume it to be confidential if you accessed it in SACWIS?

A. If I access the information, it was confidential to me? Is that what you're asking me?

Q. My question is whether or not you assumed that information in SACWIS that you accessed was confidential or not?

MR. GOTTESMAN: Objection to form.

MS. MCCLANAHAN: Objection to form.

MR. WHITTAKER: I'm going to again ask. You guys need to let me finish the question.

MR. GOTTESMAN: So -- and that's fair, Justin. Could I ask the witness -- can you slow down a little bit to allow us to interpose objections before you answer?

THE WITNESS: Absolutely.

MR. GOTTESMAN: Thank you.
Q. Did you understand information that you accessed in SACWIS to be confidential?
A. Yes.
Q. In every instance, right?
A. Not sure I understand that.
Q. Every time you accessed information in SACWIS, you considered it to be confidential, right?
MR. GOTTESMAN: Objection. Vague.
A. I'm sorry. I guess I'm just not understanding the question.
Q. You testified just a minute ago that you agreed with me that when you accessed information in SACWIS you considered it to be confidential?
A. Yes.
Q. My question is to clarify that every time you accessed information in SACWIS you considered that information you received from SACWIS to be confidential?
MR. GOTTESMAN: Objection. Vague.
MS. MCCLANAHAN: Objection.
Q. Right?
A. Yes.
Q. Did you understand my question this time?
A. I believe so. I believe that what

you're saying is that I pulled information from SACWIS, that it was -- that that specific information that I treated that as confidential. I treated it as confidential. Not necessarily that it is confidential, that I treated it as such.

Q. Always?

A. Yes.

Q. Thank you.

A. Can I clarify?

Q. You can you do whatever you like?

A. Because that question was a little complicated. I'm so sorry.

To be clear, the information that I was gathering would have been confidential, but it doesn't mean that the information I did gather was actually confidential. That maybe the SACWIS page was confidential, but just because something says it in SACWIS doesn't mean there's a police report -- that there's not a police report out there about that incident.

Q. But you don't know that?

A. But I do not know that, correct.

MS. MCCLANAHAN: I would like to clarify. Justin said always at the end of the question before. Did you hear him say that?

THE WITNESS: Yes. That's why I

clarified because the "always" is what threw me off.

MR. WHITTAKER: Anybody else?

Q. You met Officer Hooven on March 15th of 2023 in connection with that call to service to the hotel on Central Parkway?

A. That sounds right.

Q. He was in uniform and on duty at the time, right?

A. Yes.

Q. You were on duty at the time, right?

A. Yes.

Q. And throughout your relationship with Officer Hooven that you characterized as partially romantic for about a month, you interacted throughout that time period in your official capacity, right?

MS. MCCLANAHAN: Objection. Asked and answered.

MR. MUNAS: Objection.

Q. You interacted with each other in your capacity as a DJFS worker and in his capacity as a police officer?

MS. MCCLANAHAN: Objection.

Q. Not saying all the time, but there were instances in which you did?

MR. MUNAS: Objection.
A. We talked about, like, the case we had together.
Q. Uh-huh.
A. But other that, like, we didn't talk about shared cases. That was the only shared case we had.
Q. Understood. But you talked about work?
A. Yes.
Q. When you looked up information at officer Hooven's request about Brandon Taylor, I think you testified that you didn't discover any -- you didn't discover anything, did you?
MR. GOTTESMAN: Objection.
Q. Or did you?
A. I don't believe I said that.
Q. Okay. Set me straight.
A. I believe that when I looked in there I didn't see anything that would concern me. I didn't see anything of him as an alleged perpetrator.
Q. Did you see any other information that would maybe not concern you, but other information beyond whether or not he was an alleged perpetrator?
A. Since all of the information was there, I kind of couldn't, like, pick and choose. Like, you can't just, like, pick and drawdown button that says AP only. So

all that information was there. I don't recall exactly what I saw, though. I don't recall what was in his page on SACWIS.

Q. Do you recall conveying what you saw to Officer Hooven?

A. The only thing that I recall was saying he was in connection with a case through Tennessee, I think.

Q. Uh-huh.

A. It just says, like, the child's father.

Q. And that's all you told Officer Hooven about?

MR. GOTTESMAN: Objection. Misstates testimony.

Q. Did I misstate your testimony?

A. I wouldn't say that's all I saw. I don't recall everything that I saw.

Q. My question is whether or not you conveyed more information beyond your understanding of the Tennessee situation, Tennessee case?

A. Not that I recall.

Q. Officer -- did Officer Hooven tell you he would get in trouble if he looked up Taylor himself?

MS. MCCLANAHAN: Objection. Asked and answered.

A. Yes.

Q. That he was unable to use law enforcement databases to do it himself?

MR. MUNAS: Objection.

MS. MCCLANAHAN: Objection. Asked and answered.

Q. Right?

A. Yes.

MR. GOTTESMAN: Counsel, we have limited time, seven hours to use this witness. I know that Eric wants to question her and you are covering the same territory you covered this morning. And it's, like, the third time. So be mindful, please. Otherwise, we need to reserve time for our questioning.

Q. Did you -- did you believe that you were manipulated into supplying him -- supplying Officer Hooven with information?

MS. MCCLANAHAN: Can you ask that question again? I'm sorry.

Q. Did you believe that you were being manipulated into supplying information to Officer Hooven with information?

A. It's hard to say now.

Q. Hard to say now?

MS. MCCLANAHAN: Objection. Calls for

speculation.

Q. What -- what does it mean hard to say now? What has changed?

A. I feel like this case changes on a daily basis, so I'm just not --

MS. MCCLANAHAN: Calls for speculation. Hindsight is 2020. This is looking for facts of the case at the time.

Q. The facts have changed that you no longer believe you were manipulated or -- I just want to understand.

A. I'm not sure what his intent was and I can't speak for him.

Q. Gotcha. But at the time you felt manipulated?

A. He had a girlfriend, so I felt more than manipulated.

Q. Okay. Did your investigation into SACWIS indicate any childhood history of Brendon Taylor?

A. Not that I recall.

Q. You reported childhood history to Officer Hooven by phone, though, didn't you?

A. I don't recall.

Q. You didn't supply him with any documents?

A. I did not.

Q. About what you looked up on SACWIS, right?

A. Correct. I never gave him any documents.

Q. And you -- and you never shared information about what you looked up on SACWIS in text messages?

A. I did not.

Q. It was -- was it only on that one phone call?

A. It was only on that one phone call.

Q. You told -- you told Hooven that there was unsubstantiated claims about Taylor being abused while he was a child, right?

A. No.

Q. But you -- one way or another -- you didn't tell Hooven one way or another that Taylor had been abused as a child?

A. I did not.

Q. You understood that when you were giving this information to Officer Hooven that it was confidential, right?

A. Again, going back to my answer, I don't know if it's -- I don't know where else in the world this

information is.
Q. Right. But you assumed it to be confidential, right?
A. I wouldn't say assumed, but maybe believed that it could possibly be confidential, yes.
Q. Okay. You knew you shouldn't be sharing information with him, though, right? Officer Hooven?
MS. MCCLANAHAN: Objection. Asked and answered.
A. It could go both ways.
Q. What's that mean?
A. I believe and know that he does have a right to know who Brendon Taylor is. He can request that information through DR court. He could have gotten SACWIS history that way. So while I knew he was entitled to this information, he could have gotten this information anyway.
Q. You believed he was entitled to the information?
A. Through domestic relations, yes.
Q. Okay. Do you believe that he was entitled to the information from -- directly from you?
MS. MCCLANAHAN: Objection. Asked and answered.
A. It's hard to say. I believe he had every right to know who was in his child's life and who his

children were spending the night with as that is a safety risk and that has -- was what I was taught.

Q. You didn't find any information in SACWIS verifying that Brendon Taylor was a safety risk, though, right?

MS. MCCLANAHAN: Objection. Asked and answered.

A. That is correct.

Q. There's nothing in the SACWIS record that you looked up indicating that he was a danger to anybody?

A. That is correct, from the information that I had gathered.

Q. Understood. Understood. You don't know about other information other than the information you saw?

A. Correct.

Q. Would you have given Officer Hooven this information if he weren't a police officer?

A. If he weren't a police officer?

Q. Yes.

MS. MCCLANAHAN: Objection. Calls for speculation. You don't have to answer that.

A. Yeah. I don't think I can answer that.

Q. You don't think you can answer because you don't know the answer?

MR. WHITTAKER: Because that is not a properer instruction not to answer this question.

A. Can you ask it one more time?

Q. Yes. You would not have given this information to another person unless that person was a police officer, right?

MS. MCCLANAHAN: Objection. Calls for speculation.

A. I'm not sure. It's on a case-to-case basis. My own --

Q. Was there any other instances in which you gave information from SACWIS to just somebody -- a member of the public?

A. No.

Q. Would you have done that if a member of the public had asked you to access SACWIS and give them --

A. No.

MR. WHITTAKER: Objection. Calls for speculation.

Q. You wouldn't have done that if it was just a person in the public?

MS. MCCLANAHAN: Objection. Calls for speculation.

Q. Right?

A. Yes.

Q. You did it for Officer Hooven because he's a police officer, right?
A. And because I was seeing him and I cared about him. And I care about children a lot.
Q. Uh-huh. And as far as you understood it, the policy within the Department of Job and Family Services contemplated you sharing that information with him?
MS. MCCLANAHAN: Objection. Asked and answered.
Q. Right?
A. I'm not -- I'm not really understanding what -- can you re -- can you restate the question?
Q. It is the policy, as you understood, of the Department of Job and Family Services, that you should share that information with Officer Hooven because he asked for it in his capacity as a police officer, correct?
A. I'm not sure I'd say policy. My understanding.
Q. Your understanding because you were told that, right?
MS. MCCLANAHAN: Objection. Asked and answered.
A. And I clarified this after lunch that it wasn't necessarily told directly.
Q. Sure.

A. Also office gossip.
Q. Sure.
A. That's what was normal.
Q. Maybe not a policy, but a custom?
MR. MUNAS: Objection.
A. Sure.
Q. Unwritten?
A. Definitely unwritten.
Q. You understand that whether or not you believe them to be confidential, as a matter of law that information is confidential?
MS. MCCLANAHAN: Objection. Asked and answered.
Q. Correct?
A. Yes.
Q. You understood that information to be -- generally speaking, you understand that confidential information in the SACWIS database to be sensitive?
MS. MCCLANAHAN: Objection. Asked and answered.
A. Yes. And I knew it could be subpoenaed as well.
Q. Okay.
MS. MCCLANAHAN: Justin, I just know that the county wants to ask, the city probably

does and Zach what she understands information to be, the confidentiality, and she answered before lunch. She's answered this after lunch.

MR. WHITTAKER: She's not answered the same questions as I'm asking her now.

MS. MCCLANAHAN: Okay.

MR. WHITTAKER: And she's not answering the same way to the extent there's overlap.

Q. But you understood that information to be confidential as a matter of law according to the State of Ohio, right?

MR. MUNAS: Objection.

MS. MCCLANAHAN: Objection.

A. Yes.

Q. And you understood that -- you understand generally if someone had sensitive, confidential information of this character leaked about them or disclosed to the public, that person would be upset about it?

A. What information?

MS. MCCLANAHAN: Objection.

MR. MUNAS: Objection.

Q. Information about child abuse when they were a child.

MS. MCCLANAHAN: Objection. Calls for speculation.

Q. You can agree with me that if that information is disclosed that should not be disclosed -- say, it should not be disclosed and it was disclosed, the person who that information is about would be upset about it?

MR. GOTTESMAN: Objection.

MS. MCCLANAHAN: Objection.

A. I can't speak for other people.

Q. If that information was leaked about you, would you be upset about it?

MR. GOTTESMAN: Objection.

MS. MCCLANAHAN: Objection.

A. It was subpoenaed about me. My SACWIS history was subpoenaed.

Q. And how did that make you feel?

A. I was fine with it.

MS. MCCLANAHAN: Objection. Relevance.

Q. But you don't necessarily agree that that information is disclosed that it would cause someone distress?

MR. GOTTESMAN: Objection.

MS. MCCLANAHAN: Objection.

MR. MUNAS: Can you guys please let me finish?

MR. GOTTESMAN: That's a ridiculous

question, Justin. It's vague. It's nonsense and it's meaninglessly wasting time. Could you get into the facts and dispute in this case?

MR. WHITTAKER: There's a dispute in this case about whether my clients have suffered emotional distress and psychological injuries.

MR. GOTTESMAN: Whether she would react emotionally one way or another has nothing to do with your clients' claims. Don't testify about that. That's enough. We don't need to hear how she feels about her information.

MR. WHITTAKER: Stemming from the information that was accessed and disclosed.

MR. GOTTESMAN: Justin, you are really pushing the envelope right now.

MR. WHITTAKER: Pushing the envelope, right.

Q. You disagree with me that a person who has this information disclosed about them would necessarily be upset about that?

MR. GOTTESMAN: Objection.

MS. MCCLANAHAN: Objection. That's also a mischaracterization of her testimony.

MR. WHITTAKER: I'm asking the question.

MS. MCCLANAHAN: You disagreed with me.

MR. WHITTAKER: I'm asking if she disagrees with me.
Q. Do you disagree with that?
A. Yes.
Q. Okay. That's all I'm asking.
At some point you learned that Officer Hooven had a girlfriend?
A. Yes.
Q. And you contacted her, right?
A. Yes.
Q. You were interviewed by -- well, first let me go through -- I'm going to show you what has been marked as Exhibit A.
A. I have this.
Q. Do you?
A. Right in front of me, yes.
Q. Have you seen this before?
A. I don't recall.
MR. WHITTAKER: Just for the record, I'm going to clarify that it's a "Regular and Punctual Attendance Is Required To Perform The Following Essential Functions." It's a document produced in discovery as Exhibit A from Hamilton County Department of Job and Family Services.
Q. Your testimony is that you don't recall

seeing it?
A. I don't know if I've seen it or not.
MR. MUNAS: Justin, if I could clarify, actually at the top it says "position description," which is maybe a more accurate title than the portion that you read.
MR. WHITTAKER: Do I have the wrong exhibit?
MR. MUNAS: Exhibit A. It's all here, position description.
MR. WHITTAKER: Oh, yeah, right.
MR. MUNAS: The document is not entitled "Regular And Punctual Attendance Is Required". That's all I was trying to say.
MR. WHITTAKER: Fair enough.
Q. The title of the document up in the corner says "Hamilton County Position Description." Do you see that?
A. Yes.
Q. Have you seen -- and you don't recall ever seeing this document before?
A. I'm not sure if I have or not.
Q. Would you take a look at it to see if it accurately describes what your position with DJFS was?
MR. GOTTESMAN: It's a section chief job

position, Justin.

A. Yeah. The position title --

MR. GOTTESMAN: If you read down three lines on the left-hand side of the --

MR. WHITTAKER: It says "Section: Assessment."

MR. MUNAS: It says "Assessment Supervisor" by "Position Title."

MR. WHITTAKER: Okay. So this is not your job description.

MS. MCCLANAHAN: And also, Justin, it wasn't in effect when she was an employee there. If you look at bottom there's the date. So if we want to move this along, I would just -- this doesn't seem like it's going to be relevant.

MR. WHITTAKER: Right. It was produced in discovery. That's why I'm asking about it. If it's not, it's not.

A. Yeah. I was never an assessment supervisor.

(Whereupon, Deposition Exhibit B was marked for identification purposes.)

Q. I'm going to hand you Exhibit B. Have you ever seen this document before, Exhibit B?

A. I don't recall.

Q. It was produced by the county in discovery. 005 through 006, Children's Services Manual. Client Confidentiality is mentioned. Not a document you recall seeing before?

A. Yeah. I don't recall seeing this.

Q. Okay. I'm going to hand you Exhibit C as in Charlie.

A. Do you want this back?

Q. No. That's going to stay --

A. Because I think I have the file.

(Whereupon, Deposition Exhibit C was marked for identification purposes.)

Q. I handed you Exhibit C. It is called the "HCJFS New Worker Pre-Training Manual." Do you see that at the top?

A. Yes.

Q. Do you recall ever seeing this document before?

A. I don't recall.

MR. WHITTAKER: And for the record, it's produced by the county starting at 007 through 019.

Q. And take a look at it if you need to, but I think I understand your testimony to be that you've not seen it before?

MR. MUNAS: Objection.

MS. MCCLANAHAN: That's not what she said.

Q. It's not?

A. That's not what I said.

Q. Okay.

A. I don't know if I've ever seen this before.

Q. Okay. You could have, but you don't remember?

A. Yes.

(Whereupon, Deposition Exhibit D was marked for identification purposes.)

Q. Okay. I'm going to hand you Exhibit D. And as Zach observed earlier, this is a truncated version of the Personnel Policy Manual starting at the cover of it, 0020. And then skipping ahead to Section 6.0, "Ethics of Public Employment," starting at Page 222, which would be the page after the cover.

A. If this is the -- it says "Latest Revision: October 20, 2025." I was not employed.

Q. Have you seen a document similar to that that might not have been revised in 2025?

MS. MCCLANAHAN: I'll also object to this document being something that she had any

knowledge of as we don't have a red lined version of renditions of when she was employed.

Q. Have you ever seen a personnel policy manual of Hamilton County?

A. Not that I recall.

Q. If would you skip to the second page, Page -- jumping to Page 222, Section 6.0. Do you see that?

A. Uh-huh.

Q. And it's entitled "Ethics of Public Employment." Do you see that?

A. Yes.

Q. Have you ever seen -- irrespective of whether you've seen the whole document, have you seen a Section 6.0, "Ethics of Public Employment" before?

MS. MCCLANAHAN: I'm going to object. This was clearly revised, per the bottom, 5/18/23. She was --

MR. WHITTAKER: Employed at that time.

A. I was.

MS. MCCLANAHAN: But I don't know if she -- she has since this version since 5/18 of '23.

Q. Have you seen a version of an ethics and public employment policy?

A. Not that I recall.

Q. Were you given materials when you -- policy materials when you joined the county as an employee?
MS. MCCLANAHAN: Objection. Asked and answered.
A. I received, like, insurance documents and --
Q. Okay.
A. -- you know, stuff like that.
Q. But no policies?
A. No policy manuals.
Q. Let's go to Page 287 of that document. It is -- that's it, I think.
A. Section 7?
Q. Section 7. "Discipline/Appeals/Grievances." Go to the next page. It says "Section 7.0: Employee Discipline."
Have you ever seen this before or a version of it?
A. Not that I recall.
Q. Okay. Have you seen or are you aware of any other county discipline policy?
A. Not that I recall.
Q. And, again, this wouldn't have been something -- as you as far as you recall, this would not have been something that was given to you when you started

your employment?

A. I don't believe so.

Q. Okay. Not saying it wasn't -- was or was not. You just don't remember?

A. I don't recall.

Q. You don't recall. Now, I'm going to hand you Exhibit F, which is marked -- every page of it is marked confidential.

MR. WHITTAKER: And I'm going to ask how you would like me to treat this?

MR. MUNAS: So I'm going to go off the record --

MR. WHITTAKER: Yes.

MR. MUNAS: -- so we can discuss this.

MR. WHITTAKER: Yes.

(Off-the-record discussion.)

(Whereupon, Deposition Exhibit Q was marked for identification purposes.)

Q. I'm going to hand you what's been marked as Exhibit Q.

MR. MUNAS: We're back on the record now.

MR. WHITTAKER: Yes. I'm sorry.

Q. Do you recognize this as your resignation letter with the county?

A. Yes.
Q. And I'm going to represent to you that it's three pages long starting on 571 through 73. Would you confirm that this is complete?
A. Am I allowed to look at it real quick?
Q. Yeah. Go ahead. I'm sorry.
A. I haven't looked at this since I wrote it.
Q. Understood. Please take your time to satisfy yourself.
MS. MCCLANAHAN: Justin, this is not her resignation letter.
THE WITNESS: Oh, yes.
MS. MCCLANAHAN: This is a -- you can clarify what it is, but this not --
Q. Okay. I'm sorry. You're right. Not a resignation letter.
A. Yes. So I have to do an exit interview and at the end of the exit interview I'm allowed to have a rebuttal. This was my rebuttal letter.
MS. MCCLANAHAN: Sorry. Just wanted to clarify.
MR. WHITTAKER: That's fine.
A. Okay. I've skimmed it.
Q. Okay. And is it what it purports to be?

A. Yes.
Q. And is it a complete -- I think you just described it as a rebuttal?
A. Yes.
Q. Is it complete as far as you can see?
A. Yes.
Q. And you authored this document?
A. Yes.
Q. Okay. Did you have any assistance with it?
A. In writing this?
Q. Yeah.
A. No.
Q. You alone wrote it?
A. Correct.
Q. Gotcha. This is an authentic copy of it?
A. Correct.
Q. Okay. I'm going to hand you Exhibit O.
MR. WHITTAKER: I did not Print O.
MR. MUNAS: Okay. Give it back.
Q. We talked about Q. You're asking for the county to supply you with a defense in this case, right?
A. Yes.
Q. Because every action you took as

alleged -- every action that is alleged that you took, you took in your capacity as a public employee, employee of the Department of Job and Family Services, right?

A. I believe so.

Q. And you did so consistent with your training?

A. I did so consistent with everything that I had learned.

Q. Okay. Including your training?

A. Yes.

Q. Including instruction you'd been given by your supervisors?

A. Yes.

Q. Including information that was shared with you by your coworkers?

A. Yes.

Q. You didn't -- you shared this information with the police officer because that person is a police officer who you also understand you're supposed to cooperate with, right?

A. Yes.

MS. MCCLANAHAN: Objection. Asked and answered.

Q. And to protect children, right?

A. Yes.

Q. You weren't trying to hurt anybody, right?
A. Absolutely not.
Q. You didn't do it maliciously?
A. Absolutely not.
Q. You didn't do this intending to cause any trouble?
A. Correct.
Q. Or to cause anybody any harm?
A. Correct.
Q. But to be clear, you did so in your capacity as a public employee?
MR. MUNAS: Objection.
A. No.
Q. No?
A. No.
Q. You weren't a public employee when you --
A. No, that's not what same I'm saying.
Q. Oh, okay.
A. I'm saying that I don't believe that I hurt -- I don't believe that the information that I provided was so confidential that it hurt anyone.
Q. Oh, okay. That wasn't my question.
A. Oh, sorry. I misunderstood then.

Q. Excuse me. The actions -- all the actions you took -- excuse me -- related to accessing SACWIS and supplying that information to Officer Hooven you did in your capacity as an employee, right?
A. Yes.
Q. Consistent with your understanding of the policies and customs of Hamilton County, right?
MR. MUNAS: Objection.
A. What are you --
Q. You believe that you were acting consistent with your -- with what you were told the custom and policy of Hamilton County is with respect to the information?
MS. MCCLANAHAN: Objection. Asked and answered. Go ahead.
A. Yes.
Q. Do you have any idea if after this incident the county changed any policies or procedures?
MR. MUNAS: Objection.
Q. With respect to this access and sharing of SACWIS data?
A. I don't know.
MS. MCCLANAHAN: Objection. Calls for speculation.
Q. You don't know either way?

A. I wouldn't know, yeah.

Q. In your conversations with Officer Hooven, did Holly come up as a subject often?

MR. MUNAS: Objection.

MR. WHITTAKER: Objection. Asked and answered.

Q. I know it came up. Did it come up a lot?

A. I'd say a lot, yes.

Q. You didn't seek out a police officer to give this information to, right?

A. No.

Q. You feel like you were sought out as a someone who could supply that information to in this case a police officer?

MS. MCCLANAHAN: Objection.

A. I'm not sure. Jesse --

MS. MCCLANAHAN: Calls for speculation.

Q. Do you feel like -- is it your understanding that Officer Hooven sought you out so that he could get this information from you?

MS. MCCLANAHAN: Objection. Calls for speculation.

A. Possible. I'm not sure.

Q. Okay. You understood from -- from him

telling you that he wanted you to look up this information for him that so that he wouldn't get in trouble, right?

A. I don't think that that was why I was asked.

Q. Okay. But he expressed that to you?

A. He expressed he would get in trouble if he looked up the information, yes.

Q. You're aware that Officer Hooven disseminated the information he says he learned from you to Holly?

A. I've not talked to Jesse since then.

Q. Okay.

A. So I know that it was disseminated because of this lawsuit. I found out he was cheating on his girlfriend with me. My father had a heart attack that same very day. I tried to wrap this up and move on with my life.

Q. Okay. So your understanding that that was shared, you understand, because it's alleged in this lawsuit?

A. Yes.

Q. You didn't know it at the time?

A. Correct.

Q. Was there any time during your employment that you -- that you mentioned that sometimes files might be restricted?

A. Yes.
Q. Was there any point during your employment that Brendon Taylor's file was restricted to you? Or restricted from you?
A. I only looked once.
Q. Okay.
A. And it was not restricted at the time, so I'm not sure.
Q. Okay. Okay. You're not aware that if there was a case -- there was no case open with respect to Brendon Taylor at that time, was there?
A. An active, open case? I don't believe so.
Q. And, again, there's nothing in that SACWIS data that you looked up -- that you saw that you reviewed that indicated to you that Brendon Taylor was a risk or a harm to children?
MR. GOTTESMAN: Objection.
MS. MCCLANAHAN: Objection. Asked and answered.
Q. Correct?
A. Yes.
MR. WHITTAKER: That's all I have for now. Thank you. Who's next?
(Whereupon, a brief recess was taken.)

MR. MUNAS: We're back on the record.

EXAMINATION

BY MR. MUNAS

Q. Good afternoon, Miss Paul.

A. Hi.

Q. My name is Eric Munas. I am an assistant prosecuting attorney for Hamilton County and I represent Hamilton County Board of County Commissioners and the Department of Job and Family Services. Similar to how this morning went, I'll trying to follow the same rules. Try not to speak over each other. If you misunderstand my question, please let me know. If you need a break, let me know. I'll ask that you answer the pending question at that time so we can take a break.

A. Okay.

Q. Is that agreeable?

A. Yes.

Q. Okay.

(Whereupon, Deposition Exhibit HC1 was marked for identification purposes.)

Q. I'm going to hand you a document that I'm now marking as Exhibit HC1.

MR. MUNAS: And I do have copies.

Q. Are you familiar with this document?

A. Yes.

Q. And am I correct in saying this is your answer to the amended complaint that was filed in this case?
A. Yes.
Q. Okay. If you could flip to the sixth page.
A. Okay.
Q. Paragraphs 45 and 46, I'll give you a moment to see what those say before asking questions.
A. Okay.
MS. MCCLANAHAN: You can read the full 45 and 46 before he starts asking you questions.
THE WITNESS: Okay.
A. Okay.
Q. In these two paragraphs, 45 and 46, in your answer it has referenced the MOU, the Memorandum of Understanding, in Paragraph 46, the MOU in Paragraph 45.
There was some testimony about an MOU earlier and you had testified that you hadn't seen it until the lawsuit was filed; is that an accurate -- sorry. I'm trying to summarize your prior testimony, but is that fair?
A. That's fair.
Q. And you hadn't been aware -- you were not aware of that MOU or you hadn't read it at the time in 2023 when the facts of this case as alleged occurred?
A. My union rep told me about the MOU.

Q. Your union rep told you about the MOU. So this was during the disciplinary process?
A. Yes.
Q. Okay. But prior to that point in your employment with JFS, you were not aware that the MOU existed?
A. I knew that the information as far as -- let me back up. Yes.
Q. Yes, you did not know it existed?
A. I did not -- I knew the policy existed. I didn't know where.
Q. Okay. And you just called it a policy. Is it your understanding that this MOU is a policy?
A. I'm not sure what it's classified as.
Q. Okay. If you could flip to Paragraph 5 on Page 7. And if you take just a moment -- a couple moments to read that. It goes on to Page 8.
A. Just Paragraph 5?
Q. Yes.
A. Okay.
Q. In your answer this is where you identify and state that Officer Hooven contacted you in your official capacity as a JFS worker and asked if there were any substantiated claims that plaintiff Brendon Taylor had abused any child.

Do you see that?

A. Yes.

Q. And that's your testimony earlier and it lines up with this, right, that Officer Hooven contacted you because you were a JFS worker so that you could look this up for him; is that fair?

A. That's fair.

Q. And then flipping ahead to Page 19 of your complaint -- or sorry -- of your answer to the amended complaint under the heading "Affirmative Defenses."

MR. GOTTESMAN: Counsel, did you say Page 19.

MR. MUNAS: 19, yes.

MR. GOTTESMAN: Thank you.

A. It goes on to the next page. You want me to keep reading?

Q. If necessary, we can take the time for you to review this. So No. 6 at the bottom of Page 1 it says, "Defendant's actions were at all times in good faith and in accordance with the Ohio Revised Code and/or other applicable laws and regulations."

Do you see that?

A. Yes.

Q. And that's your position that you've taken in this case, that all your actions were in accordance

with the Ohio Revised Code and other laws and regulations?

MS. MCCLANAHAN: Objection. Calls for a legal conclusion.

A. I'm not an attorney. I didn't write this.

Q. But this answer was filed on your behalf, was it not?

A. Correct.

Q. Going to the next page, No. 7, it says, "Pursuant to ORC 2744.07(B)(1) and/or other relevant provisions of ORC Chapter 2744 or common law, Defendant Hamilton County Board of County Commissioners and/or Defendant JFS must indemnify and hold Plaintiff harmless in the amount of any judgment against the Defendant on the Complaint."

Do you see that?

A. Yes.

Q. Is that your understanding of the basis for your crossclaim against the county in this case?

MS. MCCLANAHAN: Objection.

A. I'm not an attorney. I can't even act like I pretend to know what all of this means. That's why I hired an attorney so they can be able to reply to these type of, you know, legal proceedings because I don't know it.

Q. All right.

A. How to proceed.

MR. MUNAS: To make sure, what did we label this as?

MS. MCCLANAHAN: HC1.

(Whereupon, Deposition Exhibit HC2 was marked for identification purposes.)

Q. I'm going to hand you what I'm marking right now as Exhibit HC2. And I'll represent to you that this is a copy of the Second Amended Crossclaims that you filed in this case.

A. Yes.

Q. Are you familiar with this document?

A. Yes.

MS. MCCLANAHAN: You don't have to talk about anything we've talked about. You don't have to talk -- please don't talk about it. You do not have to.

THE WITNESS: Got it.

Q. All right. I'm going to ask you about Paragraph 8 on Page 2 where it says, "Miss Paul was trained by JFS to consider Cincinnati Police Officers partners with JFS and that it was part of her job duties to treat the officers as partners and to work to help assist them as such."

Do you see that?

A. Yes.

Q. I believe it was your testimony earlier that that wasn't necessarily training, but it was things that you were told by supervisors? Am I general -- I guess is that your understanding of what you testified to earlier?

A. I think the generalization of that is incorrect. I didn't say it was explicitly through other people and chatter, that some of it came from official policy, that I was taught through training and some of it was through chatter in the workplace.

Q. And through chatter and everything you just said -- sorry -- was the MOU part of what your understanding of this partner relationship with Cincinnati Police?

A. The information in the MOU was some of it, was conveyed through other type of training, but I was never given the specific MOU.

Q. Yeah.

A. So I can't speak to where that information came from.

Q. Have you read that MOU since this lawsuit's been filed?

A. With my attorney, yes.

Q. Okay. Are you aware that the word "partner" does not exist in that MOU? Or "partnership"?

A. I don't know.
Q. Okay. Would it surprise you to learn that the words "partner" or "partnership" do not exist in that MOU?
A. No. Because there's other words for partnership or partner.
Q. Such as?
A. Work relationship, community agencies, anything like that.
Q. Okay.
A. I don't think it has to explicitly say partner.
Q. But that's word you've been using?
A. Yes.
Q. Okay. Are you aware that the Ohio Revised Code has an exception to the duty to provide a defense for an employee when that employee's acts or omissions occurred while the employee was not acting in good faith or when the employee was acting manifestly outside the scope of the employee's employment or official responsibilities?
MS. MCCLANAHAN: Objection.
A. No, I did not know that that's what the ORC said.
Q. All right. Sorry. Going back to

Exhibit HC2.  You still have it in front of you?

A.        Yes.

Q.        Paragraph 10 on Page 2, your crossclaim states that JFS informed you that under the terms of the MOU with the Cincinnati Police Department -- when I say "MOU," I mean Memorandum of Understanding.  I apologize.

"When an employee of JFS gives any Cincinnati Police Officer any information obtained through SACWIS, the Cincinnati Police Officer is required to keep that information confidential."

Do you see that?

A.        Yes.

Q.        So your crossclaim appears to say that JFS informed you that under the terms of the MOU that there's this confidentiality with regard to SACWIS.  But your prior testimony is that you weren't aware of an MOU, but you were just told things?

A.        Correct.  I was aware of the MOU when the union told me during my disciplinary action hearing.

Q.        Is the union the same thing as JFS?

A.        It's JFS employees, yes.

Q.        It consists of JFS employees; is that accurate?

A.        Yes.

Q.        But is it the same organization as JFS?

A. No. But people for the union and JFS.
Q. Okay. So it's actually your testimony then that the union informed you that under the terms of the Memorandum of Understanding --
A. But also a case worker. She was a case worker and a union rep.
Q. Right. But a case worker doesn't speak for JFS, do they?
A. If they are in the capacity of a JFS worker, yes.
Q. Paragraph 13, which is on Page 3, this sets forth the timeline of your interaction with Officer Hooven. It says that in April of 2023 Officer Hooven contacted you and asked if there was substantiated claims about Brendon Taylor.
Do you see that?
A. Yes.
Q. So in your crossclaim here you articulate that that conversation occurred in April. Do you agree with that still?
A. I would have to look at my text messages to line up the timing.
Q. Further down in Paragraph 16 on the same page this identifies that Officer Hooven and you had a person sexual relationship lasting for approximately two

weeks beginning on or about March 25, 2023. Do you see that?

A. Yes.

Q. So according to your crossclaim, your personal sexual relationship with Jesse Hooven began before the time that he asked you about information concerning Brendon Taylor; is that accurate?

A. Yes.

Q. All right. You can set that exhibit aside.

A. Also just a correction. I did bring this up earlier. That is a typo. It says March 25th. I believe it should be, like, March 15th. I believe that was a typo in Paragraph 16.

Q. Regarding the beginning of your relationship?

A. Yes.

Q. Okay. Thank you for that clarification.

A. Of course.

Q. Is there an Exhibit H in your pile there? I don't think there is.

A. Would it be at the top, like, how your --

Q. I don't know how that file is organized.

A. I don't think so.

Q. I have a copy for you.

MR. MUNAS: Counsel, this was the one that Justin sent us before Wednesday, so...

MR. GOTTESMAN: I've got it. Thank you.

Q. Are you familiar with -- well, if you would take a minute and flip through this.

A. Entire stack?

Q. If I ask you questions about a particular page, you will have time to look at it, but I want you to -- I want you to at least understand what is in front of you generally. I'll represent to you this is what I believe is a copy of your employment file --

A. Okay.

Q. -- with JFS. Do you have familiarity with any of the documents that you're seeing in here?

A. Some, yes.

Q. So we've already put on the record it's generally the timeline of your employment with JFS. And you worked as an assessments worker; is that correct?

A. Yes.

Q. Assessments worker, I think, in some places might say investigator. Is that a title that you're familiar with or would you call yourself an assessments worker?

A. When I started at JFS they were

transitioning from calling it investigator to assessments worker. So it kind of still said investigations on some stuff --

Q. Okay.

A. -- but we were transitioning into using the word "assessments."

Q. Okay. And that was the position you held throughout your time with JFS, correct?

A. Yes.

Q. All right. So to the best of your recollection, did you ever have any case assignments related to individuals Jesse Hooven and Holly Hooven, any of their children, Brendon Taylor or Brendon Taylor's children?

A. I don't know Brendon Taylor's children's names. So I don't want to speak without knowing them, but the rest of them, no.

Q. Okay. So you can't say for sure because you don't know the names of Brendon Taylor's children, whether or not you may have had a case with their names on it?

A. Yes. I have no idea what his children's names are.

Q. Do you believe -- scratch that. Were you ever a supervisor or section chief at JFS?

A. No.

Q. Are cases that you get with JFS, are they always listed under the children's name or are they listed under the parents' name?

A. Unfortunately, it's always under the mother's name.

Q. Under the mother's name?

A. Yes.

Q. Okay.

A. That was something that people were trying to change by the way. That's why I said "unfortunately."

Q. Okay. So you were asked earlier whether the text messages -- the large list of text messages that were produced were the ones that you produced and that they were complete. Do you remember that? And you said that they were complete?

A. I believe them to be complete, yes.

Q. Okay. Are you familiar with the content of those text messages?

A. For the most part, yes. I don't have it memorized, but...

Q. Neither do I. It's a long document.

A. Yes, it is.

Q. Are you willing to hazard a guess as to how many texts are in that chain?

A. I have no idea.
Q. Would you say it's several hundred, maybe over a thousand?
A. I'm real bad at math. I have no idea.
Q. But it's a lot?
A. It's a lot, yeah.
Q. Okay. And there's testimony that you and Jesse Hooven texted and called each over the period of three to four weeks; is that accurate?
A. I'd say so.
Q. Okay. Did you talk every day during that time?
A. Not every day.
Q. Multiple days in a row?
A. Yes.
Q. All times of the day texting?
A. No.
Q. When you say no -- I guess my question was a bad question.
Did you text each other in the mornings sometimes?
A. I believe so.
Q. During the workday did you ever text each other?
A. Yes.

Q. Did you ever text each other in the evenings or late at night?

A. Yes.

Q. Okay. Those texts contain a lot of different things, but within those texts do you recall coordinating a time to meet with him for coffee or hot chocolate, for example?

A. Yes.

Q. How many times did you meet with Jesse Hooven for -- at a coffee shop?

A. I'm not sure exactly how many, but, like, a handful.

Q. A handful meaning three, four, five?

A. Yeah. Like, three or four times.

Q. Okay.

A. I'm not sure. It could be more.

Q. Were those -- did you consider those dates?

A. I would.

Q. Okay. Was he on the -- was he, like, on the clock when you guys met?

A. I don't know how the city works. He was being paid to go to court. That's all I know.

Q. Okay. So he was -- he was going to court around the time that you guys met for a date at a

coffee shop?
A. Yes. If we were meeting for coffee, he was at work.
Q. Was this at the Coffee Emporium on Central Parkway?
A. Yes.
Q. Was it always there?
A. For coffee?
Q. Yeah.
A. Yes.
Q. Or hot chocolate?
A. Yes.
Q. Okay. Were you working for Job and Family Services during the times that you met with him? Like, were you on the clock or on the job?
A. Yes.
Q. Okay. Were -- these were dates, so they weren't actually related to the case work that you were doing at the time?
A. Yes.
Q. Okay. Did you meet with Jesse Hooven at places other than Coffee Emporium for other dates?
A. Yes.
Q. Do you recall any of those locations?
A. We met at the Knotty Pine, he came to my

house and then I went to his house.

Q. Okay. And for the record, Knotty Pine is a bar?

A. I've been there once. I would consider it a bar.

Q. A bar, tavern, restaurant, something of that nature?

A. Sure. Yeah.

Q. And at any of those meetings at the Knotty Pine, at your house, at his house, was the nature of your guys' time together related to your job?

A. We would probably complain to each other, griefs, you know, again --

Q. Is that one of your job duties, to complain -- when you were employed at JFS to complain about your job?

A. No.

Q. Okay.

A. No, it was not. But no, we were not doing, like, work together, no.

Q. Okay. You can set Exhibit HC2 aside. Hang tight with me for just one second.

(Whereupon, Deposition Exhibit J was marked for identification purposes.)

Q. I'm handing you what has been marked

Exhibit J. I don't think it's in the pile already. That's why I handed it to you.

A. I think you're correct. It's not there.

MS. MCCLANAHAN: Was this one produced by Justin?

MR. MUNAS: It was for Wednesday.

Q. Have you seen this document before?

A. With my attorney.

Q. Okay. So you're aware that this is a written transcript of an interview that you gave to the Cincinnati Police Department Internal Investigation Section?

A. Yes.

Q. Okay. Were you under oath when you gave this interview?

A. No.

Q. Were you truthful to the internal investigation section when you answered the questions?

A. I believe so.

Q. Do you have any reason to believe that the answers as recorded in this transcript are false?

A. Not that I can think of.

Q. Okay. If you could turn to Page 4.

MS. MCCLANAHAN: What's the Bates on Page 4? 462?

MR. MUNAS: My version doesn't have

Bates stamps.

MS. MCCLANAHAN: You're good. Go ahead.

Q. In the middle of the page you see a question from Sergeant Sterbling. And it says, "And is it accurate that the continued texting was not work related?"

And you said "Correct."

Do you see that?

A. Yes.

Q. In fact, you continue and you say, "It was very quick that I realize this was no longer work related. I think it was like the next day he called me asking me a question. And then it kind of just turned into personal."

Do you see that?

A. Yes.

Q. And, in fact, that lines up with the testimony you've given today, that your guys' relationship was largely personal and at a time sexual as well, right?

A. Yes.

MS. MCCLANAHAN: Objection. Mischaracterizes her testimony.

MR. MUNAS: I apologize. It's not my intention.

Q. If you could flip forward to Page 15.

A. Okay.

Q. Again, in the middle of the page Sergeant Neville asked a question. The second half of that question says, "Did you guys ever work with each other on follow-up cases or anything work related?"

Do you see that?

A. Yes.

Q. And you say no, right?

A. Yes.

Q. So other than that -- the site visit at the Budget Inn, I think is the name that we said earlier, that was the only work related case assignment where you interacted professionally with Jesse Hooven?

A. Yes. That was the only case we were assigned together.

Q. Okay. Moving to Page 19 -- in fact, if we go to the bottom of Page 18 so we see the question from Sergeant Sterbling, he asks, "Was there ever -- was there any ever -- was there any ever any indication that he may have used a police database to query Mr. Taylor specifically?"

And then you answer, "I -- the only thing I remember him saying is, if I look him up I will get in trouble. And I remember thinking, yeah, I know you will."

Do you see that?

A. Yes.
Q. And this is in regards to, I think, some of the questions and testimony that you gave earlier about Jesse Hooven potentially using LEADS as a police officer to query about Mr. Taylor?
A. Yes.
Q. Is that your understanding of what this question was about?
A. Yes.
Q. So while you were aware that Jesse Hooven as a police officer could get in trouble, and according to this interview, you knew he would get in trouble if he did this, you did not feel similarly that you would get in trouble if you queried your database, SACWIS, about Mr. Taylor?
A. I didn't feel the same, no.
Q. Why didn't you fell as though -- if it was inappropriate for him to look this up, why would it not be inappropriate for you to look it up?
A. Because I knew it was a felony if he looked into the database.
Q. And you didn't think that if you looked it up it would be a felony?
A. Correct.
Q. Would it be a misdemeanor if you looked

it up?

A. I'm not sure.

Q. But you knew that specifically for police officers looking up things in LEADS you weren't familiar that that was punishable by potentially a felony?

A. I knew that looking into LEADS for a personal reason is a felony, yes.

Q. Page 21, toward the bottom -- and I'm pointing towards the bottom because that's what I find interesting, but if you need to refer further up the page, please do so.

But Sergeant Neville says, "And he tried to get you to look it up in a capacity that was not within his police duty?"

And you said, "Almost immediately."

Do you see that?

A. Yes.

Q. So at the time you were giving this interview to the Internal Investigation Section, you understood that him asking you to look up Brendon Taylor in your database at work, SACWIS, was not him requesting that within his police duty?

A. Yes.

MS. MCCLANAHAN: Objection to form.

Q. Okay. Set J aside. Is there an Exhibit

10 in that pile? Actually I know there is not.

(Whereupon, Deposition Exhibit 10 was marked for identification purposes.)

Q. I'm going to hand you Exhibit 10.

MR. MUNAS: Also from Wednesday.

Q. Are you familiar with this document?

A. I've never seen this.

Q. You've never seen it before?

A. Correct.

Q. Do you remember around the time of these in 2023 giving a statement to the Cincinnati Citizens Complaint Authority?

A. I do.

Q. I'll represent to you that this is a transcription of that statement or interview that you gave?

A. Yes.

Q. Do you agree that's what it appears to be?

A. Yes.

Q. But you haven't seen this before and you have not read it before?

A. Correct.

Q. Okay. As we go through this, feel free to look around for context for the questions and so on. But you do remember giving this statement or interview to the

CCA?

A. Yes.

Q. The Citizens Complaint Authority. Okay. I'm going to turn to Page 11, which is -- sorry. The page numbers I'm referring to are at the top of the page. There's additional page numbers at the bottom. Are you at Page 11?

A. Yes.

Q. Okay. So on this page, Line 6 -- actually there are line numbers here. So on Line 6 it says, "Madison Paul." And then you said, "But then in one of the phone conversations he's like, you know, I just -- I don't know anything about this guy. He could be, you know, anything." Do you see that?

A. Yes.

Q. And then at the bottom of the page after some additional conversation you say, "I was helping him because I felt truly sorry for him."

Do you see that?

A. Yes.

Q. And that's referring to Jesse Hooven? That you felt sorry for Jesse Hooven and that's why you helped him?

A. I think that's who I'm talking about.

Q. Why did you feel sorry for him?

A. Because his kids was around another man and he had no idea. And nonbiological father figures are, again, the number one perpetrator of child abuse, sex abuse and neglect.

Q. Okay. And you helped him because you felt sorry for him. Do you still agree with that?

A. I wouldn't say that's the only reason. I was ultimately concerned for the safety of the children. That's why I looked him up and I did feel bad for Jesse.

Q. Okay. Page 13, starting on Line 5, you say, "And so when I hear I have concerns for my kids. I'm going to help you out."

Then Morgan Givens says, "Sure."

Then on Line 8 you say, "And against my better judgment, I did access a system called" -- in here it says "Saquest," but I think you and I would agree that's probably referring to SACWIS?

A. Yes.

Q. Could you explain what you recall meaning by against your better judgment?

A. I was there in -- I believe in August. So it's, like, six months past what had happened. And at that point, I was, like, this wasn't worth it. This guy had a girlfriend. He -- these two people are a mess. They -- no one seems to even care about these children besides me.

Why did I even do this if I -- if these people don't even care. That's really where I was at that point.

Q. So that was your mindset at that point in time, right?

A. Yes. I was extremely frustrated that it was being brought up again.

Q. But if we actually read the -- read the transcript of this interview, it appears to be referring to that when you looked up Brendon Taylor in SACWIS, that was against your better judgment. Do you agree with me that that's what appears on this page?

A. Yes.

Q. Why was doing that against your better judgment?

MS. MCCLANAHAN: Objection.

Q. Not in hindsight. But why when you looked it up at the time was it against your better judgment?

A. I trusted Jesse. I should not have trusted Jesse.

Q. So, again, you're referring to this in hindsight?

MS. MCCLANAHAN: Objection. You can go ahead and answer.

A. I mean, I can't put myself -- I don't

know what my thoughts were three years ago.

Q. When I read this, it comes off to me a different way where it appears to say that you were -- you were telling this individual, Morgan Givens, a series of events that unfolded and giving your side of the story. And we're getting to the point where you were asked to look up Brendon Taylor on SACWIS. And you say you did it against your better judgment. And I'm just trying to understand whether -- it appears to me that this statement indicates that you knew at the time you shouldn't have done it, but you did it anyway. Is that a fair reading of the transcript?

A. No.

Q. That's not what you meant when you gave this interview?

A. At the time I was remorseful. I was a single mom, still am a single mom, living paycheck to paycheck, still am living paycheck to paycheck. I couldn't lose my job or I'd lose everything. And so, yeah, I was terrified. I had two huge 6-foot-6 city police officers come in and interview me on a whim that I had no idea about. I didn't have legal representation. I didn't know I should have.

I was then recalled by the CCA again after I tried to forget. Mind you, my father had a heart

attack in the middle of all this. I was still dealing with him from having a heart attack. He had to have six stints put in that same month. I was remorseful. I was ready to move on with my life.

Q. And I appreciate that. And, believe me, I'm not trying to bring up old wounds or sore memories, but I'm in a position of having to defend the county against the crossclaim that you're instituting about duty to defend and indemnify. And I referenced earlier this statute where it talks about the scope of your employment and actions happening in good faith. And I'm just trying to get to the bottom of this where in your own words you did something against your better judgment. And I just want to understand better about what your better judgment is referring to. Was it against the training you received? Was it just against what you thought was right or you just did something because you felt sorry for somebody?

A. I thought what I was doing was right.

MS. MCCLANAHAN: Objection. Form. Go ahead.

A. I thought that what I was doing was right. I still do think that my -- I was -- I still think that what I was doing was right. I saw two kids in a position that was pretty sketchy and there were a lot of red flags. We would typically open up cases on people like

Holly. We would investigate people like Holly. So yes, I do believe that I had a reason to go in there and look. Was I remorseful at the time? Absolutely. I was fighting for my job.

Q. Moving ahead to Page 17. And this actually goes directly into the answer you just gave me. On Line 15 you say it was the first time you'd ever gotten in trouble at work.

And on Line 20 you say, "So this is out of character for me."

On Line 22 you say, "This is not how I behave."

On Line 24 you say, "This is not how I act."

Do you see that?

A. Yes.

Q. Would you say that those statements align with what you were saying regarding your remorseful feelings at the time?

A. Yes.

Q. Do those statements show that you recognize that your actions were contrary to what your work obligations were?

MR. WHITTAKER: Objection. Go ahead.

A. To be clear, when I say this is not how

I behave, this is not how I act, I don't regularly get interviewed by police officers. I don't get in trouble at work. I'm not a troublemaker. So yes, this was -- this is -- this was out of sorts for me, that I've never been called in for an issue.

Q. All right. And then on Page 32 on Line 14 you state, "I feel bad for what I did to Brendon."

Do you see that?

A. Yes.

Q. Why did you feel for what you did to Brendon?

A. Putting him in the middle of Holly and Jesse.

Q. Could you explain what that means?

A. Putting him in the middle of an argument.

Q. How did you put him in the middle of that argument?

A. I should have just let Jesse get the information through the DR court because he was going to get it anyway. I should have just let him do it. I should have just let the court handle Holly and Jesse.

Q. So just for clarity of the record, your statement of feeling bad is not related to some recognition of wrongdoing with your job, but it's a recognition that you

put Brendon Taylor in a situation that you don't feel like he deserved to be in; is that fair?

A. Yes.

Q. Okay.

MR. MUNAS: One second. If I continue with my numbering, am I on HC3?

MR. GOTTESMAN: You are.

MR. MUNAS: Thank you.

(Whereupon, Deposition Exhibit HC3 was marked for identification purposes.)

Q. Miss Paul, I'm handing you what has been marked as Exhibit HC3. I'll represent to you that these are the answers you provided in response to the county's first set of interrogatories and request for production -- or request for admission. Are you familiar with this document?

A. Yes.

Q. So you're aware of the answers that were provided in here?

A. Yes.

Q. My first question isn't directly related to the answers. If you go to the second to the last page, you'll see it's labeled at the top "Certificate of Service." Do you see that?

A. Yes.

Q. And do you see right below that it says,

"I hereby certify a copy of the foregoing was served by electronic mail this 13th day of January 2026."

Do you see that?

A. Yes.

Q. And at the bottom it's signed Steven E. Imm?

A. Yes.

Q. If you go to the next page, you'll recognize this as the verification form that you signed, correct?

A. Yes.

Q. And the date on this shows that you signed it in the presence of the notary on May 5th of 2026?

A. Yes.

Q. Had you seen this document before May?

A. Isn't that between me and my attorney?

Q. I'm not asking what you talked to your attorney about. I'm asking if you had seen this document.

MS. MCCLANAHAN: Go ahead.

THE WITNESS: Okay.

A. Yeah, I've seen it.

Q. Okay. The reason I was asking just the five months -- or the four and a half or so months that had lapsed between when they were delivered to us and when we saw that you signed them. Just trying to understand whether

or not you were aware of the answers that you provided.

I would like to ask you a few things about the answers you did provide. If you go to the fourth page where in the middle it says "Request for Admission."

A. Okay.

Q. No. 1 asks you to, "Admit that you agreed to a user attestation where you agreed that your access to and use of information maintained by the Ohio Department of Job and Family Services would be strictly limited to your performance of official job duties and assignments, and that you would comply with policies of ODJFS."

Do you see that?

A. Yes.

Q. And your answer is that you lack sufficient knowledge or information to admit or deny this request after making a reasonable inquiry.

Do you see that?

A. Yes.

Q. So you don't have any knowledge, memory or documents related to agreeing to maintain confidentiality with databases that you used at work?

A. Yes. I don't have any documents or recall signing anything.

Q. You don't recall at all?

A. I don't recall.
Q. But you're aware that there was confidentiality requirements regarding your use of this database, SACWIS, right?
A. Yes.
Q. So is it possible that you signed some sort of attestation regarding your use and access to SACWIS?
A. It is possible. I just don't recall.
Q. You don't recall. Okay. You can skip over No. 2. On No. 3 it says you were asked to admit that you admitted to wrongdoing as part of your disciplinary process with JFS -- with HCJFS. Sorry. And your answer is a denial.
Do you see that?
A. Yes.
Q. So you do not admit -- or you -- sorry. The admission of an admission. Trying not to be confusing.
You didn't admit that you did anything wrong when you were disciplined by JFS?
A. I answered this question with the help of my attorneys.
Q. Gotcha. All right.
(Whereupon, Deposition Exhibit HC4 was marked for identification purposes.)
Q. I'm going to hand you a document marked

as HC4. And I'll represent to you that this is not one cohesive document, but rather several emails and then several documents attached to the back of the emails, and that they're related to each other insofar as they're about your disciplinary process.

You weren't -- well, let's see here, so you were on these emails, two of the three of them. The first two certainly. And I'd like to ask you a few questions about these. This first email -- and, you know, emails are always a little confusing. It has my name at the top. Obviously I was not an original recipient of this email. It was sent to me after the fact. So I'm looking about a third of the way down the page or about half of the way down the page. You'll see an email from Abrena Rowe to William Lee and then ccs are Michelle Heist and Madison Paul. Do you see that?

A. Yes.

Q. Do you recall this email from May 31st of 2023 just from your memory?

A. Yes.

Q. That generally you remember there were some emails about your disciplinary process?

A. I knew it existed.

Q. In fact, the particulars of this email from Abrena Rowe to -- we'll call him Bill Lee, William

Lee -- says that, "Madison Paul would like to propose to the Employer a 1-day suspension without pay in exchange for waiving her appearance at the Pre-Disciplinary Hearing scheduled for Wednesday, June 7th."

Do you see that?

A. Yes.

Q. So is that -- is that an accurate recitation of what was happening at the time? Did you propose the one-day suspension to your employer?

A. Through my union, yes.

Q. Through your union. What does that mean to you, through your union?

A. Abrena Rowe is my union rep.

Q. Okay.

A. So I met with my union rep. They advised me on what I should do and I did it.

Q. Okay. And part of -- I guess I want to be careful about this. But it says right here in the email that this proposed level one-day suspension was in exchange for waiving your appearance at the pre-disciplinary hearing. So you could have gone through some other process in this disciplinary matter and you elected to propose a one-day suspension in lieu of that; is that accurate?

A. Yes.

Q. Okay. Do you know if going through that

process might have resulted in a different level of discipline other than the eight-hour suspension?

A. I assume it's, like, court. You take your gamble. They can give you pretty much whatever you want at that point.

Q. Okay. And you were okay with the one-day suspension given the options that you had?

A. Yes. I could not afford to lose my job as a single mother living paycheck to paycheck.

Q. Okay. There's the next email -- or two pages -- on the third page is a response from -- well, it may not be a direct response, but it appears to follow in the chain of events, an email from William Lee to you saying that, "HR has received your decision to waive your right to a pre-disciplinary conference." And that, "Your chain of command will determine the date of your one-day suspension."

Do you see that?

A. Yes.

Q. So to the best of your recollection, is that what occurred? There was -- your chain of command deciding a day that you would serve that suspension and that's what happened? You served that suspension?

A. Yes.

Q. Okay. So these are out of order and I apologize. If you go to the fifth page, this is an email.

About halfway down you'll see an email from Tara Resendiz-Trejo to William Lee, "Subject: M. Paul Discipline MOU," dated May 23rd, 2023?

A. Yes.

Q. Do you see that? You were not a recipient of this email. So I guess I'll ask you have you seen this before?

A. No.

Q. No. The email from Tara says, "Attached is an MOU regarding Madison Paul and recommending a 1-day suspension. Please let me know if I need to add or amend anything."

And then it says, "I did speak to her and she admitted to wrongdoing and does not plan to fight the 1-day suspension for breaching confidentiality."

Do you see that?

A. Yes.

Q. Did you talk to Tara Resendiz-Trejo during this disciplinary process?

A. Yes.

Q. But your testimony earlier was that you did not admit to wrongdoing?

MS. MCCLANAHAN: Objection.

Q. Correct?

A. I don't think I said that. I think I

said I did because that's what the union advised me to do in order to not risk losing my job.

Q. I'm not sure if that's exactly what your testimony was, but I appreciate you attempting to clarify it now.

Do you have any reason to think that Tara's email is accurate, that you admitted to wrongdoing and that you didn't plan to fight the one-day suspension?

A. No. I did admit to wrongdoing in that meeting --

Q. Okay.

A. -- advised by my union representation.

Q. As you sit here today, do you agree with that admission that what you did was wrong in the term of your employment?

A. No.

Q. So you don't agree anymore with the statement you made to Tara Resendiz-Trejo at the time?

A. I'm no longer fighting for my job at JFS.

Q. So that was a statement you made solely to keep your job?

A. To wrap it up, move on with my life and keep my job.

Q. Okay. There was -- you were shown a

letter earlier that I think it was just -- I think you called it a rebuttal to your exit interview?

A. Do I need to pull it out.

Q. You can if you would like.

A. Okay. I thought it was right here. Okay.

Q. And I guess I'm not asking you directly about it, but -- well, that letter expresses some frustration with the way things unfolded when you left the agency. Is that generally speaking -- I'm not asking you to totally agree with the way I'm phrasing it, but you weren't in total agreement with the way things ended at JFS?

A. Correct.

Q. And during your testimony today, at times you appeared to express that you weren't happy with the Department of Job and Family Services and Hamilton County; is that fair?

A. Yes.

Q. Your feelings about your former employer, the Department of Job and Family Services, do you feel like you were wronged as part of your time of employment and then what happened in this -- regarding this case and the circumstances surrounding your exit from employment?

MR. MUNAS: It's a bad question.

MS. MCCLANAHAN: It's a very bad question. I'm sorry.
MR. MUNAS: Let me try to rephrase it. I know it's bad when I'm saying it. It's not.
Q. So I'm trying to understand your feelings towards Hamilton County and the Department of Job and Family Services. And based on your testimony earlier today and, in fact, some of your written words from around the time you left the agency, you expressed dissatisfaction and potentially some anger with the way things ended.
I guess my question for you is do you -- why -- why are you upset with Hamilton County or the Department of Job and Family Services?
MS. MCCLANAHAN: Object. From a time standpoint, like, now or then? Like, why was she mad then or why was she mad now?
Q. Let's start with now. Are you upset with Hamilton County Department of Job and Family Services?
MS. MCCLANAHAN: Now.
A. Yes.
Q. Why?
A. Do you have a couple of days?
Q. No.
A. I mean, that's my truthful answer. There's just -- where do I start? Where do I end?

Q. You have -- you have numerous reasons and a lot to say about why you're upset with Hamilton County --

A. Yes.

Q. -- currently?

A. Yes. I never got over any of this.

Q. And I'm guessing Hamilton County's decision to not represent you in this lawsuit has not helped that in your mind?

A. I mean, I already had pretty strong feelings. That didn't help.

Q. Right. Do you feel as though Hamilton County needs to be held responsible to the plaintiffs in this case?

A. Yes.

Q. Why?

MS. MCCLANAHAN: I'm going to object. I'm going to object to the question before that also. But go ahead.

A. I believe that the bottom of -- can you reask your question and then I'll start over?

Q. Do you believe that Hamilton County Department of Job and Family Services need to be held responsible to the plaintiffs in this case, Brendon Taylor and Holly Hooven?

MR. GOTTESMAN: Note my objection.
MS. MCCLANAHAN: I want to make sure you understand what he's asking.
MR. WHITTAKER: I object as well.
MS. MCCLANAHAN: And I don't want to -- I know I'm not going to do a speaking objection. I don't mean to do that, but he's asking --
THE WITNESS: Yeah.
MS. MCCLANAHAN: There's two different questions here.
THE WITNESS: Right.
A. I think the problem is that I have -- Brendon and Holly are upset about alleged information that may or may not have been said. They were upset that his file was accessed, but they were actively in the DR court proceeding where they could just subpoena Brendon Taylor's record. It's that easy. It's not information that Jesse Hooven would have never seen ever. So I think that the basis of that is a little wonky. I mean, that all parties are being sued for dissemination of information Jesse could have gotten anyway.
Q. And I appreciate you doing your best to parse through my difficult question. And I thought I had a way to word it better, but it's escaping me in this moment and I don't think it's terribly important, so I'm going to

move on.

A. Okay.

MR. MUNAS: So give me just a minute to review my outline. You know what, I don't have any further questions right now.

MR. GOTTESMAN: Off the record.

(Off-the-record discussion.)

MR. GOTTESMAN: We're back on the record.

EXAMINATION

BY MR. GOTTESMAN

Q. Miss Paul, my name is Zach Gottesman. I'm counsel for Officer Jesse Hooven. I'm going to do what I can to avoid repetition. First thing I'd like to do is attend to timeline here to make sure we are on the same page and we have no confusion about dates and times.

Dig out of that pile, if you would, the big, thick exhibit. It's text messages you exchanged with Officer Hooven. I think it's Exhibit 22.

A. Okay.

Q. The numbers that -- your attorneys applied numbers to these and I believe they appear on the bottom right-hand corner. If you turn to Paul, Page 10, Paul 10. Did you locate the page?

A. Yes.

Q. At the top there's a date stamp. It says that this text thread indicates it started on March 15th, 2023 at 5:46 p.m. Is that the first time you and Hooven texted on that first call for service you attended together?

A. That is correct.

Q. Okay. So the first time you had any interaction with him socially or professionally was March 15th, 2023?

A. That is correct.

Q. And when he typed in "This is Hooven," that was letting you know his phone number, he was available to assist you on a professional call for service?

A. This was at the very end of both locations when I said, "Do you want me to call you if we find them?" And he said, "Yeah, just call my number." And then he texted me "This is Hooven" before we left.

Q. Okay. So it's still the same day, but near the end of the call?

A. Yes.

Q. Okay. And then you updated him on the matter, right?

A. Yes.

Q. Skip ahead for me, if you would, to Page -- I think it's 98. At the bottom of Page 98, do you

see that?

A. I'm sorry. What am I looking at?

Q. On Page -- we're on Exhibit 22 at the bottom of Page Paul 98.

A. Okay.

Q. There's a text thread that commences at 7:33 a.m. on March 20th.

A. Yes.

Q. Okay. He text you that morning, "Too early, way too early." And you said back, "Agreed. I'm struggling so hard lol," right?

A. Yes.

Q. There's a few more texts back and forth between you two and on Page -- we lose the time stamp, but if you turn to the page -- top of Page 101.

A. Okay.

Q. It appears as though it's still the morning and you text, "Okay, I will. Can I call you on my way to work?"

Do you see that?

A. Yes.

Q. And that's still March 20th; would you agree?

A. Yes.

Q. So five days after your initial

interaction with him you have this exchange. He says, "Yes. What time is that?"

"I'm going to try to leave like right at 9:00."

That's you writing back?

A. Yes.

Q. And that's right at 9:00 a.m., correct?

A. Yes.

Q. He informs you that he has a doctor's appointment at 9:15, correct?

A. Yes.

Q. The bottom of Page 101, Paul 101, you texted "Can I just call you now?"

A. Yes.

Q. Right. And that continues on to Page 102 where it says -- he responds, "Yes lol."

"Okay. Give me one second haha."

And comes back, you asked him "What screws?"

He says, "From my leg."

And the next thing we see is a screenshot -- him sending you what appears to be Brendon Taylor's Facebook page, screenshotted off Officer Hooven's phone; is that right?

A. That is correct.

Q. Okay. Because he's sending you this screenshot with no explanation apparently and a discussion about a phone call, is it fair to surmise that the phone call has occurred and you during that phone call there was discussion about him providing you this guy's name or other information, correct?

A. That is correct.

Q. All right. So that was the form, he provided it to you. And then at the top of Page 104 after he -- after he provided you that you texted, quote, "I told you nothing by the way lol if I'm asked. I don't know even know who you are." Correct?

A. That is correct.

Q. All right. So between him sending you that Facebook screenshot from what we're seeing here on this text thread, that would be that morning of March 20th, would be the date, the time where the inquiry was -- the query was run on SACWIS and information gained through that query was relayed to Officer Hooven, correct?

A. That is correct.

Q. All right. Now, insofar as the information that was provided to you or gained from that SACWIS query, as you sit here now -- I don't know. I've never seen SACWIS. I don't know how it works. But I understand that in the SACWIS database people can be listed

if they're a parent; is that correct?
A. Yes.
Q. A victim of abuse?
A. Correct.
Q. A witness to child sexual or physical abuse?
A. Yes.
Q. And abuser could be listed?
A. Yes.
Q. So a lot of different information about somebody and their status. Is any of those roles, abuser, victim, witness, parent, that you can be in SACWIS for any of those reasons, right?
A. Correct.
Q. Now, when you ran Brendon A. Taylor, do you recall, as you sit here now, whether you saw him in the database as the victim in any listing in that database?
A. I don't recall.
Q. Okay. Do you recall whether he was identified as the parent of a child that was a victim of abuse or neglect or dependency?
A. Yes. But it's listed in a different way.
Q. Explain that to me.
A. So there's an alleged perpetrator, an

OIA, which is other involved adult, an OIC, which is other involved child and then alleged child victim.

Q. Okay.

A. And then I think, like, FIN services, which is, like, family in need of services, I think they're listed separately.

Q. So AP is alleged perpetrator?

A. Yes.

Q. Was there anything in there listing Brendon Taylor as an alleged perpetrator?

A. Not that I recall.

Q. When it comes to his -- and I don't know because I've never seen it. Nobody's been able to answer it with any confidence as far as I can tell in this case.

Is there any evidence at all that he was the victim of physical or sexual abuse in that database?

A. Not that I recall.

Q. Okay. Is it -- and I can accept your answer because it was several years ago, but I have a question for you. Is it possible as you sit here now that he was listed as a victim of physical and sexual abuse and that -- as a child and that you relayed that?

A. It's possible that it was in there, but I know that I did not relay that information.

Q. Okay. And then apparently there was

some proceeding involving the Montgomery County Job and Family Services and a child of which Brendon Taylor is a parent, involving a child in Tennessee who was the subject of neglect or dependency proceedings. Do you recall that?

A. Yes. I believe it was a dependency case.

Q. Okay. And did you -- do you recall seeing that as you sit here now?

A. Yes. I do recall opening that case.

Q. Okay. All right. After you relayed this information, do you know how long it was before Jesse Hooven related -- disseminated and told his ex-wife about it?

A. I have no -- I have no clue.

Q. Turn to, if you would, please, Exhibit 26. It's a -- the cover sheet is a screenshot of a Fox News TV or something. Or CNN.

A. Yes.

Q. On Exhibit 26 -- and I don't -- these were produced by my client, Officer Hooven, with my assistance. If you'll turn to the page marked 124.

(Off-the-record discussion.)

MR. MUNAS: What exhibit number is it?

MR. GOTTESMAN: Exhibit 26.

Q. Are you with me?

A. Yes.
Q. Turn to the page marked JH7.
A. Okay.
Q. Do you see there's a black box and a green box?
A. Yes.
Q. The first two marked bubbles on JH7 are at 8:37 and 8:38 a.m., right?
A. Yes.
Q. And then there's a large green bubble at 8:43. Do you see that?
A. Okay.
Q. Do you see what I'm talking about?
A. Yes. Like, where it says "View all"?
Q. Yeah.
A. And then the next page?
Q. Yeah. If you go to JH8, that is where Jesse Hooven sent to Holly hopple I'll signed cited by the plaintiff in their amended complaint as the dissemination of confidential information. So what Officer Hooven wrote here as it is alleged by the plaintiffs is, "Remember when you sent me all that stuff about child molestation and people and whatnot? But yet you -- and yesterday you clarified that that "wavy" is supposed to be the word "want -- "you want to leave my child with someone who was physically and

sexually abused as a child."

Do you see that?

A. Yes.

Q. Now, Officer Hooven has testified that you were the one who supplied him with that information. As you sit here now, did you supply him -- did you not supply him or do you not know if you supplied him with that information?

A. I did not tell him that Brendon Taylor was physically and sexually abused as a child.

Q. Okay. The next thing that he states is, "You want to leave my children with a guy who Montgomery County told to file for emergency custody of his child because of how bad he had it with his mom in Tennessee and he couldn't be bothered with it."

Did you tell Jesse Hooven that?

A. I think Jesse fluffed what I said up a little bit. I did tell --

Q. Did you say flaunt?

A. Fluffed.

Q. Fluffed.

A. I did tell him that there was a dependency case and that Brendon was called from the State of Tennessee to become involved with his child in Tennessee and that essentially Montgomery County was, like, he is not

interested. That's what I told Jesse.

Q. Okay. Well, it squares with what's here, right?

A. Yes.

Q. Okay. The next thing that's written is him just saying, "Have a good day. I'm not fighting with you," right?

A. Yes.

Q. Now, did Jesse Hooven, as far as you know, have any other source for information of this nature, confidential SACWIS type information?

A. I'm not sure who Jesse Hooven knows.

Q. Turn back, if you would, to Exhibit 22. Before I get into the substance of this text thread again, Jesse and you in that five-day period from the time you first met to the time he sent you that screenshot of Brendon's Facebook page, he had told you and probably gone on and on about what he was concerned about with regard to his then ex-wife and her poor decision making regarding the children, correct?

A. Yes.

Q. And you agreed if what he was telling you was true that Holly was in fact making terrible decisions that could adversely affect the welfare and safety of the children, right?

A. Yes.
Q. From your perspective, was Jesse acting out of care for his children and concern for his children or was he acting out of anger and spite directed towards Holly?
A. I believe he truly cares about his children and that all of this was about the wellbeing of his children.
Q. Okay. So if you would scroll further on to Page -- Paul Page 114, Paul 114. Let's start at the bottom of 113. It's more easily read. It says -- you wrote, "Everyone in this situation deserves to get beat up. I did look him up in Montgomery County and he has a divorce there too. Slow the fuck down on these relationships lol," right?
A. Yes.
Q. You're telling Jesse that you pulled information off the internet -- off the Montgomery County DR court website?
A. Yes. This was a -- not a confidential source. This was something that I found through public records.
Q. And so Jesse didn't ask you to do this, correct?
A. Correct.
Q. So you pulled this information. You

were able to gain this information because it's in the public domain, right?

A. Yes.

Q. You were able to find out also that he had gotten married in January of 2015 in Texas and divorced in January of 2026 in Montgomery County, right?

A. Yes.

Q. And at the bottom you say, "This is the research she should be doing before your kids meet him," right?

A. Yes.

Q. So in doing this, you were attempting to help Jesse understand the situation in which he found his kids, right?

A. Yes.

Q. Now, you were joking earlier about because you're -- I think you called yourself a Millennial. I don't want to call you that if you're not.

A. Yes.

Q. And that you know how to navigate socia media platforms with more speed and knowledge and wherewithal than people that -- than others, correct?

A. Correct.

Q. Like, I'm a 60-year-old man. I don't even have a website for my law firm. So I don't know a lot

about -- I don't have a TikTok account, for instance.

A. Probably a good thing.

Q. So there -- did you feel that you had superior investigative skills to Jesse Hooven for looking into people's background because of your experience as a millennial female?

A. As a millennial female, absolutely.

Q. Okay. Were you offering using those tools that you developed as a millennial female to give him guidance into the situation he found himself with his wife making terrible decisions about the welfare and safety of the children?

A. Yes. I'm also a single mom, so I do this on people I date.

Q. Right. And that's because there's bad guys out there who will lie to women, right?

A. Yes.

MR. GOTTESMAN: All right. Let me look at my notes. Give me just a second.

Q. Oh, other than SACWIS, is there another database available to you if you're employed as a case worker or assessor at JFS?

A. Yes. I had access to a couple other ones.

Q. What are those?

A. JCMS, which I don't know what it stands for exactly, but it was --
Q. Is that tied into the juvenile courts?
A. Yes.
Q. Okay.
A. And I believe the police have access to JCMS.
Q. JCMS can give information about dependency, neglect and custody issues from the court's website?
A. Only if it's in juvenile court, not DR court.
Q. Okay. Again, to get access to that information you have to have credentials?
A. Yes.
Q. And it's --
A. But I could not access JCMS from anything but my laptop. That was an application, not a website.
Q. Okay. What other -- so that's two, SACWIS and JCMS. What other database?
A. And then we also had unredacted access to Clerk of Courts in Hamilton County.
Q. To what?
A. To Clerk of Courts in Hamilton County.

Q. Clerk of Courts. Okay. And all your interactions with Officer Hooven as far as he was a police officer in that initial meeting, was he helpful, polite and cooperative?

A. Yes. Absolutely.

Q. As you -- do you ever deal with the same police officers on a repeat basis?

A. When I worked at JFS?

Q. Yeah.

A. I'm not sure. I'm sure probably.

Q. Okay.

MR. GOTTESMAN: I think that's all I have for you. Thank you.

THE WITNESS: Thank you.

MR. GOTTESMAN: I think Katey may want to step in.

EXAMINATION

BY MS. BARON

Q. So I'm Katey Baron. I represent the city in this matter and I just have a few questions.

A. Okay.

Q. I promises I will be the shortest of everybody.

A. All right.

Q. So when you provided the information

about Brendon to Jesse, did you think you did anything wrong?

MS. MCCLANAHAN: Objection. Calls for speculation. Can you clarify the time? At that time or now?

MS. BARON: At that time.

MS. MCCLANAHAN: You can answer.

A. I don't know how I felt. I was very conflicted during that time. It was a very emotional, weird time for me. I knew that I was helping children, but I was also landing me in a mess that I didn't want to be in. But ultimately, no, I don't think I -- I don't think I did.

Q. And I think you testified -- and correct me if I'm wrong -- that you believed you could provide this information to Jesse because he was a police officer; is that correct?

A. Every part of it, yes.

Q. Okay. And why did you believe that?

MS. MCCLANAHAN: Objection. Asked and answered. Sorry.

Q. You believed that you could provide that information to Jesse as a police officer?

A. Just through what I learned at JFS.

Q. Okay. And I'm going to have you look at Exhibit 22. That's the text messages.

A. Okay.
Q. And it's Page 104. And when you were talking with Mr. Gottesman about this, you indicated that that was a text thread after you had a conversation relaying the information to Jesse about Brendon; is that correct?
A. Yes.
Q. Okay. And in that do you see a text message where you say something along the lines of you don't know anything? Or "I told you nothing by the way"?
A. Yes. Yes.
Q. Okay. So it says, "I told you nothing by the way lol. If I'm asked I don't even know who you are." And then there's an emoji.
Did I read that correctly?
A. Yes.
Q. Okay. Why did you send that if you believed that you were proper in sending this information to Jesse as a police officer?
A. I didn't want to deal with the drama.
Q. What do you mean by that?
A. Whether it was from JFS or whether it was from Holly and Brendon.
Q. What -- I don't know that I understand.
A. I didn't want to be involved at all. I didn't want Brendon and Holly to know who I was at that

point.

Q. Okay. But you thought you could provide that information?

A. Yes. And I was just telling him don't tell anybody because I don't want to be messed -- in the middle of your very messy divorce.

MS. BARON: Okay. I don't have any other questions for you.

EXAMINATION

BY MS. MCCLANAHAN

Q. Madison, you've testified a lot today?

A. Yes.

Q. You said a lot of things and then just a handful of things that I want to ask you about as -- just to kind of get some clarification on.

When you first interacted with Jesse at the very beginning when you first met at the Budget Inn?

A. Yes.

Q. He had been -- had he been calling you prior to you meeting?

A. Yes.

Q. On your Google line? Was that on your Google line?

A. No. I had been calling from -- I think I -- I think I just used my phone because I was calling the

police. So I just used my personal phone number.

Q. Okay. And how was that phone number coming up on your phone?

A. It was coming -- I had received phone calls from him coming through as unknown.

Q. Okay. And then, let's see, when -- as a worker at JFS, were you always in office when you were working?

A. No.

Q. Were you out and about in the community?

A. Yes.

Q. Did you work from home as well?

A. Sometimes.

Q. So you were a hybrid employee?

A. That is correct.

Q. You could work from home and you could work -- could you work from home and could you work in the office?

A. Yes.

Q. Okay. When you met Jesse at the Knotty Pine, do you remember that day?

A. Yes.

Q. Were there other people there that Jesse knew?

A. Yes. I brought two friends and then he

brought a friend.

Q. And were there other police officers there?

A. I believe the other person who he was with was a police officer.

Q. So that was someone he knew from his -- from his job?

A. That's what he told me, yes.

Q. Okay. And when -- I don't know if it was Eric or Mr. Munas that asked you -- or Mr. Whitaker. But someone asked you if you felt manipulated by Officer Hooven. Did you feel manipulated -- did you feel like he manipulated you into accessing SACWIS or did you feel like he manipulated you in terms of your relationship with him?

A. In terms of my relationship with him.

MS. MCCLANAHAN: Thank you. That's all I have.

FURTHER EXAMINATION

BY MR. WHITTAKER

Q. Miss Paul, I think when you were talking to Miss Baron you mentioned that you had a laptop to access --

A. I'm sorry. I'm hard of hearing in my left ear.

Q. I thought I heard you all the way down

there testify to the questions that Miss Baron was asking that you had a laptop that you could access JCMS information?

A. Yes.

Q. Was that a county issued laptop?

A. Yes.

Q. Okay. Did you use that laptop at home?

A. For work.

Q. For work. Did you use it at -- in the office?

A. Yes.

Q. Did you use it out and about if you were going to, as Mickey asked, somewhere in the community?

A. Yes. And I think in my testimony with you I referred to it as a Surface Pro.

Q. Oh, okay. So that's -- okay.

A. The Surface Pro and the laptop, same thing.

Q. Because I thought I asked you if you had a laptop. And you said no, you just had a Surface Pro?

A. Yeah. It's like a tablet with --

Q. Flips around to be --

A. Yap.

Q. So the Surface Pro is the laptop. Whether it's a laptop or not, that's what you're talking

about?

A. Yes.

Q. Gotcha.

A. Just one computer.

Q. Gotcha. And I think you mentioned that when Jesse would call you it would pop up as an unknown number. Did I hear that right?

A. It was until we met at the Budget Inn. And then after we met and I left the scene completely, that's when I had his personal number because he texted me in these text messages and said "This is Hooven." That's when I got his number.

Q. "This is Hooven" is the first text message he sent you?

A. From his actual phone number.

Q. From his actual phone number?

A. Yes.

Q. He was communicating to you from a different phone before that?

A. I don't know if it was a different phone or if he was hitting, like, the classic *67.

Q. Yeah.

A. It was coming up as, like, unknown.

Q. Okay. But the day that you spoke with him -- the day that you went out on the call to the Budget

Inn, having him meet you there, that was the first day you communicated with him at all, right?

A. Correct.

Q. By phone or text message or in person or any other way?

A. Correct.

Q. Was he calling you, though, from an unknown number before that?

A. Yes.

Q. Before the other call for the service at the Budget Inn?

A. No.

Q. Okay.

A. So what happened is I called District 5 for service.

Q. Gotcha.

A. I said I'll be in there in, like, 20 minutes. Took me a little longer because I was doing paperwork. And then I got a phone call from a restricted number, or unknown, whatever it was, and said, hey, this is Officer Hooven. We're waiting. Where are you at? I said, Give me just a few more minutes. And I think he called me, like, again on the way there, again, from an unknown number.

Q. Okay. So he called you twice on your way to the call for service at the Budget Inn?

A. Yes. Trying to like --

Q. Where are you?

A. Yeah. Like, figure out where we were meeting.

Q. Oh, he didn't know where you were meeting?

A. Oh, I'm sorry. I misspoke. Just we were meeting at the Budget Inn. He was just, like, hey, just making sure. Like, what's going on.

Q. Gotcha. Gotcha. So towards the end of that monthlong period, I think actually at the very end of that period you learned that Jesse had a girlfriend, right?

A. Yes.

Q. And he had not been truthful with you about that, right?

A. Correct.

Q. How does that -- if at all, how does that impact your feelings about his intentions in having you look up confidential information about Brendon Taylor?

MS. MCCLANAHAN: Objection.

A. I don't think it changes my view of him as a father. I still think he's a good father from what I know. It just kind of changed how I trusted him. I just didn't want to trust him anymore.

Q. So you just lost -- because of the --

because of that you lost trust in him?

A. Yes. And I found out in the same day my dad had a heart attack.

Q. I'm sorry.

A. And I just wanted to forget about it. It wasn't the best time in my life and I just wanted to forget about Jesse Hooven.

Q. I understand. Do you need a break?

A. No. I'm okay. Thank you. My dad means a lot to me, so it was a very scary dad.

Q. Understandable. I'm not trying to drudge anything up like that. I'm just trying to understand the timeline.

MR. WHITTAKER: That's all I have. I don't have any more.

THE WITNESS: Thank you.

A C K N O W L E D G E M E N T

STATE OF OHIO :
: SS:
COUNTY OF HAMILTON :

I, MADISON MARIE PAUL, have read the transcript of my testimony given under oath on June 12, 2026.

Having had the opportunity to note any necessary corrections of my testimony on the errata page, I hereby certify that the above-mentioned transcript is a true and complete record of my testimony.

____________________________

MADISON MARIE PAUL

(DEPOSITION CONCLUDED AT 3:54 P.M.)

C E R T I F I C A T E

STATE OF OHIO : 
: SS:
COUNTY OF HAMILTON :

I, Jennifer K. Starner, the undersigned, a duly qualified and commissioned Notary Public within and for the State of Ohio, do hereby certify that before giving of the aforesaid deposition, the said MADISON MARIE PAUL was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing deposition was given at the said time and place and was taken in all respects pursuant to Notice; that the deposition was taken in stenotypy by me and transcribed into typewritten form under my supervision; that the transcribed deposition is to be submitted to the witness for her examination and signature, and that signature may be affixed out of the presence of the Notary Public; that I am neither relative, attorney, nor employee of any party or their counsel and have no interest in the result of this pending action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office at Cincinnati, Ohio, this ____________________ day of ________________________, 2026.

/s/ Jennifer K. Starner
___________________________

My commission expires: March 7, 2029

Jennifer K. Starner, RPR
Notary Public