**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **BRENDON TAYLOR, *et al.*,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**JESSE HOOVEN, *et al*.,**<br><br>**Defendants.** | **Case No. 1:24-cv-204**<br><br>**Judge: HON. SUSAN J. DLOTT**<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF BRENDON TAYLOR'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT REVIVING COUNT IV FOR MONELL LIABILITY AGAINST THIRD-PARTY DEFENDANT THE CITY OF CINCINNATI UNDER FRCP 15(a)(2), OR UNDER FRCP 54(b) FOR RECONSIDERATION OF THE COURT'S SEPTEMBER 30, 2025, "CORRECTED ORDER"**

**COMES NOW**, Plaintiff Brendon Taylor, by and through counsel, and respectfully moves under FRCP 15(a)(2) for leave to file Second Amended Complaint [**Doc.141-1**], reinstating Count IV for Monell liability against Third-Party Defendant, the City of Cincinnati, on facts developed in discovery. Alternatively, Taylor moves the Court to reconsider its September 30, 2025, "Corrected Order" dismissing Count IV with prejudice. This Motion is supported by the Memorandum that follows below and the Declaration of Counsel [**Doc.136**], and a proposed Entry is attached for the Court's convenience. [**Doc.141-2**].

**DATED: October 23, 2026.**

Respectfully submitted,

*/s/ Justin M. Whittaker*_________

Justin M. Whittaker, Esq. (0093212)
WHITTAKER LAW, LLC
35 East 7th Street, Suite 603
Cincinnati, Ohio 45202
513.457.5545
513.436-0689 (fax)
Justin@WhittakerLawFirm.com

**Counsel for Plaintiffs Brendon Taylor and Holly Hooven**

## CERTIFICATE OF SERVICE

I certify that on **October 23, 2026**, I e-filed the foregoing Motion through the Court's CM/ECF system, which will send notice to all counsel of record.

*/s/ Justin M. Whittaker*__________

Justin M. Whittaker, Esq. (0093212)

## MEMORANDUM

### I. PROCEDURAL POSTURE

Plaintiffs filed this action on April 15, 2024. [Doc.1]. Count IV of the Complaint alleged Monell liability against the City for violating Taylor's clearly established right of informational privacy. [*Id*., at PageID ##19–22]. The City moved to dismiss on the ground that Officer Hooven did not act under color of state law, and said the Court need not reach "policy or custom" to do so. [Doc.21, at PageID ##139 and 144]. At the August 26, 2024, hearing on the City's Motion to Dismiss, the Court called the text of the MOU "critical" and gave Plaintiffs leave to amend without requiring a motion. [Doc.64, at PageID ##552–53 and 576].

Plaintiffs filed the First Amended Complaint on August 30, 2024. [Doc.55]. On January 3, 2025, the Court dismissed Counts II and IV against the City and the Section 1983 claims against Officer Hooven. [Doc.75]. On reconsideration, the Court held that it had erred on state action and reinstated Counts I and III against Officer Hooven on Plaintiffs' SACWIS theory. [Doc.103, at PageID ##932–33]. It adhered to the dismissal of Count IV with prejudice; however, because the First Amended Complaint did not plead facts showing that the City "endorsed, ratified, or acquiesced in Officer Hooven's alleged wrongdoing, had a policy or practice of supporting similar wrongdoing, or failed to train on the proper procedure under the Memorandum of Understanding" ("MOU"). [*Id.*, at PageID ##939–40].

Discovery has since closed. [Doc.135]. Since September 30, 2025, Taylor deposed Defendant Officer Hooven [**Doc.140**] and Madison Paul [**Doc.139**], after the parties exchanged written discovery. City Manager Sheryl Long [**Doc.137**], and Officer Hooven's former Commander, City of Cincinnati Police Department ("CPD") Captain Amanda Caton [**Doc.138**] were also deposed. The Court did not permit Plaintiffs to depose former Chief Teresa Theetge due

to a lack of necessity at the Defendants' urging. [Doc.126, at PageID ##1232–36]; and [Doc.122, at ¶10, PageID ##1168–69].

Discovery supplied the missing facts highlighted by the Court in the Corrected Order regarding training, policy, and custom, from the written and oral testimony and statements of the City's own witnesses and employees. The proposed Second Amended Complaint omits and does not rely on any of the allegations about the private dispute between Officer Hooven and Holly Hooven and the claims the Court dismissed in the Corrected Order. Plaintiff reserves the right to pursue those claims on appeal.

In short, when the City's Citizen Complaint Authority ("CCA"), an agency of City government, sustained misconduct against Officer Hooven, it found that his actions "were not within CPD policy, procedure, or training." [Doc.136-4, at p.3]. Article XXVIII of the Cincinnati Administrative Code establishes and governs the CCA as an independent oversight body responsible for investigating allegations of misconduct by CPD. [Doc.136-6, at § 1]. The CCA was "ordained" in 2002 via Ordinance No. 149-2002 ("the Ordinance"). [*Id*.]. The City Manager appoints the CCA Director, currently John Kennedy. [Doc.137, at p.56]. *See also*, [Doc.136-6, at § 2-B]. Kennedy, like the City Manager, Captain Caton, and Officer Hooven, is a City employee, and he serves at the pleasure of the City Manager. [Doc.137, at p.60].[1]

The Chief of Police and then District 5 Commander, Captain Caton, saw it differently. Captain Caton testified that "we believed [Officer Hooven] was doing what he was supposed to do," and the Chief's response was an "Instructed" log entry, not "counseled" or "disciplined," or the like. [Doc.138, at pp.24:20–25; 36:21–37:14]. Section 3-D of the Ordinance states in relevant part: "**In all cases**, the city manager and police chief will refrain from making a final decision on

---

[1] Long testified that her authority to hire and fire reaches the Chief of Police and Assistant Chiefs of Police but ends at the captain level, where the Chief or his office makes appointments. [Doc.137, at pp.41–44].

discipline until after receipt of the CCA report" (emphasis supplied). [Doc.136-6, at § 3-D]. Further, "[t]he city manager **shall** agree, disagree or agree in part with any findings and recommendations of either the board or the executive director, and she **shall inform** the executive director and the board **in writing** of any reasons for agreeing in part or disagreeing with said findings and recommendations" (emphasis supplied). [*Id*.].

The City Manager's testimony, however, establishes that she does not resolve the CCA's findings across the board. Ever. [Doc.137, at pp.62:20–25; 73:3–24; 74:1–10]. Rather, she has left those formal findings of a City agency and countless others in "purgatory" on her desk, along with those she inherited from her predecessor, and has no present intention of resolving **any** of them in writing or otherwise. [Id., at pp.73:3–24; 75:14–17]. In August 2024, the City told the Court it was "impossible" for Count IV to succeed. [Doc.64, at PageID #570]. Its own witnesses and employees have testified otherwise on the record.

## II. LEGAL STANDARD

"Under FRCP 15(a)(2), the Court should give leave for a party to amend its pleading 'when justice so requires.'" *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, No. 2:23-cv-4232, 2026 U.S. Dist. LEXIS 10022, at *5 (S.D. Ohio Jan. 20, 2026) (DLOTT, J.). "Rule 15(a) provides a liberal standard of permitting amendments to ensure the determination of claims on their merits." *Cox v. Cupertino Elec., Inc.*, No. 2:25-cv-1230, 2026 U.S. Dist. LEXIS 94179, at *8 (S.D. Ohio Apr. 29, 2026) (COLE, J.) (citing *Mahdy v. Mason City Sch. Dist.*, No. 1:16-cv-845, 2017 U.S. Dist. LEXIS 292 (S.D. Ohio Jan. 3, 2017) (BLACK, J.); and *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987)).

## III. ARGUMENT

Leave should be granted unless there is "undue delay, undue prejudice to the opposing party, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or futility." *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### A. The Court did not set a deadline for amended pleadings under Rule 16(b), and the Corrected Order remains interlocutory and subject to revision under Rule 54(b).

Rule 16(b)(4)'s good-cause requirement applies when a party seeks to modify a scheduling-order deadline. *Lucky Land*, 2026 U.S. Dist. LEXIS 10022, at *5 (citing *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005)). The Scheduling Order(s) entered in this case set dates for expert reports, discovery, duty-to-defend motions, and dispositive motions, but none for amending the pleadings. [Docs.118 and 135].

Where no deadline to amend was set, Rule 15 alone applies. *B.D.G. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-3202, 2026 U.S. Dist. LEXIS 182264, at *5 (S.D. Ohio Aug. 14, 2026) (JOLSON, M.J; MARBLEY, J.) (citing *G.M. v. Red Roof Inns, Inc.*, No. 2:22-cv-3788, 2025 LX 500575, at *2 (S.D. Ohio Nov. 10, 2025) (PRESTON DEAVERS, M.J.; MARBLEY, J.)).[2] The "with prejudice" label on Count IV does not raise the bar to amendment or reconsideration. The Corrected Order is still an interlocutory order that adjudicates fewer than all claims and parties, and "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities" under Rule 54(b). [Doc.103, at PageID #928]. Because the Court declined to "certify,"

[2] *See also*, *Shane v. Bunzl Distribution USA, Inc.*, 275 F. App'x 535, 536 (6th Cir. 2008) (citing *Leary v. Daeschner*, 349 F.3d 888, 906-07 (6th Cir. 2003) (it is only when the amendment deadline passes that litigants must meet the higher threshold for modifying a scheduling order found in Rule 16(b))).

[*Id.*, at PageID #939–40], that dismissal "is not final." *Taylor v. Hooven*, 184 F.4th 485, 498 (6th Cir. 2026).[3]

Even if Rule 16(b)(4) applies, its test is diligence, *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002), and good cause exists where the new facts emerged in discovery shortly before the motion. *See United States v. Care Servs. Mgmt. LLC*, No. 3:17-cv-01478, at **10-11 (M.D. Tenn. June 13, 2025) (good cause where new facts "did not come to light until discovery"). That's the case here. First, the testimony of City Manager Long and Captain Caton, and the City's written responses, are such facts.

Second, as to delay, it is minimal, and it was followed by diligence. Delay is measured from when the movant learned the facts. Amendments "based on new information learned during discovery" are proper. *Cornerstone Move Mgmt., LLC v. Paxton*, No. 1:24-cv-366 (S.D. Ohio Oct. 7, 2025) (McFarland, J.). Plaintiff could not have pleaded the City's written admissions, the testimony of Officer Hooven, Madison Paul, City Manager Long, or Captain Caton before they existed. *See Leary v. Daeschner*, 349 F.3d 888, 908–09 (6th Cir. 2003) (leave denied where plaintiffs had known of the basis for months).[4]

Moreover, "[d]elay, standing alone, is an insufficient basis for denying leave to amend, and this is true no matter how long the delay." *Cox*, 2026 U.S. Dist. LEXIS 94179, at *7 (citing *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 409 (6th Cir. 2000). Rather, the delay must be

---

[3] The heavier burden that applies *after* final judgment under Rule 60, therefore, does not apply. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010); and *In re Upstart Holdings, Inc. Sec. Litig.*, No. 2:22-cv-02935 (S.D. Ohio Sept. 29, 2025) (Marbley, J.) (Leisure Caviar inapplicable where dismissal with prejudice "was not certified as a final judgment under Rule 54(b)").

[4] Mr. Gottesman requested City Manager Long's deposition on August 15, 2026. The City produced her on September 21, 2026, and Captain Caton's deposition was taken on October 1, 2026. [Doc.136, ¶ 13]. Counsel did not receive Long's transcript until October 5, 2026, [Doc.136, ¶ 11], or Caton's until October 19, 2026. [*Id.*, ¶ 12]. This Motion followed four days later.

coupled with some evidence of prejudice. *Id.* (citing *Wallace Hardware*, 223 F.3d, at 409-10; and *Leary*, 349 F.3d, at 909).

Nor can the City claim prejudice. Taylor's discovery directed to the City has been narrowly focused from the start on gathering evidence in support of a revised Count IV. The City answered Taylor's written discovery without resistance. The City also did not object to any of Taylor's 25 Rule 30(b)(6) topics, [Doc.136, ¶ 7]; [Doc.136-3, at p.13], the vast majority of which relate to the City's policies and procedures governing the handling of SACWIS data and training. Likewise, the City is a third-party defendant. The facts and legal principles underlying Officer Hooven's claims against it substantially overlap the facts and legal principles underlying Count IV.

No one other than the City Manager, the City's chief executive officer, could have supplied her testimony. [Doc.137, at pp.8:22–9:1]. There is no one above her. As for Captain Caton, she was Officer Hooven's Commander, previously commanded IIS, and directly carried out the Chief's ESL order. [Doc.138, at pp.8–10, 19–20, 22–23, 28]. With Chief Theetge ruled out for deposition, no one other than Captain Caton is suited to testify about the import of the Chief's order, the procedure governing her review, and the import of the ESL.

Finally, Taylor isn't asking to reopen discovery, and there is no dispositive motions deadline or trial date that would be put at risk. Dispositive motions are not due until 45 days after the duty-to-defend rulings, [Docs.118 and 135].

### B. Proposed Count IV states a plausible Monell claim under Rule 12(b)(6).

An amendment is "futile" only if it could not survive a Rule 12(b)(6) motion, so a finding of no futility "equates to a finding that Plaintiffs have stated a plausible claim for relief." *Hora v. Risner*, No. 3:18-cv-344, 2020 U.S. Dist. LEXIS 146014, at *16 (S.D. Ohio Aug. 13, 2020) (RICE, J.). The question is "plausibility" under *Twombly* and *Iqbal*, with well-pleaded facts taken as true

as Rule 12(b)(6) instructs. [Doc.75, at PageID #683]. To prevail on Count IV, Taylor must plead **(i)** an underlying constitutional violation and **(ii)** a municipal policy or custom that caused it. *Baynes v. Cleland*, 799 F.3d 600, 620–21 (6th Cir. 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978)).

**1. The "underlying violation" element is settled and the law of the case.**

The Court has already held that Plaintiffs plausibly alleged that Officer Hooven acted under color of state law when he requested the SACWIS query and disseminated the result. [Doc.103, at PageID ##932–33]. It held that Officer Hooven "should have known that the disclosure of information of alleged child abuse - which is clearly of a sexual, personal or humiliating nature -to Holly violated Taylor's clearly established right to control whether and how to disclose such information to his fiancé." [*Id.*, at PageID #938] [citing *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008); and *Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998)].

Nor does Officer Hooven "dispute" that the right covers information "of a sexual, personal, and humiliating nature." [Doc.103, at PageID #937]. Those holdings control and are the "law of the case." *See Hora*, 2020 U.S. Dist. LEXIS 146014, at *15.

The Court identified the remaining fact question as whether Officer Hooven had a legitimate law-enforcement basis. [Doc.103, at PageID #932 n.2]. Discovery narrowed it. Paul told IIS, and testified, that Officer Hooven suggested she could look something up for him because she had access he lacked. [Doc.75, at PageID #680]; [Doc.139, at p.108:9–19]. He gave her Taylor's name through a screenshot, [*Id.*, at p.116:6–14], and she looked Taylor up in SACWIS on the same call. [*Id.*, at pp.117:1–118:19]. She understood that he consulted her in his capacity as a police officer for information in her capacity as a JFS caseworker. [*Id.*, at p.94:17–24]. Officer Hooven denies asking, but admits that he gave Paul Taylor's name and approximate age, knew he

could not search himself, told IIS he was "unable to use the law enforcement databases to look up Brendon Taylor," and received Taylor's childhood abuse history from Paul. [Doc.140, at pp.105–07, 116–17, 126–30]. Who solicited whom is a credibility question for the jury, and it does not change the municipal analysis, which turns on what the City did and did not do in its own right.

The City's own witnesses and Officer Hooven himself undercut any argument that he (Hooven) acted purely privately. His former Commander agreed that the conduct IIS investigated was not "manifestly outside the scope" of his employment, "[b]ecause we were investigating it," and that IIS would not investigate conduct that did not affect his job. [Doc.138, at pp.25:6–15; 32:14–18]. City Manager Long agrees that (a) an ESL is appropriate only if it "has some connection to employment;" and (b) Officer Hooven's dealings with the child-welfare division are "a direct connection to his employment." [Doc.137, at pp.39:5–8; 15:24–16:3; 31:10–16].

**2. Proposed amended Count IV plausibly alleges the "policy or custom" element on facts unavailable to Taylor until securing the deposition testimony of City Manager Long and Captain Caton.**

There are four ways to plead the second element: "**(a)** the existence of an illegal official policy or legislative enactment; **(b)** that an official with final decision-making authority ratified illegal actions; **(c)** the existence of a policy of inadequate training or supervision; and/or **(d)** the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Proposed Count IV pleads factors (c) and (d) as its core and factor (b) in the alternative. Each answers a ground the Court identified in the Corrected Order. [Doc.103, at PageID #939].

**a. The City inadequately trains and supervises its officers on how to handle and use confidential SACWIS data.**

A "failure-to-train" claim must plausibly plead that "(i) the training or supervision was inadequate for the tasks performed; (ii) the inadequacy was the result of the municipality's

deliberate indifference; and (iii) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); and *Jackson*, 925 F.3d at 834.

**i. The lack of any training or supervision is inadequate for the tasks to be performed.**

The MOU makes CPD patrol officers the first responders to "all calls of potential child abuse or neglect 24 hours, 7 days per week," and reproduces the rule that SACWIS information is confidential and may be shared only as that rule authorizes. [Doc.54-1, at PageID ##361, 388]; and [Doc.103, at PageID ##932–33]. The City admits in its response to Madison Paul's Request for Admission No. 3 that JFS employees "share SACWIS information with Cincinnati Police Officers." [Doc.136-2, at p.5]. The City also admits in its response to Paul's Request for Production No. 7 that it "does not have any policies and/or processes or training for CPD officers regarding SACWIS." [Id., at p.12]. Madison Paul testified that neither the general public nor police officers have direct access to SACWIS data. [Doc.139, at pp.108-09].

Its only explanation for that discrepancy is that officers are trained to abide by policies "including … the MOU." [Doc.136-1, at p.8]. Both things cannot be true. This speaks to credibility, which is "quintessentially a question of fact for the jury." *United States v. Jackson*, 918 F.3d 467, 479 (6th Cir. 2019). Officer Hooven contradicts even that. He testified that he had never seen the MOU until this case, was never trained on it, and none of his supervisors ever mentioned it. [Doc.140, at pp.60 and 115–16]. The only instruction he recalls is to call JFS if he needs something. [*Id.*, at p.60]. Asked whether he received "training on confidential records stored and maintained in statewide databases," he answered, "Not as a police agency." [Id., at p.117:5–8].

CPD gives inconsistent answers about what the rule even is. Captain Caton testified that *on the facts in the IIS report*, Officer Hooven complied with all rules, regulations, policies, and

procedures and with "how he had been trained by the City." [Doc.138, at pp.26:1–16; 29:15–31:14; 35:11–19]. Asked in what circumstances it would be consistent with CPD policy for an officer to have *someone else* access child-welfare records on his behalf, she answered that it "depends on the circumstances," and then, "I can't answer that." [*Id.*, at pp.34:13–35:10].

The CCA reached the opposite conclusion in CCA Report No. 23072, finding that Officer Hooven's actions "*were not* within CPD policy, procedure, or training" (emphasis supplied). [Doc.136-4, at p.3]. When City leadership, Officer Hooven, his former Commander, and the CCA all disagree about whether the training covers an officer's use of a county caseworker to reach child-welfare records, the City's credibility is at issue, which should be resolved by the trier of fact.

**ii. The inadequacy was the result of the City's deliberate indifference to the obvious risk of constitutional violations.**

"There are 'at least two situations in which inadequate training could be found to be the result of deliberate indifference.'" *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020). Taylor alleges the second situation, the so-called "obvious need" scenario. Under this method, "a plaintiff can show that a municipality was deliberately indifferent by fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Id.*

"[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Ouza*, 969 F.3d, at 287 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Here, the facts demonstrate that by the City's own account, the MOU "by its plain terms governs that aspect of an officer's official duties" in response to Taylor's Request for Admission

No. 7. [Doc.136-1, at p.8]. Captain Caton confirmed that JFS is a "partner agency" and that interactions with partner agencies are a regular part of officers' duties. [Doc.138, at pp.21:11–22:15]. Officer Hooven agrees. [Doc.140, at pp.31-32]. *Madison Paul also agrees*. [Doc.139, at pp.69-70]. She testified that this kind of interaction with police officers was "very common," "[n]ot unusual," and "[t]ypical," and that her supervisors instructed her to accommodate police officers who ask for information. [Doc.139, at pp.96:3–97:14; 99:22–100:6].

She explained that CPD has a "personal crimes" unit that JFS works with, and that the bulk of JFS's criminal-case work involved that unit. [Doc.139, at pp.98:4–9; 99:8–16]. The information is confidential by statute [Doc.75, at PageID #678], and the Court has held that disclosing it violates a clearly established right. [Doc.103, at PageID #938]. To this end, the Court of Appeals explained in *Ouza:*

> So, for example, if a municipality failed to provide any training to its officers on the use of deadly force, it would be liable to a person unconstitutionally killed by the police, given that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and "[t]he city has armed its officers with firearms, in part to allow them to accomplish this task."

*Ouza*, 969 F.3d, at 287 (citing *Harris*, 489 U.S., 390 fn.10).

The analogy here is clean: policymakers know to a moral certainty that officers will be required to assist JFS workers and will come into possession of confidential information, and the City has armed them, not with firearms but with statutory access, in part to allow them to accomplish that task. As in *Ouza*, "the need to train officers in the constitutional limitations on the use [of confidential information] … can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Ouza*, 969 F.3d, at 287.

"Under this approach of demonstrating deliberate indifference, a plaintiff does not need to show that the municipality had notice of a pattern of unconstitutional conduct." *Ouza*, 969 F.3d, at 287 (citing *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015)). "Instead, a plaintiff can show deliberate indifference based on 'single-incident liability' if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it." *Id.*; *accord Matthews v. Butler Cnty.*, No. 1:22-cv-380, 2025 U.S. Dist. LEXIS 123803, at *76 (S.D. Ohio June 30, 2025) (BOWMAN, M.J.) (report and recommendation).[5]

The Court has already identified the CPD–JFS "partnership" as the lynchpin of plausible state action and inferred that Paul would not have disclosed the information had Officer Hooven not been a police officer. [Doc.103, at PageID ##931–33]. Discovery supports that inference. Paul testified that she would not have run the query for a member of the public, [Doc.139, at p.150:15–25]; that she understood Officer Hooven to be consulting her in his capacity as a police officer, [*Id.*, at p.94:17–24]; that neither the public nor the police have direct access to SACWIS, [*Id.*, at pp.108:20–109:10]; and that she was told that "if a police officer asks you for information help him out." [*Id.*, at p.109:22–25].

Recent decisions support this conclusion. In *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 760–61 (6th Cir. 2020), another case involving a JFS worker, the Sixth Circuit held it plausible that a hospital and JFS, which "relied on each other" to keep a minor hospitalized, acted together as state actors. After discovery, the district court held that the hospital and several of its treating staff were state actors. *Siefert v. Hamilton Cnty. Bd. of Comm'rs*, No. 1:17-cv-511, 2026 U.S. Dist. LEXIS 177, at *4–5, *25–27 (S.D. Ohio Jan. 2, 2026) (HOPKINS, J.). The JFS caseworker testified that JFS

[5] *See also, Stucker v. Louisville Metro Government*, No. 23-5214 (6th Cir. May 13, 2024) (unpublished) (citing *Ouza*, 969 F.3d 265 (considering evidence that supervisors seldom questioned officers about probable cause, supervisory review was minimal, lack of accountability, constitutional violations left unchecked, no meaningful review)).

had become "part of the [hospital's] team," and the court found that the collaboration "exceeded compliance with the statute" and suggested a "deep and symbiotic relationship … beyond mere acquiescence." *Id.* at *25–26 (quoting *Siefert,* 951 F.3d at 761). The "team" dynamic of officials from two partnering agencies working together is the same here, and it is the very reason for the MOU.

Paul's supervisors instructed her to treat police officers as partners and to "[m]aintain strong relationships with community partners," and she was expected to share confidential information with them. [Doc.139, at pp.96:17–97:24; 109:11–17]. Lest there be any mistake about her testimony:

> Q. So, to clarify, you were *permitted* to share … confidential information with the police or you were instructed that you *should* share that information with the police (emphasis supplied).
>
> A. I can't speak for what written protocol is. However, I was told that -- *and it is emphasized* -- that if a police officer asks you for information, help him out (emphasis supplied).

[*Id.*, at p.109:18–25]. She made it clear that the sharing of information included confidential information as part of a custom of "you scratch my back, I'll scratch yours," [*Id.*, at p.110:5–12], with the expectation that confidential information would be treated confidentially. [*Id.*, at p.109:16–17]. The instruction came from "[m]ultiple different people," including supervisors, [*Id.*, at p.110:13–18], although she later clarified that it was not always told directly, that some of it was "office gossip," and that the practice was "[d]efinitely unwritten." [*Id.*, at pp.151:23–152:8].

A breach of confidential information is guaranteed to happen under the circumstances of this case, which creates an obvious need for training, supervision, policymaking, and discipline. But the City has never done that, and the City Manager doesn't show any interest in taking on the issue. The attitude from the top was and is indifference.

Madison Paul describes the same relationship with CPD. She testified that her actions in accessing SACWIS and supplying the information to Officer Hooven were taken in her capacity as a JFS employee, [Doc.139, at p.168:1–5]; *see also* [*Id.*, at p.166:1–4], consistent with what her supervisors and coworkers had taught her. [*Id.*, at p.166:5–16].

The City identifies Chief Theetge and City Manager Long as the persons who decided what action to take on Officer Hooven's conduct in its Answer to Madison Paul's Interrogatory No. 7. [Doc.136-2, at p.8]. The CCA put the City on notice on September 21, 2023, when it sustained misconduct and found the conduct outside policy and training [Doc.136-4, at p.1]; [Doc.75, at PageID #681]. The Chief's only recorded response, however, was a handwritten directive for a log entry, and the only document she consulted was the IIS report according to the City's responses to Taylor's Requests for Production 11–13. [Doc.136-1, at pp.18–19].

The City Manager was not aware of the MOU, did not know the City's policy on officer–JFS interaction ("[t]hat would lie with the chief"), and has taken no action on the finding [Doc.137, at pp.67:15–68:12; 71:2–11; 73:3–24; 75:14–17]. A City that routes confidential records to its officers under an agreement its chief executive does not know exists, and that has identified no change in training since its own agency found the conduct *outside* its training, has plausibly chosen not to train. *Canton,* 489 U.S., at 389–90.

**iii. The inadequacy is closely related to or actually caused Taylor's constitutional injury.**

Officer Hooven knew the rule for law-enforcement databases: he told Holly that improper use of LEADS is "a felony and I lose my job." [Doc.75, at PageID #679]. What the City never told him was any rule about child-welfare data, and he went through a county caseworker to reach it because he knew he could. An officer who has been given no instruction on what to ask for or what

to do with SACWIS information is more likely to pass it on, so the missing training is "closely related to" the injury. *Jackson*, 925 F.3d at 834.

**b. The City had a policy of inaction and a custom of tolerating officer misconduct.**

The Court also found that Plaintiffs did not plead that the City "had a policy or practice of supporting similar wrongdoing." [Doc.103, at PageID #939]. But an unwritten custom of tolerating violations is actionable if the plaintiff shows "(i) the existence of a clear and persistent pattern" of the violations, "(ii) notice or constructive notice," "(iii) the [municipality's] tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction," and "(iv) that the [municipality's] custom was the 'moving force.'" *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

Where a plaintiff offers evidence of a custom, deliberate indifference is for the jury. *Doe*, 103 F.3d at 509. A policymaker's "deliberate choice to follow a course of action" from among alternatives is also the City's policy, with no pattern required. *Burgess*, 735 F.3d at 479 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality)). The City arranged for SACWIS information to reach its officers and then adopted no rule on how they may use it.

That plausibly reflects a choice by the officials responsible. The Chief is the person to whom the City Manager defers on police policy and discipline [Doc.137, at pp.33:1–4; 41:19–20; 70:23–71:11]. The City has identified no policy that the Chief adopted. The City Manager testified that no deadline governs her decision, [Doc.137, at p.74:1–7]; that she inherited "stacks" of unresolved CCA findings from prior city managers, [*Id.*, at p.62:20–25]; that she is "the first city manager that has even *addressed* any of these reports," [*Id.*, at p.74:9–10]; that the finding on Mr. Taylor's complaint has been on her desk since about January 2024 in "purgatory," unresolved; and

that she has no present intention of signing off on it, in part because of this litigation. [*Id.*, at pp.45:21–46:1; 73:1–24; 75:3–17].

Indeed, the City Manager, charged with resolving CCA findings, has not even seen the CCA's recommendation. [Doc.137, at p.46:8–10]. She explains her inaction as the CCA finding being in "just a state of limbo" until she acts, and that when the CCA issues a bare "sustained" without a recommended action, she perceives no "signal" to do anything. [*Id.*, at pp.63:8–64:20]. The CCA's report on Mr. Taylor's complaint states a sustained finding and no recommended discipline. [Doc.136-4, at p.3]. A sustained finding of misconduct against a police officer has, in other words, produced no decision.

Long's testimony supports an inference of a practice, continuing across administrations, in which findings go undecided despite a mandatory ordinance. "[C]ourts are not required to ignore the fact of life that policies can be and often are subtly but effectively promulgated by seemingly benign conduct," *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1990), and that's the case here. The Sixth Circuit has treated comparable testimony as evidence from which a jury could find a settled practice. *Wright v. City of Euclid*, 962 F.3d 852, 881–82 (6th Cir. 2020) (supervisor never heard of an inappropriate use of force).

The front end of the process shows similar gaps, as Captain Caton, who ran IIS for two years, explains: IIS investigates "serious" complaints against officers, including a complaint that an officer misused a law-enforcement database, and Mr. Taylor's complaint *was the kind IIS would investigate* because "it's a law violation." [Doc.138, at pp.8:20–9:6; 15:7–21; 28:15–29:10]. But when Taylor went to District 5, a sergeant "looked into it," found "nothing there," and no complaint was taken, because "if it's not a complaint, we don't take it." [*Id.*, at p.16:2–24]. Captain Caton herself learned of the IIS investigation only when the report crossed her desk, and

"thought it was done when [Taylor] came to District 5." [Doc.138, at pp.27:21–28:7]. That isn't just a contradiction among witnesses; it is a contradiction within Caton's own testimony.

When the matter did reach the Chief, the City's response was a log entry. The Chief directed the Commander and Lt. Wilson to meet with Officer Hooven and to document the meeting in an ESL, and Captain Caton took it as an order. [Doc.138, at pp.19:1–24; 23:5–13]. By her account, the meeting did not go over the report's allegations and conclusions because "it had already been investigated," so they "just talked about … his conduct and how it's affecting his work." [*Id.*, at p.22:16–25]. She said that "we believed [Officer Hooven] was doing what he was supposed to do," and that the Chief "just wanted it documented." [Doc.138, at pp.24:20–25; 37:3–10].

That was a *pro forma* exercise at best. The City's own matrix lists an oral reprimand "documented via ESL" as the lowest rung of discipline, and Captain Caton called the ESL "our kind of first line of discipline in the progressive discipline process." [Doc.138, at pp.10:15–11:2; 12:1–2]. The entry here was categorized "instructed," which she distinguished from counseling. [Doc.138, at pp.36:21–37:14].

Officer Hooven agrees: the conversation "was not about the investigation, *per se*;" the ESL was "[i]ndifferent;" and the discussion amounted to "make better choices." [Doc.140, at pp.156–59 and 161]. That is not discipline or counseling; it's career advice. The Chief's response and the Commander's testimony indicate that the City treated the use of a county caseworker to reach confidential child-welfare records as conduct consistent with policy and training. The City's own CCA found the opposite.

By contrast, the County suspended Ms. Paul without pay for a workday over the same episode. [Doc.139, at pp.133:25–134:18]. The City gave its officer career advice, and its City

Manager, who must resolve the conflict, has not, and does not intend to – even now. That supports a plausible inference of "tacit approval," of which the City's policymakers were on notice. *Thomas*, 398 F.3d, at 429.

Officer Hooven's own history supplies more of the same notice: the CCA report lists a sustained excessive-force and body-camera finding (CCA No. 20112) and a sustained IIS "Law Violation by Officer" finding (IIS No. 2022-023) in the three years before April 2023. [Doc.136-4, at p.4]. The City's post-April 2023 response is offered as evidence of its customs and of its policymakers' knowledge and indifference, not as an independent cause of the April 2023 disclosure. The practice that left Officer Hooven free to abuse the access the MOU gives CPD officers, with no instruction and no consequence, plausibly was the moving force. *See Doe*, 103 F.3d at 508–09 (custom must be the direct causal link).

**c. Taylor pleads "ratification" in the alternative.**

Taylor pleads ratification in the alternative, as further evidence of the City's custom, and to preserve the issue. Plaintiff acknowledges that a policymaker's "after-the-fact approval of the investigation, which did not itself cause or continue a harm," does not impose liability under *Burgess*, 735 F.3d at 479; *Guptill v. City of Chattanooga*, No. 24-5688, slip op. at 15–16 (6th Cir. Nov. 26, 2025) (published); and *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020). And failure to investigate counts only where there were "multiple earlier inadequate investigations [that] concern comparable claims." *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024) (quoting *Pineda*, 977 F.3d at 495).

But "failing to meaningfully investigate and punish allegations of unconstitutional conduct" can ratify the one violation. *Wright*, 962 F.3d, at 882. The Court rejected a "ratification" theory resting only on the IIS report. [Doc.75, at PageID #690]. The record, however, now shows that the City Manager alone can approve or disapprove a CCA finding, and that her word is final and not optional for the Chief. [Doc.137, at pp.57:3–17; 61:22–24; 64:25–65:7]. The CCA Board accepted its findings on Taylor's complaint on January 3, 2024, and forwarded them to Long "for review and final disposition." [Doc.136-5, at pp.2–3]. The City's own admissions establish what the Chief did and consulted. In *Wright*, the supervisors never meaningfully investigated complaints; here the City Manager does not decide.

**C. New evidence warrants revising the Corrected Order under Rule 54(b).**

District courts may "reconsider interlocutory orders and … reopen any part of a case before entry of final judgment," traditionally on "(i) an intervening change of controlling law; (ii) new evidence available; or (iii) a need to correct a clear error or prevent manifest injustice." [Doc.103, at PageID #928] [citing *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 952, 959 (6th Cir. 2004)]. Taylor asks the Court to reconsider Count IV as amended because it answers the reasons the Court gave for dismissing it, on evidence gathered in discovery.

*Rodriguez* denied relief where the movant "had the evidence at the time of the court's earlier decision." *Rodriguez*, 89 F. App'x, at 959. Plaintiffs did not have the evidence described above when they filed the First Amended Complaint and could not reasonably have obtained it before discovery. The Court itself said that questions of fact remained to be "fleshed out during discovery and resolved later." [Doc.103, at PageID #932 fn.2]. Those questions were pursued in discovery and now answer the pleading deficiencies the Court identified.

## CONCLUSION

Taylor respectfully submits that the Court should grant him leave under FRCP 15(a)(2) to file the Second Amended Complaint [Doc.141-1] *instanter*, and to the extent necessary, revise the Corrected Order under Rule 54(b) as to Count IV only.

**DATED: October 23, 2026.**

Respectfully submitted,

/*s/ Justin M. Whittaker*___________
Justin M. Whittaker (0093212)
WHITTAKER LAW, LLC
35 East 7th Street, Suite 603
Cincinnati, Ohio 45202
513.457.5545
513.436-0689 (fax)
Justin@WhittakerLawFirm.com

**Counsel for Plaintiffs Brendon Taylor and Holly Hooven**

## CERTIFICATE OF SERVICE

I certify that on **October 23, 2026**, I e-filed the foregoing Motion through the Court's CM/ECF system, which will send notice to all counsel of record.

*/s/ Justin M. Whittaker*__________
Justin M. Whittaker (0093212)