**In The Matter Of:**

*Brendon Taylor, et al. v.*

*Jesse Lee Anthony Hooven, et al.*

---

*Holly Hooven*

*April 6, 2026*

---

*Miami Valley Reporting, LLC*

*4246 McCandliss Road*

*Troy, Ohio 45373*

*(937) 440-1400*

*angeladilts@miamivalleyreporting.com*

Original File 260406HH.txt

**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
* * *

BRENDON TAYLOR, et al.,
Plaintiffs,
vs. CASE NO. 1:24-CV-00204-SJD
JESSE LEE ANTHONY HOOVEN,
et al.,
Defendants.

* * *

Deposition of HOLLY HOOVEN, Plaintiff herein, called by the Defendants for cross-examination pursuant to the Rules of Civil Procedure, taken before me, Monica K. Schrader, Court Reporter and Notary Public in and for the State of Ohio, at the Finney Law Firm, 635 Main Street, Cincinnati, Ohio, on Monday, April 6, 2026, at 9:39 a.m.

* * *

I N D E X

WITNESS: HOLLY HOOVEN


| EXAMINATION | PAGE |
|---|---|
| BY MR. GOTTESMAN:................ | 5 |
| BY MS. MCCLANAHAN:............... | 93 |
| BY MR. MUNAS:.................... | 121 |
| BY MR. WHITTAKER:................ | 130 |
| BY MR. GOTTESMAN:................ | 132 |


E X H I B I T S


| No. | Description | Page |
|---|---|---|
| 1 | Separation and Property Settlement Agreement | 17 |
| 2 | Judge's Decision | 20 |
| 3 | Notice of Appeal | 22 |
| 4 | Notice of Dismissal of Appeal | 23 |
| 5 | series of text messages | 30 |
| 6 | First Amended Complaint and Jury Demand | 37 |
| 7 | series of text messages | 61 |
| 10 | Complaint | 91 |
| 11 | Internal Investigations report | 92 |
| 103 | Cincinnati Enquirer article | 107 |
| 104 | Child Abuse & Neglect Memorandum of Understanding | 111 |
| 105 | letter dated 6/1/2023 | 115 |
| 106 | letter dated 9/18/2023 | 117 |

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

By: Justin M. Whittaker, Esq.
Whittaker Law, LLC
2055 Reading Road, Suite 260
Cincinnati, Ohio 45202
513-457-5545
Justin@WhittakerLawFirm.com

ON BEHALF OF THE DEFENDANT JESSE LEE ANTHONY HOOVEN:

By: Zachary Gottesman, Esq.
Gottesman & Associates, LLC
9200 Montgomery Road
Building E, Suite 18B
Cincinnati, Ohio 45242
513-651-2121
zg@zgottesmanlaw.com

ON BEHALF OF THE DEFENDANT MADISON PAUL:

By: Mickey S. McClanahan, Esq.
Finney Law Firm
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, Ohio 45245
513-797-2850
mickey@finneylawfirm.com

ON BEHALF OF THE DEFENDANT BOARD OF HAMILTON COUNTY COMMISSIONERS:

By: Eric Munas, Esq.
Amanda R. Bent, Esq.
Assistant Prosecuting Attorneys
230 East Ninth Street, Suite 4000
Cincinnati, Ohio 45202
513-946-3133
Eric.Munas@hcpros.org
Amanda.Bent@hcpros.org

ON BEHALF OF THE CITY OF CINCINNATI:

By: Shuva J. Paul, Senior Assistant City Solicitor
Katherine C. Baron, Assistant City Solicitor
801 Plum Street, Suite 214
Cincinnati, Ohio 45202
513-352-4551
shuva.paul@cincinnati-oh.gov
Katherine.Baron@cincinnati-oh.gov

ALSO PRESENT:

Brendon Taylor
Jesse Lee Anthony Hooven

* * *

HOLLY HOOVEN

of lawful age, Plaintiff herein, having been first duly cautioned and sworn, as hereinafter certified, was examined and said as follows:

CROSS-EXAMINATION

BY MR. GOTTESMAN:

Q. Good morning. My name is Zach Gottesman. I am counsel for defendant, Jesse Lee Hooven. We are here this morning for your deposition pursuant to notice. Have you been deposed before?

A. I have not.

Q. The woman seated to your right is taking down everything that we say. She is going to render a transcript at the end of this process. To make sure that transcript is fair and usable in this matter, it's important that you and I not talk over each other. It's also important that you use words for your answers, instead of sounds. Uh-huh and huh-uh look remarkably similar on paper, even though you and I would understand it, okay?

A. Okay.

Q. So if I pester you for a yes or a no, I am doing it for purposes of the record, not to

pester you about your language, okay?
A. Okay.
Q. At any point during this process if I ask a question that you are not clear what I am asking, please ask me to clarify or explain. At the end of the day, I want your -- I am entitled to what you know. I don't want your guesses. If you have a basis for estimating something, you can estimate. But guesses aren't what I am asking for, and I don't want you to speculate. Just what you know in your head, okay?
A. Okay.
Q. What's your current residence address?
A. 2456 Moore Road, Hamilton, Ohio, 45013.
Q. And how long have you lived there?
A. A little over a year and a half now.
Q. And who resides in that home with you?
A. Brendon Taylor, and then my daughter, Willow Hooven, and Aiden Hooven.
Q. Aiden and Willow are there on a parenting schedule?
A. Correct.

09:41:14 Q. And you share the parenting time with your ex-husband now, the defendant in this case, Jesse Lee Hooven, right?
09:41:22 A. Yes.
09:41:22 Q. What is your date of birth?
09:41:30 A. 6/21/88.
09:41:32 MR. GOTTESMAN: And off the record.
09:41:33 (Thereupon, an off-the-record discussion was had.)
09:41:43 MR. GOTTESMAN: Back on.
09:41:43 BY MR. GOTTESMAN:
09:41:46 Q. What's your educational background?
09:41:47 A. I have a bachelor's in social work and a master's in social work.
09:41:52 Q. Where did you get the bachelor's degree?
09:41:55 A. Eastern Kentucky University.
09:41:57 Q. What year was that conferred?
09:41:58 A. 2012.
09:42:02 Q. And where did you get the master's?
09:42:04 A. University of -- I am blanking -- UC.
09:42:10 Q. And when was that conferred?
09:42:13 A. 2016.
09:42:14 Q. Prior to working at Children's Hospital, where else did you work?

A. Greater Cincinnati Behavioral Health, and then I have also worked at Council on Aging.
Q. What were the dates for the Greater Cincinnati Behavioral Health?
A. 2013 through 2017. And then Council on Aging was 2017 through 2021. That's a little confusing because I did PRN at Children's Hospital for a period of time and then also was working at Council on Aging full-time before I completely stopped working at Council on Aging and went full-time at Children's Hospital.
Q. So when did you start full-time at Children's?
A. 2022, I believe.
Q. What does that work entail?
A. I work in psychiatry, specifically Psychiatric Intake Response Center. I work in the emergency room. But currently, I am doing bridge within that department, so kids that come for -- it can be anything mental health related, so suicide, homicide, depression. It just depends on anything mental health related.
Q. Do you deal with child abuse, physical or sexual?
A. Yes.

Q. Are you in any way -- what's the center at Children's Hospital for --

A. Mayerson.

Q. The Mayerson.

A. I will make reports, but I'm not -- I don't do any of those interviews.

Q. In that capacity as a social worker at Children's, do you deal with Hamilton County JFS on a regular basis?

A. Yes.

Q. How often would you say you deal with Hamilton County JFS?

A. Any time I feel it's deemed necessary to make a report.

Q. So you are a mandatory reporter, correct?

A. Yes.

Q. That means if you come upon a child that you believe is a victim of either physical or sexual abuse, you have a duty to report?

A. Yes.

Q. How many times have you done that?

A. I honestly can't count.

Q. Have you ever called Hamilton County JFS -- they have a registry. Are you familiar

with the registry?

A. I didn't know -- like for somebody that calls in?

Q. Yeah.

A. I wasn't aware.

Q. What about -- the sheriff has a database of offenders that's available online. Are you familiar with that?

A. No.

Q. Have you ever had to call Hamilton County JFS to get information about a parent or a child in a history of abuse?

A. No.

Q. Is that just because it's never come up, or is that something you would not be charged with?

A. That's something I wouldn't do.

Q. Back to sort of your biographical information. When did you meet Brendon Taylor and where?

A. I met Brendon Taylor -- we have been together three years now, and we met on a dating app.

Q. What dating app?

BRENDON TAYLOR: Hinge.

THE WITNESS: Hinge.

BY MR. GOTTESMAN:

Q. So what just happened, you looked to Brendon for an answer.

A. I can't do that?

Q. I am asking you not to.

A. Oh, okay.

Q. First of all, it's a deposition. It's just attorneys here, the court reporter. You are not getting into trouble, it's nothing like that. But I want what you know.

A. Okay.

Q. I don't want what he knows. That will come up Wednesday, okay?

A. Uh-huh.

Q. So if you don't know something, just tell me you don't know.

MR. GOTTESMAN: And, Mr. Taylor, if you would let her answer the questions. I know you are trying to be helpful, trying to make an accurate record. But really this is about what's in her head, between her ears, not what you know.

BRENDON TAYLOR: All right.

MR. GOTTESMAN: Okay. You'll get your chance.

MR. WHITTAKER: Don't be helpful.
BRENDON TAYLOR: Okay.
MR. GOTTESMAN: That's what I meant.
BY MR. GOTTESMAN:
Q. So what was it, Hinge?
A. Yes.
Q. Okay. When did you first meet him?
A. It was February 10th or 11th. It was on my mom's birthday.
Q. And how long after you met him did he move in with you?
A. It was April or May of that year.
Q. At the time were you living in Northern Kentucky?
A. I was.
Q. What was that residence address?
A. 136 Bramble Avenue, Highland Heights, Kentucky, 41076.
Q. And at the time were you the custodial parent, or did you have shared parenting of Willow and Aiden?
A. We had shared parenting, but I was the custodial parent.
Q. Did you have -- between the time you divorced Jesse Hooven and the time you met

Mr. Taylor, how many different men did you date in that time frame?

MR. WHITTAKER: Objection, irrelevant. You can answer the question.

THE WITNESS: Like actually date? Really only one person.

BY MR. GOTTESMAN:

Q. Who was that?

A. His name was Matt.

Q. Do you know his last name?

A. Mice.

Q. Could you spell that for me?

A. M-I-C-E.

Q. Did he ever cohabitate with you?

A. No.

Q. How long did you date him?

A. Maybe a month.

Q. Through records I have reviewed, I have seen the name Evan.

A. Yes.

Q. Who is Evan?

A. He was just a friend that I hung out with from time to time.

Q. Did you date him?

A. No.

09:48:46 Q. At some point did you introduce Evan -- let me ask about Mr. Mice first. Did you introduce Mr. Mice to your children?
09:48:59 A. No.
09:48:59 Q. And why not?
09:49:00 A. I just didn't feel comfortable introducing the kids to him.
09:49:07 Q. And what about Evan?
09:49:12 A. It was more of a friendship than anything.
09:49:17 Q. Did you introduce Evan to your children?
09:49:20 A. Yes, because I felt it was more of a friendship.
09:49:22 Q. Okay. Did Evan ever stay the night at your home?
09:49:33 MR. WHITTAKER: Objection, irrelevance. I don't know what her -- what this has to do with any of the claims in this case, but you can answer the question.
09:49:41 THE WITNESS: No.
09:49:41 BY MR. GOTTESMAN:
09:49:42 Q. He never stayed at your house?
09:49:44 MR. WHITTAKER: Same objection.
09:49:45 THE WITNESS: (No verbal response.)

BY MR. GOTTESMAN:
Q. At some point did you come to learn that Evan had a -- was a drug user?
A. Yes.
Q. And what sort of drugs was Evan using?
A. I am not sure. My sister looked him up online.
Q. What is your sister's name?
A. Courtney.
Q. Courtney. What's her last name?
A. Troxler.
Q. Spell that for me.
A. T-R-O-X-L-E-R.
Q. Is that her maiden name or your maiden name?
A. No, that's her married name.
Q. What's your maiden name?
A. Pratt, P-R-A-T-T.
Q. Did you ever refer in conversations with your ex-husband, Jesse Hooven, to Evan as a crackhead?
A. Probably, yes.
Q. Were you under the impression he was a crack user?

A. I -- from my understanding, my sister looked him up. And he was arrested for substances, so it was just probably in conversation with Jesse.

Q. So he was around your children?

A. Yes.

Q. And you did share with Jesse your belief or concerns about his drug use, and specifically potentially crack cocaine, correct?

A. I, again, don't know what he was using. But as soon as I found out he was arrested at some point, I had him stop -- I stopped hanging out with him.

Q. Did he have a passcode to your home?

A. No.

Q. When did you file for divorce?

A. I was still pregnant with Aiden, so I want to say August of 2028 -- or 2018, sorry.

Q. And the children's current ages are what?

A. Aiden is seven, Willow is nine.

Q. Have you been represented throughout your domestic relations case by counsel?

A. Yes.

Q. The same counsel?

A. Like for -- I have been in custody court multiple times, so --

Q. Have you used different counsel?

A. Yes.

Q. List off all the attorneys that have represented you in your dealings.

A. Erin Wilkins.

Q. Excuse me, say that again.

A. Erin Wilkins.

Q. Can you spell that last name?

A. W-I-L-K-I-N-S. And then Ed Collins.

Q. Are those the only two attorneys you have had?

A. Yes.

Q. Are they in the same firm?

A. No.

(Thereupon, Exhibit 1, Separation and Property Settlement Agreement, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. Ma'am, I have marked for identification Exhibit No. 1. It's a Separation and Property Settlement Agreement from your domestic relations case. Do you recognize that document?

A. I do.
Q. Have you seen it before?
A. Yes.
Q. Go to the last two pages. Page 9, is that your signature? Or I'm sorry, page 8, at the bottom.
A. It is.
Q. Is it your understanding this is the separation agreement -- separation and property settlement agreement that's still in effect in your divorce case?
A. Yes.
Q. The second page of this document, under paragraph 1, it says each party agrees not to molest, annoy, interfere with, or harass the other in any manner whatsoever. Do you see that?
A. Yes.
Q. Have you ever filed a contempt motion against Mr. Hooven for violating that?
A. Have I ever?
Q. Correct.
MR. WHITTAKER: Object to the extent you are asking a legal conclusion, but you can answer the question if you know the answer.
THE WITNESS: Yes.

BY MR. GOTTESMAN:

Q. When did you file that? How many times have you filed it?

MR. WHITTAKER: Same objection. You can answer.

THE WITNESS: At this time, I don't know without having something to refer to.

BY MR. GOTTESMAN:

Q. Have you filed multiple motions for contempt against Jesse Hooven?

MR. WHITTAKER: Same objection. You can answer.

THE WITNESS: Again, at this time, I would have to refer back to something.

BY MR. GOTTESMAN:

Q. What would you have to refer to?

A. I don't know how many motions I filed.

Q. A lot?

A. I would not say a lot, no.

Q. But is it your understanding as you sit here now that you have filed motions for contempt against Jesse for violating that provision?

MR. WHITTAKER: Same objection. You

can answer.

THE WITNESS: I would say multiple, no.

BY MR. GOTTESMAN:

Q. Just one?

MR. WHITTAKER: Same objection. You can answer.

THE WITNESS: Again, I would say multiple, no.

BY MR. GOTTESMAN:

Q. So multiple is more than one is what I'm getting at.

A. Yeah, I would say maybe one.

(Thereupon, Exhibit 2, Judge's Decision, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. Holly, do you recognize Exhibit 2 as a decision from Judge Sundermann?

A. Yes.

Q. It's my understanding that this decision was issued in your domestic relations case sometime in October of '25?

A. Yes.

Q. On the first page, it lists off a

litany of motions that the judge considered?

A. Yes.

Q. And there is a motion for contempt on June 7th, 2024, filed by mother. Do you see that? It's the third line down.

A. Yes.

Q. Looking at that, is it your understanding that's the only motion for contempt you filed against Jesse?

A. It looks like there is one -- there is --

Q. That's the only mother's motion?

A. Yes, correct.

Q. Go to the bottom of page 20.

A. Okay.

Q. It's my understanding this document, that this is where the Court addresses the motion for contempt filed on your behalf on June 7th, '24. Is that your understanding?

A. Yes.

Q. Ultimately, the Court did not find Mr. Hooven in contempt for any of the grounds stated in your motion; is that accurate?

A. That is accurate.

Q. And the Court at the same time found

you in this decision in contempt over 13 times, correct?

A. That is accurate.

Q. And the Court assessed against you as a result of that contempt sanctions in the amount of $3,250, right?

A. Correct.

Q. Did you pay all those?

A. I did.

Q. At the same time, the Court indicates on the last page that the motions for attorney's fees will be addressed in a separate entry?

A. Correct.

Q. And the Court did ultimately issue an award in Mr. Hooven's favor granting attorney's fees that you were ordered to pay, correct?

A. Correct.

Q. And did you pay those as well?

A. I did.

Q. When this decision first came out, you filed an appeal of that decision, correct?

A. I did.

Q. Bear with me just a second.

(Thereupon, Exhibit 3, Notice of Appeal, was marked for purposes of

identification.)

BY MR. GOTTESMAN:

Q. I am putting before you what I marked as Exhibit 3. The Notice of Appeal was filed on your behalf from that judge's decision we just discussed as Exhibit 2?

A. Yes.

Q. Do you recognize that as the Notice of Appeal?

A. I do.

Q. And it was filed by Mr. Collins and his associate?

A. Yes.

Q. And ultimately --

(Thereupon, Exhibit 4, Notice of Dismissal of Appeal, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. -- that appeal was dismissed, correct?

A. Yes.

Q. That's Exhibit 4. Do you recognize that as the notice of dismissal of your appeal?

A. I do.

Q. So as we sit here today, all contempt

10:02:35 sanctions were paid, all attorney's fees were paid, and your appeal to the First District Court of Appeals has been voluntarily withdrawn by you?
10:02:44 A. Correct.
10:02:57 Q. After you and Mr. Hooven were divorced, was your relationship amicable? By the way, to make sure we are on the same page for timing, prior to your relationship with Mr. Taylor, just between -- after you filed for divorce and before you started seeing Mr. Taylor, was your relationship with Mr. Hooven amicable?
10:03:31 A. It waxed and waned.
10:03:32 Q. Explain that to me.
10:03:36 A. There were periods where it was okay and periods where it weren't -- it was not, and he would continuously make unwanted sexual advances towards me.
10:03:48 Q. All right. Anything else other than the unwanted sexual advances that was contributing to difficulty in that relationship?
10:03:57 A. We would argue. I mean, your typical arguing over certain things. He was persistent on me moving into Ohio, persistent on when he bought his home in the Oak Hills school district the children moving into that school district.

When I had been a resident in Campbell County and had established an apartment and been the sole caretaker and had been caring for the kids since I had gave birth to Aiden moving into Oak Hills and persistent on them moving into his school district once he finally established residency in Oak Hills, and that's been pretty evident since he finally moved from Oak Hills into Indian Hill.

And that's where they are now, in Indian Hill. It just got significantly worse once Brendon came into the picture or he found out that I was talking to somebody else, and it became -- every time I was trying to date somebody, it became very evident and very rocky. So that's why I said it waxed and waned.

Q. So from the time you filed for divorce to the time you started seeing Mr. Taylor, were there any time periods where your relationship improved to the point where you were close to reconciling?

A. No. I mean, we had a divorce because he had an affair with somebody who was in college and graduated. And then once we tried to work on our marriage -- and that was pretty evident that

that wasn't going anywhere, and that's why I filed for divorce once I gave birth. And then shortly after I had Aiden, he tried to reconcile but it was too far gone.

Q. After Aiden was born and before you started seeing Mr. Taylor, did the two of you have a sexual relationship?

A. I mean, at one point, yes. But it was one of those situations where I -- he was very persistent. And then I just knew because of how he is, I just tried to keep it even keel and tried to just keep -- not rock the boat. And I just tried to keep -- he was also not -- during the time, too, he was also so distant and not coming around to see the kids.

I wanted to make sure he was seeing the children. I mean, he wasn't coming around, and I was worried he wasn't going to see the kids at all. And his excuse was you are too far away, I am only going to see them when I am not working. I mean, he -- he wasn't around at all, and so I was just trying to encourage him to see the children.

And then he had his DUI, and then I had to drive and pick the kids up and take them

over to Tim's house because he couldn't even get an apartment because he was -- you know, there was that issue. And so I was really trying to overcompensate and have him see the kids. And then he finally got a place, and then it was like let's have the kids move to Oak Hills.

And I'm like -- it was just a lot. And then when I finally got to a place where I wanted to try to date somebody after four or five years, then it was you are a horrible mom, who is this person, you know, you are dating all these men, they are coming and going. And I'm just trying to start life over, so yeah.

Q. So at some point all this back-and-forth -- let me back up. You covered a lot of territory there. Was the sexual interaction with Mr. Hooven in that time frame, was it repeated multiple times?

A. No.

Q. Just once?

A. I mean, maybe once or twice, but it wasn't like he was staying over. No, it was never like that.

Q. At some point, you were -- I think for Aiden's delivery you were in Florida?

A. No, I was not in Florida. I -- my mom came up for the delivery because my sister had just started at Council on -- my sister is a social worker. She also was working at Council on Aging, and she was afraid she wasn't going to be able to be present for the birth.

Because Jesse was so not around, I didn't know if he was going to be there for the delivery of Aiden, and so my mom flew in. And I had told Jesse because he wasn't around I'm going to Florida for a month for -- on maternity leave. And then I gave birth, cleared it with the doctor. We went down to Florida for a month, and then I came back.

Q. Okay. I was under the impression you had an extended period in Florida.

A. I did on maternity leave, but I gave birth here.

Q. All right. All of the back-and-forth that you described where Jesse was difficult for you to deal with; is that a fair way to characterize it?

A. Yes.

Q. Did you ever seek court intervention with regard to that?

A. No, because I just wanted -- I never even wanted to go back to court. I was just hoping he would -- whatever was going on with him, I hoped he would figure it out and just see the kids. I mean, all this going back and forth to court was really him taking me back all these times.

Q. All right. Were you aware that that was an option, that you could seek court intervention?

A. Yes, but I never wanted to spend all these thousands of dollars that we wasted in court.

Q. So the thousands of dollars you are referencing just now --

A. Yes.

Q. -- were those on this case or were those on the DR case? By the way, do you know what I mean by DR?

A. No, I was just going to ask.

Q. Domestic relations.

A. The domestic relations.

Q. In February of '23, it's my understanding that you sent Jesse Hooven a text message with a photograph of a graphic from the

television.

(Thereupon, Exhibit 5, series of text messages, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. I am handing you what I marked for identification as Exhibit 5. It's a text thread with excerpts. Do you recall on February 26th, 2023, sending that screenshot to Mr. Hooven?

A. I do.

Q. What was your purpose in sending that?

A. Just letting him know, I mean, the risk. I mean, it is -- I mean, it's true.

Q. Say that -- I didn't understand what you said.

A. Just letting him know the risks of when, you know, parents divorce and having another parent in the home of the risks of children either being sexually abused or -- well, it's just sexual abuse. But yeah, that the risk is significantly higher.

Q. So this is right about the same time you started a relationship with Mr. Taylor, right?

A. I guess, but it just -- well, yeah.

And I didn't even realize it correlated, but yeah.
Q. And did you and Mr. Hooven have an agreement in place that said -- where you agreed not to introduce your children to anyone -- any romantic interest either of his or of yours until six months of duration?
MR. WHITTAKER: Objection to the form, but you can answer if you know the answer.
THE WITNESS: We discussed it offhand, but it was nothing, like, formally written in a court document.
BY MR. GOTTESMAN:
Q. It was just an agreement between the two of you?
A. Correct.
Q. And this was after the children had met and you had cut off contact with a guy named Evan, right?
A. Yes.
Q. By the way, did you tell me Evan's last name?
A. No.
Q. What is it?
A. I honestly don't know.
Q. You said he was your friend and you

two had been hanging out for a while, and you don't know his last name?

A. I don't know his last name. I mean, we only hung out for maybe like a month or so.

Q. How old was Evan?

A. It's been so long, I don't even remember.

Q. How did you know him? Where did you meet him?

A. It was another dating app. I was trying to date. And it's difficult when you have children, so I -- I don't know.

Q. What dating apps have you used?

A. Hinge was really the only one I used.

Q. You say your sister looked him up. Did she look him up on -- do you know how she looked him up?

A. I don't know.

Q. Would it have been based on information you had provided her?

A. Yes. I mean, I -- this time I really honestly don't remember his last name. It's been so long.

Q. In this email -- or text thread, you discussed with Jesse the increased risk of abuse,

sexual or physical, for children when there is a single parent household, correct?

A. Correct.

Q. And you were telling him that because you knew he was concerned and you were concerned about Aiden and Willow's welfare, right?

A. Correct.

Q. And Aiden is a little boy, and Willow is a little girl?

A. Yes.

Q. So you appreciated at that time there was -- in February of 2023 that your interactions with other adults, especially in a cohabitation situation, could result in an increased risk of harm to Willow and/or Aiden?

MR. WHITTAKER: Objection to the form of the question. You can answer if you understood.

THE WITNESS: Can you repeat the question, please?

MR. GOTTESMAN: Monica?

(Question read.)

THE WITNESS: Yes, but I wasn't cohabitating with anybody at that time.

BY MR. GOTTESMAN:

Q. And you knew Jesse was concerned about that, as were you?
A. Correct.
Q. Is your Hinge dating app still active?
A. No.
Q. When you encountered Mr. Taylor on the Hinge dating app, what did you learn about him?
A. That he was in the military, that he had children, that he owns his own business, where he resided, his age. And then we communicated on the app before we ever exchanged phone numbers.
Q. How long after you started seeing Mr. Taylor did you decide -- did the two of you start living together?
A. Four or five months.
Q. You said it was April or May?
A. Yes.
Q. So if you started seeing him in February, it would be -- if he moved in in April, that would be three months, right?
A. So I was off, three months.
Q. Was there any -- how long was it before you met him that you introduced him to your

children?

A. It was about a month.

Q. Why did you disregard your previous agreement with Jesse where you two had agreed that you would give six months before you would introduce the children?

A. Because he disregarded me in regards to Emma. She -- I just felt like he never really took any of our conversations seriously, either, so I just -- yeah, that's why.

Q. Ultimately, that agreement between the two of you was for the benefit of the children, right?

A. Correct. And I felt like it wasn't held up on his side, so I didn't hold up on my side.

Q. How long -- did you ever have the children stay overnight at Mr. Taylor's house?

A. Yes, one time.

Q. And how long had you known Mr. Taylor at that time?

A. I honestly don't know.

Q. And were you present that night?

A. Yeah.

Q. Let's switch gears a little bit.

MR. GOTTESMAN: I did not bring -- and I apologize to everyone. I did not bring enough copies of the complaint, but I figured you would all -- Counsel, you would all have a copy of the first amended complaint.

MR. MUNAS: Document 55?

MR. GOTTESMAN: Yeah, ECF-55. I figured everybody would have brought that.

MR. WHITTAKER: If I could have one, if you have a spare.

MS. MCCLANAHAN: I can print one.

MR. WHITTAKER: No, no, no, you don't have to do that. You don't have to do that.

MS. MCCLANAHAN: I can print it right -- it's like 12 steps away.

MR. GOTTESMAN: I have my highlighted copy and one for the witness, so --

MR. WHITTAKER: It's okay. I thought if Zach had more than one, maybe I could have it. But he doesn't, so I will just -- on my laptop.

MS. MCCLANAHAN: Are you sure you don't want me to print one?

MR. WHITTAKER: I'm okay, thanks, yeah. I wrote it, so --

MR. MUNAS: The complaint is being

marked Exhibit 6?

MR. GOTTESMAN: It is.

(Thereupon, Exhibit 6, First Amended Complaint and Jury Demand, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. Mrs. Hooven, I put in front of you what I marked as Exhibit 6. It's a copy of ECF-55, the current operative complaint in this matter. Do you recognize this document?

A. I do.

Q. Have you reviewed this document?

A. I have.

Q. Did you review it prior to its filing?

A. Yes.

Q. Turn if you would, please, to page 6.

A. Okay.

Q. Directing your attention to paragraph 31. By the way, how did you meet Jesse Hooven?

A. At Greater Cincinnati Behavioral Health.

Q. And what was the context surrounding that meeting?

A. I was a care manager, and he was a

Homelink worker.

Q. What's a Homelink worker?

A. He -- I would make referrals for clients, I guess you could say, for housing, and he was a housing specialist.

Q. Was he -- what year was that?

A. 2013.

Q. At the time that you met him, was he a Cincinnati police officer?

A. No.

Q. Did you start a relationship with him then?

A. Yes.

Q. And did it remain -- were you in a regular relationship with him up to the time you got married?

A. Yes.

Q. And when you got married, what year was it?

A. 2015.

Q. And was that -- was he a police officer at that time?

A. Yes.

Q. So you were in a relationship with him through his time in the academy?

A. Yes.
Q. When you say that Officer Hooven has driven conflict with Holly Hooven regarding the custody of their minor children, can you explain what it is you are referring there?
A. Yeah. So he would cause conflict at the school, specifically Willow's school at the time. She was attending St. Therese in Southgate, Kentucky. He would openly discuss our custody dispute to parents when he was volunteering, making -- in front of the children, so in front of other children at the school, making other staff uncomfortable. He would -- I mean, that's one example. Do you need other examples?
Q. I am just -- you predicated a federal lawsuit on him, and I'm curious -- this is my one chance to hear what it is you are claiming --
A. Okay.
Q. -- supports that. And so you are saying that he is doing that in his capacity as a police officer. So --
A. Correct.
Q. -- explain to me how being at St. Theresa -- Therese --
A. Uh-huh.

Q. Yes?
A. Yes, sorry.
Q. At Willow's school --
A. Yes.
Q. -- how he is doing that to drive conflict.
A. So that was one example. Another example is he was at Aiden's school, was requesting the teachers to quote, unquote, spy or obtain information on my vehicle. He -- and how I became aware of that was there was a sticky note that I obtained from my lawyer at the time -- that was Erin Wilkins -- and that had who was picking up or taking Aiden to school because he went to different schools. He was in preschool.
And it had who was driving, and then the teachers were inquiring who was -- asking him who was taking the kids, and then it had the teacher where my car was that night. And it just so happened that that preschool teacher lived across the street from me and was saying that my car wasn't in the driveway. And it happened to be a Wednesday night at 10:00 p.m.
Q. So what does that have to do with him being a police officer?

MR. WHITTAKER: Objection to the form. You can answer the question.

THE WITNESS: Well, in that particular capacity, it doesn't. But, I mean, I can give you -- if you want me to speak to the -- in this particular case, I can.

BY MR. GOTTESMAN:

Q. I don't understand what you mean. I am asking -- so you said that he has driven conflict in his capacity and retaliated against you in his capacity as a police officer acting under color of state law, and so I am trying to get to that.

A. Okay. So -- well, he obtained information on Brendon Taylor.

Q. That's the second part. This --

A. Okay.

Q. I will come to that, trust me. I am taking it in the order presented in your complaint, so --

A. Okay. I mean, I guess I don't -- it's just he has been the driving force of conflict this entire time through our custody dispute. And I can give you more examples, but --

Q. So, in fairness, I understand that's

your perspective. But you would agree with me that in the contempt proceedings that was decided by Judge Sundermann, she declined to find Officer Hooven in contempt. But she did find you in contempt for multiple violations of the DR court documents, correct?

A. Correct.

Q. So -- and that focused on conflict between you and who was at fault in those conflicts, correct?

MR. WHITTAKER: Objection, calls for a legal conclusion. You can answer.

THE WITNESS: I mean, she did. But there was two jails [sic] who actually sided with me. And I was going to appeal it. But I didn't want to spend more money, so I opted not to.

BY MR. GOTTESMAN:

Q. When it comes to Mr. Taylor, do you believe it's a legitimate concern for Jesse Hooven whether or not Mr. Taylor presents a threat or a risk to his children?

MR. WHITTAKER: Objection, vague and speculative. You can answer.

THE WITNESS: Yes and no.

BY MR. GOTTESMAN:

Q. What's the no part?
A. I feel like he should respect me enough as the mother of his children and my judgment as to who is around my children, who I allow around my children.
Q. In a perfect setting, that, of course, would be the case. But you would agree with me that in a divorce, that's not exactly the situation in which you two exist, right?
MR. WHITTAKER: Objection, vague and speculative. You can answer.
THE WITNESS: Well, then maybe he shouldn't have an affair.
BY MR. GOTTESMAN:
Q. No doubt. Fair enough. However, here we are, right?
A. Correct.
Q. And you would agree with me that interaction -- the Evan person was -- would you agree with me that was maybe a poor decision on your part to introduce your children to Evan?
A. Dating is difficult. And I took -- we took the kids out to dinner, and we took them out to one of those, like, Dave & Busters type situation. As soon as I found out what I found

out, I immediately ended the situation. He is the one -- he, as in Jesse -- is the one who referred to Evan as my boyfriend. I never referred to him as that. So that being said, I mean, I ended that immediately.

Q. To be clear, though, you met him on a dating app, right?

A. Correct.

Q. And -- all right. Well, I get what you are saying. Let's keep moving. Did you ever take your kids to Evan's house?

A. No.

Q. Do you recall that Evan had a parrot?

A. Yes.

Q. Did your kids meet the parrot?

A. Willow did -- so I take that back. Willow did not, Aiden did.

Q. Did she travel with the parrot?

A. That's what I'm saying. I correct myself. I let Aiden meet the parrot, Willow did not.

Q. What kind of parrot was it?

A. A gray one.

MR. WHITTAKER: Is the parrot a witness in this case? It hasn't been disclosed.

BY MR. GOTTESMAN:

Q. All right. Do you recall an incident where you had entrusted the children to Mr. Taylor and they were -- Willow had been bullied at a park?

A. Yeah. I think they -- the kids are riding by and they called Willow, like, a name, like idiot or something. Yes, I do remember that.

Q. When was that?

A. I don't remember the date. It was early on in us dating.

Q. Would that have been before he moved in?

A. I don't recall.

Q. Did you share that situation with Mr. Hooven?

A. I did, yes.

Q. Did you send him a -- explain that. How did you share that with him?

A. I don't remember the specifics leading up to it. I was frustrated that -- that Willow was, like, called names or something. It was so long ago. I don't remember the exact specifics, but I remember sharing it with Jesse.

Q. And do you recall that Mr. -- did

Mr. Taylor not share that information about that incident with you right away?

A. No. Because I talked to Brendon about it, and he said he handled it after the fact.

Q. So explain that to me. What happened?

A. Honestly, it was so long ago. I don't remember the exact specifics. I just remember that the kids were on their scooters because there is, like, a big bike path right by Brendon's shop. And I guess the kids -- older kids drove by, maybe a couple years older, and called Willow, like, an idiot or something, and Willow was upset.

Q. Was that incident that we just talked about, the bullying and name-calling at a park, was that the incident that brought this disclosure to your knowledge about Mr. Taylor's history?

A. It was.

Q. So does that orient you to time?

A. Yeah. I mean, yes, I know what you are talking about.

Q. So was he living with you at the time?

A. I believe so, yes.
Q. You had left both Aiden and Willow in Mr. Taylor's care?
A. Yes, because it was around Easter time. I had to work at the hospital. Because I remember they were on their scooters. And they also got cookies that day because I have a picture.
Q. So you were -- were you regularly leaving the children in Mr. Taylor's care?
A. No. They just went to the shop that day because I believe it was around spring break.
Q. Okay. Was that the only time you have ever left the children in Mr. Taylor's care?
A. No. I mean, they have been with him before, but they were -- they went with him to the shop that day. They were able to go to the park and ride their bikes and scooters and things like that.
Q. So would you regularly leave -- at this time frame between February of '23 and March or April of '23, would you regularly leave the children in Mr. Taylor's care?
A. No.
Q. How many times did you do it, if you

had to estimate?

A. I don't know.

MR. WHITTAKER: Don't estimate. If you know the answer, you can answer it. If you don't know, you don't know.

THE WITNESS: I don't know.

BY MR. GOTTESMAN:

Q. More or less than five times?

A. Less.

Q. Have you made any complaints other than the complaint we are here to discuss today in Federal Court to either the police or CCA or any other agency regarding Mr. Hooven?

A. No.

Q. Did you file a complaint with CCA? Do you know what I mean by that?

A. Yes, I do. I guess you could say Brendon and I did. Or I think --

Q. I am talking about you.

A. I think Brendon did.

Q. Okay. Did you?

A. I don't know.

Q. Did you file a complaint -- did you call the Cincinnati Police Department?

A. Brendon did.

Q. Did you?

A. No.

Q. Have you been interviewed by the Cincinnati Police, internal?

A. No.

Q. Were you interviewed by CCA?

A. No.

Q. Have you ever met Madison Paul before?

A. No.

Q. It's my understanding she testified in a domestic relations hearing. Do you recall that?

A. She testified to what?

Q. During your domestic relations hearing.

A. Yes. That's what I first met her.

Q. Did you meet her?

A. That's when I first met her, yes.

Q. Okay. But, I mean, it's one thing to have somebody come and be a witness. It's another thing to actually meet somebody. Like I introduced myself when you walked in today, correct?

A. Correct. I mean, so I have seen her,

but I wasn't like -- that's the first time I ever saw her.

Q. Have you ever talked to her?

A. No.

Q. Other than seeing her come into court and testify?

A. No.

Q. Do you have her phone number?

A. No.

Q. When it comes down to -- is it fair to say when it comes down to communications between Jesse Hooven and Madison Paul, you have no firsthand personal knowledge of those communications?

A. No.

MR. WHITTAKER: Objection.

THE WITNESS: Oh, I'm sorry.

MR. WHITTAKER: No, go ahead.

THE WITNESS: No, I have no idea.

BY MR. GOTTESMAN:

Q. So I asked that question in the negative. To be clear, do you have any firsthand personal knowledge of the communications between Madison Paul and Jesse Hooven?

MR. WHITTAKER: Objection, calls for

a legal conclusion. You can answer.

THE WITNESS: I have no -- no, I don't know.

BY MR. GOTTESMAN:

Q. On April 11th -- turn to page 13 of Exhibit 6.

A. Okay.

Q. There is an allegation that Jesse Hooven sent you a text message with excerpts from those text messages reproduced on page 13. Do you see that?

A. I do.

Q. What was the context in which Jesse sent you that text message?

A. This is him saying -- he is referring to Exhibit 5 initially about the sexual abuse risk. And then he is going on to say that I am leaving the children with somebody who has been physically and sexually abused as a child, which is Brendon. And then he is going on to say that Brendon's son -- there is some sort of custody issue or JFS dispute with Brendon's son in Tennessee.

Q. Okay. Let's break that down. First of all, do you know if Brendon Taylor was ever a

victim of physical or sexual abuse as a child?

A. Brendon told me that he was physically abused as a child.

Q. Did he say by who?

A. His dad.

Q. Did he tell you his age?

A. No.

Q. And what was the nature of that abuse?

A. It was just more or less too rough, like, reprimanding. Like when they were -- when he would get in trouble that the physical, like, reprimand would be too rough.

Q. Corporal punishment?

A. Thank you. Yes.

Q. So his father administered corporal punishment that was in Brendon's --

A. In Brendon's eyes, it was too --

Q. Excessive?

A. Correct. Thank you.

Q. Did Brendon say he filed a complaint about that?

A. He said he called the police.

Q. How old was he when he did this?

A. He did not tell me.

Q. His father's name is Daniel Lee Taylor?
A. I am referring to his stepfather.
Q. That's Mr. Pernia?
A. Correct.
Q. Jason Pernia?
A. Correct.
Q. And Jason Pernia is married to his mother, Traci Pernia?
A. Correct.
Q. At what point did Traci Pernia and Daniel Lee Taylor get divorced?
A. Brendon and his sister were very young, like three, four maybe. Because I think Brendon was five when Jason and Traci got married.
Q. And after they got married, did -- let me start over. Was there an explanation given to you about what kind of corporal punishment? Was it a whipping with a belt? Was it beating him with his fists, anything like that?
A. I think it was, like, spanking on the butt. Brendon never went into too much detail.
Q. What was the nature of the conduct for which the discipline was applied? Did he tell you?

A. I think if the kids were acting up, like typical kids do, or Brendon was talking back. I mean, Brendon didn't go into too much detail, but...

Q. When did he tell you this? When did Brendon tell you?

A. I mean, earlier on in the relationship. So, I mean, I -- you know, when we were talking about getting -- you know, getting to know each other.

Q. Was it before he moved in with you?

A. Yes.

Q. Did he explain why if he was being excessively punished his mother didn't intervene?

A. I mean, we discussed that.

Q. What did he say?

A. He just felt like his punishments were too -- his dad was just too rigid. And then JFS stepped in, and then they closed the case.

MR. WHITTAKER: By dad, do you mean stepdad?

THE WITNESS: Correct. He refers to him as his dad. So I always just say dad because they have a good relationship.

BY MR. GOTTESMAN:

Q. So where did he live when this happened?
A. Brendon? He lived with his dad and his mom, so stepdad. I keep saying his dad, his stepdad.
Q. My question was where did they live?
A. I don't know. I mean, in Miamisburg.
Q. Did he tell you what police agency it was?
A. I believe that's Montgomery.
Q. Montgomery County?
A. Correct.
Q. But was it Miamisburg Police, Montgomery County Sheriff?
A. I don't know.
Q. Any discussion -- did he tell he you called 9-1-1?
A. I don't know.
Q. And did he tell you what, if any, action followed those complaints? The police arrived? JFS was involved?
A. I don't know.
Q. My question was did he tell you?
A. Oh, sorry. No.
Q. Did you ask?

A. No.

Q. The next step in this email talks about Brendon being contacted regarding a child in Tennessee.

A. Yes.

Q. Do you see what I am talking about? Now, it's my understanding Mr. Taylor has a son named Carson?

A. Correct.

Q. How old is Carson now?

A. He will be 16 on the 24th -- or 23rd.

Q. And do you know Carson's mother's name?

A. I do.

Q. What's her name?

A. Paige.

Q. How do you spell that?

A. P-A-I-G-E.

Q. What's her last name?

A. Reed.

Q. Spell that.

A. R-E-E-D.

Q. Two Es?

A. Yes.

Q. And does Carson stay with you

occasionally?

A. He does.

Q. How many times has he stayed at your home?

A. He stays over the holidays and stays for the summer.

Q. How many times has he stayed with you, a dozen times?

A. Yes.

Q. Something like that?

A. Yes.

Q. And what's the age difference between Carson and Willow, seven years?

A. Yes.

Q. Do you recall an incident when you lived in Kentucky that Carson was roughhousing with children and knocked out -- or somehow a child lost a tooth during roughhousing?

A. Yeah. They were playing with pillows. And a little girl had braces, and it got stuck in the carpet. And her tooth got loose.

Q. How old was that girl?

A. Well, I don't know at the time. Now -- she must be 13, 14 now.

Q. Was she -- younger than Carson?

A. Correct.
Q. And older than Willow?
A. Yes.
Q. And ultimately, the children were in your care when that happened, correct?
A. Yes.
Q. And you weren't supervising the horseplay when it happened, correct?
MR. WHITTAKER: Objection, speculative, vague. You can answer if you know the answer.
THE WITNESS: I did not see it happen, correct.
BY MR. GOTTESMAN:
Q. Where were you when it happened?
A. In the other room.
Q. So what room were you in?
A. I was in my room, and they were in Willow's room.
Q. Ultimately, that child losing her tooth resulted in a falling out between you and Alyssa Royer, the child's mother, correct?
A. She didn't lose her tooth. It got wiggly because she had braces, but yes.
Q. Did you know Mr. Taylor when an issue

arose regarding Carson and his welfare in Tennessee?

A. No.

Q. Do you know the story to which I am referring?

A. Vaguely.

Q. What is your understanding of what happened?

A. Something with either the mom wasn't there or there was school placement or something. I am not entirely sure.

Q. Did you understand at some point Mr. Taylor, Brendon Taylor, was encouraged to seek emergency custody of his son by the Montgomery County JFS?

A. I wasn't informed of that.

Q. Were you informed that he had declined to seek emergency custody of his child?

A. That's not my understanding of the situation.

Q. What is your understanding then?

A. That -- from what Brendon told me, that he was trying to get custody of Carson.

Q. What efforts do you understand that he took in that regard?

A. I honestly don't know. I mean, I know that he had Carson for a period of time over COVID. But from my understanding, that wasn't the situation, what Jesse is telling me in this text message.

Q. At any point did Jesse tell you that he had used a law enforcement database to do background searches on Brendon Taylor?

A. No.

Q. Did you ask him if he did?

A. I asked him how he obtained the information.

Q. And did you do that in text form?

A. I did.

Q. And he responded that he learned it from a JFS worker, correct?

A. Yes.

Q. Did he ever tell you he solicited the information from the JFS worker?

A. I would have to look at my text messages to see.

Q. Do you have your phone here?

A. I do.

Q. Go ahead.

MR. WHITTAKER: Let's go off the

record.

(Thereupon, an off-the-record discussion was had.)

(Thereupon, Exhibit 7, series of text messages, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. Did Jesse Hooven ever tell you he solicited that information from the JFS worker?

MR. WHITTAKER: Objection, vague. You can answer.

THE WITNESS: No.

BY MR. GOTTESMAN:

Q. Exhibit 7 I have handed you is a text exchange between you and Officer Hooven from April of 2023, correct?

A. Correct.

Q. Have you had a chance to review it?

A. Yes.

Q. Does it accurately reflect your exchange that day?

A. It does.

Q. And it starts with a screenshot of a text from Brendon about the incident at the park, correct?

A. Yes.

Q. So what happened after Mr. Hooven sent you that text? What did you do next?

A. I called Brendon because I was aware of the physical stuff, and I told Brendon that somehow Jesse was aware of this stuff and some of the other stuff. And Brendon was like, I don't know what you are referring to in regards of sexual abuse. I have never been sexually abused before.

And he was pretty upset, and he called Cincinnati Police. And I believe then Jesse told me to go to their site and look it up. Like I said, I didn't do it. Someone that works there told me this stuff. And I said who is this person that told you that information, and he said it was Madison, I don't know her last name.

And I was trying to find out when did he speak to her, and he wouldn't tell me, wouldn't tell me when, wouldn't tell me her last name, wouldn't give me any information. And then Brendon went and called his district to try to make a formal complaint, and they really gave us the runaround. So then Brendon -- and were not helpful and actually pretty rude.

Q. Hold on a second. You say gave us the runaround. It was just him on the phone, right?

A. It was just him on the phone. But then I had gotten off because I worked at 5:00 a.m. So at that time I was still just strictly in perk, not working from home, which perk is the ED. So I was 5A to 3P. And so I got home, and he left work early that day. He wasn't with the sheriff's department -- or yeah.

So I left work, and then I went home. And Jesse had the kids that day. And I met him at the house. And we tried calling CPD again because I remember Jesse saying I was harassing him and he was going to file a motion for harassment because we called CPD. And we called CPD again, and whoever his higher-up was really rude on the phone.

Q. So when you -- what district were you calling?

A. He was District 5 at that time. Because I know there is no other District 5, and he was very rude.

Q. And you said we were calling. Whose phone was being used?

A. I believe it was Brendon's.
Q. And when you say we, were you on the phone with him?
A. He was on speaker because I remember just literally saying just hang up the phone, they are not going to do anything. I remember being in the background saying that.
Q. Now, when you call a district and you ask who you are speaking to, they give you their name, correct?
A. I don't remember who it was. I just remember being very upset because they were extremely rude, whoever we spoke to.
Q. So we are talking about -- to get this oriented to time, when Jesse -- when you -- this screenshot that started this interaction looks like it came sometime in the early morning, 8:27 a.m.?
A. Yes.
Q. On April 11th, right?
A. Correct.
Q. So where were you at the time you received this?
A. I was in the ED.
Q. Emergency department at Children's

Hospital?
A. Correct.
Q. And the children were with?
A. Jesse.
Q. Now, it references an incident that took place at the park the prior day, correct?
A. Yes.
Q. And so the children had then been handed off to Jesse sometime after the park incident, correct?
A. Yes.
Q. And then you responded with a screenshot from Brendon Taylor; is that right? Because Jesse wouldn't have had text exchanges with Brendon Taylor, right?
A. I'm sorry. Can you repeat that?
Q. Do you see that on the front page of Exhibit 7? That's a screenshot from a message exchange with Brendon Taylor, isn't it? Stay on the first page.
A. Oh, yeah, I got you. Yeah, I think I sent this. I screenshot my text message to what Brendon had said and sent it to Jesse. Yes, I am with you, yes.
Q. So it says that that happened to

Willow?

A. Yes.

Q. And then you sent Jesse a screenshot?

A. Of what -- Brendon's response.

Q. Correct.

A. Yes, I'm with you.

Q. And then the next page is shortly thereafter at 8:37. You are texting Jesse: Brendon didn't tell me because I was frustrated last night and went straight to bed.

A. Correct.

Q. So do you recall what it was that had you frustrated the night before?

A. I don't know. And I also went to bed because I had to be up at 3:30 to be at the hospital.

Q. Is it your testimony that at the time you received that, you had already been apprised of the history of him -- of Brendon Taylor being subjected to excessive corporal punishment by his father and involving the police and JFS?

MR. WHITTAKER: Objection to the form. You can answer.

THE WITNESS: I wouldn't say excessive. But I knew that there was some sort

of, like, in his mind physical, yes.
BY MR. GOTTESMAN:
Q. He told you it was excessive corporal punishment, right?
A. Yes.
Q. And that he had called the police and the police had involved JFS, right?
A. Correct.
Q. So my question to you is, is it your testimony on April 11th, you were already aware of those allegations?
A. Yes.
MR. GOTTESMAN: Do you have a conference room that's available?
MS. MCCLANAHAN: There is one right in the back, yes.
MR. GOTTESMAN: Can I see you and you two? You can come if you want. I just have a question.
(Recess taken.)
(Confidential portion redacted.)
BY MR. GOTTESMAN:
Q. Turn if you would to page 18.
A. On which document?
Q. Of Exhibit 6.

A. You said 18?
Q. Yes, ma'am.
A. Okay.
Q. This is part of your first count of your complaint. Count 1 starts on page 17.
A. Okay.
Q. This allegation is -- it's paragraph 78. It's alleged in your complaint that Officer Hooven abused his authority as a public official by approaching Madison Paul to access confidential SACWIS data related to Mr. Taylor.
My question for you -- pretty simple -- do you have any personal knowledge that that, in fact, happened? It's a yes or no question.
A. Yes.
Q. What is your personal knowledge?
A. That he wouldn't have been able to obtain that information without being a police officer.
Q. Okay. Do you know that he actually approached her as opposed to her volunteering the information to him?
A. Can you repeat the question?
Q. Do you know if he actually approached

her versus her giving him the information unsolicited?

A. No.

Q. Okay. Is it your testimony that he would not have been given that information were it not for his employment as a Cincinnati police officer?

A. Can you repeat the question?

Q. Is it your testimony that he would not have been given that information but for his employment as a Cincinnati police officer?

A. Yes.

Q. Once he had that information in his possession, keeping in mind the context where you had sent him a screenshot of the graphic from Fox News talking about potential risks to children from -- and single parents being around other adults. Do you remember that?

A. I do.

Q. That's the context I am referring. Once he was in possession of the information that Mr. Taylor may have a history of being a victim of abuse, do you believe Mr. Hooven had the duty to inform you as the children's parents?

A. No.

Q. Do you understand why -- that he did have a duty to look out for the welfare of his children?

MR. WHITTAKER: Objection, vague. You can answer.

THE WITNESS: He did it in the wrong way, so no.

BY MR. GOTTESMAN:

Q. Let me ask it. Do you understand that a father has a duty to look out for the welfare of their children?

A. Yes.

Q. Okay. And Mr. Hooven had that duty to Aiden and Willow, to look out for their welfare --

A. Yes.

Q. -- right? And if he comes into information relevant to their welfare, do you think he should share that with you?

A. Is this just a yes or no question, or do you want more information?

Q. I am going to ask for a yes or no. But if you would like to explain after answering it, that's fine with me. I am not going to try and limit you.

MR. WHITTAKER: Do you know what he is asking you?

THE WITNESS: I do. Should I give more information?

MR. WHITTAKER: Answer his question is all you have to worry about doing.

THE WITNESS: Okay. I'm sorry. Can you ask it again?

(Question read.)

MR. WHITTAKER: I am going to object based on the lack of foundation. You can answer.

THE WITNESS: Yes.

BY MR. GOTTESMAN:

Q. At some point in your DR proceedings, did you testify that if you two were getting along this wouldn't have been a big deal?

MR. WHITTAKER: Objection, irrelevant. You can answer.

THE WITNESS: I honestly don't remember at this point.

BY MR. GOTTESMAN:

Q. If you two were getting along and he shared -- came into this information and shared it with you, would it have been a big deal to you then?

MR. WHITTAKER: Objection, speculative. You can answer.

THE WITNESS: Not under the circumstances of how he obtained this information, no.

BY MR. GOTTESMAN:

Q. Because it was a bad question, I am confused. What do you mean by that?

A. Because I still feel like the law was broken.

Q. Okay. And that is that Mr. Taylor's information from the child abuse database was improperly --

A. Both Jesse and Madison broke the law, yes.

Q. How did Jesse break it?

A. He should not have been able to because he is a police officer go to JFS and obtain information under a database by going to Madison, which is a sealed document or a sealed classified, however you want to preface it, and obtain information because his ex-wife is dating somebody and obtain that information. And Madison should not have given that information to Jesse because he is a police officer. They both broke

the law.

Q. Do you know that Jesse went to do that? I have asked you before.

A. The only possible way that she would have gained that information because she doesn't know me is that Jesse gave her Brendon's first and last name and his date of birth. And how Jesse obtained Brendon's last name -- or, well, his last name and also his date of birth I do not know because we were not on talking terms.

Q. Okay. So did you -- had you not disclosed your relationship with Brendon Taylor to Jesse?

A. No. Because he didn't also disclose that he was dating Emma, and the only reason why at that time --

Q. Let's leave Emma out of it for a second.

A. Okay. No, I did not, because we weren't on those terms.

Q. So as you sit here now, do you know how Jesse knew that you were dating somebody named Brendon Taylor?

A. I have no idea.

Q. Now, let's talk about this. That

day, April 10th, I believe, you had left the children with Mr. Taylor, correct?

A. Yes.

Q. And then that evening or later that day, Aiden and Willow were handed off to Officer Hooven, correct?

A. There's been so much time that has passed and so many things that have transpired since then. I think the very first time he may have seen Brendon in the car was when we were going to my grandfather's funeral. And then since then, it has just snowballed from there. But no, I did not tell Jesse that I was dating Brendon until -- I mean, he just -- I -- no, I didn't tell him.

Q. When did your grandfather's funeral occur?

A. It's been several years since he has passed.

Q. So we are talking about April 11th when this information is shared with you. It had to be before that, right?

A. Well, correct. And I don't remember the exact date. I would have to ask my dad.

Q. But you were in a -- April 11th and

early February I think is the time frame --
A. Correct.
Q. -- during which you started seeing Mr. Taylor?
A. Correct.
Q. Sometime in that time frame, your grandfather's funeral occurred?
A. Yes. I think it was sometime in March. I remember it was, like, springtime.
Q. Now, the children had met Mr. Taylor, correct?
A. Uh-huh, yes.
Q. And they could have told Officer Hooven Mr. Taylor's name, right?
A. Yes.
Q. So you don't know when that happened?
A. No.
Q. Did your children know his name when they met him?
A. Well, yeah, they know his name.
Q. First and last name?
A. Yes. But I'm positive they don't know his birthday and the year.
Q. Do you have social media?
A. I think I just have Facebook.

Q. On social media do you update it like to reflect -- to talk about what you are doing, when you do it?

A. At that time I didn't have social media.

Q. In April of '23, you didn't have social media?

A. No.

Q. Do you have Facebook right now?

A. Yes.

Q. And have you deleted any postings off Facebook or done anything to disable the account?

MR. WHITTAKER: Objection to the form. You can answer if you understand what he is asking.

THE WITNESS: I have gone on and off of it, just for personal reasons. But I know my birthday is not on there. My work is not on there. I deleted it when I divorced Jesse. So I only have, like, 200 friends. So I am just very personal about social media.

BY MR. GOTTESMAN:

Q. When you got the decision in October of '25, regarding custody, how did that affect you?

A. I was upset. But ultimately, it didn't change my parenting schedule with the kids, and that's what matters. You know, I was going to appeal it but decided it was just a never-ending, like, money pit, so to speak. So I decided not to appeal it because it's -- my time with the children does not change, and that's what matters.

Q. So has your relationship -- was there a marked change when Mr. Taylor was introduced into the equation?

MR. WHITTAKER: Objection, vague. You can answer.

THE WITNESS: Yes. But I feel like every time I tried -- historically tried to date somebody that there is a shift.

BY MR. GOTTESMAN:

Q. Things get worse and more contentious; is that what you are saying?

A. Correct.

Q. Okay. Mr. Taylor and Mr. Hooven have had a contentious relationship. Would you agree?

A. Yes.

Q. They throw barbs back and forth at each other?

A. Yes.

Q. Is that ongoing, or has that stopped?
A. They don't speak to each other.
Q. So is it still contentious between them, or not?
A. If not speaking to each other is contentious, then yes.
Q. Has your relationship overall with Officer Hooven been about the same, gotten worse since Mr. Taylor's presence in your life?
A. We only communicate on OFW, Our Family Wizard. We only speak in person if absolutely needed. I follow the decree to a T, and I would imagine he does the same. And I keep it moving.
Q. Have things smoothed out then since October of '25?
A. For the most part, yes.
Q. And with regard to your state of mind, your mental well-being, how do you break it down between what you attribute to having a contentious divorce versus this particular situation where Brendon Taylor's history as a victim of abuse was disclosed to you?
MR. WHITTAKER: Object to the form of the question, but you can answer it.

THE WITNESS: So the divorce itself wasn't contentious. It slowly evolved over time to be contentious. I feel as though Jesse didn't disclose the information or obtain the information to -- with good intent. I feel like that there was malice behind it, if that's answering your question.

BY MR. GOTTESMAN:

Q. It's really not.

A. Okay.

Q. What I am getting at is your state of mind.

A. Yes.

Q. You have made a complaint where you say you suffered compensable harm.

A. Yes.

Q. I can take you directly to it, if you would like to see it. Let's go to page 20, paragraph 87.

A. Paragraph what? I'm sorry.

Q. 87. It says: As a direct and proximate result of Officer Hooven's retaliation against Holly Hooven and Mr. Taylor in violation of the First Amendment, Plaintiffs have suffered compensable injuries.

A. Okay.

Q. And I am asking you what are you referring to there?

A. I have had multiple people bring it up to me at work. I -- even Willow, when she was in therapy for us going to -- going through our divorce or our -- not divorce but going through our court issues, her therapist brought it up saying that he saw it in the news, saw it in -- saw it in the newspaper.

I have had a coworker bring it up to multiple other colleagues. I have had Jesse throw it in my face saying that I'm only after money, that -- you know, that even though I am, quote, unquote, a private person that I am, you know, now throwing Brendon's abuse and splashing it all over the news.

And, you know, although it is -- it's something that needs to be brought to an attention because the law was broken. So it has been very difficult to deal with and hard. And it's difficult for my kids because I don't want them to know the difficulties between their dad and Brendon and myself, but I feel like this needs to be addressed properly.

Q. So I understand there is some publicity that you are complaining of.
A. Correct.
Q. And that was -- after this lawsuit was filed, colleagues, people you encountered at the DR court had brought up that they are aware of this lawsuit?
A. Correct.
Q. Prior to filing the lawsuit what injuries, if any, had you sustained?
A. I mean, multiple stress, frustration. I mean, it's just been a lot to handle with as far as just the ongoing, like, stress from Jesse and just the constant berating and harassment.
Q. So my question for you is prior to the publicity and not related to the publicity, how do you distinguish between stress related to your divorce and the contentious relationship with Jesse and the -- Jesse's disclosure to you of Mr. Taylor's history as a victim of abuse?
A. Well, it just -- it's never ending. It's just constant with Jesse. I guess I don't understand your question.
Q. So let me break it down till you get it. You are claiming compensable injuries

occurred when Jesse made a disclosure to you of Mr. Taylor's history of abuse, right? You are making that allegation, that you have suffered a compensable injury by virtue of Jesse Hooven disclosing to you Mr. Taylor's history of abuse. Am I right?

A. Yes.

Q. What are those injuries related to that disclosure?

A. I mean, I already kind of told you. I don't know how else to explain it. I just feel like it's the never-ending -- that there is no privacy from Jesse. I can't live my own life. I can't -- you know, we got a divorce.

I am trying to move on. I am trying to break away from him, and I feel like I can't. And so I -- it's never ending. I feel like this is constant harassment, and I just can't break free. And so it's just -- it's constant.

Q. So he brought up Mr. Taylor's history --

A. Yes.

Q. -- on one day, April 11th, 2023?

A. Yes.

Q. And since that time, he didn't bring

it up repeatedly or over and over again, did he?
A. No.
Q. In fact, my understanding is he sent Mr. Taylor an apology that Mr. Taylor purported to accept. Have you seen that text message?
A. He was ordered by the GAL to send an apology. But he refused initially, and Brendon apologized first.
Q. My point is he brought up -- he made the disclosure to you on April 11th. And then that was it, correct? He didn't keep bringing it up over and over again, did he?
A. I don't remember at this point.
Q. In any event, my question is can you -- other than -- set this aside. Set the -- entire Mr. Taylor disclosure of confidential information related to him, set that aside.
A. Okay.
Q. Your divorce was contentious --
A. Yes.
Q. -- prior to that and after that, right?
A. No, our divorce was not contentious. It was after the divorce, like, it snowballed up to that point. Our divorce was -- we had a

dissolution of marriage.

Q. All right. So after the dissolution, things started to get contentious, I think you told me, any time you would try and move on with your life and meet someone new --

A. Yes.

Q. -- right? And that's been the pattern that you have observed?

A. Yes.

Q. So what is new, distinct, or different for you now that you attribute to this disclosure of Mr. Taylor's history, if anything?

A. I mean, if anything, I just feel that the law was broken. He broke the law. He is an officer of the law. He enforces the law. He -- and he has broke it, and justice needs to be served. He is no different. He is not above it.

He enforces it. He needs to be held for what he did. He needs to be held accountable. Just because he is my ex-husband, just because he is the father of my children doesn't mean that he is -- it doesn't matter.

Q. And when you say he broke the law, to be clear, you are saying he actively pursued this information?

A. Yes. And even if --
Q. Okay. But --
A. Yes, yes.
Q. Sorry to cut you off, but I am trying to keep it -- other attorneys want a shot at taking questions, too, I'm sure by now especially. My point to you is you don't know what transpired between Jesse and Madison Paul. You have no idea what they said or didn't say to each other, correct?
A. No.
Q. I am correct?
A. Correct.
Q. Okay. And when you say he broke the law, you are basing that on some understanding of actions undertaken by Officer Hooven, correct?
A. Correct.
Q. And I am trying to get to it. You believe he actively solicited this information?
A. Correct.
Q. But you don't have any personal knowledge that that did, in fact, occur, correct?
A. Because I don't know Madison Paul. And the only way she would have obtained that information because I know Jesse is that she got

that information from Jesse.
Q. And, again, that's a presumption on your part, not something of which you have personal knowledge?
A. Correct.
Q. I am getting really near the end, for anybody who is counting. At some point, have you sought mental health counseling or therapy or treatment?
A. I did see a therapist when I was pregnant with Aiden. And then I kept seeing her for -- maybe up until he was two, maybe three.
Q. Who was that?
A. Pricilla Wood.
Q. Do you know the practice group with whom she is associated?
A. I think she is independent, psychologist.
Q. Where is her office located?
A. Oh, I'd have to Google it. I don't know off the top of my head. It's over on -- in Finneytown, I believe.
Q. When is the last time you saw her?
A. It's been several years. Aiden was, like, two.

Q. Aiden was two?
A. Yeah.
Q. So does that predate this incident?
A. Yes.
Q. Since this incident, this April 11th date, have you had any further mental health treatment?
A. I actually was going to reach back out to her. I did, and she is no longer in practice. She is retired.
Q. Have you sought treatment from any other mental health professional?
A. No.
Q. Just to be clear, I mean, relevant to the claims you are making in this case, have you sought any mental health treatment?
A. No.
Q. Any other physical manifestations of stress from a primary care physician, your OB/GYN, anything like that? Have you sought any other medical treatment for injuries you relate in your mind to this federal case?
A. I changed my mental health medication recently. But as far as, like, therapy, no.
Q. And you say you are on a mental

health medication. What is that?

A. Depression medication.

Q. And who prescribes it?

A. My primary.

Q. Who is your primary?

A. I am blanking on her name. I just switched. Can I grab my phone to --

Q. Yeah, of course.

MR. WHITTAKER: Off the record, please.

(Thereupon, an off-the-record discussion was had.)

BY MR. GOTTESMAN:

Q. Go ahead.

A. Alexandra Lawson.

MR. MUNAS: Can you repeat that?

THE WITNESS: Alexandra Lawson.

MR. MUNAS: Lawson. Thank you.

BY MR. GOTTESMAN:

Q. Is she a D.O., M.D., do you know?

A. M.D.

Q. What family practice is that?

A. TriHealth in West Chester.

Q. And what does she prescribe for you?

A. I can tell you.

MR. WHITTAKER: Off the record again, please, just while she is going through her My Chart.

(Thereupon, an off-the-record discussion was had.)

MR. WHITTAKER: Sorry, let's go back on.

THE WITNESS: Wellbutrin and Cymbalta.

BY MR. GOTTESMAN:

Q. C-Y-M-B-A-L-T-A?

A. Yes.

Q. And before you started seeing Dr. Lawson, you were on Wellbutrin and Cymbalta?

A. Yes. I started Wellbutrin when I was pregnant with Aiden. That was safe for pregnancies.

Q. And have you been on it continuously?

A. Yes.

Q. And when did the Cymbalta -- when was that introduced into your medical regimen?

A. That started because I noticed during this case that I was having more anxiety.

Q. So that started after the filing of this litigation?

A. Yes.
Q. And are you alleging that you have suffered any financial or economic loss as a result of the actions that are at issue in this federal case?
A. In this federal case?
Q. Yes.
A. No.
Q. Turn if you would to page 27 of your complaint, Exhibit 6. Paragraph 128 says: As a direct and proximate result, Plaintiffs have suffered compensable mental anguish, emotional distress, and psychological injuries so serious that no reasonable person could be expected to endure them and other compensable injuries in excess of the jurisdictional threshold of this Court.
Do you see that?
A. I do.
Q. Because this is likely the only time I am going to get to talk to you, Mrs. Hooven, I need to know if there is anything you want to add because I want to know everything that that entails. Is there anything you want to tell me that -- that I have not already covered with you

regarding emotional distress or injuries you allege are related to the conduct at issue in this case?

MR. WHITTAKER: Objection to the form of the question. You can answer.

THE WITNESS: No.

BY MR. GOTTESMAN:

Q. And then similarly, Count 8. That is Mr. Taylor's, so you don't have to worry about that. Just for purposes of the record --

MR. GOTTESMAN: And, by the way, for all counsel, my intention is for Defendants to use sequentially numbered exhibits starting where I am and continuing throughout. I don't care if somebody has a better idea how to do that, but I want to get these in the record.

(Thereupon, Exhibit 10, Complaint, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. I am going to hand you what I have marked as Exhibit 10, ask you if you recognize Exhibit 10. Let me see that one. I might have handed off the wrong one.

MR. GOTTESMAN: If somebody got a highlighted one, let me know.

MR. WHITTAKER: I just got the one with your notes, your handwritten notes, all over it.

BY MR. GOTTESMAN:

Q. Do you recognize Exhibit 10 as the investigation report from the CCA relevant to this matter?

A. I do.

Q. Have you seen this before?

A. I have.

Q. And then one last.

(Thereupon, Exhibit 11, Internal Investigations report, was marked for purposes of identification.)

BY MR. GOTTESMAN:

Q. Exhibit 11, look at that. Do you recognize Exhibit 11 as the June 22nd -- or June 25th, 2023, report from Cincinnati's Internal Investigations Section relative to Brendon Taylor's complaint?

A. I actually have never seen this.

Q. So you don't recognize it? That's fine.

A. No.

MR. GOTTESMAN: Unless somebody asks

some questions that trigger any need from me, I don't have any more questions for you. I appreciate your time, and I hope this wasn't too unpleasant for you.

THE WITNESS: Thank you.

MR. GOTTESMAN: I will yield my seat.

MR. PAUL: Can I take a couple minutes?

(Recess taken.)

CROSS-EXAMINATION

BY MS. MCCLANAHAN:

Q. Good afternoon, Ms. Hooven. My name is Mickey McClanahan. I represent Madison Paul in this matter.

A. Okay.

Q. So Mr. Gottesman went over a bunch of the rules and kind of how depositions flow, and you did a really good job at the beginning with him. But the only other kind of big thing for me is making sure you let me fully finish my question before you answer. It gets really awkward and it sounds really awkward because it's not how people talk. But for our court reporter, she can't transcribe if we are both talking or trying to talk over each other.

A. Okay.
Q. And then the other thing -- and you did a good job with him. There will be questions that are super unclear that I ask, I'm sure of it. If I ask a question and you answer, I am under the assumption that you understood the question. And your answer is under oath.
So if you are even a little bit unclear of what I am asking, just ask me to rephrase or ask again, and I'll do my best. I am sure there will be things that are confusing.
A. Okay.
Q. So we already covered a lot of this background stuff, so this part will feel really jumbled and kind of all around. We already went over the fact that you use Facebook. And you weren't using Facebook at the time this incident kind of all happened, correct?
A. Correct.
Q. Do you use any other social media platforms, Instagram, Twitter, X, anything like that?
A. No.
Q. Do you use any messaging apps, like WhatsApp, Snapchat?

A. I have Snapchat. I really only keep it because I have pictures of the kids when they were really little. And I just want to hold on to those, like little videos and things, but I don't actively use it.

Q. What's your Snapchat username?

A. I don't even know. Can I look at my phone?

Q. Yeah.

MR. WHITTAKER: Let's go off the record.

(Thereupon, an off-the-record discussion was had.)

THE WITNESS: HHooven1.

BY MS. MCCLANAHAN:

Q. Thank you. And you said you primarily communicate with Mr. Hooven through Our Family Wizard?

A. Correct.

Q. Is that by order of the DR court?

A. We put that in -- I think that was the March 7th entry, like agreed entry.

Q. And how do you primarily communicate with Mr. Taylor?

A. Text.

Q. Do you guys talk on the phone, too?
A. Yes.
Q. Do you FaceTime?
A. Sometimes if, like, I'm at home and I can't figure out something or the kids want to talk to him.
Q. Do you both have iPhones?
A. Yes.
Q. Have you deleted any texts relating to this case?
A. Not to my knowledge, no.
Q. Have you deleted any social media posts or messages that relate to this case?
A. No.
Q. So we went over that you met Mr. Hooven in 2013, correct?
A. Yes.
Q. You got married in 2015?
A. To Jesse, yes.
Q. And then the divorce to Jesse was finalized in 2018?
A. Finalized January 4th of '19.
Q. Of '19. And how was your relationship in 2019?
A. It was okay. It was okay, I guess

you could say it.

Q. How was your relationship in 2020?

A. About the same.

Q. 2021?

A. I mean, it's always ebbed and flowed. So, I mean, we were on talking terms. At that point, we were still texting.

Q. Okay. In 2022?

A. The same.

Q. When would you say it got bad?

A. It's ebbed and flowed. It really got bad when Brendon came in the picture. We went back to court prior to the March 7th entry, and that was because that's when I met Matt. And he refused to take Willow to St. Therese for preschool and then stated that he was only going to see Aiden. And that's why we did mediation and then came up with an agreed entry to the March, and then Brendon entered the picture.

Q. When did you meet Matt? I know we talked about him. But I don't think we got a date down when you guys met, dated, talked.

A. It was over the summer. I went on a summer trip, like a weekend thing. And then we stopped talking. Jesse found out about that. We

were still going back and forth because that lasted several months. And then --

Q. Summer of what year?

A. 2022, 2023. I don't remember. But at that point, Jesse and I were still at odds with each other.

Q. Okay. And there is -- we have talked about them extensively. There is domestic relations proceedings currently that were going on during 2023?

A. Correct.

Q. And they are still going on?

A. They are done now.

Q. They are done. When did they finish?

A. That was October of last year.

Q. October of '25?

A. Yes.

Q. What is your understanding of what this case is about as it relates to Ms. Paul?

A. That -- my understanding because I learned more in my family case is that Jesse was called out to -- to meet her to go check on a child. They exchanged phone numbers. During the course of their relationship, which was short-lived, he talked about me extensively,

complained about me extensively and then Brendon but said I had multiple men in and out of the children's lives or in and out of my home. And then he had asked her to gain information on Brendon, to which she looked up that information. And then she felt like he was -- the only reason why she talked to him -- or he talked to her was to use it as leverage.

Q. And how was that -- that information was communicated to you via a text?

A. That was in that text message when we were talking about Willow being called a loser in the park. And then he said that I am allowing somebody that's been abused around my kids and I need to ask my boyfriend for further information.

Q. Can you pull that exhibit back out? I think it's Exhibit 7.

A. Yes.

Q. So as we sit here today, is Mr. Hooven the only person that has shared the information on page 2, the long -- I think it's page 2, if you flip to page 2 -- page 3, that long message, page 3 of this exhibit. Is Mr. Hooven the only person that has shared that information with you?

A. No. Because I had another parent at St. Therese come up to me that I was relatively close with saying that -- and he wouldn't go into more detail because he didn't feel comfortable -- but saying that there was -- he was spreading a lot of information -- pretty bad information -- about me and Brendon at St. Therese.

Q. When was this conversation?

A. That was when -- Willow's last year. So that was 2023, I believe, when we knew all of this was going on. But I hadn't done anything with the information. I think at that time we may have -- or Brendon may have already filed a complaint with the Citizens Complaint Authority. But that was her last year at St. Therese.

Q. Who was this parent?

A. Steven -- I can't think of his last name. I would have to look to see if I can even find him on Facebook because I don't have him in my phone.

MR. GOTTESMAN: I'm sorry, I didn't hear. Did you say a first name?

THE WITNESS: Steve. But he was a father of one of Willow's friends in her class.

BY MS. MCCLANAHAN:

Q. And when in 2023 was this?
A. It was in the spring. We were both picking up our kids. Her [sic] daughter's name is Nora, the daughter. I can't think of the last name.
Q. And Steve approached you, correct?
A. Correct.
Q. And what did -- what exactly did Steve -- Steve, Nora's dad Steve, correct?
A. Yes.
Q. What did he share with you?
A. Asked me how things were going; knew that I was in a relationship with Brendon and told me that Jesse had been stating a lot of bad information. I tried to get more information. And he said he didn't feel comfortable, but that Jesse was saying a lot of bad stuff about me and Brendon. And then he wouldn't go into further detail.
Q. Was it Steve Whalen?
A. Yes.
Q. So you don't know what this information could have been because he just said it was bad information?
A. He didn't feel comfortable sharing.

Q. So you are -- kind of circling back. You allege that Ms. Paul accessed this information from SACWIS, right?
A. Correct.
Q. And that she shared this information with Mr. Hooven?
A. Yes.
Q. What information do you believe was accessed?
A. Brendon's child custody when he was little and then I'm assuming whatever CPS custody involving Carson when he was residing in Tennessee -- or is residing in Tennessee.
Q. This text from Mr. Hooven is all the information you received?
A. Yes.
Q. You never accessed SACWIS yourself?
A. No. I don't have access to SACWIS.
Q. And you have no independent knowledge of what was in those records?
A. No.
Q. So your understanding of what comes from SACWIS comes entirely from what Mr. Hooven told you?
A. I'm sorry, can you repeat that?

Q. Yeah. Your understanding of what was in the SACWIS records comes entirely from what Jesse Hooven told you?
A. Yes.
Q. And you have alleged throughout I think your answers to interrogatories that he is a liar?
A. Yes.
Q. So when do you think that this information was shared with Mr. Hooven?
A. Sometime before -- between the beginning of April to April 11th.
Q. So between April 1 and April 11th is your guess?
A. Yes.
Q. But you don't know an exact date?
A. No.
Q. And you don't know how this -- I know we kind of already got into this. You don't know how this conversation happened?
A. No.
Q. Between Madison Paul and Jesse Hooven?
A. No.
Q. When you received this message from

Mr. Hooven, what were your first -- what were your first thoughts?

A. I was astounded because Brendon and Jesse never spoke to one another. To my understanding, Jesse didn't even know -- you know, I would imagine he knew Brendon's name because of the kids but didn't know his last name, let alone his birthday and how he was able to even obtain any of this very personal information.

Q. Did you believe it?

A. No. I mean, I knew that there was physical stuff. But the sexual stuff and then the stuff regarding Carson, I had no -- didn't know what he was talking about.

Q. After you received this information, did you -- you conferred with Mr. Taylor?

A. Yes.

Q. How quickly after receiving this?

A. Immediately.

Q. Did you call him, or did you text him?

A. I called him.

Q. And did you tell anyone else?

A. No.

Q. No friends?

A. No.
Q. No family?
A. No.
Q. Just -- you just called Mr. Taylor?
A. Yes.
Q. Within the week, two weeks of that happening, did you guys confer with anyone else?
A. No. I just talked to Brendon.
Q. So just making sure I have the timeline. You received the message from Mr. Hooven on April 11th. You confer with Brendon that same day. You don't confer with anyone else. And then sometime along that timeline in the next few months, you file this lawsuit?
A. We waited a while to file the lawsuit because I honestly didn't know how to handle this situation.
Q. So between -- between the time that you got this text and you talked to Brendon --
A. Yes.
Q. -- before filing this lawsuit --
A. Yes.
Q. -- who else knew this information?
A. It was me, Brendon. I believe Brendon told his parents because he did -- he

still states he does not believe he has ever been sexually abused. And I will say being a social worker, there are cases where individuals are sexually abused, and they have no recollection of the sexual abuse. He still states he has no recollection of the sexual abuse.

I didn't even tell my parents any of this for a long time. So I can't -- I don't remember when I told my parents or my sister. And I might have told my best friend, Shelby. But other than that, I haven't told anybody.

Q. What is Shelby's last name?

A. Rouse, R-O-U-S-E.

Q. So you understand at this time prior to the filing of the lawsuit, Madison Paul told Jesse Hooven?

A. Yes.

Q. Who told you?

A. Yes.

Q. Who told Mr. Taylor?

A. Yes.

Q. Who told his parents?

A. Yes.

Q. And you told -- maybe told Shelby. And at some point, you told your parents and your

sister, but the timing of that could be -- is really close to the time of the lawsuit?

A. Correct.

Q. That's your understanding?

A. Yes.

Q. So -- but after the lawsuit was filed, a lot of people became aware of this?

A. Correct.

Q. And this case did receive media attention?

A. Yes.

Q. I am going to hand you an exhibit. And this is actually going to be out of order because I premarked my exhibits, sorry. So it's marked as Exhibit 103. I just started at 100 to be easy.

MR. MUNAS: Should we label it a second time? That probably won't help, would it?

MR. GOTTESMAN: The best-laid plans.

(Thereupon, Exhibit 103, Cincinnati Enquirer article, was marked for purposes of identification.)

BY MS. MCCLANAHAN:

Q. Have you seen this before?

A. I have.

Q. Have you read this full article before?
A. I have. And I only became aware of it because an old colleague texted me one night and said you are on the news, what is going on.
Q. So this was -- this article was posted -- updated, so -- on July 2nd, 2024; is that correct?
A. Yes.
Q. And when was your lawsuit filed?
A. I don't know at this time. I would have to look. I'm not sure off the top of my head.
Q. But --
A. Around that time.
Q. -- around at that time, right?
A. Yes.
Q. Okay. Have you spoken to any media about this case?
A. No.
Q. Has anyone contacted you?
A. No.
Q. But you are aware that this case has received some attention from the media?
A. Yes.

Q. And this media attention occurred after the lawsuit was filed?

A. Correct.

Q. So multiple -- you testified earlier that multiple people have brought this up at work?

A. Yes.

Q. And that's probably due -- is that due to the media attention?

A. Yes.

MR. WHITTAKER: Object --

THE WITNESS: Oh, sorry.

MR. WHITTAKER: That's all right.

THE WITNESS: Yes.

BY MS. MCCLANAHAN:

Q. So the media attention happened after the lawsuit was filed?

A. Yes.

Q. And looking back to a question that Mr. Gottesman asked you. And we are going to go to the complaint, which I believe is Exhibit 6. Let's go to paragraph 124. That's on page 26.

A. You said page 26?

Q. Yeah, page 26, paragraph 124. So we talked about this already, about the injuries that you have suffered. And you discussed that a lot

of people at work had been coming up to you, kind of colleagues of yours, maybe friends of yours, maybe friends at -- your kids' friends' parents, right? But that all happened after the lawsuit was filed?

A. Steve came up to me before --

Q. Okay.

A. -- the lawsuit, I know that for sure. And then once the lawsuit was filed, people came out after the lawsuit was filed.

Q. And that was kind of based -- what is your assumption?

A. The media attention.

Q. Okay. I am going to totally switch gears, okay?

A. Okay.

Q. So you understand that Ms. Paul worked for Hamilton County Jobs & Family Services, correct?

A. Yes.

Q. During your DR proceeding, I know CPS and JFS got really thrown around. And we call it JFS in Cincinnati because CPS is our public schools. I am going to call it JFS through all of this. Do you understand that JFS employees have

access to SACWIS as part of their job?
A. Yes.
Q. Okay. And that the information that is at the center of this lawsuit, at least Ms. Paul's role in this lawsuit, is obtained via SACWIS?
A. Yes.
Q. Okay. And without working at JFS, a person could not obtain that information?
A. Correct.
Q. And without working at JFS and obtaining that information, a person could not share that information?
A. Correct.
Q. So to be clear, you understand -- your understanding is that Ms. Paul's involvement, if any, comes from her role at JFS?
A. Correct.
(Thereupon, Exhibit 104, Child Abuse & Neglect Memorandum of Understanding, was marked for purposes of identification.)
BY MS. MCCLANAHAN:
Q. I am going to hand you an exhibit that's been marked 104. Have you ever seen this before?

A. I have not.
Q. Okay. You did produce this. I am not putting it on you for the fact that you have never seen it, but you did produce this. This is a memorandum of understanding between -- it's the Hamilton County Memorandum of Understanding. I will give you a second to kind of flip through it and look at it if you want before we dive into it.
A. Okay.
Q. Page 3, and this is just for some background, is the purpose section. Do you see that?
A. Uh-huh.
Q. Can you just read that into the record so that we can --
A. The whole thing?
Q. -- establish your background? Just the purpose section.
A. Purpose?
Q. Yep.
A. The memorandum of understanding sets forth the normal operating procedure employed by concerned officials in the execution of their respective responsibilities with respect to the following sections of the Ohio Revised Code.

Q. You can stop there. So do you understand -- and this aside for a second. Do you understand that the role of JFS is to protect kids?
A. Yes.
Q. That includes protecting children from harm?
A. Yes.
Q. And that includes investigating concerns involving kids?
A. Yes.
Q. So could you turn to page 5 of that? And go down to the very last paragraph.
A. Okay.
Q. It's -- the title is Hamilton County Department of Jobs & Family Services. Do you see where I am?
A. I do.
Q. Okay. I am going to read the first sentence. HCJFS is the local organization legally responsible for taking reports of child abuse, neglect, and dependency; investigating those reports; assessing the safety of children; and acting to protect child victims and children at risk.

Did I read that correct?
A. Yes.
Q. Is that consistent with your understanding of what JFS does?
A. Yes.
Q. So would it be reasonable to understand that Ms. Paul's job was to protect children?
A. Yes.
Q. So after you share the information with Mr. Taylor, he contacted JFS; is that true?
A. After he contacted CPD, yes.
Q. So he contacted CPD first?
A. Yes.
Q. And then he contacted JFS?
A. Yes.
Q. What was the timeline of that?
A. I believe he contacted JFS the next day.
Q. He contacted CPD the same day Jesse sent you that text?
A. Yes.
Q. Interesting. And there was a bit of confusion about Madison's last name I am understanding; is that correct? And if you don't

know --

A. I don't know.

Q. Okay. So based on your understanding, Mr. Taylor spoke with individuals at JFS; is that correct?

A. I'm sorry, can you repeat the question?

Q. Based on your understanding, did Mr. Taylor speak with individuals at JFS?

A. He did. And to answer your first question, I do believe there were two Madisons because my recollection is Brendon had left a voicemail to one Madison. Again, we got a little bit of a runaround initially, but yes.

Q. Okay. Do you have any understanding of what JFS did with Ms. Paul as a result of the report Brendon made?

A. She was put on unpaid leave for eight days but then returned to work after one day.

Q. I am going to give you an exhibit that's been marked 105.

(Thereupon, Exhibit 105, letter dated 6/1/2023, was marked for purposes of identification.)

BY MS. MCCLANAHAN:

Q. Have you seen this before?
A. No.
Q. You can look at both sides of this exhibit and kind of familiarize yourself. You just let me know when you are ready.
A. I'm ready.
Q. So you just testified that she was put on -- suspended for eight days?
A. Yes.
Q. After reading this, is this consistent with your testimony?
A. Yes. But she returned to work after one day is my understanding.
Q. On the back page it's marked Taylor.Hooven12. Other side.
MR. WHITTAKER: The bottom.
BY MS. MCCLANAHAN:
Q. If you read the very top sentence -- will you read that out loud?
A. This will notify you that you are suspended without pay from the position of Children's Services Worker for eight working hours to be served on the following dates: June 9th, 2023.
Q. So was she suspended for eight days

or eight hours?

A. Oh, eight -- eight working hours.

Q. Okay. So she was suspended for eight working hours as a result of what happened?

A. Correct.

Q. Okay. And then if you will flip to the front, this was just -- I just want to get the exhibit into the record. This is just the cover letter of what we just read --

A. Yes.

Q. -- is that correct? Okay, perfect. So Ms. Paul was not terminated for what happened?

A. No.

Q. Okay. I am going to hand you another exhibit. This one is marked 106.

(Thereupon, Exhibit 106, letter dated 9/18/2023, was marked for purposes of identification.)

BY MS. MCCLANAHAN:

Q. Have you seen this exhibit?

A. No.

Q. There is a front and back. We are really only going to talk about the front, but I will give you a chance. If you could just review the whole thing.

A. Okay.
Q. What is this exhibit would you say? The front page. Other page.
A. This one?
MR. WHITTAKER: Objection, calls for speculation. You can answer.
THE WITNESS: The front page, 106, is Madison Paul's letter of resignation.
BY MS. MCCLANAHAN:
Q. And when is this dated?
A. 9/18/2023.
Q. Could you pull back up Exhibit 105?
A. Okay.
Q. What is that dated?
A. June 1st, 2023.
Q. Okay. So Ms. Paul resigned from her job at JFS; is that correct?
A. Yes.
Q. And she resigned some months after she was suspended?
A. Yes.
Q. So as we sit here today, Ms. Paul was not fired as a result of any action alleged under this complaint?
A. No.

Q. Have you given any written statements about this case other than statements that have been made inside this complaint?

MR. WHITTAKER: Objection to the form of the question, but you can answer.

THE WITNESS: Can you repeat the question?

BY MS. MCCLANAHAN:

Q. Have you given any statements that aren't answers to interrogatories or answers to things that you would have written for this case specifically?

MR. WHITTAKER: The same objection. You can answer.

THE WITNESS: No.

BY MS. MCCLANAHAN:

Q. And then are there any facts -- and like Mr. Gottesman kind of outlined, we really -- this is the only time we really have to talk to you. Are there any facts that support your claims that you have damages against Ms. Paul --

MR. WHITTAKER: Objection.

BY MS. MCCLANAHAN:

Q. -- that we have not talked about?

MR. WHITTAKER: Objection, vague.

You can answer.

THE WITNESS: Like outside of this case?

BY MS. MCCLANAHAN:

Q. Inside of this case.

A. Yes.

Q. What are those facts?

A. What we already -- like what we already discussed?

Q. That we have not discussed.

A. Oh, no.

Q. I only have one other question for you. So you assert in the complaint that Ms. Paul accessed Mr. Taylor's records in SACWIS; is that true?

A. Yes.

Q. And that she learned in SACWIS -- from SACWIS that Mr. Taylor had been sexually abused as a child; is that true?

A. From what Jesse told me.

Q. And that she then gave that information to Mr. Hooven?

A. Yes.

Q. And your whole understanding of that process, of that that happened, is based on your

conversation with Mr. Hooven?

A. Yes.

MS. MCCLANAHAN: That's all I have.

CROSS-EXAMINATION

BY MR. MUNAS:

Q. Good afternoon. My name is Eric Munas. I am an attorney with the Hamilton County Prosecutor's Office. I represent the County government in this case, so the Board of County Commissioners. Just a few questions based off of the testimony you have been given [sic] earlier in your allegations in your complaint. So just at a basic level, this lawsuit is a lawsuit that's being brought by you and Brendon Taylor against a cast of defendants, correct?

A. Correct.

Q. But not all the claims in the complaint are being brought by you in particular; is that correct?

A. Correct.

Q. Okay. And I guess the other side of that is that not all the claims in the complaint are being alleged against all the defendants. Is that your understanding of the complaint?

A. Correct.

Q. If you want to refer to Exhibit 6, which is the complaint, we will be on the same page literally and figuratively. So I am going to ask you to go to page 17 of that.

A. Okay.

Q. Count 1 is a First Amendment retaliation claim, as its captioned here. It is being brought against -- by both you and Mr. Taylor against Officer Hooven in his official capacity; is that correct?

A. Yes.

Q. Is your understanding of this allegation that it is not being advanced against the County?

MR. WHITTAKER: Objection, calls for a legal conclusion. You can answer.

THE WITNESS: Correct.

MR. MUNAS: I just asked for her understanding.

BY MR. MUNAS:

Q. Moving ahead to page 20.

A. Okay.

Q. Do you see where -- towards the bottom where Count 2 is labeled?

A. Yes.

Q. And as this is written in the complaint, this is the amended complaint that you filed. It is identified as a Monell liability claim, both by you and Mr. Taylor as against the City; is that correct?

A. Correct.

Q. And this count as you understand it is not being advanced against the County; is that correct?

MR. WHITTAKER: Objection. You can answer.

THE WITNESS: Correct.

BY MR. MUNAS:

Q. Fast-forwarding to page 22, Count 3. I am about two-thirds of the way down. This is being captioned as a -- or identified as a Fourteenth Amendment violation, substantive due process violation, but this is only being advanced by Mr. Taylor as against Officer Hooven and Ms. Paul in their official capacities; is that correct?

A. Correct.

Q. So you as a plaintiff do not -- are not participating in Count 3 in any way?

A. No, just Brendon.

Q. Moving on to page 24. About halfway down, we see Count 4. This is a Monell liability claim that, again, Mr. Taylor and not you are advancing against -- is advancing against the City; is that correct?

A. Correct.

Q. And you are not participating in any way with regards to the allegations in Count 4 of the complaint?

A. Correct.

Q. Same question with Count 5. Again, Monell liability this time against the County defendants, but Mr. Taylor is the only plaintiff advancing that claim. Is that your understanding?

A. Correct.

Q. Moving to page 26, count 6, about one-third of the way down. This is labeled as a civil conspiracy to violate civil rights under Section 42 of the United States -- or Title 42 of the United States Code Section 1985 (3). And this is labeled as a count that is being advanced by both Mr. Taylor and you as against Officer Hooven and Ms. Paul in their official capacities. Is that an accurate reading, I guess, of what Count 6 is labeled as?

MR. WHITTAKER: Objection. You can answer.

THE WITNESS: Yes.

BY MR. MUNAS:

Q. Are you aware that the district court in this case has dismissed Count 6 as -- as it was advanced against Officer Hooven?

A. Yes.

Q. Okay. Is it your position that you still have a civil conspiracy claim in this case that you could recover against --

A. Yes.

Q. -- against Ms. Paul?

A. Sorry.

MR. WHITTAKER: Objection, calls for a legal conclusion. You can answer.

THE WITNESS: Yes.

BY MR. MUNAS:

Q. So even though the district court has dismissed one of the two people that the alleged conspiracy is being advanced against, you believe that you still have a conspiracy claim?

MR. WHITTAKER: Objection, calls for a legal conclusion. You can answer.

THE WITNESS: Yes.

BY MR. MUNAS:

Q. Would you mind explaining the basis for your conspiracy allegation against Ms. Paul?

MR. WHITTAKER: Objection, calls for a legal conclusion. You can answer.

THE WITNESS: I still feel that they worked together to obtain information that they shouldn't have been able to obtain on a case that was closed due to looking at a closed document or closed file that were not involving children because Brendon Taylor is an adult, and there shouldn't have been access to a file. Further -- further, that information shouldn't have been privy to either one of them because -- especially Jesse -- because he is my ex-husband. And he shouldn't have been able to access that information, and neither Ms. Paul.

BY MR. MUNAS:

Q. Are you claiming that this alleged conspiracy had a motivation for committing the conspiracy?

MR. WHITTAKER: Objection, calls for a legal conclusion. You can answer.

THE WITNESS: That would be maybe a question for them. But I feel like whatever the

conspiracy -- yes, I feel like it was driven for some reason, and it shouldn't have been able to -- neither one of them, both Jesse and Ms. Paul, should not have accessed that information.

BY MR. MUNAS:

Q. And, believe me, I will ask them questions about their conduct in this case. But I am asking you. This is an allegation that you were presenting --

A. Yes.

Q. -- and claiming damages as a result of. I want to know what you believe their motivation was for conspiring to do this.

A. Jesse's motivation I feel was to try to harm the relationship between Brendon and myself and disrupt that relationship. Ms. Paul -- I think Jesse was feeding her information saying that I was having multiple men in and out of the home or whatever he may have said to maybe fear that my kids were at harm.

But I still feel that there wasn't an open case. The children were residing outside of Hamilton County. They were in Kentucky, and Jesse was residing in Oak Hills. And she should not have opened or had access to that case.

Q. So if I understand your testimony correctly, she was solicited in your belief by Officer Hooven to make these inquiries into Mr. Taylor's case history?

A. Yes.

Q. And that was the reason that she did it?

A. Yes.

Q. If you would look at pages 27 and 28, just to finish what I started here. You could see Count 7 at the top of page 27, Count 8 about two-thirds of the way down, and then on page 28 near the top, Count 9.

A. Okay.

Q. Each of these three counts in the complaint, none of these are being advanced as against the County government; is that correct?

A. Correct.

Q. You testified earlier about your professional history to a little extent, that you are a social work professional; is that correct?

A. Correct.

Q. Are you currently involved -- or employed at Cincinnati Children's?

A. I am.

Q. Okay. And if I heard correctly earlier, you testified that you are not personally or professionally familiar with the SACWIS database?

A. I know of it. But I never accessed it, no.

Q. You don't have access to that database as part of your job with Cincinnati Children's?

A. No.

Q. Okay. Have you ever used the SACWIS database at all?

A. I have not.

MR. MUNAS: That's all I have. Thank you.

MR. PAUL: Nothing from the City.

MR. WHITTAKER: Nothing from you guys?

MR. PAUL: No.

MR. WHITTAKER: I just have a few.

MR. GOTTESMAN: So to wrap -- are we done?

MR. WHITTAKER: I was going to ask some follow-ups. It's your deposition.

MR. GOTTESMAN: No, feel free to

depose your own client.

DIRECT EXAMINATION

BY MR. WHITTAKER:

Q. Holly, do you remember when Mr. Gottesman was asking you about how you know what information was looked up in SACWIS?

A. Yes.

Q. Is your knowledge of what was looked up in SACWIS based on what Jesse told you?

A. Yes.

Q. Do you have any other source of information about what information was looked up in SACWIS?

A. Other than during my custody hearing.

Q. Okay.

A. I don't know.

Q. The extent of the information you have of what was discussed between Jesse and Madison Paul is based on what Jesse told you, correct? I'm sorry, I didn't mean to lead. Is that -- is that your understanding?

A. Yes.

Q. Okay. I think either Mickey or Mr. Gottesman was asking you about whether or not Madison Paul was fired by JFS. Do you remember

that line of questioning?

A. I do.

Q. Do you have any information about the circumstances that led to Ms. Paul's departure from JFS, other than what you have heard?

A. No.

Q. Do you have any information about any City -- what investigation the City did into the allegations in the CCA complaint other than what was reported by CCA?

A. No.

Q. Do you have any information about what information was gathered and considered in the police department's investigation and report, other than what's in that report?

A. No.

Q. Are you bringing this lawsuit against Jesse and Madison in their capacities as in Jesse's case a police officer?

A. Yes.

Q. In Madison's case a former JFS employee?

A. Yes.

MR. WHITTAKER: That's all I have.

RECROSS-EXAMINATION

BY MR. GOTTESMAN:
Q. Mrs. Hooven, one question I didn't ask you that I need to follow up on. How did you end up connecting with Justin Whittaker?
MR. WHITTAKER: Objection, irrelevant and privileged. Don't answer.
BY MR. GOTTESMAN:
Q. I am not asking for any communications you have had with him, but I would like to know, how did you find him as your attorney?
MR. WHITTAKER: The same objection.
MR. GOTTESMAN: Are you instructing her?
MR. WHITTAKER: Yeah.
MR. GOTTESMAN: I have nothing else. Shuva?
MR. PAUL: No, nothing from the City.
MR. GOTTESMAN: I am ordering. And I would like the portion related to -- at the outset of this deposition, I said -- I asked her questions about if she paid her fines or contempt sanctions, she paid her attorney's fees, she filed a Notice of Appeal and withdrew her Notice of Appeal. I would like that section on an expedited

basis.

And then, Justin, if you would like to explain signature to your client, I prefer that on the record.

MR. WHITTAKER: We will take signature.

MR. PAUL: I didn't hear you.

MS. BARON: He is going to take signature.

MR. PAUL: You are taking it? All right.

MR. WHITTAKER: I'll take an e-tran.

MR. MUNAS: Yeah, just an electronic copy.

MS. MCCLANAHAN: I will take an electronic copy.

MR. WHITTAKER: It doesn't need to be expedited from our end.

MR. BARON: No, thank you.

(Thereupon, the deposition was concluded at 12:57 p.m.)

I, HOLLY HOOVEN, do hereby certify that the foregoing is a true and accurate transcription of my testimony.

Signature: ____________________________

Date: ____________________________

PLEASE USE THIS ERRATA SHEET TO MAKE ANY AND ALL CORRECTIONS BY LISTING THE PAGE NUMBER, LINE NUMBER AND THE PROPOSED CHANGE. PLEASE DO NOT MARK ON THE TRANSCRIPT. UPON COMPLETION, PLEASE SIGN AND DATE AT THE BOTTOM. THANK YOU.

Signature: ____________________ Date: ____________

STATE OF OHIO )
COUNTY OF MIAMI ) SS: CERTIFICATE

I, Monica K. Schrader, a Notary Public within and for the State of Ohio, duly commissioned and qualified,

DO HEREBY CERTIFY that the above-named, HOLLY HOOVEN, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth; that said testimony was reduced to writing by me stenographically in the presence of the witness and thereafter reduced to typewriting.

I FURTHER CERTIFY that I am not a relative or attorney of either party nor in any manner interested in the event of this action; I am not under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office at Troy, Ohio, on this 14th day of April, 2026.

/S/ Monica K. Schrader _ ___
MONICA K. SCHRADER
NOTARY PUBLIC, STATE OF OHIO
My commission expires 4-18-2030

## $

**$3,250 (1)**
22:6

## [

**[sic] (3)**
42:14;101:3;121:11

## A

**able (8)**
28:6;47:17;68:18;72:17;104:8;126:8,16;127:2
**above (1)**
84:17
**absolutely (1)**
78:12
**abuse (20)**
8:23;9:20;10:12;30:21;32:25;51:16;52:1,9;62:9;69:23;72:12;78:23;80:16;81:20;82:2,5;106:5,6;111:19;113:21
**abused (9)**
30:20;51:19;52:3;62:9;68:9;99:14;106:2,4;120:19
**academy (1)**
38:25
**accept (1)**
83:5
**access (7)**
68:10;102:18;111:1;126:12,16;127:25;129:7
**accessed (6)**
102:2,9,17;120:14;127:4;129:5
**account (1)**
76:12
**accountable (1)**
84:19
**accurate (6)**
11:21;21:23,24;22:3;124:24;134:2
**accurately (1)**
61:20
**across (1)**
40:21
**acting (3)**
41:11;54:1;113:24
**action (2)**
55:20;118:23
**actions (2)**
85:16;90:4
**active (1)**
34:5
**actively (3)**
84:24;85:19;95:5
**actually (9)**
13:5;42:14;49:22;62:25;68:21,25;87:8;92:21;107:13
**add (1)**
90:22
**address (2)**
6:14;12:16
**addressed (2)**
22:12;80:25
**addresses (1)**
21:17
**administered (1)**
52:16
**adult (1)**
126:11
**adults (2)**
33:13;69:18
**advanced (7)**
122:13;123:8,18;124:21;125:7,21;128:16
**advances (2)**
24:16,19
**advancing (3)**
124:4,4,14
**affair (2)**
25:23;43:13
**affect (1)**
76:24
**afraid (1)**
28:5
**afternoon (2)**
93:12;121:6
**again (15)**
16:10;17:8;19:13;20:8;63:13,16;71:8;83:1,12;86:2;89:1;94:10;115:13;124:3,11
**against (27)**
18:19;19:10,23;21:9;22:4;41:10;79:23;119:21;121:14,23;122:8,9,13;123:4,8,19;124:4,4,12,22;125:7,11,13,21;126:3;128:17;131:17
**age (4)**
5:2;34:12;52:6;57:12
**agency (2)**
48:13;55:8
**ages (1)**
16:19
**Aging (5)**
8:2,6,9,10;28:5
**ago (2)**
45:23;46:8
**agree (5)**
42:1;43:7,18,20;77:21
**agreed (4)**
31:3;35:4;95:22;97:18
**Agreement (8)**
17:18,23;18:9,10;31:3,13;35:4,11
**agrees (1)**
18:14
**ahead (4)**
50:18;60:24;88:14;122:21
**Aiden (23)**
6:22,23;12:21;16:17,21;25:4;26:3,5;28:9;33:6,8,15;40:14;44:17,20;47:2;70:14;74:5;86:11,24;87:1;89:16;97:17
**Aiden's (2)**
27:25;40:8
**Alexandra (2)**
88:15,17
**allegation (6)**
51:8;68:7;82:3;122:13;126:3;127:8
**allegations (4)**
67:11;121:12;124:8;131:9
**allege (2)**
91:2;102:2
**alleged (6)**
68:8;103:5;118:23;121:23;125:20;126:19
**alleging (1)**
90:2
**allow (1)**
43:5
**allowing (1)**
99:13
**alone (1)**
104:7
**along (3)**
71:15,22;105:13
**although (1)**
80:18
**always (2)**
54:23;97:5
**Alyssa (1)**
58:22
**amended (3)**
36:5;37:3;123:2
**Amendment (3)**
79:24;122:6;123:17
**amicable (2)**
24:6,11
**amount (1)**
22:5
**and/or (1)**
33:15
**anguish (1)**
90:12
**annoy (1)**
18:15
**anxiety (1)**
89:23
**apartment (2)**
25:2;27:2
**apologize (1)**
36:2
**apologized (1)**
83:8
**apology (2)**
83:4,7
**app (7)**
10:23,24;32:10;34:4,8,13;44:7
**appeal (13)**
22:21,25;23:4,9,16,19,23;24:2;42:15;77:4,6;132:24,25
**Appeals (1)**
24:3
**applied (1)**
53:24
**appreciate (1)**
93:3
**appreciated (1)**
33:11
**apprised (1)**
66:18
**approached (3)**
68:22,25;101:6
**approaching (1)**
68:10
**apps (2)**
32:13;94:24
**April (20)**
12:12;34:18,21;47:22;51:5;61:15;64:20;67:10;74:1,20,25;76:6;82:23;83:10;87:5;103:12,12,13,13;105:11
**argue (1)**
24:21
**arguing (1)**
24:22
**arose (1)**
59:1
**around (16)**
16:5;26:15,17,21;28:7,10;43:4,5;47:4,12;69:17;94:15;99:14;108:15,16;110:22
**arrested (2)**
16:2,11
**arrived (1)**
55:21
**article (3)**
107:21;108:1,6
**aside (3)**
83:15,17;113:2
**assert (1)**
120:13
**assessed (1)**
22:4
**assessing (1)**
113:23
**associate (1)**
23:12
**associated (1)**
86:16
**assuming (1)**
102:11
**assumption (2)**
94:6;110:12
**astounded (1)**
104:3
**attending (1)**
39:8
**attention (8)**
37:19;80:19;107:10;108:24;109:1,8,15;110:13
**attorney (2)**
121:7;132:11
**attorneys (4)**
11:9;17:5,12;85:5
**attorney's (4)**
22:11,15;24:1;132:23
**attribute (2)**
78:20;84:11
**August (1)**
16:18
**authority (2)**
68:9;100:14
**available (2)**
10:7;67:14
**Avenue (1)**
12:17
**award (1)**
22:15
**aware (11)**
10:5;29:8;40:11;62:4,6;67:10;81:6;107:7;108:3,23;125:5
**away (4)**
26:19;36:15;46:2;82:16
**awkward (2)**
93:21,22

## B

bachelor's (2)
7:13,15
Back (22)
7:10;10:18;19:14;27:15;28:14;29:2,5,6;44:16;54:2;67:16;77:23;87:8;89:6;97:13;98:1;99:16;102:1;109:18;116:14;117:22;118:12
back-and-forth (2)
27:15;28:19
background (6)
7:12;60:8;64:7;94:14;112:11,17
bad (7)
72:7;97:10,12;100:6;101:14,17,24
barbs (1)
77:23
BARON (2)
133:8,19
based (9)
32:19;71:11;110:11;115:3,8;120:25;121:10;130:9,19
basic (1)
121:13
basing (1)
85:15
basis (4)
6:8;9:9;126:2;133:1
Bear (1)
22:23
beating (1)
53:19
became (5)
25:13,15;40:11;107:7;108:3
bed (2)
66:10,14
beginning (2)
93:18;103:12
behalf (2)
21:18;23:5
Behavioral (3)
8:1,4;37:21
behind (1)
79:6
belief (2)
16:8;128:2
belt (1)
53:19
benefit (1)
35:12
berating (1)
81:14
best (2)
94:10;106:10
best-laid (1)
107:19
better (1)
91:15
big (4)
46:11;71:16,24;93:19
bike (1)
46:11
bikes (1)
47:18
biographical (1)
10:18
birth (8)
7:5;25:4;26:2;28:6,12,18;73:7,9
birthday (4)
12:9;75:23;76:18;104:8
bit (4)
35:25;94:8;114:23;115:14
blanking (2)
7:21;88:6
Board (1)
121:9
boat (1)
26:12
born (1)
26:5
both (11)
47:2;72:14,25;93:24;96:7;101:2;116:3;122:8;123:4;124:22;127:3
bottom (5)
18:6;21:14;116:16;122:24;135:5
bought (1)
24:23
boy (1)
33:8
boyfriend (2)
44:3;99:15
braces (2)
57:20;58:24
Bramble (1)
12:17
break (7)
47:12;51:24;72:16;78:19;81:24;82:16,18
Brendon (68)
6:21;10:19,21,25;11:4,23;12:2;25:12;41:15;46:3;48:18,20,25;51:20,25;52:2,21;53:13,15,22;54:2,3,6;55:3;56:3;59:13,22;60:8;61:24;62:4,5,7,22,24;65:13,15,19,23;66:9,19;73:12,23;74:10,13;78:22;80:24;83:7;92:19;97:12,19;99:1,5;100:7,13;101:13,18;104:3;105:8,11,19,24,25;115:12,17;121:14;123:25;126:11;127:15
Brendon's (12)
46:12;51:21,22;52:17,18;64:1;66:4;73:6,8;80:16;102:10;104:6
bridge (1)
8:18
bring (5)
36:1,2;80:4,11;82:25
bringing (2)
83:11;131:17
broke (6)
72:14,25;84:14,16,23;85:14
broken (3)
72:10;80:20;84:14
brought (11)
36:8;46:18;80:8,19;81:6;82:20;83:9;109:5;121:14,18;122:8
bullied (1)
45:4
bullying (1)
46:17
bunch (1)
93:16
business (1)
34:11
Busters (1)
43:24
butt (1)
53:22

## C

call (6)
10:10;48:24;64:8;104:20;110:22,24
called (16)
9:24;45:7,22;46:14;52:23;55:17;62:4,12,22;63:16,16;67:6;98:22;99:12;104:22;105:4
calling (3)
63:13,20,24
calls (9)
10:3;42:11;50:25;118:5;122:15;125:15,23;126:4,22
came (10)
22:20;25:12;28:2,14;64:17;71:23;97:12,18;110:6,9
Campbell (1)
25:2
can (69)
6:8;8:20;13:4;14:20;17:10;18:23;19:5,12;20:1,7;31:8;33:17,19;36:11,14;39:4;41:2,5,6,24;42:12,23;43:11;48:4;51:1;58:10;61:11;65:16;66:23;67:17,18;68:24;69:8;70:5;71:7,11,18;72:2;76:14;77:12;78:25;79:17;83:14;88:7,16,25;91:5;93:7;95:7;99:16;100:18;102:25;112:14,15;113:1;115:6;116:3;118:6;119:5,6,14;120:1;122:16;123:10;125:1,16,24;126:5,23
capacities (3)
123:20;124:23;131:18
capacity (6)
9:7;39:20;41:4,10,11;122:10
captioned (2)
122:7;123:16
car (3)
40:19,22;74:10
care (8)
37:25;47:3,10,14,23;58:5;87:19;91:14
caretaker (1)
25:3
caring (1)
25:3
carpet (1)
57:21
Carson (11)
56:8,10,25;57:13,16,25;59:1,23;60:2;102:12;104:13
Carson's (1)
56:12
case (39)
7:2;14:19;16:23;17:24;18:11;20:23;29:17,18;41:6;43:7;44:25;54:19;87:15,22;89:23;90:5,6;91:3;96:10,13;98:19,21;107:9;108:19,23;119:2,11;120:3,5;121:9;125:6,10;126:8;127:7,22,25;128:4;131:19,21
cases (1)
106:3
cast (1)
121:15
cause (1)
39:6
cautioned (1)
5:3
CCA (6)
48:12,15;49:6;92:6;131:9,10
Center (3)
8:17;9:2;111:4
certain (1)
24:22
certified (1)
5:4
certify (1)
134:1
chance (4)
11:25;39:17;61:18;117:24
change (4)
77:2,7,9;135:3
changed (1)
87:23
characterize (1)
28:22
charged (1)
10:15
Chart (1)
89:3
check (1)
98:22
Chester (1)
88:23
child (17)
8:23;9:18;10:12;51:19;52:1,3;56:3;57:18;58:20;59:18;72:12;98:23;102:10;111:19;113:21,24;120:19
children (47)
14:3,12;16:5;24:25;26:17,23;30:19;31:4,16;32:12;33:1;34:11;35:1,6,13,18;39:4,11,12;42:21;43:3,

4,5,21;45:3;47:10,14,23;51:18;57:17;58:4;65:3,8;69:16;70:3,11;74:2;75:10,18;77:7;84:21;113:6,23,24;114:8;126:10;127:22
**Children's (13)** 7:24;8:7,11,13;9:2,8;16:19;64:25;69:24;99:3;116:22;128:24;129:9
**child's (1)** 58:22
**Cincinnati (13)** 8:1,4;37:21;38:9;48:24;49:4;62:12;69:6,11;107:20;110:23;128:24;129:8
**Cincinnati's (1)** 92:18
**circling (1)** 102:1
**circumstances (2)** 72:4;131:4
**Citizens (1)** 100:14
**City (6)** 123:5;124:5;129:16;131:8,8;132:18
**civil (3)** 124:18,18;125:10
**claim (6)** 122:7;123:4;124:3,14;125:10,22
**claiming (4)** 39:17;81:25;126:19;127:11
**claims (5)** 14:19;87:15;119:20;121:17,22
**clarify (1)** 6:5
**class (1)** 100:24
**classified (1)** 72:21
**clear (6)** 6:4;44:6;50:22;84:24;87:14;111:15
**cleared (1)** 28:12
**client (2)** 130:1;133:3
**clients (1)** 38:4
**close (3)** 25:21;100:3;107:2
**closed (4)** 54:19;126:9,9,10
**cocaine (1)** 16:9
**Code (2)** 112:25;124:20
**cohabitate (1)** 13:14
**cohabitating (1)** 33:24
**cohabitation (1)** 33:13
**colleague (1)** 108:4
**colleagues (3)** 80:12;81:5;110:2
**college (1)** 25:23
**Collins (2)** 17:11;23:11
**color (1)** 41:12
**comfortable (4)** 14:6;100:4;101:16,25
**coming (4)** 26:14,17;27:12;110:1
**Commissioners (1)** 121:10
**committing (1)** 126:20
**communicate (3)** 78:10;95:17,23
**communicated (2)** 34:12;99:10
**communications (4)** 50:11,14,23;132:9
**compensable (6)** 79:15,25;81:25;82:4;90:12,15
**complained (1)** 99:1
**complaining (1)** 81:2
**complaint (33)** 36:3,5,25;37:4,9;41:20;48:11,15,23;52:21;62:23;68:5,8;79:14;90:10;91:17;92:20;100:14,14;109:20;118:24;119:3;120:13;121:12,18,22,24;122:2;123:2,2;124:9;128:16;131:9
**complaints (2)** 48:10;55:20
**completely (1)** 8:9
**COMPLETION (1)** 135:4
**concern (1)** 42:19
**concerned (4)** 33:5,5;34:1;112:23
**concerns (2)** 16:8;113:10
**concluded (1)** 133:21
**conclusion (8)** 18:23;42:12;51:1;122:16;125:16,24;126:5,23
**conduct (3)** 53:23;91:2;127:7
**confer (3)** 105:7,11,12
**conference (1)** 67:14
**conferred (3)** 7:18,22;104:16
**Confidential (3)** 67:21;68:10;83:16
**conflict (6)** 39:3,6;40:6;41:10,23;42:8
**conflicts (1)** 42:10
**confused (1)** 72:8
**confusing (2)** 8:7;94:11
**confusion (1)** 114:24
**connecting (1)** 132:4
**considered (2)** 21:1;131:13
**consistent (2)** 114:3;116:11
**conspiracy (8)** 124:18;125:10,21,22;126:3,20,21;127:1
**conspiring (1)** 127:13
**constant (4)** 81:14,22;82:18,19
**contact (1)** 31:17
**contacted (8)** 56:3;108:21;114:11,12,13,15,18,20
**contempt (14)** 18:18;19:10,23;21:3,8,18,22;22:1,5;23:25;42:2,4,5;132:22
**contentious (11)** 77:18,21;78:3,6,21;79:2,3;81:18;83:19,23;84:3
**context (4)** 37:23;51:13;69:14,20
**continuing (1)** 91:14
**continuously (2)** 24:16;89:18
**contributing (1)** 24:19
**conversation (4)** 16:4;100:8;103:20;121:1
**conversations (2)** 15:20;35:9
**cookies (1)** 47:7
**copies (1)** 36:3
**copy (5)** 36:4,17;37:8;133:14,16
**Corporal (5)** 52:14,16;53:18;66:20;67:3
**CORRECTIONS (1)** 135:2
**correctly (2)** 128:2;129:1
**correlated (1)** 31:1
**Council (6)** 8:2,5,9,10;28:3,4
**counsel (6)** 5:8;16:23,25;17:3;36:4;91:12
**counseling (1)** 86:8
**count (19)** 9:23;68:4,5;91:8;122:6,24;123:7,14,24;124:2,8,11,16,21,24;125:6;128:11,11,13
**counting (1)** 86:7
**counts (1)** 128:15
**County (19)** 9:8,12,24;10:11;25:2;55:11,14;59:15;110:18;112:6;113:15;121:7,8,9;122:14;123:8;124:12;127:23;128:17
**couple (2)** 46:13;93:7
**course (3)** 43:7;88:8;98:24
**court (26)** 11:9;17:2;21:17,21,25;22:4,10,14;24:2;28:24;29:2,6,9,13;31:11;42:5;48:12;50:5;80:8;81:6;90:17;93:23;95:20;97:13;125:5,19
**Courtney (2)** 15:10,11
**cover (1)** 117:8
**covered (3)** 27:15;90:25;94:13
**COVID (1)** 60:3
**coworker (1)** 80:11
**CPD (6)** 63:13,16,16;114:12,13,20
**CPS (3)** 102:11;110:21,23
**crack (2)** 15:25;16:9
**crackhead (1)** 15:22
**CROSS-EXAMINATION (3)** 5:5;93:10;121:4
**curious (1)** 39:16
**current (3)** 6:13;16:19;37:9
**currently (3)** 8:18;98:9;128:23
**custodial (2)** 12:20,23
**custody (12)** 17:1;39:4,9;41:23;51:21;59:14,18,23;76:24;102:10,11;130:14
**cut (2)** 31:17;85:4
**Cymbalta (3)** 89:9,14,20
**C-Y-M-B-A-L-T-A (1)** 89:11

## D

**dad (10)** 52:5;54:18,20,23,23;55:3,4;

74:24;80:23;101:9
**damages (2)**
119:21;127:11
**Daniel (2)**
53:1,12
**data (1)**
68:11
**database (7)**
10:7;60:7;72:12,
19;129:4,8,12
**date (19)**
7:5;13:1,5,16,24;
25:14;27:9;32:11;
45:10;73:7,9;
74:24;77:14;87:6;
97:21;103:16;
134:8;135:5,25
**dated (5)**
97:22;115:22;
117:16;118:10,14
**dates (2)**
8:3;116:23
**dating (14)**
10:22,24;27:11;
32:10,13;34:4,8;
43:22;44:7;45:11;
72:22;73:15,22;
74:13
**daughter (2)**
6:21;101:4
**daughter's (1)**
101:3
**Dave (1)**
43:24
**day (16)**
6:6;47:7,12,17;
61:21;63:9,12;
65:6;74:1,5;82:23;
105:12;114:19,20;
115:19;116:13
**days (3)**
115:19;116:8,25
**deal (7)**
8:23;9:8,11;
28:21;71:16,24;
80:21
**dealings (1)**
17:6
**decide (1)**
34:15
**decided (3)**
42:2;77:4,5
**Decision (9)**
20:15,19,22;
22:1,20,21;23:5;
43:20;76:23
**declined (2)**
42:3;59:18
**decree (1)**
78:12
**deemed (1)**
9:13
**defendant (2)**
5:8;7:2
**Defendants (4)**
91:12;121:15,23;
124:13
**degree (1)**
7:16
**deleted (4)**
76:11,19;96:9,12
**delivery (3)**
27:25;28:2,9
**Demand (1)**
37:4
**department (5)**
8:19;48:24;
63:10;64:25;
113:16
**department's (1)**
131:14
**departure (1)**
131:4
**dependency (1)**
113:22
**depends (1)**
8:21
**depose (1)**
130:1
**deposed (1)**
5:11
**deposition (5)**
5:10;11:8;
129:24;132:21;
133:20
**depositions (1)**
93:17
**depression (2)**
8:21;88:2
**described (1)**
28:20
**detail (4)**
53:22;54:3;
100:4;101:19
**difference (1)**
57:12
**different (5)**
13:1;17:3;40:15;
84:11,17
**difficult (5)**
28:20;32:11;
43:22;80:21,22
**difficulties (1)**
80:23
**difficulty (1)**
24:20
**dinner (1)**
43:23
**direct (3)**
79:21;90:11;
130:2
**Directing (1)**
37:19
**directly (1)**
79:17
**disable (1)**
76:12
**discipline (1)**
53:24
**disclose (2)**
73:14;79:4
**disclosed (3)**
44:25;73:12;
78:23
**disclosing (1)**
82:5
**disclosure (7)**
46:18;81:19;
82:1,9;83:10,16;
84:12
**discuss (2)**
39:9;48:11
**discussed (8)**
23:6;31:9;32:25;
54:15;109:25;
120:9,10;130:18
**discussion (6)**
7:9;55:16;61:3;
88:12;89:5;95:13
**Dismissal (2)**
23:16,23
**dismissed (3)**
23:19;125:6,20
**dispute (3)**
39:10;41:24;
51:22
**disregard (1)**
35:3
**disregarded (1)**
35:7
**disrupt (1)**
127:16
**dissolution (2)**
84:1,2
**distant (1)**
26:14
**distinct (1)**
84:10
**distinguish (1)**
81:17
**distress (2)**
90:13;91:1
**District (11)**
24:2,24,25;25:6;
62:22;63:19,21,22;
64:8;125:5,19
**dive (1)**
112:8
**divorce (19)**
16:16;18:11;
24:10;25:18,22;
26:2;30:18;43:8;
78:21;79:1;80:7,7;
81:18;82:14;83:19,
23,24,25;96:20
**divorced (4)**
12:25;24:6;
53:12;76:19
**doctor (1)**
28:12
**document (10)**
17:25;18:13;
21:16;31:11;36:6;
37:10,12;67:24;
72:20;126:9
**documents (1)**
42:6
**dollars (2)**
29:12,14
**domestic (8)**
16:23;17:24;
20:22;29:21,22;
49:12,15;98:8
**done (6)**
9:22;76:12;
98:13,14;100:11;
129:22
**doubt (1)**
43:15
**down (14)**
5:14;21:5;28:13;
50:10,11;51:24;
78:20;81:24;97:22;
113:13;123:15;
124:2,17;128:12
**dozen (1)**
57:8
**DR (8)**
29:18,19;42:5;
71:14;81:6;89:14;
95:20;110:21
**drive (2)**
26:25;40:5
**driven (3)**
39:3;41:9;127:1
**driveway (1)**
40:22
**driving (2)**
40:16;41:22
**drove (1)**
46:13
**drug (2)**
15:3;16:8
**drugs (1)**
15:5
**due (4)**
109:7,8;123:17;
126:9
**DUI (1)**
26:24
**duly (1)**
5:3
**duration (1)**
31:6
**during (10)**
6:3;26:13;49:15;
57:18;75:3;89:22;
98:10,23;110:21;
130:14
**duty (5)**
9:20;69:23;70:2,
10,13

**E**

**earlier (5)**
54:7;109:4;
121:11;128:19;
129:2
**early (4)**
45:11;63:9;
64:17;75:1
**ears (1)**
11:22
**Easter (1)**
47:4
**Eastern (1)**
7:17
**easy (1)**
107:16
**ebbed (2)**
97:5,11
**ECF-55 (2)**
36:7;37:9
**economic (1)**
90:3
**Ed (3)**
17:11;63:7;
64:24
**educational (1)**
7:12
**effect (1)**
18:10
**efforts (1)**
59:24
**eight (8)**
115:18;116:8,22,
25;117:1,2,2,3
**either (8)**
9:19;30:19;31:5;
35:9;48:12;59:9;
126:14;130:23
**electronic (2)**
133:13,16
**else (9)**
7:25;24:18;
25:13;82:11;
104:23;105:7,12,
23;132:16
**email (2)**
32:24;56:2
**emergency (4)**
8:18;59:14,18;
64:25
**Emma (3)**
35:8;73:15,17
**emotional (2)**
90:12;91:1
**employed (2)**
112:22;128:24
**employee (1)**
131:22
**employees (1)**
110:25
**employment (2)**

69:6,11
**encountered (2)**
34:7;81:5
**encourage (1)**
26:22
**encouraged (1)**
59:13
**end (5)**
5:15;6:6;86:6;
132:4;133:18
**ended (2)**
44:1,4
**ending (2)**
81:21;82:17
**endure (1)**
90:15
**enforcement (1)**
60:7
**enforces (2)**
84:15,18
**enough (3)**
36:3;43:3,15
**Enquirer (1)**
107:21
**entail (1)**
8:15
**entails (1)**
90:24
**entered (1)**
97:19
**entire (2)**
41:23;83:16
**entirely (3)**
59:11;102:23;
103:2
**entitled (1)**
6:6
**entrusted (1)**
45:3
**entry (5)**
22:12;95:22,22;
97:13,18
**equation (1)**
77:10
**Eric (1)**
121:6
**Erin (3)**
17:7,9;40:13
**ERRATA (1)**
135:1
**Es (1)**
56:23
**especially (3)**
33:13;85:6;
126:14
**establish (1)**
112:17
**established (2)**
25:2,7
**estimate (3)**
6:9;48:1,3
**estimating (1)**
6:8
**e-tran (1)**
133:12
**Evan (15)**
13:19,21;14:2,8,
11,15;15:3,5,21;
31:18;32:5;43:19,
21;44:3,13
**Evan's (2)**
31:20;44:11
**even (16)**
5:21;26:11;27:1;
29:2;31:1;32:6;
80:5,14;85:1;94:8;
95:7;100:18;104:5,
8;106:7;125:19
**evening (1)**
74:4
**event (1)**
83:14
**everybody (1)**
36:8
**everyone (1)**
36:2
**evident (3)**
25:8,15,25
**evolved (1)**
79:2
**exact (4)**
45:23;46:9;
74:24;103:16
**exactly (2)**
43:8;101:8
**EXAMINATION (1)**
130:2
**examined (1)**
5:4
**example (3)**
39:14;40:7,8
**examples (2)**
39:14;41:24
**excerpts (2)**
30:8;51:9
**excess (1)**
90:16
**Excessive (4)**
52:19;66:20,25;
67:3
**excessively (1)**
54:14
**exchange (3)**
61:15,21;65:19
**exchanged (2)**
34:13;98:23
**exchanges (1)**
65:14
**Excuse (2)**
17:8;26:19
**execution (1)**
112:23
**Exhibit (47)**
17:17,22;20:14,
18;22:24;23:4,6,
15,22;30:2,7;37:1,
3,8;51:6,16;61:4,
14;65:18;67:25;
90:10;91:17,21,22;
92:5,12,16,17;
99:16,17,23;
107:12,15,20;
109:20;111:19,23;
115:20,22;116:4;
117:8,15,16,20;
118:2,12;122:1
**exhibits (2)**
91:13;107:14
**ex-husband (4)**
7:2;15:21;84:20;
126:15
**exist (1)**
43:9
**expected (1)**
90:14
**expedited (2)**
132:25;133:18
**explain (10)**
6:5;24:13;39:4,
23;45:18;46:6;
54:13;70:23;82:11;
133:3
**explaining (1)**
126:2
**explanation (1)**
53:17
**extended (1)**
28:16
**extensively (3)**
98:8,25;99:1
**extent (3)**
18:22;128:20;
130:17
**extremely (1)**
64:13
**ex-wife (1)**
72:22
**eyes (1)**
52:18

## F

**face (1)**
80:13
**Facebook (6)**
75:25;76:9,12;
94:16,17;100:19
**FaceTime (1)**
96:3
**fact (6)**
46:5;68:14;83:3;
85:22;94:16;112:3
**facts (3)**
119:17,20;120:7
**fair (4)**
5:16;28:21;
43:15;50:10
**fairness (1)**
41:25
**falling (1)**
58:21
**familiar (3)**
9:25;10:8;129:3
**familiarize (1)**
116:4
**Family (7)**
78:11;88:22;
95:18;98:21;105:2;
110:18;113:16
**far (4)**
26:4,19;81:12;
87:24
**Fast-forwarding (1)**
123:14
**father (5)**
52:16;66:21;
70:10;84:21;
100:24
**father's (1)**
53:1
**fault (1)**
42:9
**favor (1)**
22:15
**fear (1)**
127:19
**February (7)**
12:8;29:23;30:8;
33:12;34:21;47:21;
75:1
**federal (5)**
39:15;48:12;
87:22;90:5,6
**feeding (1)**
127:17
**feel (22)**
9:13;14:6;43:2;
72:9;77:13;79:3,5;
80:24;82:11,16,17;
84:13;94:14;100:4;
101:16,25;126:6,
25;127:1,14,21;
129:25
**fees (4)**
22:12,16;24:1;
132:23
**felt (5)**
14:13;35:8,14;
54:17;99:6
**few (3)**
105:14;121:10;
129:20
**figuratively (1)**
122:3
**figure (2)**
29:4;96:5
**figured (2)**
36:3,8
**file (9)**
16:16;19:2;
48:15,23;63:15;
105:14,15;126:10,
12
**filed (26)**
18:18;19:3,9,18,
22;21:4,9,18;
22:21;23:4,11;
24:9;25:17;26:1;
52:21;81:5;100:13;
107:7;108:10;
109:2,16;110:5,9,
10;123:3;132:23
**filing (5)**
37:15;81:9;
89:24;105:21;
106:15
**finalized (2)**
96:21,22
**finally (4)**
25:6,8;27:5,8
**financial (1)**
90:3
**find (6)**
21:21;42:3,4;
62:18;100:19;
132:10
**fine (2)**
70:24;92:23
**fines (1)**
132:22
**finish (3)**
93:20;98:14;
128:10
**Finneytown (1)**
86:22
**fired (2)**
118:23;130:25
**firm (1)**
17:15
**first (27)**
5:2;11:8;12:7;
14:2;20:25;22:20;
24:2;36:5;37:3;
49:17,19;50:1;
51:24;65:20;68:4;
73:6;74:9;75:21;
79:24;83:8;100:22;
104:1,2;113:19;
114:13;115:10;
122:6
**firsthand (2)**
50:13,22
**fists (1)**
53:20
**five (4)**
27:9;34:17;48:8;
53:15
**flew (1)**
28:9
**flip (3)**
99:22;112:7;
117:6
**Florida (5)**
27:25;28:1,11,
13,16

**flow (1)**
93:17
**flowed (2)**
97:5,11
**focused (1)**
42:8
**follow (2)**
78:12;132:3
**followed (1)**
55:20
**following (2)**
112:25;116:23
**follows (1)**
5:4
**follow-ups (1)**
129:24
**force (1)**
41:22
**foregoing (1)**
134:2
**form (9)**
31:8;33:16;41:2;60:13;66:23;76:14;78:24;91:4;119:4
**formal (1)**
62:23
**formally (1)**
31:10
**former (1)**
131:21
**forth (4)**
29:5;77:23;98:1;112:22
**found (6)**
16:11;21:25;25:12;43:25,25;97:25
**foundation (1)**
71:11
**four (3)**
27:9;34:17;53:14
**Fourteenth (1)**
123:17
**Fox (1)**
69:15
**frame (5)**
13:2;27:17;47:21;75:1,6
**free (2)**
82:19;129:25
**friend (3)**
13:22;31:25;106:10
**friends (5)**
76:20;100:24;104:25;110:2,3
**friends' (1)**
110:3
**friendship (2)**
14:9,14
**front (9)**
37:7;39:11,11;65:17;117:7,22,23;118:3,7
**frustrated (3)**
45:21;66:9,13
**frustration (1)**
81:11
**full (1)**
108:1
**full-time (3)**
8:9,11,12
**fully (1)**
93:20
**funeral (3)**
74:11,16;75:7
**further (5)**
87:6;99:15;101:18;126:12,13

## G

**gain (1)**
99:4
**gained (1)**
73:5
**GAL (1)**
83:6
**gathered (1)**
131:13
**gave (8)**
25:4;26:2;28:12,17;62:23;63:1;73:6;120:21
**gears (2)**
35:25;110:15
**gets (1)**
93:21
**girl (3)**
33:9;57:20,22
**given (7)**
53:17;69:5,10;72:24;119:1,9;121:11
**giving (1)**
69:1
**Good (7)**
5:7;54:24;79:5;93:12,18;94:3;121:6
**Google (1)**
86:20
**GOTTESMAN (79)**
5:6,8;7:7,10,11;11:2,18,24;12:3,4;13:7;14:22;15:1;17:20;19:1,8,15;20:4,10,17;23:2,18;30:5;31:12;33:21,25;36:1,7,16;37:2,6;41:7;42:17,25;43:14;45:1;48:7;50:20;51:4;54:25;58:14;61:7,13;67:2,13,17,22;70:8;71:13,21;72:6;76:22;77:16;79:8;88:13,19;89:10;91:7,11,19,24;92:4,15,25;93:6,16;100:21;107:19;109:19;119:18;129:21,25;130:5,24;132:1,7,13,16,19
**government (2)**
121:9;128:17
**grab (1)**
88:7
**graduated (1)**
25:24
**grandfather's (3)**
74:11,16;75:7
**granting (1)**
22:15
**graphic (2)**
29:25;69:15
**gray (1)**
44:23
**Greater (3)**
8:1,3;37:21
**grounds (1)**
21:22
**group (1)**
86:15
**guess (10)**
30:25;38:4;41:21;46:12;48:17;81:22;96:25;103:14;121:21;124:24
**guesses (2)**
6:7,9
**guy (1)**
31:17
**guys (4)**
96:1;97:22;105:7;129:18

## H

**half (1)**
6:18
**halfway (1)**
124:1
**Hamilton (10)**
6:15;9:8,12,24;10:10;110:18;112:6;113:15;121:7;127:23
**hand (4)**
91:20;107:12;111:23;117:14
**handed (4)**
61:14;65:9;74:5;91:23
**handing (1)**
30:6
**handle (2)**
81:12;105:16
**handled (1)**
46:4
**handwritten (1)**
92:2
**hang (1)**
64:5
**hanging (2)**
16:12;32:1
**happen (1)**
58:13
**happened (20)**
11:3;40:20,22;46:7;55:2;58:5,8,15;59:8;62:2;65:25;68:14;75:16;94:18;103:20;109:15;110:4;117:4,12;120:25
**happening (1)**
105:7
**harass (1)**
18:15
**harassing (1)**
63:14
**harassment (3)**
63:15;81:14;82:18
**hard (1)**
80:21
**harm (5)**
33:15;79:15;113:7;127:15,20
**HCJFS (1)**
113:20
**head (4)**
6:11;11:22;86:21;108:13
**Health (11)**
8:1,4,20,22;37:22;86:8;87:6,12,16,23;88:1
**hear (3)**
39:17;100:22;133:7
**heard (2)**
129:1;131:5
**hearing (3)**
49:12,16;130:14
**Heights (1)**
12:17
**held (3)**
35:15;84:18,19
**help (1)**
107:18
**helpful (3)**
11:20;12:1;62:25
**hereby (1)**
134:1
**herein (1)**
5:2
**hereinafter (1)**
5:3
**HHooven1 (1)**
95:14
**higher (1)**
30:22
**higher-up (1)**
63:17
**Highland (1)**
12:17
**highlighted (2)**
36:16;91:25
**Hill (2)**
25:9,11
**Hills (6)**
24:24;25:5,7,9;27:6;127:24
**Hinge (6)**
10:25;11:1;12:5;32:14;34:4,8
**historically (1)**
77:14
**history (12)**
10:12;46:19;66:19;69:22;78:22;81:20;82:2,5,21;84:12;128:4,20
**hold (3)**
35:15;63:1;95:3
**holidays (1)**
57:5
**HOLLY (6)**
5:1;20:18;39:3;79:23;130:4;134:1
**home (12)**
6:19;14:16;16:14;24:24;30:19;57:4;63:7,8,11;96:4;99:3;127:19
**Homelink (2)**
38:1,2
**homicide (1)**
8:21
**honestly (8)**
9:23;31:24;32:22;35:22;46:8;60:1;71:19;105:16
**HOOVEN (64)**
5:1,9;6:22,22;7:3;12:25;15:21;18:19;19:10;21:22;24:5,11;27:17;29:24;30:9;31:2;37:7,20;39:2,3;42:4,19;45:16;48:13;50:12,24;51:9;61:8,15;62:2;68:9;69:23;70:13;74:6;75:14;77:20;78:8;79:23;82:4;85:16;90:21;93:12;95:17;96:16;99:20,23;102:6,14,23;

103:3,10,23;104:1;
105:11;106:16;
120:22;121:1;
122:9;123:19;
124:22;125:7;
128:3;132:2;134:1
**Hooven's (2)**
22:15;79:22
**hope (1)**
93:3
**hoped (1)**
29:4
**hoping (1)**
29:3
**horrible (1)**
27:10
**horseplay (1)**
58:8
**Hospital (7)**
7:25;8:7,11;9:2;
47:5;65:1;66:16
**hours (4)**
116:22;117:1,2,4
**house (5)**
14:23;27:1;
35:18;44:11;63:13
**household (1)**
33:2
**housing (2)**
38:4,5
**huh-uh (1)**
5:20
**hung (2)**
13:22;32:4

## I

**idea (4)**
50:19;73:24;
85:8;91:15
**identification (15)**
17:19,22;20:16;
23:1,17;30:4,7;
37:5;61:6;91:18;
92:14;107:22;
111:21;115:24;
117:18
**identified (2)**
123:3,16
**idiot (2)**
45:8;46:14
**imagine (2)**
78:13;104:6
**immediately (3)**
44:1,5;104:19
**important (2)**
5:17,18
**impression (2)**
15:24;28:15
**improperly (1)**
72:13
**improved (1)**
25:20
**incident (11)**
45:2;46:2,16,18;
57:15;61:24;65:5,
10;87:3,5;94:17
**includes (2)**
113:6,9
**increased (2)**
32:25;33:14
**independent (2)**
86:17;102:19
**Indian (2)**
25:9,11
**indicates (1)**
22:10
**individuals (3)**
106:3;115:4,9
**inform (1)**
69:24
**information (77)**
10:11,19;32:20;
40:10;41:15;46:1;
60:12,19;61:9;
62:16,21;68:19,23;
69:1,5,10,13,21;
70:18,21;71:4,23;
72:4,12,19,22,23,
24;73:5;74:21;
79:4,4;83:17;
84:25;85:19,25;
86:1;99:4,5,9,15,
21,24;100:6,6,12;
101:15,15,23,24;
102:2,5,8,15;
103:10;104:9,15;
105:23;111:3,9,12,
13;114:10;120:22;
126:7,13,17;127:4,
17;130:6,12,12,17;
131:3,7,12,13
**informed (2)**
59:16,17
**initially (3)**
51:16;83:7;
115:14
**injuries (9)**
79:25;81:10,25;
82:8;87:21;90:13,
15;91:1;109:24
**injury (1)**
82:4
**inquiries (1)**
128:3
**inquiring (1)**
40:17
**inside (2)**
119:3;120:5
**Instagram (1)**
94:21
**instead (1)**
5:19
**instructing (1)**
132:13
**Intake (1)**
8:17
**intent (1)**
79:5
**intention (1)**
91:12
**interaction (3)**
27:17;43:19;
64:16
**interactions (1)**
33:12
**interest (1)**
31:5
**Interesting (1)**
114:23
**interfere (1)**
18:15
**internal (3)**
49:4;92:12,18
**interrogatories (2)**
103:6;119:10
**intervene (1)**
54:14
**intervention (2)**
28:24;29:10
**interviewed (2)**
49:3,6
**interviews (1)**
9:6
**into (22)**
11:10;24:23,25;
25:5,6,9,12;50:5;
53:22;54:3;70:17;
71:23;77:10;89:21;
100:3;101:18;
103:19;112:8,14;
117:8;128:3;131:8
**introduce (6)**
14:1,3,11;31:4;
35:6;43:21
**introduced (4)**
34:25;49:23;
77:9;89:21
**introducing (1)**
14:7
**investigating (2)**
113:9,22
**investigation (3)**
92:6;131:8,14
**Investigations (2)**
92:13,19
**involved (3)**
55:21;67:7;
128:23
**involvement (1)**
111:16
**involving (4)**
66:21;102:12;
113:10;126:10
**iPhones (1)**
96:7
**irrelevance (1)**
14:18
**irrelevant (3)**
13:4;71:18;
132:5
**issue (6)**
22:14;27:3;
51:22;58:25;90:4;
91:2
**issued (1)**
20:22
**issues (1)**
80:8

## J

**jails (1)**
42:14
**January (1)**
96:22
**Jason (3)**
53:6,8,15
**Jesse (81)**
5:8;7:3;12:25;
15:21;16:4,7;
19:10,23;21:9;
28:7,10,20;29:24;
32:25;34:1;35:4;
37:20;42:19;44:2;
45:24;50:12,24;
51:8,13;60:4,6;
61:8;62:6,13;
63:12,14;64:15;
65:4,9,14,23;66:3,
8;72:14,16,24;
73:2,6,7,13,22;
74:13;76:19;79:3;
80:12;81:13,19,22;
82:1,4,13;85:8,25;
86:1;96:19,20;
97:25;98:5,21;
101:14,17;103:3,
22;104:4,5;106:16;
114:20;120:20;
126:15;127:3,17,
23;130:9,18,19;
131:18
**Jesse's (3)**
81:19;127:14;
131:19
**JFS (33)**
9:9,12,25;10:11;
51:22;54:19;55:21;
59:15;60:16,19;
61:9;66:21;67:7;
72:18;110:22,23,
24,25;111:8,11,17;
113:3;114:4,11,15,
18;115:5,9,16;
118:17;130:25;
131:5,21
**job (6)**
93:18;94:3;
111:1;114:7;
118:17;129:8
**Jobs (2)**
110:18;113:16
**Judge (3)**
20:19;21:1;42:3
**Judge's (2)**
20:14;23:5
**judgment (1)**
43:4
**July (1)**
108:7
**jumbled (1)**
94:15
**June (6)**
21:4,18;92:17,
18;116:23;118:15
**jurisdictional (1)**
90:16
**Jury (1)**
37:4
**justice (1)**
84:16
**Justin (2)**
132:4;133:2

## K

**keel (1)**
26:11
**keep (9)**
26:11,12,13;
44:10;55:4;78:13;
83:11;85:5;95:1
**keeping (1)**
69:14
**Kentucky (6)**
7:17;12:14,18;
39:9;57:16;127:23
**kept (1)**
86:11
**kids (30)**
8:19;14:7;25:4;
26:15,18,25;27:4,
6;29:5;40:18;
43:23;44:11,15;
45:6;46:10,12,13;
54:1,2;63:12;77:2;
80:22;95:2;96:5;
99:14;101:3;104:7;
113:4,10;127:20
**kids' (1)**
110:3
**kind (14)**
44:22;53:18;
82:10;93:17,19;
94:15,18;102:1;
103:19;110:1,11;
112:7;116:4;
119:18
**knew (10)**
26:10;33:5;34:1;
66:25;73:22;
100:10;101:12;
104:6,11;105:23
**knocked (1)**

57:17
**knowledge (10)**
46:19;50:13,23;
68:13,17;85:22;
86:4;96:11;102:19;
130:8
**known (1)**
35:20
**knows (1)**
11:13

## L

**label (1)**
107:17
**labeled (4)**
122:24;124:17,
21,25
**lack (1)**
71:11
**language (1)**
6:1
**laptop (1)**
36:20
**last (28)**
13:10;15:11;
17:10;18:4;22:11;
31:21;32:2,3,22;
56:19;62:17,20;
66:10;73:7,8,8;
75:21;86:23;92:11;
98:15;100:9,15,17;
101:4;104:7;
106:12;113:13;
114:24
**lasted (1)**
98:2
**later (1)**
74:4
**law (12)**
41:12;60:7;72:9,
14;73:1;80:20;
84:14,14,15,15,23;
85:15
**lawful (1)**
5:2
**Lawson (4)**
88:15,17,18;
89:14
**lawsuit (22)**
39:16;81:4,7,9;
105:14,15,21;
106:15;107:2,6;
108:10;109:2,16;
110:4,8,9,10;111:4,
5;121:13,13;
131:17
**lawyer (1)**
40:12
**lead (1)**
130:20
**leading (1)**
45:21
**learn (2)**
15:2;34:8
**learned (3)**
60:15;98:21;
120:17
**least (1)**
111:4
**leave (6)**
28:11,17;47:20,
22;73:17;115:18
**leaving (2)**
47:10;51:18
**led (1)**
131:4
**Lee (4)**
5:8;7:3;53:1,12
**left (6)**
47:2,14;63:8,11;
74:1;115:12
**legal (8)**
18:23;42:12;
51:1;122:16;
125:16,24;126:5,
23
**legally (1)**
113:20
**legitimate (1)**
42:19
**less (3)**
48:8,9;52:10
**letter (4)**
115:22;117:9,16;
118:8
**letting (2)**
30:13,17
**level (1)**
121:13
**leverage (1)**
99:8
**liability (3)**
123:3;124:2,12
**liar (1)**
103:7
**life (4)**
27:13;78:9;
82:13;84:5
**likely (1)**
90:20
**limit (1)**
70:25
**line (3)**
21:5;131:1;
135:2
**List (1)**
17:5
**LISTING (1)**
135:2
**lists (1)**
20:25
**litany (1)**
21:1
**literally (2)**
64:5;122:3
**litigation (1)**
89:25
**little (12)**
6:18;8:6;33:8,9;
35:25;57:20;94:8;
95:3,4;102:11;
115:13;128:20
**live (3)**
55:1,6;82:13
**lived (4)**
6:17;40:20;55:3;
57:16
**lives (1)**
99:3
**living (3)**
12:13;34:16;
46:24
**local (1)**
113:20
**located (1)**
86:19
**long (14)**
6:17;12:10;
13:16;32:6,23;
34:14,24;35:17,20;
45:23;46:8;99:21,
22;106:8
**longer (1)**
87:9
**look (14)**
5:20;32:16;
60:20;62:13;70:2,
10,14;92:16;95:7;
100:18;108:12;
112:8;116:3;128:9
**looked (9)**
11:3;15:7;16:2;
32:15,17;99:5;
130:6,8,12
**Looking (3)**
21:7;109:18;
126:9
**looks (2)**
21:10;64:17
**loose (1)**
57:21
**lose (1)**
58:23
**loser (1)**
99:12
**losing (1)**
58:20
**loss (1)**
90:3
**lost (1)**
57:18
**lot (11)**
19:19,20;27:7,
16;81:12;94:13;
100:6;101:14,17;
107:7;109:25
**loud (1)**
116:19

## M

**Ma'am (2)**
17:21;68:2
**Madison (18)**
49:8;50:12,24;
62:17;68:10;72:14,
20,23;85:8,23;
93:13;103:22;
106:15;115:13;
118:8;130:19,25;
131:18
**Madisons (1)**
115:11
**Madison's (2)**
114:24;131:21
**maiden (3)**
15:15,16,18
**making (6)**
39:11,12;82:3;
87:15;93:20;105:9
**malice (1)**
79:6
**manager (1)**
37:25
**mandatory (1)**
9:15
**manifestations (1)**
87:18
**manner (1)**
18:16
**many (8)**
9:22;13:1;19:2,
17;47:25;57:3,7;
74:8
**March (5)**
47:21;75:9;
95:22;97:13,18
**MARK (1)**
135:4
**marked (25)**
17:18,21;20:15;
22:25;23:3,16;
30:3,6;37:1,4,8;
61:5;77:9;91:18,
21;92:13;107:15,
21;111:20,24;
115:21,23;116:14;
117:15,17
**marriage (2)**
25:25;84:1
**married (7)**
15:17;38:16,18;
53:8,15,16;96:18
**master's (2)**
7:14,20
**maternity (2)**
28:11,17
**Matt (3)**
13:9;97:14,20
**matter (5)**
5:17;37:10;
84:22;92:7;93:14
**matters (2)**
77:3,7
**May (7)**
12:12;34:18;
69:22;74:9;100:12,
13;127:19
**Maybe (16)**
13:17;20:13;
27:21;32:4;36:19;
43:12,20;46:13;
53:14;86:12,12;
106:24;110:2,3;
126:24;127:19
**Mayerson (2)**
9:3,4
**MCCLANAHAN (21)**
36:11,14,21;
67:15;93:11,13;
95:15;100:25;
107:23;109:14;
111:22;115:25;
116:17;117:19;
118:9;119:8,16,23;
120:4;121:3;
133:15
**MD (2)**
88:20,21
**mean (43)**
24:21;25:22;
26:8,17,21;27:21;
29:5,19;30:13,14,
14;32:3,21;39:13;
41:4,8,21;42:13;
44:4;46:22;47:15;
48:16;49:20,25;
54:3,7,8,15,20;
55:7;60:1;72:8;
74:14;81:11,12;
82:10;84:13,21;
87:14;97:5,6;
104:11;130:20
**means (1)**
9:18
**meant (1)**
12:3
**media (14)**
75:24;76:1,5,7,
21;94:20;96:12;
107:9;108:18,24;
109:1,8,15;110:13
**mediation (1)**
97:17
**medical (2)**
87:21;89:21
**medication (3)**
87:23;88:1,2
**meet (11)**
10:19;12:7;32:9;
37:20;44:15,20;
49:18,22;84:5;
97:20;98:22
**meeting (1)**

37:24
**Memorandum (4)**
111:20;112:5,6,21
**men (4)**
13:1;27:12;99:2;127:18
**mental (10)**
8:20,22;78:19;86:8;87:6,12,16,23,25;90:12
**message (11)**
29:25;51:9,14;60:5;65:18,22;83:5;99:11,23;103:25;105:10
**messages (5)**
30:3;51:10;60:21;61:5;96:13
**messaging (1)**
94:24
**met (17)**
10:21,22;12:10,25;31:17;34:25;38:8;44:6;49:8,17,19;63:12;75:10,19;96:15;97:14,22
**Miamisburg (2)**
55:7,13
**Mice (3)**
13:11;14:2,3
**M-I-C-E (1)**
13:13
**Mickey (2)**
93:13;130:23
**might (2)**
91:22;106:10
**military (1)**
34:10
**mind (6)**
67:1;69:14;78:19;79:12;87:22;126:2
**minor (1)**
39:4
**minutes (1)**
93:8
**molest (1)**
18:15
**mom (5)**
27:10;28:2,9;55:4;59:9
**mom's (1)**
12:9
**Monell (3)**
123:3;124:2,12
**money (3)**
42:16;77:5;80:13
**Monica (1)**
33:21
**Montgomery (4)**
55:10,11,14;59:14
**month (5)**
13:17;28:11,13;32:4;35:2
**months (8)**
31:6;34:17,22,23;35:5;98:2;105:14;118:19
**Moore (1)**
6:15
**more (16)**
14:9,13;20:11;36:19;41:24;42:16;48:8;52:10;70:21;71:4;77:17;89:23;93:2;98:21;100:4;101:15
**morning (3)**
5:7,9;64:17
**most (1)**
78:17
**mother (5)**
21:4;43:3;53:9;54:14;58:22
**mother's (2)**
21:12;56:12
**motion (7)**
18:18;21:3,8,12,17,23;63:15
**motions (5)**
19:9,17,22;21:1;22:11
**motivation (3)**
126:20;127:13,14
**move (4)**
12:11;27:6;82:15;84:4
**moved (4)**
25:8;34:21;45:12;54:11
**moving (9)**
24:23,25;25:5,6;44:10;78:14;122:21;124:1,16
**Mrs (3)**
37:7;90:21;132:2
**much (3)**
53:22;54:3;74:7
**multiple (14)**
17:2;19:9;20:2,9,11;27:18;42:5;80:4,12;81:11;99:2;109:4,5;127:18
**MUNAS (17)**
36:6,25;88:16,18;107:17;121:5,7;122:18,20;123:13;125:4,18;126:1,18;127:5;129:14;133:13
**must (1)**
57:24
**myself (4)**
44:20;49:23;80:24;127:16

**N**

**name (41)**
5:7;13:9,10,19;15:9,11,15,16,17,18;17:10;31:21;32:2,3,22;45:7;53:1;56:13,15,19;62:17,20;64:10;73:7,8,9;75:14,18,20,21;88:6;93:12;100:18,22;101:3,5;104:6,7;106:12;114:24;121:6
**name-calling (1)**
46:17
**named (3)**
31:17;56:8;73:22
**names (1)**
45:22
**nature (2)**
52:8;53:23
**near (2)**
86:6;128:13
**necessary (1)**
9:13
**need (6)**
39:14;90:22;93:1;99:15;132:3;133:17
**needed (1)**
78:12
**needs (5)**
80:19,24;84:16,18,19
**negative (1)**
50:22
**Neglect (2)**
111:20;113:22
**neither (2)**
126:17;127:3
**never-ending (2)**
77:4;82:12
**new (2)**
84:5,10
**News (4)**
69:16;80:9,17;108:5
**newspaper (1)**
80:10
**next (5)**
56:2;62:3;66:7;105:13;114:18
**night (7)**
14:15;35:23;40:19,23;66:10,13;108:4
**nine (1)**
16:21
**none (1)**
128:16
**Nora (1)**
101:4
**Nora's (1)**
101:9
**normal (1)**
112:22
**Northern (1)**
12:14
**note (1)**
40:11
**notes (2)**
92:2,2
**notice (8)**
5:10;22:24;23:4,8,15,23;132:24,24
**noticed (1)**
89:22
**notify (1)**
116:20
**number (3)**
50:8;135:2,3
**numbered (1)**
91:13
**numbers (2)**
34:13;98:23

**O**

**Oak (6)**
24:24;25:5,7,9;27:6;127:24
**oath (1)**
94:7
**OB/GYN (1)**
87:19
**Object (4)**
18:22;71:10;78:24;109:10
**Objection (38)**
13:3;14:17,24;19:4,11,25;20:6;31:7;33:16;41:1;42:11,22;43:10;50:16,25;58:9;61:10;66:22;70:4;71:17;72:1;76:13;77:11;91:4;118:5;119:4,13,22,25;122:15;123:10;125:1,15,23;126:4,22;132:5,12
**observed (1)**
84:8
**obtain (10)**
40:10;68:19;72:19,22,23;79:4;104:8;111:9;126:7,8
**obtained (7)**
40:12;41:14;60:11;72:4;73:8;85:24;111:5
**obtaining (1)**
111:12
**occasionally (1)**
57:1
**occur (2)**
74:17;85:22
**occurred (3)**
75:7;82:1;109:1
**October (5)**
20:23;76:23;78:16;98:15,16
**odds (1)**
98:5
**off (19)**
7:7;17:5;20:25;31:17;34:23;60:25;63:5;65:9;74:5;76:11,16;85:4;86:21;88:9;89:1;91:23;95:10;108:12;121:10
**offenders (1)**
10:7
**offhand (1)**
31:10
**office (2)**
86:19;121:8
**officer (26)**
38:9,22;39:2,21;40:25;41:11;42:3;61:15;68:8,20;69:7,11;72:18,25;74:5;75:13;78:8;79:22;84:15;85:16;122:9;123:19;124:22;125:7;128:3;131:19
**official (4)**
68:9;122:9;123:20;124:23
**officials (1)**
112:23
**off-the-record (5)**
7:8;61:2;88:11;89:4;95:12
**often (1)**
9:11
**OFW (1)**
78:10
**Ohio (3)**
6:15;24:23;112:25
**old (5)**
32:5;52:24;56:10;57:22;108:4
**older (3)**
46:12,13;58:2
**once (9)**
25:6,11,24;26:2;

27:20,21;69:13,21;
110:9
**one (42)**
13:6;20:5,11,13;
21:10;26:8,9;
32:14;35:19;36:9,
11,17,19,22;39:13,
16;40:7;43:24;
44:2,2,23;49:20;
67:15;82:23;91:22,
23,25;92:1,11;
100:24;104:4;
108:4;115:13,19;
116:13;117:15;
118:4;120:12;
125:20;126:14;
127:3;132:2
**one-third (1)**
124:17
**ongoing (2)**
78:1;81:13
**online (2)**
10:7;15:8
**only (28)**
13:6;17:12;21:8,
12;26:20;32:4,14;
47:13;73:4,15;
76:20;78:10,11;
80:13;85:24;90:20;
93:19;95:1;97:16;
99:6,20,24;108:3;
117:23;119:19;
120:12;123:18;
124:13
**open (1)**
127:22
**opened (1)**
127:25
**openly (1)**
39:9
**operating (1)**
112:22
**operative (1)**
37:9
**opposed (1)**
68:22
**opted (1)**
42:16
**option (1)**
29:9
**order (3)**
41:19;95:20;
107:13
**ordered (2)**
22:16;83:6
**ordering (1)**
132:19
**organization (1)**
113:20
**orient (1)**
46:21
**oriented (1)**
64:15
**out (31)**
13:22;16:11,13;
22:20;25:12;29:4;
32:1,4;43:23,24,
25;44:1;57:17;
58:21;62:18;70:2,
10,14;73:17;78:15;
87:9;96:5;97:25;
98:22;99:2,3,16;
107:13;110:10;
116:19;127:18
**outlined (1)**
119:18
**outset (1)**
132:20
**outside (2)**
120:2;127:22
**over (23)**
5:18;6:18;22:1;
24:22;27:1,13,22;
53:17;57:5;60:2;
79:2;80:16;83:1,1,
12,12;86:21;92:2;
93:16,25;94:16;
96:15;97:23
**overall (1)**
78:7
**overcompensate (1)**
27:4
**overnight (1)**
35:18
**own (3)**
34:11;82:13;
130:1
**owns (1)**
34:11

## P

**Page (40)**
18:4,5,13;20:25;
21:14;22:11;24:7;
37:17;51:5,10;
65:17,20;66:7;
67:23;68:5;79:18;
90:9;99:21,22,22,
22,23;109:21,22,
23;112:10;113:12;
116:14;118:3,3,7;
122:3,4,21;123:14;
124:1,16;128:11,
12;135:2
**pages (2)**
18:4;128:9
**paid (4)**
24:1,2;132:22,23
**Paige (1)**
56:16
**P-A-I-G-E (1)**
56:18
**paper (1)**
5:21
**paragraph (9)**
18:14;37:19;
68:7;79:19,20;
90:10;109:21,23;
113:13
**parent (7)**
10:11;12:20,23;
30:19;33:2;100:1,
16
**parenting (5)**
6:24;7:1;12:20,
22;77:2
**parents (10)**
30:18;39:10;
69:17,24;105:25;
106:7,9,22,25;
110:3
**park (7)**
45:5;46:17;
47:17;61:24;65:6,
9;99:13
**parrot (6)**
44:13,15,18,20,
22,24
**part (9)**
41:16;43:1,21;
68:4;78:17;86:3;
94:14;111:1;129:8
**participating (2)**
123:24;124:7
**particular (4)**
41:4,6;78:21;
121:18
**party (1)**
18:14
**passcode (1)**
16:14
**passed (2)**
74:8,19
**path (1)**
46:11
**pattern (1)**
84:8
**Paul (33)**
49:8;50:12,24;
68:10;85:8,23;
93:7,13;98:19;
102:2;103:22;
106:15;110:17;
115:16;117:12;
118:16,22;119:21;
120:13;123:20;
124:23;125:13;
126:3,17;127:3,16;
129:16,19;130:19,
25;132:18;133:7,
10
**Paul's (5)**
111:5,16;114:7;
118:8;131:4
**pay (4)**
22:8,16,18;
116:21
**people (8)**
80:4;81:5;93:22;
107:7;109:5;110:1,
9;125:20
**perfect (2)**
43:6;117:11
**period (3)**
8:8;28:16;60:2
**periods (3)**
24:14,15;25:19
**perk (2)**
63:7,7
**Pernia (5)**
53:4,6,8,9,11
**persistent (4)**
24:22,23;25:5;
26:10
**person (11)**
13:6;27:11;
43:19;62:16;78:11;
80:15;90:14;99:20,
24;111:9,12
**personal (9)**
50:13,23;68:13,
17;76:17,21;85:21;
86:4;104:9
**personally (1)**
129:2
**perspective (1)**
42:1
**pester (2)**
5:24;6:1
**phone (14)**
34:13;50:8;
60:22;63:2,4,18,
25;64:3,5;88:7;
95:8;96:1;98:23;
100:20
**photograph (1)**
29:25
**physical (9)**
8:24;9:19;33:1;
52:1,12;62:5;67:1;
87:18;104:12
**physically (2)**
51:19;52:3
**physician (1)**
87:19
**pick (1)**
26:25
**picking (2)**
40:13;101:3
**picture (4)**
25:12;47:8;
97:12,19
**pictures (1)**
95:2
**pillows (1)**
57:20
**pit (1)**
77:5
**place (4)**
27:5,8;31:3;65:6
**placement (1)**
59:10
**Plaintiff (3)**
5:2;123:23;
124:13
**Plaintiffs (2)**
79:24;90:11
**plans (1)**
107:19
**platforms (1)**
94:21
**playing (1)**
57:19
**please (8)**
6:5;33:20;37:17;
88:10;89:2;135:1,
3,4
**pm (2)**
40:23;133:21
**point (21)**
6:3;14:1;15:2;
16:12;25:20;26:8;
27:14,24;53:11;
59:12;60:6;71:14,
20;83:9,13,25;
85:7;86:7;97:7;
98:5;106:25
**police (23)**
38:9,21;39:21;
40:25;41:11;48:12,
24;49:4;52:23;
55:8,13,20;62:12;
66:21;67:6,7;
68:19;69:6,11;
72:18,25;131:14,
19
**poor (1)**
43:20
**portion (2)**
67:21;132:20
**position (2)**
116:21;125:9
**positive (1)**
75:22
**possession (2)**
69:14,21
**possible (1)**
73:4
**posted (1)**
108:7
**postings (1)**
76:11
**posts (1)**
96:13
**potential (1)**
69:16
**potentially (1)**
16:9
**practice (3)**
86:15;87:10;
88:22
**Pratt (1)**
15:19
**P-R-A-T-T (1)**

15:19
**predate (1)**
87:3
**predicated (1)**
39:15
**preface (1)**
72:21
**prefer (1)**
133:3
**pregnancies (1)**
89:17
**pregnant (3)**
16:17;86:11;
89:16
**premarked (1)**
107:14
**preschool (3)**
40:15,20;97:16
**prescribe (1)**
88:24
**prescribes (1)**
88:3
**presence (1)**
78:9
**present (2)**
28:6;35:23
**presented (1)**
41:19
**presenting (1)**
127:9
**presents (1)**
42:20
**presumption (1)**
86:2
**pretty (6)**
25:8,25;62:11,
25;68:12;100:6
**previous (1)**
35:3
**Pricilla (1)**
86:14
**primarily (2)**
95:17,23
**primary (3)**
87:19;88:4,5
**print (3)**
36:11,14,22
**Prior (9)**
7:24;24:8;37:14;
65:6;81:9,15;
83:21;97:13;
106:14
**privacy (1)**
82:13
**private (1)**
80:15
**privileged (1)**
132:6
**privy (1)**
126:14
**PRN (1)**
8:7
**Probably (4)**
15:23;16:3;
107:18;109:7
**procedure (1)**
112:22
**proceeding (1)**
110:21
**proceedings (3)**
42:2;71:14;98:9
**process (4)**
5:15;6:3;120:25;
123:18
**produce (2)**
112:2,4
**professional (3)**
87:12;128:20,21
**professionally (1)**
129:3
**properly (1)**
80:25
**Property (3)**
17:18,23;18:9
**PROPOSED (1)**
135:3
**Prosecutor's (1)**
121:8
**protect (3)**
113:3,24;114:7
**protecting (1)**
113:6
**provided (1)**
32:20
**provision (1)**
19:24
**proximate (2)**
79:22;90:11
**Psychiatric (1)**
8:17
**psychiatry (1)**
8:16
**psychological (1)**
90:13
**psychologist (1)**
86:18
**public (2)**
68:9;110:23
**publicity (3)**
81:2,16,16
**pull (2)**
99:16;118:12
**punished (1)**
54:14
**punishment (5)**
52:14,17;53:18;
66:20;67:4
**punishments (1)**
54:17
**purported (1)**
83:4
**purpose (4)**
30:11;112:11,18,
19
**purposes (15)**
5:25;17:19;
20:15;22:25;23:16;
30:3;37:4;61:5;
91:10,18;92:13;
107:21;111:21;
115:23;117:17
**pursuant (1)**
5:10
**pursued (1)**
84:24
**put (4)**
37:7;95:21;
115:18;116:8
**putting (2)**
23:3;112:3

## Q

**quickly (1)**
104:18
**quote (2)**
40:9;80:14

## R

**reach (1)**
87:8
**read (9)**
33:22;71:9;
108:1;112:14;
113:19;114:1;
116:18,19;117:9
**reading (2)**
116:10;124:24
**ready (2)**
116:5,6
**realize (1)**
31:1
**really (23)**
11:21;13:6;27:3;
29:6;32:14,21;
35:8;62:23;63:17;
79:9;86:6;93:18,
21,22;94:14;95:1,
3;97:11;107:2;
110:22;117:23;
119:18,19
**reason (4)**
73:15;99:6;
127:2;128:6
**reasonable (2)**
90:14;114:6
**reasons (1)**
76:17
**recall (8)**
30:8;44:13;45:2,
14,25;49:12;57:15;
66:12
**receive (1)**
107:9
**received (7)**
64:23;66:18;
102:15;103:25;
104:15;105:10;
108:24
**receiving (1)**
104:18
**recently (1)**
87:24
**Recess (2)**
67:20;93:9
**recognize (9)**
17:24;20:18;
23:8,22;37:10;
91:21;92:5,17,22
**recollection (3)**
106:4,6;115:12
**reconcile (1)**
26:3
**reconciling (1)**
25:21
**record (12)**
5:25;7:7;11:21;
61:1;88:9;89:1;
91:10,16;95:11;
112:15;117:8;
133:4
**records (4)**
13:18;102:20;
103:2;120:14
**recover (1)**
125:11
**RECROSS-EXAMINATION (1)**
131:25
**redacted (1)**
67:21
**Reed (1)**
56:20
**R-E-E-D (1)**
56:22
**refer (5)**
15:20;19:7,14,
16;122:1
**references (1)**
65:5
**referencing (1)**
29:15
**referrals (1)**
38:3
**referred (2)**
44:2,3
**referring (7)**
39:5;51:15;53:3;
59:5;62:8;69:20;
80:3
**refers (1)**
54:22
**reflect (2)**
61:20;76:2
**refused (2)**
83:7;97:15
**regard (3)**
28:25;59:25;
78:18
**regarding (7)**
39:3;48:13;56:3;
59:1;76:24;91:1;
104:13
**regards (3)**
35:7;62:8;124:8
**regimen (1)**
89:21
**registry (2)**
9:25;10:1
**regular (2)**
9:9;38:15
**regularly (3)**
47:9,20,22
**relate (2)**
87:21;96:13
**related (9)**
8:20,22;68:11;
81:16,17;82:8;
83:17;91:2;132:20
**relates (1)**
98:19
**relating (1)**
96:9
**relations (8)**
16:23;17:24;
20:22;29:21,22;
49:12,15;98:9
**relationship (23)**
24:6,8,11,20;
25:20;26:7;30:24;
38:11,15,24;54:8,
24;73:12;77:8,21;
78:7;81:18;96:24;
97:2;98:24;101:13;
127:15,16
**relative (1)**
92:19
**relatively (1)**
100:2
**relevant (3)**
70:18;87:14;
92:6
**remain (1)**
38:14
**remarkably (1)**
5:20
**remember (24)**
32:7,22;45:8,10,
20,23,24;46:9,10;
47:6;63:14;64:4,6,
11,12;69:18;71:20;
74:23;75:9;83:13;
98:4;106:9;130:4,
25
**render (1)**
5:15
**repeat (8)**
33:19;65:16;
68:24;69:8;88:16;
102:25;115:6;
119:6
**repeated (1)**
27:18
**repeatedly (1)**
83:1

**rephrase (1)**
94:10
**report (8)**
9:14,20;92:6,13,18;115:17;131:14,15
**reported (1)**
131:10
**reporter (3)**
9:15;11:9;93:23
**reports (3)**
9:5;113:21,23
**represent (2)**
93:13;121:8
**represented (2)**
16:22;17:6
**reprimand (1)**
52:13
**reprimanding (1)**
52:11
**reproduced (1)**
51:10
**requesting (1)**
40:9
**resided (1)**
34:12
**residence (2)**
6:13;12:16
**residency (1)**
25:7
**resident (1)**
25:1
**resides (1)**
6:19
**residing (4)**
102:12,13;127:22,24
**resignation (1)**
118:8
**resigned (2)**
118:16,19
**respect (2)**
43:2;112:24
**respective (1)**
112:24
**responded (2)**
60:15;65:12
**Response (3)**
8:17;14:25;66:4
**responsibilities (1)**
112:24
**responsible (1)**
113:21
**result (9)**
22:5;33:14;79:22;90:4,11;115:16;117:4;118:23;127:11
**resulted (1)**
58:21
**retaliated (1)**
41:10
**retaliation (2)**
79:22;122:7
**retired (1)**
87:10
**returned (2)**
115:19;116:12
**review (3)**
37:14;61:18;117:24
**reviewed (2)**
13:18;37:12
**Revised (1)**
112:25
**ride (1)**
47:18
**riding (1)**
45:7
**right (42)**
5:13;7:3;11:23;22:6;24:18;28:19;29:8;30:23,24;31:18;33:6;34:22;35:13;36:15;43:9,16;44:7,9;45:2;46:2,11;63:3;64:20;65:13,15;67:4,7,15;70:17;74:22;75:14;76:9;82:2,6;83:22;84:2,7;102:3;108:16;109:12;110:4;133:11
**rights (1)**
124:18
**rigid (1)**
54:18
**risk (7)**
30:14,21;32:25;33:14;42:21;51:17;113:25
**risks (3)**
30:17,19;69:16
**Road (1)**
6:15
**rock (1)**
26:12
**rocky (1)**
25:15
**role (3)**
111:5,17;113:3
**romantic (1)**
31:5
**room (6)**
8:18;58:16,17,18,19;67:14
**rough (2)**
52:10,13
**roughhousing (2)**
57:16,18
**Rouse (1)**
106:13
**R-O-U-S-E (1)**
106:13
**Royer (1)**
58:22
**rude (4)**
62:25;63:17,23;64:13
**rules (1)**
93:17
**runaround (3)**
62:24;63:2;115:14

## S

**SACWIS (16)**
68:11;102:3,17,18,23;103:2;111:1,6;120:14,17,18;129:3,11;130:6,9,13
**safe (1)**
89:16
**safety (1)**
113:23
**Same (21)**
14:24;16:25;17:15;19:4,11,25;20:6;21:25;22:10;24:7;30:23;78:8,13;97:3,9;105:12;114:20;119:13;122:2;124:11;132:12
**sanctions (3)**
22:5;24:1;132:23
**saw (5)**
50:2;80:9,9,10;86:23
**saying (17)**
39:20;40:21;44:10,19;51:15;55:4;63:14;64:5,7;77:18;80:9,13;84:24;100:3,5;101:17;127:17
**schedule (2)**
6:24;77:2
**school (10)**
24:24,25;25:6;39:7,7,12;40:3,8,14;59:10
**schools (2)**
40:15;110:24
**scooters (3)**
46:10;47:6,18
**screenshot (8)**
30:9;61:23;64:16;65:13,18,22;66:3;69:15
**sealed (2)**
72:20,20
**searches (1)**
60:8
**seat (1)**
93:6
**seated (1)**
5:13
**second (8)**
18:13;22:23;41:16;63:1;73:18;107:18;112:7;113:2
**Section (6)**
92:19;112:11,18;124:19,20;132:25
**sections (1)**
112:25
**seeing (10)**
24:10;25:18;26:6,16;34:14,20;50:5;75:3;86:11;89:13
**seek (4)**
28:24;29:9;59:13,18
**send (2)**
45:18;83:6
**sending (2)**
30:9,11
**sent (10)**
29:24;51:9,14;62:3;65:22,23;66:3;69:15;83:3;114:21
**sentence (2)**
113:20;116:18
**separate (1)**
22:12
**Separation (4)**
17:17,22;18:9,9
**sequentially (1)**
91:13
**series (2)**
30:2;61:4
**serious (1)**
90:13
**seriously (1)**
35:9
**served (2)**
84:17;116:23
**Services (3)**
110:18;113:16;116:22
**Set (3)**
83:15,15,17
**sets (1)**
112:21
**setting (1)**
43:6
**Settlement (3)**
17:18,23;18:10
**seven (2)**
16:21;57:13
**several (3)**
74:18;86:24;98:2
**sexual (14)**
8:24;9:20;24:16,19;26:7;27:16;30:20;33:1;51:16;52:1;62:9;104:12;106:5,6
**sexually (6)**
30:20;51:19;62:9;106:2,4;120:18
**share (9)**
7:1;16:7;45:15,19;46:1;70:19;101:11;111:13;114:10
**shared (9)**
12:20,22;71:23,23;74:21;99:20,24;102:5;103:10
**sharing (2)**
45:24;101:25
**SHEET (1)**
135:1
**Shelby (2)**
106:10,24
**Shelby's (1)**
106:12
**sheriff (2)**
10:6;55:14
**sheriff's (1)**
63:9
**shift (1)**
77:15
**shop (3)**
46:12;47:11,17
**short-lived (1)**
98:25
**shortly (2)**
26:2;66:7
**shot (1)**
85:5
**Shuva (1)**
132:17
**side (4)**
35:15,16;116:15;121:21
**sided (1)**
42:14
**sides (1)**
116:3
**SIGN (1)**
135:5
**signature (6)**
18:5;133:3,6,9;134:6;135:25
**significantly (2)**
25:11;30:21
**similar (1)**
5:20
**similarly (1)**
91:8
**simple (1)**
68:13
**single (2)**

33:2;69:17
**sister (8)** 15:7;16:1;28:2, 3;32:15;53:13; 106:9;107:1
**sister's (1)** 15:9
**sit (5)** 19:22;23:25; 73:21;99:19; 118:22
**site (1)** 62:13
**situation (9)** 33:14;43:9,25; 44:1;45:15;59:20; 60:4;78:22;105:17
**situations (1)** 26:9
**six (2)** 31:6;35:5
**slowly (1)** 79:2
**smoothed (1)** 78:15
**Snapchat (3)** 94:25;95:1,6
**snowballed (2)** 74:12;83:24
**social (13)** 7:13,14;9:7; 28:4;75:24;76:1,4, 7,21;94:20;96:12; 106:2;128:21
**sole (1)** 25:3
**solicited (4)** 60:18;61:9; 85:19;128:2
**somebody (15)** 10:2;25:13,14, 23;27:9;49:21,22; 51:18;72:23;73:22; 77:15;91:15,24; 92:25;99:14
**somehow (2)** 57:17;62:6
**Someone (2)** 62:14;84:5
**sometime (7)** 20:23;64:17; 65:9;75:6,8; 103:11;105:13
**Sometimes (1)** 96:4
**son (4)** 51:21,22;56:7; 59:14
**soon (2)** 16:11;43:25
**sorry (17)** 16:18;18:5;40:2; 50:17;55:24;65:16; 71:7;79:20;85:4; 89:6;100:21; 102:25;107:14; 109:11;115:6; 125:14;130:20
**sort (4)** 10:18;15:5; 51:21;66:25
**sought (4)** 86:8;87:11,16,20
**sounds (2)** 5:19;93:22
**source (1)** 130:11
**Southgate (1)** 39:8
**spanking (1)** 53:21
**spare (1)** 36:10
**speak (6)** 41:5;62:19;77:5; 78:2,11;115:9
**speaker (1)** 64:4
**speaking (2)** 64:9;78:5
**specialist (1)** 38:5
**specifically (4)** 8:16;16:9;39:7; 119:12
**specifics (3)** 45:20,24;46:9
**speculate (1)** 6:10
**speculation (1)** 118:6
**speculative (4)** 42:23;43:11; 58:10;72:2
**spell (5)** 13:12;15:13; 17:10;56:17,21
**spend (2)** 29:11;42:16
**splashing (1)** 80:16
**spoke (3)** 64:13;104:4; 115:4
**spoken (1)** 108:18
**spreading (1)** 100:5
**spring (2)** 47:12;101:2
**springtime (1)** 75:9
**spy (1)** 40:9
**St (6)** 39:8,23;97:15; 100:2,7,15
**staff (1)** 39:12
**start (5)** 8:12;27:13; 34:16;38:11;53:17
**started (16)** 24:10;25:18; 26:6;28:3;30:24; 34:14,20;64:16; 75:3;84:3;89:13, 15,22,24;107:15; 128:10
**starting (1)** 91:13
**starts (2)** 61:23;68:5
**state (3)** 41:12;78:18; 79:11
**stated (2)** 21:23;97:16
**statements (3)** 119:1,2,9
**states (4)** 106:1,5;124:19, 20
**stating (1)** 101:14
**stay (4)** 14:15;35:18; 56:25;65:19
**stayed (3)** 14:23;57:3,7
**staying (1)** 27:22
**stays (2)** 57:5,5
**step (1)** 56:2
**stepdad (3)** 54:21;55:4,5
**stepfather (1)** 53:3
**stepped (1)** 54:19
**steps (1)** 36:15
**Steve (7)** 100:23;101:6,9, 9,9,20;110:6
**Steven (1)** 100:17
**sticky (1)** 40:11
**still (16)** 16:17;18:10; 34:4;63:6;72:9; 78:3;97:7;98:1,5, 12;106:1,5;125:10, 22;126:6;127:21
**stop (2)** 16:12;113:1
**stopped (4)** 8:10;16:12;78:1; 97:25
**story (1)** 59:4
**straight (1)** 66:10
**street (1)** 40:21
**stress (4)** 81:11,13,17; 87:19
**strictly (1)** 63:6
**stuck (1)** 57:21
**stuff (9)** 62:5,6,7,15; 94:14;101:17; 104:12,12,13
**subjected (1)** 66:20
**substances (1)** 16:3
**substantive (1)** 123:17
**suffered (6)** 79:15,24;82:3; 90:3,12;109:25
**suicide (1)** 8:21
**summer (4)** 57:6;97:23,24; 98:3
**Sundermann (2)** 20:19;42:3
**super (1)** 94:4
**supervising (1)** 58:7
**support (1)** 119:20
**supports (1)** 39:19
**sure (13)** 5:16;15:7;24:7; 26:16;36:21;59:11; 85:6;93:20;94:4, 11;105:9;108:12; 110:8
**surrounding (1)** 37:23
**suspended (5)** 116:8,21,25; 117:3;118:20
**sustained (1)** 81:10
**switch (2)** 35:25;110:14
**switched (1)** 88:7
**sworn (1)** 5:3

## T

**talk (10)** 5:18;73:25;76:2; 90:21;93:23,25; 96:1,6;117:23; 119:19
**talked (13)** 46:3,16;50:3; 97:21,22;98:7,25; 99:7,7;105:8,19; 109:24;119:24
**talking (15)** 25:13;46:23; 48:19;54:2,9;56:6; 64:14;69:16;73:10; 74:20;93:24;97:6, 25;99:12;104:14
**talks (1)** 56:2
**Taylor (62)** 6:21;10:19,21, 25;11:18,23;12:2; 13:1;24:9,10; 25:18;26:6;30:24; 34:7,15;35:20; 41:15;42:18,20; 45:3;46:1;51:25; 53:2,12;56:7; 58:25;59:13,13; 60:8;65:13,15,19; 66:19;68:11;69:22; 73:12,23;74:2; 75:4,10;77:9,20; 79:23;83:4,4,16; 95:24;104:16; 105:4;106:20; 114:11;115:4,9; 120:18;121:14; 122:9;123:4,19; 124:3,13,22; 126:11
**TaylorHooven12 (1)** 116:15
**Taylor's (19)** 35:18;46:19; 47:3,10,14,23; 72:11;75:14;78:9, 22;81:20;82:2,5, 20;84:12;91:9; 92:20;120:14; 128:4
**teacher (2)** 40:19,20
**teachers (2)** 40:9,17
**television (1)** 30:1
**telling (2)** 33:4;60:4
**Tennessee (5)** 51:23;56:4;59:2;

102:13,13
**terminated (1)**
117:12
**terms (3)**
73:10,20;97:6
**territory (1)**
27:16
**testified (6)**
49:11,14;109:4;
116:7;128:19;
129:2
**testify (2)**
50:6;71:15
**testimony (8)**
66:17;67:10;
69:4,9;116:11;
121:11;128:1;
134:3
**texted (1)**
108:4
**texting (2)**
66:8;97:7
**texts (1)**
96:9
**thanks (1)**
36:23
**therapist (2)**
80:8;86:10
**therapy (3)**
80:6;86:8;87:24
**thereafter (1)**
66:8
**Theresa (1)**
39:24
**Therese (6)**
39:8,24;97:15;
100:2,7,15
**Thereupon (19)**
7:8;17:17;20:14;
22:24;23:15;30:2;
37:3;61:2,4;88:11;
89:4;91:17;92:12;
95:12;107:20;
111:19;115:22;
117:16;133:20
**third (1)**
21:5
**though (5)**
5:21;44:6;79:3;
80:14;125:19
**thought (1)**
36:18
**thoughts (1)**
104:2
**thousands (2)**
29:12,14
**thread (2)**
30:7;32:24
**threat (1)**
42:20
**three (6)**
10:22;34:22,23;
53:14;86:12;
128:15
**threshold (1)**
90:16
**throughout (3)**
16:22;91:14;
103:5
**throw (2)**
77:23;80:12
**throwing (1)**
80:16
**thrown (1)**
110:22
**till (1)**
81:24
**timeline (3)**
105:10,13;
114:17
**times (11)**
9:22;17:2;19:3;
22:1;27:18;29:7;
47:25;48:8;57:3,7,
8
**timing (2)**
24:8;107:1
**Tim's (1)**
27:1
**title (2)**
113:15;124:19
**today (5)**
23:25;48:11;
49:23;99:19;
118:22
**together (3)**
10:22;34:16;
126:7
**told (28)**
28:10;52:2;
59:22;62:5,13,15,
16;67:3;75:13;
82:10;84:4;101:13;
102:24;103:3;
105:25;106:9,10,
11,15,18,20,22,24,
24,25;120:20;
130:9,19
**took (6)**
35:9;43:22,23,
23;59:25;65:6
**tooth (4)**
57:18,21;58:21,
23
**top (5)**
86:21;108:12;
116:18;128:11,13
**totally (1)**
110:14
**towards (2)**
24:17;122:23
**Traci (3)**
53:9,11,15
**transcribe (1)**
93:24
**transcript (3)**
5:15,16;135:4
**transcription (1)**
134:2
**transpired (2)**
74:8;85:7
**travel (1)**
44:18
**treatment (5)**
86:9;87:7,11,16,
21
**tried (9)**
25:24;26:3,11,
11,13;63:13;77:14,
14;101:15
**trigger (1)**
93:1
**TriHealth (1)**
88:23
**trip (1)**
97:24
**trouble (2)**
11:10;52:12
**Troxler (1)**
15:12
**T-R-O-X-L-E-R (1)**
15:14
**true (5)**
30:14;114:11;
120:15,19;134:2
**trust (1)**
41:18
**try (5)**
27:9;62:22;
70:24;84:4;127:14
**trying (15)**
11:20,20;25:14;
26:22;27:3,13;
32:11;41:12;59:23;
62:18;82:15,15;
85:4,18;93:24
**Turn (5)**
37:17;51:5;
67:23;90:9;113:12
**twice (1)**
27:21
**Twitter (1)**
94:21
**two (20)**
17:12;18:4;26:6;
31:14;32:1;34:15;
35:4,12;42:14;
43:9;56:23;67:18;
71:15,22;86:12,25;
87:1;105:6;115:11;
125:20
**two-thirds (2)**
123:15;128:12
**type (1)**
43:24
**typical (2)**
24:21;54:2

## U

**UC (1)**
7:21
**Ultimately (7)**
21:21;22:14;
23:14;35:11;58:4,
20;77:1
**unclear (2)**
94:4,9
**uncomfortable (1)**
39:13
**under (10)**
15:24;18:14;
28:15;41:12;72:3,
19;94:5,7;118:23;
124:18
**understood (2)**
33:18;94:6
**undertaken (1)**
85:16
**United (2)**
124:19,20
**University (2)**
7:17,21
**Unless (1)**
92:25
**unpaid (1)**
115:18
**unpleasant (1)**
93:4
**unquote (2)**
40:9;80:15
**unsolicited (1)**
69:2
**unwanted (2)**
24:16,19
**up (42)**
10:15;11:14;
15:8;16:2;26:25;
27:15;28:2;32:15,
16,17;35:15,15;
38:15;40:14;45:21;
54:1;62:13;64:5;
66:15;80:5,8,11;
81:6;82:20;83:1,9,
12,24;86:12;97:18;
99:5;100:2;101:3;
109:5;110:1,6;
118:12;130:6,9,12;
132:3,4
**update (1)**
76:1
**updated (1)**
108:7
**upon (2)**
9:18;135:4
**upset (4)**
46:15;62:11;
64:12;77:1
**usable (1)**
5:16
**use (9)**
5:19;16:8;91:12;
94:16,20,24;95:5;
99:8;135:1
**used (6)**
17:3;32:13,14;
60:7;63:25;129:11
**user (2)**
15:3,25
**username (1)**
95:6
**using (3)**
15:6;16:11;
94:17

## V

**vague (7)**
42:22;43:10;
58:10;61:10;70:4;
77:11;119:25
**Vaguely (1)**
59:6
**vehicle (1)**
40:10
**verbal (1)**
14:25
**versus (2)**
69:1;78:21
**via (2)**
99:10;111:5
**victim (5)**
9:19;52:1;69:22;
78:23;81:20
**victims (1)**
113:24
**videos (1)**
95:4
**violate (1)**
124:18
**violating (2)**
18:19;19:23
**violation (3)**
79:23;123:17,18
**violations (1)**
42:5
**virtue (1)**
82:4
**voicemail (1)**
115:13
**voluntarily (1)**
24:3
**volunteering (2)**
39:10;68:22

## W

**waited (1)**
105:15
**walked (1)**
49:23
**waned (2)**
24:12;25:16

**wasted (1)**
29:12
**waxed (2)**
24:12;25:16
**way (15)**
9:1;24:7;28:21;29:18;31:20;37:20;70:7;73:4;85:24;91:11;123:15,24;124:8,17;128:12
**Wednesday (2)**
11:14;40:23
**week (1)**
105:6
**weekend (1)**
97:24
**weeks (1)**
105:6
**welfare (6)**
33:6;59:1;70:2,11,15,18
**well-being (1)**
78:19
**Wellbutrin (3)**
89:8,14,15
**weren't (4)**
24:15;58:7;73:20;94:17
**West (1)**
88:23
**Whalen (1)**
101:20
**What's (13)**
6:13;7:12;9:1;11:21;15:11,18;38:2;43:1;56:15,19;57:12;95:6;131:15
**WhatsApp (1)**
94:25
**whatsoever (1)**
18:16
**whipping (1)**
53:19
**WHITTAKER (71)**
12:1;13:3;14:17,24;18:22;19:4,11,25;20:6;31:7;33:16;36:9,12,18,23;41:1;42:11,22;43:10;44:24;48:3;50:16,18,25;54:20;58:9;60:25;61:10;66:22;70:4;71:1,5,10,17;72:1;76:13;77:11;78:24;88:9;89:1,6;91:4;92:1;95:10;109:10,12;116:16;118:5;119:4,13,22,25;122:15;123:10;125:1,15,23;126:4,22;129:17,20,23;130:3;131:24;132:4,5,12,15;133:5,12,17
**whole (3)**
112:16;117:25;120:24
**Whose (1)**
63:24
**wiggly (1)**
58:24
**Wilkins (3)**
17:7,9;40:13
**W-I-L-K-I-N-S (1)**
17:11
**Willow (23)**
6:22,23;12:21;16:21;33:8,15;44:16,17,20;45:4,7,22;46:14,15;47:2;57:13;58:2;66:1;70:14;74:5;80:5;97:15;99:12
**Willow's (6)**
33:6;39:7;40:3;58:19;100:9,24
**withdrawn (1)**
24:3
**withdrew (1)**
132:24
**within (2)**
8:19;105:6
**without (5)**
19:7;68:19;111:8,11;116:21
**WITNESS (55)**
11:1;13:5;14:21,25;18:25;19:6,13;20:2,8;31:9;33:19,23;36:17;41:3;42:13,24;43:12;44:25;48:6;49:21;50:17,19;51:2;54:22;58:12;61:12;66:24;70:6;71:3,7,12,19;72:3;76:16;77:13;79:1;88:17;89:8;91:6;93:5;95:14;100:23;109:11,13;118:7;119:6,15;120:2;122:17;123:12;125:3,17,25;126:6,24
**Wizard (2)**
78:11;95:18
**woman (1)**
5:13
**Wood (1)**
86:14
**words (1)**
5:19
**work (17)**
7:13,14,25;8:15,16,17;25:24;47:5;63:9,11;76:18;80:5;109:5;110:1;115:19;116:12;128:21
**worked (4)**
8:2;63:5;110:18;126:7
**worker (9)**
9:7;28:4;38:1,2;60:16,19;61:9;106:3;116:22
**working (11)**
7:24;8:8,10;26:20;28:4;63:7;111:8,11;116:22;117:2,4
**works (1)**
62:14
**worried (1)**
26:18
**worry (2)**
71:6;91:9
**worse (3)**
25:11;77:17;78:8
**wrap (1)**
129:21
**written (4)**
31:11;119:1,11;123:1
**wrong (2)**
70:6;91:23
**wrote (1)**
36:24

**Y**

**year (10)**
6:18;7:18;12:12;38:6,18;75:23;98:3,15;100:9,15
**years (6)**
10:22;27:10;46:13;57:13;74:18;86:24
**Yep (1)**
112:20
**yield (1)**
93:6
**young (1)**
53:14
**younger (1)**
57:25

**Z**

**Zach (2)**
5:7;36:19

**1**

**1 (6)**
17:17,22;18:14;68:5;103:13;122:6
**10 (4)**
91:17,21,22;92:5
**10:00 (1)**
40:23
**100 (1)**
107:15
**103 (2)**
107:15,20
**104 (2)**
111:19,24
**105 (3)**
115:21,22;118:12
**106 (3)**
117:15,16;118:7
**10th (2)**
12:8;74:1
**11 (3)**
92:12,16,17
**11th (12)**
12:8;51:5;64:20;67:10;74:20,25;82:23;83:10;87:5;103:12,13;105:11
**12 (1)**
36:15
**12:57 (1)**
133:21
**124 (2)**
109:21,23
**128 (1)**
90:10
**13 (4)**
22:1;51:5,10;57:24
**136 (1)**
12:17
**14 (1)**
57:24
**16 (1)**
56:11
**17 (2)**
68:5;122:4
**18 (2)**
67:23;68:1
**19 (2)**
96:22,23
**1985 (1)**
124:20
**1st (1)**
118:15

**2**

**2 (7)**
20:14,18;23:6;99:21,22,22;122:24
**20 (3)**
21:14;79:18;122:21
**200 (1)**
76:20
**2012 (1)**
7:19
**2013 (3)**
8:5;38:7;96:16
**2015 (2)**
38:20;96:18
**2016 (1)**
7:23
**2017 (2)**
8:5,6
**2018 (2)**
16:18;96:21
**2019 (1)**
96:24
**2020 (1)**
97:2
**2021 (2)**
8:6;97:4
**2022 (3)**
8:14;97:8;98:4
**2023 (11)**
30:9;33:12;61:16;82:23;92:18;98:4,10;100:10;101:1;116:24;118:15
**2024 (2)**
21:4;108:7
**2028 (1)**
16:18
**22 (1)**
123:14
**22nd (1)**
92:17
**23 (4)**
29:23;47:21,22;76:6
**23rd (1)**
56:11
**24 (2)**
21:19;124:1
**2456 (1)**
6:15
**24th (1)**
56:11
**25 (4)**
20:23;76:24;78:16;98:16
**25th (1)**
92:18
**26 (4)**
109:21,22,23;124:16
**26th (1)**
30:8
**27 (3)**
90:9;128:9,11
**28 (2)**
128:9,12
**2nd (1)**
108:7

### 3

**3 (8)**
22:24;23:4;99:22,23;112:10;123:14,24;124:20
**3:30 (1)**
66:15
**31 (1)**
37:20
**3P (1)**
63:8

### 4

**4 (4)**
23:15,22;124:2,8
**41076 (1)**
12:18
**42 (2)**
124:19,19
**45013 (1)**
6:16
**4th (1)**
96:22

### 5

**5 (7)**
30:2,7;51:16;63:21,22;113:12;124:11
**5:00 (1)**
63:5
**55 (1)**
36:6
**5A (1)**
63:8

### 6

**6 (12)**
37:1,3,8,17;51:6;67:25;90:10;109:20;122:1;124:16,24;125:6
**6/1/2023 (1)**
115:23
**6/21/88 (1)**
7:6

### 7

**7 (5)**
61:4,14;65:18;99:17;128:11
**78 (1)**
68:8
**7th (4)**
21:4,18;95:22;97:13

### 8

**8 (3)**
18:5;91:8;128:11
**8:27 (1)**
64:18
**8:37 (1)**
66:8
**87 (2)**
79:19,21

### 9

**9 (2)**
18:4;128:13
**9/18/2023 (2)**
117:17;118:11
**9-1-1 (1)**
55:17
**9th (1)**
116:23